## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 16-34028 |
| | § | |
| NORTHSTAR OFFSHORE GROUP, LLC | § | |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |

| | | |
|---|---|---|
| JAMES KATCHADURIAN, Litigation | § | |
| Trustee, on behalf of Northstar Litigation | § | |
| Trust, | § | |
| | § | ADVERSARY NO. 18-03079 |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| NGP ENERGY CAPITAL | § | |
| MANAGEMENT, LLC; NGP X US | § | |
| HOLDINGS, L.P.; NGP NATURAL | § | |
| RESOURCES X, L.P.; NGP X PARALLEL | § | |
| HOLDINGS, L.P.; NGP NATURAL | § | |
| RESOURCES X PARALLEL FUND, L.P.; | § | |
| NOG ROYALTY HOLDINGS, LP; | § | |
| CHRISTOPHER RAY; JESSE BOMER; | § | |
| TOMAS ACKERMAN; DAVID ALBIN; | § | |
| DAVID HAYES; S. GLYNN ROBERTS; | § | |
| GAYLON FREEMAN; MARK STEVENS; | § | |
| and JAMES P. ULM, II, | § | |
| | § | |
| Defendants. | § | |

### NORTHSTAR DIRECTORS'
### MOTION TO DISMISS PLAINTIFF'S ORIGINAL COMPLAINT

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE**

**MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**

# Table of Contents

I.   Introduction .................................................................................................................1

II.  Argument and Authorities .........................................................................................6

    A.   Plaintiff fails to state claims for fraudulent transfer against the Northstar
        Directors ....................................................................................................... 7

        1.   Plaintiff fails to plead facts showing that any Northstar Director
             caused Northstar to make fraudulent transfers............................................ 9

        2.   Plaintiff fails to state a claim against any Northstar Director for the
             payment of the purchase price to Propel Energy for the Creole
             Assets. ...................................................................................................... 11

        3.   Plaintiff fails to state a claim under TUFTA that the release of
             NGP-NOG's Supplemental Commitment was a fraudulent transfer. ....... 13

        4.   Any Northstar Director's Supplemental Commitment was not
             Northstar's property under 11 U.S.C. § 548 because any such
             Supplemental Commitment would not have been an asset of
             Northstar's bankruptcy estate. ................................................................. 14

        5.   Plaintiff fails to plead actual fraudulent-transfer claims with the
             particularity that Federal Rule of Civil Procedure 9(b) requires. ............. 16

        6.   Plaintiff violates Federal Rule of Civil Procedure Rule 8(a) by
             impermissibly grouping together Defendants. .......................................... 20

        7.   Plaintiff fails to identify any "triggering" unsecured creditor
             required to state a claim under 11 U.S.C. § 544(b).................................... 21

        8.   Plaintiff fails to plausibly establish that Northstar received less
             than reasonably equivalent value for its release of Supplemental
             Commitments. ........................................................................................... 22

        9.   Plaintiff fails to plead facts supporting Northstar's insolvency at
             the time of each alleged transfer. ............................................................. 25

        10.  The one-year statute of limitations bars Plaintiff's constructive
             fraudulent-transfer claim under Tex. Bus. & Com. Code §
             24.006(b). ................................................................................................. 26

        11.  Plaintiff's other fraudulent-transfer claims are barred to the extent
             they seek to avoid transfers beyond the relevant statutes of
             limitations. ............................................................................................... 27

B.     Plaintiff fails to state a claim for breach of fiduciary duty against any Northstar Director. ............................................................................ 28

    1.    Plaintiff fails to show that any Northstar Director lacked independence................................................................................... 28

    2.    Plaintiff fails to state a claim that any Northstar Director breached his duty of care to Northstar...................................................... 30

    3.    Plaintiff fails to plausibly allege that Northstar Directors Exercised Control. ....................................................................................... 31

C.     Plaintiff does not state a claim for breach of contract against NGP-NOG. .......... 32

D.     Plaintiff fails to state a claim against any Northstar Director for conspiracy. .......................................................................................... 32

    1.    Plaintiff fails to state a claim for conspiracy to commit breaches of fiduciary duty. ........................................................................... 32

    2.    Plaintiff fails to state a claim for conspiracy to commit fraudulent transfers.................................................................................... 33

E.     Plaintiff fails to state a claim for aiding and abetting. ........................................ 33

F.     Any amendment to the Complaint would be futile............................................... 34

III.    Conclusion ..................................................................................................34

Under Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012, Defendants S. Glynn Roberts, Gaylon Freeman, Mark Stevens, and James P. Ulm, II (together, "**Northstar Directors**") ask that the Court dismiss with prejudice all claims asserted against them by James Katchadurian, Trustee of the Northstar Litigation Trust ("**Plaintiff**"), in Plaintiff's Original Complaint [Doc. 1224] (the "**Complaint**").

## I.     Introduction

The Northstar Directors move on bases similar to those advanced by their Co-Defendants on this same date. Though this Motion borrows a good amount from the Co-Defendants' Motion to Dismiss, this Motion varies from that of the Co-Defendants, where necessary, to make the appropriate arguments specific to the Northstar Directors.

Plaintiff bases his claims against all Defendants, and, specifically, the Northstar Directors, on nothing more than conclusory allegations and mere recitations of the elements of causes of action. His Complaint is devoid of factual allegations necessary to support the assumption that underlies his claims. A central premise of the Complaint is that, because former individual managers of debtor Northstar Offshore Group, LLC ("Northstar") had an unspecified affiliation with one of Northstar's principal investors, that unspecified affiliation gave the principal investor control over Northstar and gave those individual managers motive to bankrupt Northstar. Indeed, Plaintiff simply presumes self-dealing and a motive to bankrupt Northstar.

Plaintiff's fraudulent transfer and fiduciary duty allegations (Counts 1-3) depend on those *assumptions*. However, Plaintiff does not plead *facts* plausibly suggesting that *any* Defendant— much less the Northstar Directors—could and did cause Northstar to make a fraudulent transfer. No facts show that any or all of the Northstar Directors controlled the Northstar board of

managers or that they had authority to act on behalf of any other Defendant.   Similarly, Plaintiff's claim for breach of fiduciary duty alleges no more than the *possibility* of breaches of the duties of loyalty or care where there are no facts explaining the relationship between any Northstar Director and any other Defendant, or how any Northstar Directors was dominated by or conspired with any other Defendant.

The Complaint suffers, further, from another glaring factual insufficiency:   Plaintiff ignores the fact that the questioned transactions left Northstar with funding sufficient to pay Northstar's liabilities as of September 22, 2014—the date of the closing of the sale of Northstar to Lafitte Energy Corp.   As Plaintiff acknowledges in the Complaint, another party contracted with Northstar to fund at the closing of the sale of Northstar—and did in fact fund at the closing—an amount that the parties agreed was sufficient to cover Northstar's remaining liabilities.   Northstar did not file for bankruptcy until nearly two years later—on August 12, 2016.   Plaintiff fails to explain—nor can he explain—how the Northstar Directors could be liable for Northstar's bankruptcy nearly two years after funding an amount that Northstar agreed was sufficient to pay its liabilities existing at that time.

To hide these factual insufficiencies, Plaintiff makes *demonstrably false allegations that are not the basis for any claim*.   In particular, Plaintiff alleges that, "[t]o avoid their capital obligations and risk of reputational harm of a bankruptcy, Defendants agreed to sell Northstar to an obviously risky, non-creditworthy buyer."[1]   The sole basis for this accusation is the allegation that the buyer's parent company, Platinum Partners, was "a Ponzi scheme" and that "[i]ts subsidiaries are now bankrupt."[2]   But public records available to Plaintiff reveal that Platinum Partners did not file for bankruptcy until October 18, 2016—over two years *after* the sale of

---

[1] The Complaint ¶ 48.
[2] The Complaint ¶ 50.

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 2**

Northstar.[3]  Even more telling, the complaint that the Securities and Exchange Commission filed against the Platinum Partners entities managing the bankrupt Platinum Partners hedge funds and their officers on December 19, 2016—over two years *after* the sale of Northstar—confirms that the fraud was and intentionally and systematically hidden from the everyone but the perpetuators of the fraud through 2016.[4]

The central feature of Plaintiff's allegations regarding Platinum Partners is that the Northstar Directors should have known that Platinum Partners was a Ponzi scheme *at the time of the sale of Northstar* to Platinum Partners' subsidiary in September 2014.  But the Securities and Exchange Commission's complaint establishes that *no one*—including any Northstar Director—knew or could have known about Platinum Partners' fraud until 2016:

- "To existing and prospective investors, Platinum Management projected stability and confidence, reporting steady, positive returns every year that averaged 17% annually from 2003-15."[5]

- "Meanwhile, in 2014-15, PPVA's liquidity crisis worsened, and Platinum Management resorted to other schemes to keep the fund afloat. For example, faced with relying on heavy short-term borrowing at annual interest rates as high as 19%, Platinum Management and PPVA CFO San Filippo told PPVA's auditor that the loans were done to complete 'investment transactions' —*a false explanation provided to investors in the fund's audited financials, when they were finally released to investors months later than they were supposed to be.* Platinum Management's *internal* documents confirmed that the real purpose for the high- interest borrowing was to ease the fund's liquidity constraints."[6]

---

[3] *See Platinum (In re Platinum Partners Value Arbitrage Fund L.P.*, No. 16-12925-scc, Dkt. No. 1 (Bankr. S.D.N.Y. Oct. 18, 2016); *In re Platinum Partners Value Arbitrage Fund (Int'l) Ltd.*, No. 16-12934-scc, Dkt. No. 1 (Bankr. S.D.N.Y. Oct. 18, 2016).  Plaintiff does not identify a specific Platinum Partners fund in the Complaint, referring only to "Platinum Partners."  The Complaint ¶ 8.

[4] *See* Complaint filed in Cause No. 16-cv-6848; in the United States District Court for the Eastern District of New York, attached as Exhibit A ("SEC Complaint").  To avoid duplication and bulk in the Court's file, the Northstar Directors hereby incorporate each of the Exhibits that its Co-Defendants (NGP Energy Capital Management, LLC, et al.) are filing today with their Motion to Dismiss.  The Northstar Directors identify the Exhibits by the same letters and in the same order is do their Co-Defendants.  Some of the Exhibits are being filed under seal.

[5] SEC Complaint ¶ 2, Exhibit A.

[6] SEC Complaint ¶ 6, Exhibit A (emphasis added).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 3**

- "*On the surface, PPVA and PPCO were highly successful funds*. As of March 2016, Platinum Management reported that PPVA had almost $l.l billion in AUM, and PPCO had almost $600 million in AUM. Also, PPVA reported a virtually unbroken string of strong and steady reported performance, with its NAV going up each year from 2003 to 2015, for an average annual return of 17%, with typically small gains reported for 85% of the months throughout this period."[7]

- "Beneath the surface, however, lurked serious problems, which *defendants kept from investors for years*."[8]

- "Platinum Management's external auditor in early 2015 reported to it that 'a material weakness exists in the Master Fund's investment valuation process related to its Leve1 3 investments.' *Platinum Management did not disclose to its investors this important information.*"[9]

In fact, both Northstar and another Platinum-controlled entity, Black Elk Energy Offshore Operations, LLC ("**Black Elk**"),[10] filed Chapter 11 cases in this Court and continued to operate their estates as debtors-in-possession in this Court through confirmation of their respective plans.[11]

Therefore, this Court should strike Plaintiff's gratuitously false allegations regarding Platinum Partners.

---

[7] SEC Complaint ¶ 42, Exhibit A (emphasis added).

[8] SEC Complaint ¶ 43, Exhibit A (emphasis added).

[9] SEC Complaint ¶ 47, Exhibit A (emphasis added).

[10] *In re Black Elk Energy Offshore Operations, LLC*, Case. No. 15-34287 in this Court34287, Doc. 115 (S.D. Tex. Sep. 8, 2015).

[11] *See In re Black Elk Energy Offshore Operations, LLC*, Case. No. 15-34287, Doc. 1204 (S.D. Tex. July 16, 2016). (Order Confirming Black Elk's Plan); In re Northstar Offshore Group, LLC, Case No. 16-34028, Doc. 1078 (S.D. Tex. Dec. 22, 2017) (Order Confirming Northstar's Plan). There is no evidence in the record of Black Elk's bankruptcy case or Northstar's bankruptcy case that, at the time of their bankruptcy filings, any party-in-interest asserted that Platinum, their parent entity, was operating a Ponzi scheme.

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 4**

Plaintiff's claims further suffer from the following defects that invalidate them:

- Count 1:  Plaintiff cannot recover from any Northstar Director for the purchase price that Northstar paid to Propel Energy L.L.C. ("**Propel Energy**") for oil and gas assets in the Creole Field (the "**Creole Assets**") because the Northstar Directors are not transferees of the purchase price and there are no facts demonstrating how the purchase price paid to Propel Energy benefitted any Northstar Director.

- Count 1:  The capital commitments owed by any Northstar Directors that were released wer not an asset that could be transferred under the Texas Uniform Fraudulent Transfer Act ("**TUFTA**") because any such capital commitments were fully encumbered by a valid lien held by Wells Fargo Bank, N.A. at the time of the release.

- Count 2:  The Northstar Directors' capital commitments that were released were not Northstar's property under 11 U.S.C. § 548 because they would not have been an asset of Northstar's bankruptcy estate.

- Counts 1 and 2:  Plaintiff fails to plead his claims for actual fraudulent transfer with the particularity that Federal Rule of Civil Procedure 9(b) requires.

- Counts 1 and 2:  Plaintiff violates Federal Rule of Civil Procedure 8(a) by failing to specify the Northstar Directors' alleged individual roles in the transfers.

- Count 1:  Plaintiff fails to identify any "triggering" unsecured creditor required to state a claim under 11 U.S.C. § 544(b).

- Counts 1 and 2:  Plaintiff fails to plead facts supporting his allegations (1) that Northstar received less than reasonably equivalent value for the transfers; and (2) that Northstar was insolvent at the time of the transfers or became insolvent from them.

- Count 1: The one-year statute of limitations bars Plaintiff's constructive fraudulent-transfer claim under Tex. Bus. & Com. Code § 24.006(b).

- Count 3: Plaintiff fails to plead facts negating the business-judgment rule because no facts raise the reasonable inference that any Northstar Director breached his fiduciary duties of loyalty or care to Northstar.

- Count 4: Plaintiff does not allege any breach of contract by any Northstar Director.

- Count 5: Plaintiff fails to state a claim for conspiracy to commit breaches of fiduciary duty because Plaintiff fails to plausibly allege elements of a conspiracy claim.

- Count 6: Because Plaintiff's claim for breach of fiduciary duty fails, his claim for aiding and abetting breaches of fiduciary duties must fail as well.

- Counts 5 and 6: There is no cause of action for conspiracy to commit, or aiding and abetting, fraudulent transfers.

## II.      Argument and Authorities

Under Federal Rule of Civil Procedure 8, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A plaintiff's complaint must contain enough factual allegations "to state a claim to relief that is plausible on its face."[12] Accordingly, "a plaintiff's obligation to provide the "grounds" of his "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[13] Furthermore, although courts must accept all factual allegations as true, courts are not "bound to accept as true a legal conclusion couched as a factual allegation."[14] The

---

[12] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[13] *Id.*

[14] *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 6**

burden, therefore, rests on the plaintiff to provide a complaint with "enough factual matter (taken as true) to suggest that [the plaintiff] is entitled to relief."[15]

A complaint's factual allegations must "raise a right to relief above the speculative level"[16] and state a claim that is "plausible on its face."[17]  This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."[18]  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[19]  But "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief."[20]

Plaintiff's causes of action fail to cross the line from possibility to plausibility and therefore fail as a matter of law.

## A.      Plaintiff fails to state claims for fraudulent transfer against the Northstar Directors.

Plaintiff appears to base his fraudulent-transfer claims in Counts 1 and 2 of the Complaint on two alleged transfers: (1) Northstar's payment of the purchase price for the Creole Assets to Propel Energy; and (2) Northstar's release of capital commitments allegedly owed by "Defendants."[21]

The release of the capital commitments owed to Northstar was part of the transaction under which Northstar was sold to Lafitte Energy Corp.  As fully explained below, the

---

[15] *Twombly*, 550 U.S. at 556.

[16] *Id.* at 555.

[17] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[18] *Id.*

[19] *Id.*

[20] *Id.* at 679.

[21] *See* the Complaint ¶¶ 61, 67-68.

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 7**

requirement that NGP-NOG and the Northstar Directors[22] make capital commitments was is stated in the Amendment to the Amended and Restated Limited Liability Company Agreement of Northstar dated November 8, 2013 (the "**Amendment to the Northstar LLC Agreement**").[23] The Amendment to the Northstar LLC Agreement required Movant NGP X US Holdings, LP ("**NGP X US**") to make a capital commitment of up to $75 million and required Northstar Directors to make capital commitments up to $1,450,000, under certain conditions.[24]  It also required Northstar to pay a fee to NGP X US and Northstar Directors when the capital commitments were funded.[25]  The Assignment of Interests dated July 7, 2014 (the "**Assignment to NGP-NOG**") transferred NGP X US's membership interest in Northstar to NGP-NOG, and NGP-NOG assumed the obligation to make the capital commitment of up to $75 million.[26]   In a Letter Agreement effective September 22, 2014 (the "**Contract**"), Northstar released its members with capital commitments from those capital commitments and obligated NGP-NOG to pay an amount equal to the remaining Bank Debt and Working Capital Deficit of Northstar— which the Contract estimated to be $40 million—at the closing of the sale of Northstar to Lafitte Energy Corp.[27]

For the reasons explained below, Plaintiff fails to state claims for fraudulent transfer under TUFTA or under 11 U.S.C. § 548.  Therefore, Plaintiff's fraudulent-transfer claims in Counts 1 and 2 of the Complaint should be dismissed.

---

[22] Non-Movant Defendants are S. Glynn Roberts, Gaylon Freeman, Mark Stevens, and James P. Ulm.  *See* the Complaint at 1.

[23] Amendment to Northstar LLC Agreement, Exhibit B.

[24] Amendment to Northstar LLC Agreement, Exhibit B.

[25] Amendment to Northstar LLC Agreement, Exhibit B.

[26] Assignment to NGP-NOG, Exhibit C.

[27] Contract, Exhibit D.

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 8**

1.     **Plaintiff fails to plead facts showing that any Northstar Director caused Northstar to make fraudulent transfers.**

Absent pleading facts showing that and Northstar Director caused—and indeed even had the *ability to cause*—Northstar to make fraudulent transfers, Plaintiff has failed to state fraudulent-transfer claims in Counts 1 and 2 of the Complaint.  In conclusory fashion, Plaintiff alleges that "Defendants," "NGP,"[28] or the "NGP Directors"[29] used their "control" over Northstar to cause Northstar to make fraudulent transfers:

- "In 2012, using its control over Northstar, NGP caused the Board to overpay for NGP assets for NGP's benefit."[30]

- "Through its NGP directors, NGP caused Northstar to increase its bid by 40% to over $113 million."[31]

- "NGP exercised complete control over Northstar."[32]

- "Defendants used their control of Northstar to transfer those funds out of Northstar for the benefit of Defendants."[33]

- "Defendants caused Northstar to sign the release of these valuable capital obligations…."[34]

But Plaintiff pleads no facts that would allow the reasonable inference that any Northstar Director controlled the Northstar board of managers.  Because Northstar was formed under the laws of Delaware, Delaware law supplies the governing principles for determining whether any Entity Movant's alleged intent can be imputed to any of the Northstar Directors, who served on

---

[28] Plaintiff defines "NGP" to collectively refer to all NGP-related entity Defendants.  The Complaint at 1.

[29] Plaintiff defines "NGP Directors" to collectively refer to NGP-related individual Defendants.  The Complaint ¶ 3.

[30] The Complaint ¶ 38.

[31] The Complaint ¶ 39.

[32] The Complaint ¶ 45.

[33] The Complaint ¶ 61.

[34] The Complaint ¶ 67.

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 9**

Northstar's board of managers.[35]  Under Delaware law, a plaintiff asserting the "control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'"[36]  Simply alleging that a person or entity "'dominated and controlled directors' is insufficient."[37]

Yet all Plaintiff alleges is that other entity Defendants "controlled" individual Defendants, including the Northstar Directors.  Plaintiff pleads no facts showing *how* any entity Defendant controlled any individual Defendant's conduct or decisions.  Rather, Plaintiff pleads only that some of the individual Defendants were "NGP-related directors."[38]  But this contention does nothing more than allege an unspecified *affiliation* between individual Defendants and entity Defendants.  "Allegations that a director has a relationship with a third party do not suffice absent some indication of how that affiliation influenced the director's decision-making."[39]  Nor does the fact that some entity Defendants were investors in Northstar plausibly establish control over any of the Northstar Directors.   "It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."[40]

---

[35] *See Pilepro, LLC v. Chang*, 152 F. Supp. 3d 659, 674-75 (W.D. Tex. 2016) (Under Texas choice-of-law rules, the law of the incorporating state governs a corporation's internal affairs); *see also Asarco LLC v. Americas Mining Corp.*, 382 B.R. 49, 61 (S.D. Tex. 2007) (applying Texas choice-of-law rules to decide what law governed fraudulent transfer claims because they involved a property dispute, which does not require the analysis of any federal interest).

[36] *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002).

[37] *Id.  See also Miramar Firefighters Pension Fund v. AboveNet, Inc*., C.A. 7376-VCN, 2013 WL 4033905, at *3 (Del. Ch. July 31, 2013) (allegations that directors "succumbed" to a party's desire or "acquiesced in" that party's plan are "insufficient to raise a reasonable inference that [the directors] were beholden to, or controlled by, [that party]").

[38] The Complaint ¶ 3.

[39] *Official Committee of Unsecured Creditors v. Meltzer*, 1:17-CV-256-NT, 2018 WL 2123558, at *6 (D. Me. May 8, 2018) (applying Delaware law).

[40] *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014), *aff'd sub nom*, *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015) (citing cases).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 10**

And even if Plaintiff had pleaded facts demonstrating how any of the Northstar Directors was controlled by an entity Defendant (which he failed to do), Plaintiff pleads no facts showing that any single Northstar Director had authority to act on behalf of any entity Defendant. In fact, Plaintiff does not even *allege* that any agency relationship existed between any Northstar Director and any entity Defendant. Therefore, Plaintiff has failed to plausibly allege that any Northstar Director—even if he were under an entity Defendant's control—acted on behalf of the entity Defendant to cause Northstar to do anything.[41]

As a result, the Complaint is factually insufficient to show that any of the Northstar Directors controlled—or could control—Northstar's actions. Plaintiff claims that any Northstar Director caused Northstar to make the transfers made the basis for Plaintiff's fraudulent-transfer claims.[42] But absent facts sufficient to plausibly allege such control, Plaintiff fails to state a claim for fraudulent transfer against any or all of the Northstar Directors. Counts 1 and 2 of the Complaint should be dismissed.

### 2. Plaintiff fails to state a claim against any Northstar Director for the payment of the purchase price to Propel Energy for the Creole Assets.

Plaintiff claims in Count 1 that Northstar's alleged overpayment to Propel Energy for the purchase of the Creole Assets was a fraudulent transfer.[43] But neither TUFTA nor 11 U.S.C. § 548 permits Plaintiff to recover for that transfer from any Northstar Director.

---

[41] *See In re Xtreme Power Inc.*, 563 B.R. 614, 643 (Bankr. W.D. Tex. 2016) (applying Delaware law) (determining that Amended Complaint failed "to allege sufficient facts to indicate that [the third-party] exercised actual dominion and control over the business affairs of [the company]," in part because, although it alleged that two directors were the third-party's agents, "the Amended Complaint fails to even set forth elements of an agency relationship, much less set forth facts to prove them.").

[42] *See* the Complaint ¶¶ 38, 39, 45, 61, 67.

[43] The Complaint ¶¶ 57-69. It is not clear whether Plaintiff asserts the payment for the Creole Assets as a basis for his fraudulent-transfer claim under 11 U.S.C. § 548 (Count 2). To the extent that Plaintiff does bring a claim under 11 U.S.C. § 548 for the payment for the Creole Assets, that claim is barred by the two-year statute of limitations. 11 U.S.C. § 548(a)(1).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 11**

TUFTA allows recovery for a fraudulent transfer only against the debtor, the transferee, or the person for whose benefit the transfer was made.[44]  11 U.S.C. § 550(a) allows recovery for a transfer avoided under 11 U.S.C. § 544(b) only from the initial transferee, any immediate or mediate transferee of such initial transferee, or the entity for whose benefit the transfer was made.[45]  Plaintiff does not allege that any of the Northstar Directors was a transferee of the purchase price for the Creole Assets.  Instead, Plaintiff alleges that Northstar paid the allegedly inflated price for the Creole Assets to a third party, Propel Energy.[46]  Although Plaintiff claims that Propel Energy was a "NGP company,"[47] Plaintiff does not explain how Propel Energy was affiliated with any Northstar Director.  Nor does Plaintiff allege any veil-piercing theory under which Propel Energy and any of the Northstar Directors were alter egos.  Therefore, Plaintiff fails to plead any facts that would enable the reasonable inference that any Northstar Director was the transferees of the purchase price.[48]

And despite Plaintiff's conclusory allegation that "[t]he NGP Directors benefited personally by this self-dealing,"[49] Plaintiff does not explain how a purchase price paid to a separate entity—Propel Energy—benefitted any Northstar Director.  Indeed, there are *no factual allegations whatsoever* explaining how or why the payment of the purchase price to Propel Energy was made for the benefit of—or benefitted in any way—any of the Northstar Directors.[50]

---

[44] TEX. BUS. & COM. CODE ANN. §§ 24.008, 24.009 (West 2017).

[45] 11 U.S.C. § 550(a)(1)-(2).

[46] The Complaint ¶¶ 38-39.

[47] The Complaint ¶ 38.

[48] *See Clapper v. Am Realty Inv'rs, Inc.*, 3:14-CV-2970-D, 2016 WL 302313, at *12-13 (N.D. Tex. Jan. 25, 2016) (dismissing claim under Texas Uniform Fraudulent Transfer Act against defendants who were not transferees of assets fraudulently transferred when there were no facts explaining how the alleged fraudulent transfers resulted in any benefit to any defendant); *In re Elrod Holdings Corp.*, 394 B.R. 751, 757 (Bankr. D. Del. 2008) (dismissing fraudulent transfer claims under bankruptcy code against defendants who were not transferees).

[49] The Complaint ¶ 40.

[50] *See Clapper*, 2016 WL 302313, at *12-13.  *See also In re Int'l Mgmt. Assoc.*, 399 F.3d 1288 (11th Cir. 2005) (Whatever benefit one shareholder obtained when, in order to satisfy condition placed by lender on extension of

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 12**

Therefore, Plaintiff's fraudulent-transfer claims in Count 1 regarding the purchase price paid for the Creole Assets should be dismissed.

### 3. Plaintiff fails to state a claim under TUFTA that the release of NGP-NOG's Supplemental Commitment was a fraudulent transfer.

The release any of the Northstar Directors' Supplemental Commitment in the Contract was not a transfer under TUFTA because the Supplemental Commitment was fully encumbered by a valid lien.  In order to state a claim for fraudulent transfer under TUFTA, Plaintiff must allege, among other elements, that a "transfer" occurred.[51]  A "transfer" "means every mode,…of disposing of or parting with an *asset or an interest in an asset*…."[52]  TUFTA defines an "asset" as "property of a debtor," but expressly excludes "property to the extent it is encumbered by a valid lien."[53]  A "valid lien" is "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."[54]  A "lien" includes "a security interest created by agreement…."[55]

Publicly filed documents show that Wells Fargo Bank, N.A. ("**Wells Fargo**") held a security interest on the Supplemental Commitments as of the effective date of the Contract—September 22, 2014.  "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record."[56]  The UCC financing statement filed with the Delaware Secretary

---

credit to bankrupt corporation, corporation repurchased its allegedly worthless stock from its other shareholder for sum of $100,000 and thereby enabled this first shareholder to gain sole control over corporation's assets, as reduced by its $100,000 payment to second shareholder, was not the kind of quantifiable benefit needed to support recovery against first shareholder, following avoidance of this stock repurchase transaction as fraudulent transfer, on theory that first shareholder was "entity for whose benefit" the fraudulent transfer was made).

[51] *See* Tex. Bus. & Com. Code Ann. §§ 24.005, 24.006 (West 2017).

[52] Tex. Bus. & Com. Code Ann. § 24.002(12) (West 2017) (emphasis added).

[53] Tex. Bus. & Com. Code Ann. § 24.002(2)(A) (West 2017).

[54] Tex. Bus. & Com. Code Ann. § 24.002(13) (West 2017).

[55] Tex. Bus. & Com. Code Ann. § 24.002(8) (West 2017).

[56] *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (directing courts to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 13**

of State on November 8, 2013 provides that Wells Fargo held a security interest in "all assets of the Debtor [Northstar], whether now existing or hereafter arising."[57]  The Termination of Wells Fargo's security interest was not filed with the Delaware Secretary of State until April 1, 2015.[58]

Wells Fargo's security interest in the Supplemental Commitments was a valid lien under TUFTA because it would have had priority over a subsequent judicial lien.  A security interest in collateral has priority over subsequent judicial liens if the security interest was perfected by filing an appropriate financing statement.[59]  The UCC Financial Statement evidencing Wells Fargo's lien on the Supplemental Commitment was filed with the Delaware Secretary of State on November 8, 2013, therefore giving priority to Wells Fargo's lien over any subsequent judicial lien created after the filing of Wells Fargo's financing statement on November 8, 2013.[60]

Because any Supplemental Commitment owed by a Northstar Director was not an "asset" under TUFTA, the release of the Supplemental Commitment cannot be a "transfer" under TUFTA.[61]  Plaintiff therefore fails to state a claim in Count 1 of the Complaint that the release of the Supplemental Commitment was a fraudulent transfer.

> **4.** **Any Northstar Director's Supplemental Commitment was not Northstar's property under 11 U.S.C. § 548 because any such Supplemental Commitment would not have been an asset of Northstar's bankruptcy estate.**

Count 2 of the Complaint alleging a fraudulent-transfer claim under 11 U.S.C. § 548 based on the release of Supplemental Commitment should be dismissed because any such

---

[57] Financing Statement, attached as Exhibit E.

[58] Termination, attached as Exhibit F.

[59] *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 414 n.20 (5th Cir. 2009) (quoting *Grocers Supply Co. v. Intercity Inv. Props., Inc.*, 795 S.W.2d 225, 226-27 (Tex. App.—Houston [14th Dist.] 1990, no writ) (collecting cases from other Uniform Commercial Code Article 9 jurisdictions and following this super-majority rule that confers priority on the holder of a prior-perfected security interest over a judgment creditor); 9 ANDERSON ON THE UNIFORM COMMERCIAL CODE § 9-301:15 ("A security interest perfected  by filing prevails over a subsequent judgment lien….").

[60] *See* Financing Statement, attached as Exhibit E.

[61] *See Mullins*, 564 F.3d at 414-16 (holding that, because sale proceeds were encumbered by a valid lien, the payment of the sale proceeds was not a transfer under TUFTA and vacating the district court's judgment on the plaintiff's fraudulent transfer claim).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 14**

Supplemental Commitment was not Northstar's property.  Therefore, the release of any such Supplemental Commitment was not a "transfer" under the Bankruptcy Code.   Under the Bankruptcy Code, a "transfer" is "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—*(i) property; or (ii) an interest in property*."[62] Although the Bankruptcy Code does not define "an interest of the debtor in property," the United States Supreme Court has explained that the phrase "is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."[63]

As an initial matter, 11 U.S.C. § 365(c)(2) prohibits a trustee from assuming a contract for financing, such as a loan commitment, letter of credit or capital contribution.[64]  Therefore, obligations to provide financing, like the Supplemental Commitment, do not constitute property of a debtor's bankruptcy estate.[65]

---

[62] 11 U.S.C. § 101(54) (emphasis added).

[63] *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58 (1990); *see also Gladstone v. U.S. Bancorp*, 811 F.3d 1133, 1138–39 (9th Cir. 2016). The interest must be analyzed under § 541. *See* Part II, Chapter 69: Bankruptcy Code § 541.

[64] *See e.g., In re Lockspur, Inc.*, 82 B.R. 37, 39 (Bankr. E.D La. 1987) (holding that debtor could not assume agreement requiring third party to provide financial accommodations under section 365(c)(2)); *In re New Town Mall*, 17 B.R. 326, 328 (Bankr. D.S.D. 1982) ("Under [11 USC 365(c)(2)] contracts such as loan commitments and letters of credit are nonassignable, and may not be assumed by the parties" and "are not assignable or assumable by a debtor-in-possession"); *Taggatz v. Bank of Onalaska (In re Taggatz)*, 106 B.R. 983, 993 (Bankr. W.D. Wis. 1989) (finding that a loan commitment or "other debt financing or financial accommodation [agreement] . . . may not be assume[d]" by the debtor under 11 USC 365(c)(2)); *Marcus Lee Assocs. v. Wachovia Bank,* NA *(In re Marcus Lee Assocs.)*, 422 B.R. 21, 35 (Bankr. E.D. Pa. 2009) (finding that capital contribution or loan agreement could not be assumed under 11 USC 365(c)(2) "even if the lender had a pre-bankruptcy contractual obligation to do so"). *See also In re CoServ, LLC*, 273 B.R. 487, 494 n.12 (Bankr. N.D. Tex. 2002) (dicta stating that debtor cannot assume pre-petition agreement requiring third party to advance additional funds under section 365(c)(2)).

[65] *See Marshall v. FIA Card Servs. (In re Marshall)*, 372 B.R. 511, 516 n.18 (Bankr. D. Kan. 2007), rev'd on other grounds 550 F.3d 1251 (10th Cir. 2008) (finding that pre-petition credit commitment was not assumable under section 365(c)(2) and not a part of the debtor's bankruptcy estate); *Roach Automotive v. Daimler Chrysler Fin. Servs. Americas (In re Roach Automotive)*, 540 B.R. 146, 148 (Bankr. W.D. Pa. 2007) (finding that section 365(c)(2) prohibits the assumption of a contract to extend credit and that "[f]unds that a lender owns is therefore not 'property of the estate'").

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 15**

In addition, even if the Supplemental Commitment would have been property of Northstar's estate despite Section 365(c)(2)'s explicit prohibition – which the Northstar Directors deny – any such Supplemental Commitment was not Northstar's property in any event because Northstar's right to such Supplemental Commitment was highly conditional and restricted for at least three reasons.  First, as explained above, Wells Fargo held a valid lien on the Supplemental Commitments at the time of the release.[66]  Second, Northstar's right to the Supplemental Commitments was conditioned upon the requirement of a call by the Northstar board of managers.[67]  Third, the Northstar board of managers could make the call for the Supplemental Commitments only "when needed by [Northstar] or its subsidiaries for their operations."[68] Moreover, apparently recognizing that the Supplemental Commitments were not Northstar's property, Northstar did not consider the Supplemental Commitments an asset of Northstar.[69] Because Northstar did not possess the unrestricted control over the Supplemental Commitments necessary to establish that it owned the Supplemental Commitments, any such Supplemental Commitments were not Northstar's property subject to a "transfer" under 11 U.S.C. § 548.[70]

### 5. Plaintiff fails to plead actual fraudulent-transfer claims with the particularity that Federal Rule of Civil Procedure 9(b) requires.

Plaintiff's actual fraudulent-transfer claims under Tex. Bus. & Com. Code § 24.005(a)(1) (Count 1) and 11 U.S.C. § 548(a)(1)(A) (Count 2) should be dismissed because Plaintiff fails to plead them with particularity, as Rule 9(b) requires.

---

[66] *See* Financing Statement, Exhibit E.

[67] Amendment to the Northstar LLC Agreement § 1(c), Exhibit B.

[68] Amendment to the Northstar LLC Agreement § 1(c), Exhibit B.

[69] *See* Final Settlement Statement, Exhibit G.

[70] *See, e.g., In re Southmark Corp.*, 95 F.3d 53 (5th Cir. 1996) ("CHC's necessary participation in the disposition of the note demonstrates that Southmark did not possess the unrestricted control that we have required to establish an interest in property in avoidance actions.").

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 16**

The same pleading standard under Rule 9(b) applies to Plaintiff's actual fraudulent-transfer claims under Tex. Bus. & Com. Code § 24.005(a)(1) and 11 U.S.C. § 548(a)(1)(A).[71] Rule 7009 of the Federal Rules of Bankruptcy Procedure makes Rule 9(b) applicable to adversary proceedings.  Rule 9(b) applies to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically fraud.[72]  For that reason, courts in the Fifth Circuit generally apply Rule 9(b) to actual fraudulent transfer claims under Tex. Bus. & Com. Code § 24.005(a)(1) and 11 U.S.C. § 548(a)(1)(A).[73]  "General allegations, which lump all defendants together failing to segregate the alleged wrongdoing of one from those of another cannot meet the requirements of Rule 9(b)."[74]  So when the plaintiff alleges that a defendant made a transfer with "actual intent to hinder, delay or defraud entities," the details of each fraudulent act must be alleged with specificity as to each defendant.[75]

Plaintiff violates Rule 9(b) by impermissibly grouping together Defendants for purposes of alleging the intent element of his actual fraudulent transfer claims:

- "In 2012, using its control over Northstar, *NGP* caused the Board to overpay for NGP assets for *NGP's* benefit."[76]  "Padding its profits from the sale of this field would give *NGP* both immediate accounting benefits and a reputational boost in raising funds."[77]

---

[71] *In re Life Partners Holdings, Inc.*, No. 15-40289-RFN11, 2017 WL 5599485, at *6 (N.D. Tex. Nov. 17, 2017).

[72] *Id.* at *4; *see also Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 n.3 (5th Cir. 2010).

[73] *In re Life Partners Holdings, Inc.*, 2017 WL 5599485, at *7.  *See also Think3 Litig. Tr. v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 197 (Bankr. W.D. Tex. 2015); *e.g.*, *Vision Bank v. Jordan*, 3:11-CV-2065-B, 2012 WL 716097, at *3 (N.D. Tex. Mar. 5, 2012) (citing cases) ("Although the Fifth Circuit has not definitively held that fraudulent transfer claims fall within the purview of Rule 9(b), this Court has noted that where plaintiffs seek to establish the actual intent of the debtor, the enhanced pleading requirements of Rule 9(b) should apply.").

[74] *In re Life Partners Holdings, Inc.*, 2017 WL 5599485, at *5 (quoting *Tigue Inv. Co. v. Chase Bank of Tex., N.A.*, No. 3:03-CV-2490-N, 2004 WL 3170789, at *1 (N.D. Tex. Nov. 15, 2004)).

[75] *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).  *See also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)) (To successfully plead fraud under Rule 9(b), a plaintiff must allege the "'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'"); *Ingalls v. Edgewater Private Equity Fund III, L.P.*, CIV.A. H-05-1392, 2005 WL 2647962, at *5 (S.D. Tex. Oct. 17, 2005) ("Group pleading fails to satisfy the requirement that the who, what, where, why, and when of the fraud be specified." (quoting *Glaser v. Enzo Biochem, Inc.*, 303 F.Supp.2d 724, 734 (E.D.Va. 2003)).

[76] The Complaint ¶ 38 (emphasis added).

[77] The Complaint ¶ 38 (emphasis added).

- "The *NGP Directors* benefitted personally by this self-dealing…."[78]

- "*Defendants* used their control of Northstar to transfer those funds out of Northstar for the benefit of *Defendants*."[79]

- "*Defendants* also hindered Northstar's creditors by securing releases of capital contributions committed to Northstar…."[80]

- "Northstar's release of the funding obligations of *NGP* and individual directors was intended to hinder, delay, or defraud Northstar's creditors and avoid *NGP* being tainted with a Northstar bankruptcy."[81]

Further, Plaintiff also fails to adequately plead the intent element of an actual fraudulent-transfer claim. Plaintiff's actual fraudulent-transfer claims under Tex. Bus. & Com. Code § 24.005(a)(1) and 11 U.S.C. § 548(a)(1)(A) require that Plaintiff plead facts showing that a defendant transferred assets "with actual intent to hinder, delay, or defraud any of the debtor's creditors."[82] But Plaintiff's allegations do not contain any specificity as to the "who, what, when, where, and how" of the actual fraudulent transfers he alleges. Instead, Plaintiff makes only conclusory allegations of intent:

- In 2012, using its control over Northstar, NGP caused the Board to overpay for NGP assets for NGP's benefit….Padding its profits from the sale of this field would give NGP both immediate accounting benefits and a reputational boost in raising funds."[83]

- "The NGP Directors benefitted personally by this self-dealing…."[84]

-  "Defendants used their control of Northstar to transfer those funds out of Northstar for the benefit of Defendants."[85]

---

[78] The Complaint ¶ 40 (emphasis added).

[79] The Complaint ¶ 61 (emphasis added).

[80] The Complaint ¶ 61 (emphasis added).

[81] The Complaint ¶ 68 (emphasis added).

[82] *In re Life Partners Holdings, Inc.*, No. 15-40289-RFN11, 2017 WL 5599485, at *5 (N.D. Tex. Nov. 17, 2017).

[83] The Complaint ¶ 38.

[84] The Complaint ¶ 40.

[85] The Complaint ¶ 61.

- "Defendants also hindered Northstar's creditors by securing releases of capital contributions committed to Northstar…."[86]

- "Northstar's release of the funding obligations of NGP and individual directors was intended to hinder, delay, or defraud Northstar's creditors and avoid NGP being tainted with a Northstar bankruptcy."[87]

Nor does Plaintiff even allege the "badges of fraud" listed in TUFTA or the Bankruptcy Code that could provide circumstantial evidence of actual intent to defraud creditors.[88] The only "badges of fraud" that Plaintiff pleaded—that the consideration was not reasonably equivalent to the value of the asset transferred and that Northstar was insolvent—are not sufficient to allege actual intent to hinder, delay, or defraud creditors because those are elements of a constructive fraud claim.[89]

And interestingly, facts that Plaintiff does plead demonstrate that the Northstar Directors did *not* have an intent to defraud any creditors. Plaintiff claims that, with respect to determining the price that Northstar would pay for the Creole Assets, "NGP director Ackerman told Northstar Director Glynn Roberts to 'think about where you love the deal and let me know and I can back

---

[86] The Complaint ¶ 61.

[87] The Complaint ¶ 68.

[88] *See* TEX. BUS. & COM. CODE ANN. § 24.005(b) (West 2017) (providing that, "[i]n determining actual intent…, consideration may be given, among other factors, to whether: (1) transfer or obligation was to an insider; (2) debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation incurred, the debtor had been sued or threatened with a suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the asset to an insider of the debtor"); *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 551 (D. Del. 2005) (badges of fraud under 11 U.S.C. § 548 are (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control, or dominion by the debtor; and (6) secrecy or concealment of the transaction).

[89] *See In re Brown Med. Ctr., Inc.*, 552 B.R. 165, 171 (S.D. Tex. 2016) (dismissing claim for actual fraudulent transfer under Texas Uniform Fraudulent Transfer Act and 11 U.S.C. § 548 because the only badges of fraud that the plaintiff pleaded with particularity were insolvency and lack of reasonably equivalent value, and the plaintiff therefore failed to state a claim for actual fraudulent transfer rather than constructive fraudulent transfer).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 19**

channel.'"[90]   This alleged quote indicates that Mr. Ackerman and Mr. Roberts were trying to ensure that they would *not* overpay for the Creole Assets.   Plaintiff further alleges that Mr. Ackerman wrote in various emails that the Defndants had every motive to *avoid* bankrupting Northstar:

- "Northstar is in survival mode.  The goal is to salvage as much equity value as we can without going bankrupt."[91]

- "We have no more time, we don't want to bankrupt this company for the sake of all of our reputations."[92]

Because Plaintiff's actual fraudulent-transfer claims in Counts 1 and 2 of the Complaint violate Rule 9(b), they should be dismissed.

### 6.      Plaintiff violates Federal Rule of Civil Procedure Rule 8(a) by impermissibly grouping together Defendants.

Even if Rule 9(b) did not apply to Plaintiff's actual fraudulent-transfer claims (which it does), Plaintiff's actual and constructive fraudulent-transfer claims violate Rule 8(a).  The same pleading standard under Rule 8(a) applies to Plaintiff's actual fraudulent-transfer claims under Tex. Bus. & Com. Code § 24.005(a)(1) and 11 U.S.C. § 548(a)(1)(A) and constructive fraudulent-transfer claims under Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006, and 11 U.S.C. § 548(a)(1)(B).[93]   Rule 7008 of the Federal Rules of Bankruptcy Procedure makes Rule 8 applicable to adversary proceedings.  "[A]ny reference by a plaintiff to defendants collectively in a complaint fails to satisfy the pleading standards of Rule 8(a)."[94]

---

[90] The Complaint ¶ 39.

[91] The Complaint ¶ 44.

[92] The Complaint ¶ 47.

[93] [93] *In re Life Partners Holdings, Inc., No. 15-40289-RFN11, 2017 WL 5599485, at *7 (N.D. Tex. Nov. 17, 2017).*

[94] *Id.* at *3 (citing *Griggs v. State Farm Lloyds,* 181 F.3d 694, 699 (5th Cir. 1999)).  *See also Gurganus v. Furniss,* 3:15-CV-03964-M, 2016 WL 3745684, at *5 (N.D. Tex. July 13, 2016) ("In addition to being conclusory and formulaic, this type of group pleading fails to meet the pleading requirements of Federal Rule of Civil Procedure 8."); *Del Castillo v. PMI Holdings N. Am. Inc.,* 4:14-CV-3435, 2015 WL 3833447, at *6 (S.D. Tex. June 22, 2015) ("A complaint does not satisfy the requirements of *Iqbal* and *Twombly* by lumping together all defendants, while

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 20**

Throughout the Complaint, Plaintiff violates Rule 8(a)'s proscription against group pleading by failing to distinguish Defendants' individual roles in the alleged fraudulent transfers:

- "Through its *NGP Directors*, *NGP* caused Northstar to increase its bid by 40% to over $113 million."[95]

- *Defendants* used their control of Northstar to transfer those funds out of Northstar for the benefit of *Defendants*."[96]

- "*Defendants* also hindered Northstar's creditors by securing releases of capital contributions committed to Northstar…."[97]

- "*Defendants* signed an agreement for Northstar to release Defendants from their obligations to provide more than $75 million in capital to the desperate company. *Defendants* caused Northstar to sign the release of these valuable capital obligations…."[98]

Because Plaintiff's fraudulent-transfer claims in Counts 1 and 2 of the Complaint violate Rule 8(a)'s prohibition against group pleading, they should be dismissed.

### 7. Plaintiff fails to identify any "triggering" unsecured creditor required to state a claim under 11 U.S.C. § 544(b).

Plaintiff fails to state a claim in Count 1 of the Complaint under TUFTA, which 11 U.S.C. § 544(b) allows him to assert, because he fails to identify any unsecured creditor that had standing to bring the claim on the date that Northstar's bankruptcy petition was filed. A trustee can bring an action under § 544(b) only if there is a "triggering" unsecured creditor that could have brought an action when the bankruptcy petition was filed.[99] This means that a bankruptcy

---

providing no factual basis to distinguish their conduct."); *Freuler v. Parker*, CIV.A. H-10-3148, 2012 WL 896414, at *2 (S.D. Tex. Mar. 14, 2012) ("Moreover Plaintiff continues to fail to distinguish Defendants' individual roles with respect to all the claims and continues to indulge in prohibited group pleading, alleging identical facts against each."), *aff'd*, 517 F. App'x 227 (5th Cir. 2013).

[95] The Complaint ¶ 39 (emphasis added). Plaintiff defines "NGP" to collectively refer to all NGP-related entity Defendants. The Complaint at 1. Plaintiff defines "NGP Directors" to collectively refer to all NGP-related individual Defendants. The Complaint ¶ 3.

[96] The Complaint ¶ 61 (emphasis added).

[97] The Complaint ¶ 61 (emphasis added).

[98] The Complaint ¶ 67 (emphasis added).

[99] *In re Life Partners Holdings, Inc.*, No. 15-40289-RFN11, 2017 WL 5599485, at *6 (N.D. Tex. Nov. 17, 2017); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 326 (S.D. Tex. 2008).

trustee's rights to avoid a fraudulent transfer "are derivative of an actual unsecured creditor's rights."[100]   Therefore, the actual unsecured creditor must have had standing to assert the fraudulent-transfer claim on the date of the filing of bankruptcy petition.[101]

Plaintiff failed to identify even a class or category of creditors that had standing to assert a fraudulent transfer claim.  All Plaintiff pleads is that the causes of action were "transferred to the Northstar Litigation Trust under the terms of the Chapter 11 plan...."[102]   For that reason, Count 1 of the Complaint should be dismissed.

### 8.   Plaintiff fails to plausibly establish that Northstar received less than reasonably equivalent value for its release of Supplemental Commitments.

Under TUFTA, "reasonably equivalent value" includes "a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction."[103]   "Value" is given for a transfer or an obligation "if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied...."[104] Although "reasonably equivalent value" under § 548(a)(1)(B) is not defined in the Bankruptcy Code, the United States Supreme Court noted that "reasonably equivalent" value in this context should be read as "approximately equivalent" or "roughly equivalent."[105]   "The inquiry under § 548(a)(2)(A) [is] whether the debtor has received value that is substantially comparable to the worth of the transferred property."[106]   "There need not be a dollar-for-dollar exchange to satisfy

---

[100] *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 479 B.R. 405, 410 (N.D. Tex. 2012).

[101] *See In re Moore*, 608 F.3d 253, 260 (5th Cir. 2010) ("The trustee's successor rights arise under federal law, but the extent of those rights depends entirely on applicable state law.").  Under Texas law, a claim for a transfer that is fraudulent as to present and future creditors may be brought only by a creditor whose claim arose shortly before or after the debtor transferred the assets.  See TEX. BUS. & COM. CODE ANN. § 24.005(a) (West 2017); *In re Life Partners Holdings, Inc.*, 2017 WL 5599485, at *5.

[102] The Complaint ¶ 11.

[103] TEX. BUS. & COM. CODE ANN. § 24.005(d) (West 2017).

[104] TEX. BUS. & COM. CODE ANN. § 24.004(a) (West 2017).

[105] *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 548 n.4 (1994).

[106] *Id.* at 548.

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 22**

the reasonable equivalence test, the Court should simply compare 'the value of what went out [of the debtor's estate] with the value of what came in."[107]

Ultimately, the determination "requires consideration of whether or not the debtor's unsecured creditors were better off before or after the transfer."[108]   Along these lines, some courts find reasonably equivalent value if the transfer at issue created no negative net effect on the bankruptcy estate.[109]   In undertaking such an inquiry when an integrated transaction is involved, courts must examine the net effect of the transaction in its entirety; analyzing merely one part of the overall transaction would be inappropriate.[110]

Here, Plaintiff claims that Northstar released the Supplemental Commitments of NGP-NOG and the Northstar Directors and granted NGP-NOG a net profits interest in an oil and gas prospect in exchange for NGP-NOG's promise to "eliminate the bank debt and working capital deficit" of Northstar.[111]   But documents that are part of the pleadings show that the actual value of the Supplemental Commitments that Northstar released and the net profits interest were, at most, roughly equivalent to—if not *less than*—the value of NGP-NOG's conditional promise to pay the amount of money equivalent to Northstar's bank debt and working capital deficit.

Northstar and Lafitte Energy Corp. entered into the Purchase and Sale Agreement to facilitate Lafitte Energy Corp.'s acquisition of the equity of Northstar.   Prior to the sale, Northstar (1) held highly conditional and fully encumbered Supplemental Commitments of NGP-NOG to fund an amount "not to exceed" $75 million and Northstar Directors to fund an

---

[107] *In re SMTC Mfg. of Tex.*, 421 B.R. 251, 300 (Bankr. W.D. Tex. 2009). *See also Matter of Besing,* 981 F.2d 1488, 1494 (5th Cir. 1993) (courts must determine "reasonably equivalent value" by looking at the value of the property transferred and the value received in exchange).
[108] *See In re Expert S. Tulsa, LLC*, 534 B.R. 400, 413 (B.A.P. 10th Cir. 2015), *aff'd*, 842 F.3d 1293 (10th Cir. 2016).
[109] *See, e.g.*, *Dye v. Commc'ns Ventures III., LP (In re Flashcom, Inc.)*, No. 13-57161, 2016 BL 98588, at *2 (9th Cir. Mar. 30, 2016) (*citing Frontier Bank v. Brown (In re Northern Merchandise, Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004)).
[110] *See Frontier Bank*, 371 F.3d at 1059.
[111] The Complaint ¶¶ 52-54.

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 23**

amount "not to exceed" $1,450,000 "upon call by the Board when needed by the Company or its subsidiaries for their operations;"[112] (2) was required to pay NGP-NOG and Northstar Directors the Supplemental Capital Contribution Fee;[113] and (3) had Bank Debt of $120,000,000 and a Working Capital Deficit of $20,022,920.[114]  In exchange for the release of the Supplemental Commitments and a 22.5% net profits interest in two of Northstar's prospects (the "**NPI**"), Northstar received (1) $40 million, an amount that the parties determined was sufficient, along with the Purchase Proceeds, to pay the Bank Debt in full and eliminate the Working Capital Deficit, from NGP-NOG; and (2) a release of the obligation to pay NGP-NOG and Northstar Directors the Supplemental Capital Contribution Fee.[115]

As a result, the true "net effect" of the transaction was that: (1) instead of holding highly conditional and fully encumbered Supplemental Commitments in the maximum amount of $76,450,000, Northstar was recapitalized with amounts to pay the $120,000,000 Bank Debt in full and to eliminate the $20,022,920 Working Capital Deficit; and (2) Northstar was released from the obligation to pay the Supplemental Capital Contribution Fee.

Accordingly, Northstar has failed to adequately plead that it did not receive reasonably equivalent value in exchange for the release of the Supplemental Commitments because it cannot.  Documents that are part of the pleadings show that, when the value that Northstar gave in connection with the release is compared to the value Northstar received, it is unquestionable that Northstar received, at the very least, reasonably equivalent value.

---

[112] *See* the Amendment to the Northstar LLC Agreement § 1(c) & Exhibit A to the Amendment to the Northstar LLC Agreement, Exhibit B.

[113] *See* the Amendment to the Northstar LLC Agreement § 1(e), Exhibit B.

[114] *See* the Contract ¶ C, Exhibit D.  *See infra*, § C(1).

[115] *See* the Contract ¶¶ 1-3, Exhibit D.  *See* the Complaint ¶ 51 (alleging that "Platinum paid $80 million directly to the bank….").

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 24**

9.     **Plaintiff fails to plead facts supporting Northstar's insolvency at the time of each alleged transfer.**

Plaintiff's constructive fraudulent-transfer claims in Counts 1 and 2 require that the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.[116] But Plaintiff fails to allege facts demonstrating insolvency at the time of the two transfers alleged—(1) the payment of the purchase price for the Creole Assets in September 2012; and (2) the release of the Supplemental Commitments in the Contract effective September 22, 2014.[117]

Plaintiff does not even *allege* that Northstar was insolvent when it purchased the Creole Assets or became insolvent as a result of that purchase.  Rather, Plaintiff claims only that Northstar's "*dire financial condition* began with Defendants causing Northstar to pay an NGP affiliate tens of millions of dollars more than the next highest bidder for the Creole Assets."[118] Plaintiff makes only a blanket conclusory allegation that transfers "were made while Northstar was insolvent or became insolvent as a result of those transfers…."[119]  But without a specific reference to Northstar's insolvency at the time of the purchase of the Creole Assets, Plaintiff cannot plausibly show that Northstar was insolvent at the time of that alleged transfer.[120]

Similarly, Plaintiff fails to allege facts showing that Northstar was insolvent at the time of the releases of the Supplemental Commitments.  Insolvency can be proven in two ways: (1) by showing that "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation," or (2) by showing that the debtor "is generally not paying the debtor's debts as they

---

[116] *See* TEX. BUS. & COM. CODE ANN. § 24.006 (West 2017); 11 U.S.C. § 548(a)(1)(B).

[117] *See* the Complaint ¶¶ 38-39, 53-54, 61, 67.

[118] The Complaint ¶ 61 (emphasis added).

[119] The Complaint ¶ 63.

[120] *In re ATP Oil & Gas Corp.*, 711 F. App'x 216, 223 (5th Cir. 2017).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 25**

become due."[121]  Plaintiff alleges no *facts* that establish either of these two tests at the time of the release of the Supplemental Commitments.   Although Plaintiff claims Defendants "acknowledged that Northstar was in dire financial straits" and that Northstar "was incurring debts beyond its ability to repay as the debts matured," Plaintiff fails to present any financial data showing that Northstar was actually insolvent at the time of the release.[122]

Absent factual allegations demonstrating Northstar's insolvency at the time of the transfers, Plaintiff has failed to state claims for constructive fraudulent transfer in Counts 1 and 2 of the Complaint.

### 10. The one-year statute of limitations bars Plaintiff's constructive fraudulent-transfer claim under Tex. Bus. & Com. Code § 24.006(b).

A statute of limitations may support dismissal under Rule 12(b)(6) when it is evident from a plaintiff's pleadings that the action is time barred and the pleadings fail to set forth or raise some basis for tolling the statute.[123]  A suit under Tex. Bus. & Com. Code § 24.006(b) must be filed within one year after the transfer was made.[124]   Under 11 U.S.C. § 544, a bankruptcy trustee "has standing to pursue any causes of action a creditor could have pursued, provided that a creditor existing at the time the transfers were made still has a viable claim against the debtor at the time the bankruptcy petition was filed."[125]   Thus, the statute of limitations must not have run when the bankruptcy petition was filed.[126]

---

[121] TEX. BUS. & COMM. CODE ANN. § 24.003(a), (b) (West 2017); *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 387 (5th Cir. 2017).

[122] *See In re ATP Oil & Gas Corp.*, 711 F. App'x at 223 (finding that "Plaintiff cannot plausibly show that ATP was insolvent at the time of the transfers" when "Plaintiff failed to present any financial data showing that ATP was actually insolvent or had little capital when making the [transfers]").

[123] *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) (citations omitted).

[124] TEX. BUS. & COM. CODE ANN. § 24.010(a)(3) (West 2017).

[125] *In re Consol. Indus. Corp.*, 397 F.3d 524, 526 (7th Cir. 2005).

[126] *See Cadle Co. v. Mims*, 608 F.3d 253, 260 (5th Cir. 2010).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 26**

Plaintiff alleges the transfers occurred in (1) September 2012; and (2) September 2014.[127] Northstar filed its bankruptcy petition on August 12, 2016.[128]  Therefore, as of the petition date, the statute of limitations had already run on claims under § 24.006(b) for the transfers Plaintiff alleges.  Plaintiff does not allege—nor can it allege—that any tolling doctrine tolled the one-year statute of limitations.  Therefore, considering the filing date of Northstar's bankruptcy petition— a matter of which the Court can take judicial notice—it is evident from the Complaint that the one-year statute of limitations bars Plaintiff's claim under § 24.006(b) in Count 1 of the Complaint.

### 11.    Plaintiff's other fraudulent-transfer claims are barred to the extent they seek to avoid transfers beyond the relevant statutes of limitations.

It is unclear from the Complaint exactly what specific alleged transfers Plaintiff seeks to avoid in Counts 1 and 2 of the Complaint.  Plaintiff's claims in Count 1 under Tex. Bus. & Com. Code § 24.005(a)(1)-(2) and § 24.006(a) carry a four-year statute of limitations that begins to run when the transfer is made.[129]  For Plaintiff to have standing to pursue fraudulent-transfer claims under 11 U.S.C. § 544, the statute of limitations must not have expired before the bankruptcy petition was filed.[130]  Northstar filed its bankruptcy petition on August 12, 2016.  Therefore, any claims asserted under Tex. Bus. & Com. Code § 24.005(a)(1)-(2) and § 24.006(a) for any alleged transfers occurring prior to August 12, 2012 are barred by the statute of limitations.

The Bankruptcy Code allows a two-year look-back period from the date of the

---

[127] The Complaint ¶¶ 39, 53-54, 67.

[128] "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n. 9 (5th Cir. 2007); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (directing courts to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

[129] TEX. BUS. & COM. CODE ANN. § 24.010(a)(1)-(2) (West 2017).  Plaintiff does not plead that any tolling doctrine applies.

[130] *In re Consol. Indus. Corp.*, 397 F.3d 524, 526 (7th Cir. 2005).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 27**

bankruptcy petition.[131]   Therefore, any claims asserted under 11 U.S.C. § 548 for any alleged

transfers occurring prior to August 12, 2014 are barred by the statute of limitations.

**B.      Plaintiff fails to state a claim for breach of fiduciary duty against any Northstar Director.**

Plaintiff claims in Count 3 of the Complaint that Northstar Directors and NGP-NOG

breached fiduciary duties to Northstar.[132]  But Plaintiff fails to plead facts sufficient to rebut the

presumption of the business-judgment rule because the facts alleged do not raise the reasonable

inference that Northstar Directors breached their duties of loyalty or care to Northstar.   Thus,

Plaintiff fails to state a valid claim for breach of fiduciary duty against any Northstar Director.

**1.      Plaintiff fails to show that any Northstar Director lacked independence.**

Independence   requires   that   a   director   consider   only   the   corporate   merits   of   the

transaction, ignoring any personal or extraneous considerations or influences.[133]  "This inquiry

asks not whether the director has derived some benefit from the transaction, but rather whether

the director's decision resulted from the director being controlled by another."[134]   Control exists

(1) where another entity or individual dominates the director, either through a close personal or

familial relationship or by force of will; or (2) when circumstances show that the director is

beholden to another entity or individual.[135]   To raise a question concerning the independence of a

particular board member, a plaintiff asserting the "control of one or more directors must allege

particularized facts manifesting 'a direction of corporate conduct in such a way as to comport

with the wishes or interests of the corporation (or persons) doing the controlling.'"[136]

---

[131] 11 U.S.C. § 548(a)(1).

[132] The Complaint ¶¶ 71-72.

[133] *In re Xtreme Power Inc.*, 563 B.R. 614, 632 (Bankr. W.D. Tex. 2016) (applying Delaware law).

[134] *Id.*

[135] *Id.* at 632-33.

[136] *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 28**

Plaintiff asserts nothing more than *bare conclusions* that certain entity Defendants controlled individual Defendants:

- "NGP controlled the Northstar board of managers, comprised of five NGP-related directors… and [the Northstar Directors]."[137]

- "The NGP directors caused Northstar to overpay for the asset….This inflated price benefitted the NGP Directors, who had financial interests in NGP."[138]

- "NGP directed Northstar to take out $120 million in shot-term bank debt….Yet the NGP-controlled board refused to call NGP's contractually committed $75 million obligation."[139]

- "In 2012, using its control over Northstar, NGP caused the Board to overpay for NGP assets for NGP's benefit."[140]

- "Through its NGP directors, NGP caused Northstar to increase its bid by 40% to over $113 million."[141]

- "NGP exercised complete control over Northstar."[142]

- "Defendants used their control of Northstar to transfer those funds out of Northstar for the benefit of Defendants."[143]

- "Defendants caused Northstar to sign the release of these valuable capital obligations…."[144]

There are no facts supporting these conclusions.   No facts pleaded explain *how* any individual Defendant, much less one of the Northstar Directors, was dominated by any entity Defendant or beholden to any entity Defendant.   Such "[g]eneral allegations of domination over

---

[137] The Complaint ¶ 3.

[138] The Complaint ¶ 4.

[139] The Complaint ¶ 6.

[140] The Complaint ¶ 38.

[141] The Complaint ¶ 39.

[142] The Complaint ¶ 45.

[143] The Complaint ¶ 61.

[144] The Complaint ¶ 67.

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 29**

a Board are simply not sufficient under Delaware law to state a traditional duty of loyalty claim."[145]

### 2. Plaintiff fails to state a claim that any Northstar Director breached his duty of care to Northstar.

The duty of care requires directors to make an "informed business judgment" when acting in the interests of the company.[146]  Under Delaware law, breach of the duty of care is "predicated upon concepts of gross negligence."[147]  A failure to make an informed business decision will only result in liability if the directors' conduct was committed with gross negligence or beyond the "bounds of reason."[148]  For this reason, Delaware courts have been "extremely stringent" in finding directors liable for breaching their duty of care.[149]  This reluctance to find liability applies equally to both solvent and insolvent corporations.[150]

It is unclear from the Complaint whether Plaintiff is alleging that any Northstar Director breached his duty of care.[151]  To the extent that Plaintiff claims that any Northstar Director breached his duty of care, Plaintiff has failed to state a claim.  Plaintiff does not even *allege*—

---

[145] *Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, CIV.A. 20228-NC, 2004 WL 1949290, at *10 (Del. Ch. Aug. 24, 2004).  *See also Miramar Firefighters Pension Fund v. AboveNet, Inc.*, C.A. 7376-VCN, 2013 WL 4033905, at *3 (Del. Ch. July 31, 2013) (allegations that directors "succumbed" to a party's desire or "acquiesced in" that party's plan are "insufficient to raise a reasonable inference that [the directors] were beholden to, or controlled by, [that party]"); *Official Committee of Unsecured Creditors v. Meltzer*, 1:17-CV-256-NT, 2018 WL 2123558, at *6 (D. Me. May 8, 2018) ("Allegations that a director has a relationship with a third party do not suffice absent some indication of how that affiliation influenced the director's decision-making." (applying Delaware law)).

[146] *Smith v. Van Gorkom*, 488 A.2d 858, 872–73 (Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695, 713 n.54 (Del. 2009).

[147] *In re Think3, Inc.*, 529 B.R. 147, 172 (Bankr. W.D. Tex. 2015).

[148] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008); *see also In re Xtreme Power Inc.*, 563 B.R. 614, 640 (Bankr. W.D. Tex. 2016) (applying Delaware law).

[149] *McPadden*, 964 A.2d at 1274.

[150] *Id.*

[151] Plaintiff alleges that the NGP Directors, Northstar Directors, and NGP-NOG "violated their fiduciary duties through acts of self-dealing and conflicting interests…."  The Complaint ¶ 72.  These are allegations of breaches of the duty of loyalty only.  *See In re Xtreme Power Inc.*, 563 B.R. 614, 632 (Bankr. W.D. Tex. 2016) (applying Delaware law).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 30**

much less plead facts plausibly suggesting—that any Individual Movant committed any act with gross negligence.

### 3. Plaintiff fails to plausibly allege that Northstar Directors Exercised Control.

Plaintiff does not allege facts plausibly suggesting that any Northstar Director exercised actual control over Northstar.  When a shareholder owns less than 50% of the voting power, actual control must be pled.[152]  For a complaint to survive a motion to dismiss, a plaintiff must plead specific facts to support the allegation that the minority shareholder's power is "so potent that independent directors ... cannot freely exercise their judgment" without fear of retribution.[153]  Mere allegations of the potential to exercise control will not suffice.[154]  The bare conclusory allegation that a minority stockholder possessed control is also insufficient.[155]   Rather, the Complaint must contain well-pled facts showing that the minority stockholder "exercised actual domination and control over ... [the] directors."[156]  A minority stockholder is not considered to be a controlling stockholder unless it exercises "such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control."[157]   There are *no plausible allegations* that any Northstar Director controlled the Northstar board of managers, much less any specific facts supporting any such allegation. Indeed, Plaintiff alleges that NGP controlled the Northstar board of managers, which was comprised of five NGP-related directors and only four Northstar Directors.[158]

---

[152] *In re Xtreme Power Inc.*, 563 B.R. 614, 643 (Bankr. W.D. Tex. 2016) (applying Delaware law).
[153] *Id.*
[154] *Id.*
[155] *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 664–65 (Del. Ch. 2013).
[156] *Id.*
[157] *Id.*
[158] The Complaint ¶ 3.

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 31**

Because no facts in the Complaint support the reasonable inference that any Northstar Director controlled Northstar, Plaintiff fails to state a claim for breach of fiduciary duty against them.

**C.      Plaintiff does not state a claim for breach of contract against NGP-NOG.**

In Count 4, Plaintiff expressly alleges that NGP-NOG breached the contract.  Plaintiff does not allege that any Northstar Director breached the contract.  Northstar Directors note those so that the Court does not consider anything in Count 4 as an impediment to dismissal.

**D.      Plaintiff fails to state a claim against any Northstar Director for conspiracy.**

In Count 5 of the Complaint, Plaintiff claims that the entity Defendants "conspired with the Northstar Directors and NGP Directors to commit the above fiduciary breaches and fraudulent transfers…."[159]  Plaintiff's conspiracy claim should be dismissed because he fails to state a claim either for conspiracy to commit breaches of fiduciary duty or conspiracy to commit fraudulent transfers.

**1.      Plaintiff fails to state a claim for conspiracy to commit breaches of fiduciary duty.**

Plaintiff fails to state a claim for conspiracy to commit breaches of fiduciary duty because Plaintiff fails to plausibly allege elements of a conspiracy claim.  Therefore, Plaintiff's claim for conspiracy to commit breaches of fiduciary duty in Count 5 of the Complaint should be dismissed.

To state a claim for conspiracy, a plaintiff must plead facts that support the following elements: (1) two or more persons; (2) an object to be accomplished; (3) *a meeting of the minds on the object or course of action*; (4) *one or more unlawful overt acts*; and (5) resulting

---

[159] The Complaint ¶ 78.

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 32**

damages.[160]   A plaintiff must allege "enough factual matter (taken as true) to suggest that an [unlawful] agreement was made."[161]   The factual allegations cannot merely be consistent with the existence of an unlawful agreement; rather, the allegations must plausibly suggest that an unlawful agreement existed.[162]

Plaintiff fails to allege facts that plausibly suggest that the Northstar Directors made any unlawful agreement.   Plaintiff also cannot allege the "unlawful act" requirement because, as explained above, its claim for breach of fiduciary duty fails.[163]

### 2.     Plaintiff fails to state a claim for conspiracy to commit fraudulent transfers.

There is no cause of action for conspiracy to commit a fraudulent transfer.[164]   Further, because, as discussed above, Plaintiff's claims for fraudulent transfer fail, Plaintiff's claim for conspiracy to commit fraudulent transfers must fail as well.   Therefore, Plaintiff's claim for conspiracy to commit fraudulent transfers in Count 5 of the Complaint should be dismissed.

### E.     Plaintiff fails to state a claim for aiding and abetting.

Because Plaintiff's breach-of-fiduciary-duty and fraudulent-transfer claims fail, its claim for aiding and abetting breaches of fiduciary duty and fraudulent transfers also fails.[165]   Further,

---

[160] *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *In re Transamerica Airlines, Inc.*, CIV.A. 1039-N, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006).

[161] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

[162] *Id.* at 556-57.

[163] *See Matter of ATP Oil & Gas Corp.*, 711 F. App'x 216, 223–24 (5th Cir. 2017) ("Moreover, because, as discussed *supra*, Plaintiff's fiduciary duty breach claims fail, Plaintiff cannot satisfy the 'unlawful act' requirement of civil conspiracy.").

[164] *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, 3:12-CV-4641-N, 2014 WL 12572881, at *10 (N.D. Tex. Dec. 17, 2014) (noting that the "weight of authority" concludes that "TUFTA does not provide for secondary liability"); *Quadrant Structured Products Co., Ltd. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014) ("Under Delaware law, a conspiracy cannot be predicated on fraudulent transfer.").

[165] *See Matter of ATP Oil & Gas Corp.*, 711 F. App'x at 223–24 ("Instead—as the district court recognized—the aiding and abetting claim fails because Plaintiff has failed to plausibly allege a fiduciary duty breach.").

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 33**

there is no cause of action for aiding and abetting fraudulent transfers.[166]  Therefore, Plaintiff's

claim for aiding and abetting in Count 6 of the Complaint should be dismissed.

**F.      Any amendment to the Complaint would be futile.**

Amendment of a complaint is not warranted where it would be futile—where the

complaint would not be able to withstand a motion to dismiss under Rule 12(b)(6).[167]  As

discussed above, each of Plaintiff's claims is either legally defective and/or is factually defective.

The legal defects cannot be cured.  And Plaintiff cannot—absent filing false pleadings—plead

any facts that would cure the factual deficiencies underlying his claims.   Plaintiff should not

have another "bite at the apple" in an attempt to create viable claims that he does not possess.

The Northstar Directors ask that the Court dismiss Plaintiff's claims with prejudice to refiling.

**III.      Conclusion**

For these reasons, the Northstar Directors ask that the Court to enter an order dismissing

with prejudice each of Plaintiff's claims asserted against them in Plaintiff's Original Complaint.

---

[166] *Official Stanford Inv'rs Comm.*, 2014 WL 12572881, at *10 (holding that Texas does not recognize a cause of action for aiding and abetting fraudulent transfers); *In re the Brown Schools*, 386 B.R. 37, 58 (Bankr. D. Del. 2008) (dismissing a claim for aiding and abetting fraudulent transfers, because such a claim was not permitted under Delaware law or the Bankruptcy Code).
[167] *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.,* 620 F.3d 465, 468 (5th Cir. 2010).

**Northstar Directors' Motion to Dismiss Plaintiff's Original Complaint – Page 34**

Respectfully submitted,

**COZEN O'CONNOR**

By: _/s/ Stephen B. Edmundson_
    Stephen B. Edmundson
    Bar No. 00796507
    1221 McKinney Street, Suite 2900
    Houston, Texas 77010
    Telephone: (832) 214-3930
    Facsimile: (713) 512-5334
    E-mail:  sedmundson@cozen.com

**ATTORNEYS FOR DEFENDANTS**
**S. GLYNN ROBERTS;**
**GAYLON FREEMAN;**
**MARK STEVENS; AND**
**JAMES P. ULM, II**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on those parties entitled to notice via this Court's ECF system on June 4, 2018.

/s/ *Stephen B. Edmundson*
Stephen B. Edmundson