IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 16-34028 |
| | § | |
| NORTHSTAR OFFSHORE GROUP LLC, | § | |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |
| JAMES KATCHADURIAN, Litigation Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 18-03079 |
| | § | |
| NGP ENERGY CAPITAL MANAGEMENT, | § | |
| L.L.C.; NGP X US HOLDINGS, L.P.; NGP | § | |
| NATURAL RESOURCES X, L.P.; NGP X | § | |
| PARALLEL HOLDINGS, L.P.; NGP | § | |
| NATURAL RESOURCES X PARALLEL | § | |
| FUND, L.P.; NOG ROYALTY HOLDINGS, | § | |
| L.P.; CHRISTOPHER RAY; JESSE BOMER; | § | |
| TOMAS ACKERMAN; DAVID ALBIN; | § | |
| DAVID HAYES; S. GLYNN ROBERTS; | § | |
| GAYLON FREEMAN; MARK STEVENS; and | § | |
| JAMES P. ULM, II, | § | |
| | § | |
| Defendants. | § | |

**TRUSTEE'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS (DKTS. #19 & #23)**

PORTER HEDGES LLP
John F. Higgins
State Bar No. 09597500
jhiggins@porterhedges.com
Eric M. English
State Bar No. 24062714
eenglish@porterhedges.com
1000 Main St., 36th Floor
Houston, Texas 77002
(713) 226-6000

YETTER COLEMAN LLP
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Robert K. Ellis
State Bar No. 24076367
rellis@yettercoleman.com
Wyatt J. Dowling
State Bar No. 24074152
wdowling@yettercoleman.com
811 Main, Suite 4100
Houston, Texas 77002
(713) 632-8000

TABLE OF CONTENTS

Table of Authorities ................................................................................................ iv

I.      Overview and Summary ............................................................................... 1

II.     Factual and Procedural Background .......................................................... 2

        A.      The Parties ........................................................................................ 2

        B.      Actions giving rise to the claims.................................................... 3

                1.      Defendants conspire to cause Northstar to overpay for NGP assets........... 4

                2.      Defendants saddle Northstar with $120 million in debt. ........................... 4

                3.      In selling Northstar, Defendants promise to pay off and eliminate
                        its debt and working capital deficit. ........................................................ 5

                4.      Northstar goes into bankruptcy after Defendants breach their
                        duties. ....................................................................................................... 5

        C.      Procedural Posture of this Litigation ........................................... 6

        D.      Governing Legal Standards............................................................. 6

III.    Argument and Authorities........................................................................... 7

        A.      Defendants may not rely on outside documents for their Motions. ...................... 7

        B.      Count 1: Fraudulent transfers under TUFTA............................... 9

                1.      Defendants need not "cause" Northstar to make fraudulent
                        transfers.................................................................................................... 12

                2.      Relief is available against NGP and NGP Directors, who benefitted
                        from Northstar's overpayment for the Creole assets. .............................. 14

                3.      The Motions raise fact disputes over releases of capital
                        commitments............................................................................................. 15

                4.      Defendants' other TUFTA arguments relating to the releases fail. .......... 16

                5.      Rule 9 does not apply to the TUFTA claims. ........................................... 17

                6.      The Complaint satisfies Rule 8, including as to the TUFTA claims. ....... 19

                7.      The Complaint adequately pleads that Northstar got less than
                        reasonably equivalent value for releases of capital commitments............ 20

**8.** The Complaint adequately pleads Northstar's insolvency......................... 21

**9.** The discovery rule tolls limitations for the fraudulent-transfer claims. ................................................................................................ 21

**10.** The Trust has standing to pursue TUFTA claims. ................................... 23

**C.** Count 2: Fraudulent transfers under 11 U.S.C. §548(a)(1) ................................. 24

**D.** Count 3: Breach of fiduciary duty (NGP Directors, Northstar Directors, and NGP-NOG) ...................................................................................................... 26

    **1.** The Complaint pleads facts to render the business judgment rule inapplicable. ...................................................................................... 27

    **2.** Plaintiff sufficiently alleges NGP-NOG's control of Northstar. .............. 31

    **3.** The Complaint states a claim for breach of the duty of care. .................. 32

**E.** Count 4: Breach of contract (NGP-NOG) ............................................................. 33

**F.** Count 5: Conspiracy (all Defendants) ................................................................... 36

**G.** Count 6: Aiding and abetting (all Defendants) ..................................................... 38

Conclusion ............................................................................................................................ 39

Certificate of Service ........................................................................................................... 39

TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*122261 Fondren, LLC v. Riverbank Realty GP,*
   2010 WL 1741071 (S.D. Tex. 2010) ..................................................................7

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ...........................................................................................7

*Biliouris v. Sundance Resources, Inc.,*
   559 F. Supp. 2d 733 (N.D. Tex. 2008) ............................................................38

*Causey v. Sewell Cadillac-Chevrolet, Inc.,*
   394 F.3d 285 (5th Cir. 2004) ..............................................................................6

*In re Charrington Worldwide Enters., Inc.,*
   110 B.R. 973 (Bankr. M.D. Fla. 1990) ............................................................26

*Collins v. Morgan Stanley Dean Witter,*
   224 F.3d 496 (5th Cir. 2000) ..................................................................... *passim*

*Dayton Sec. Assoc. v. Sec. Grp. 1980,*
   74 F.3d 1103 (11th Cir. 1996) .........................................................................25

*In re Enron Corp. Sec., Derivs., & ERISA Litig.,*
   761 F. Supp. 2d 504 (S.D. Tex. 2011) .............................................................37

*Fawaz v. Byers,*
   2014 WL 1671746 (S.D. Tex. 2014) ................................................................17

*Fee v. Herndon,*
   900 F.2d 804 (5th Cir. 1990) ..............................................................................7

*GE Capital Commercial, Inc. v. Wright & Wright, Inc.,*
   2009 WL 5173954 (N.D. Tex. 2009) ................................................................18

*Inc. v. Forward Air, Inc.,*
   2016 WL 8672773 (N.D. Tex. 2016) ................................................................17

*Janvey v. Alguire,*
   846 F. Supp. 2d 662 (N.D. Tex. 2011) ............................................................17

*Janvey v. Democratic Senatorial Campaign Comm.,*
   712 F.3d 185 (5th Cir. 2013) ............................................................................22

*Janvey v. Democratic Senatorial Campaign Comm.,*
   793 F. Supp. 2d 825 (N.D. Tex. 2011) ............................................................22

*Janvey v. Romero*,
    817 F.3d 184 (5th Cir. 2016) ..........................................................22

*Jolly v. Klein*,
    923 F. Supp. 931 (S.D. Tex. 1996) ....................................................6

*Lange v. Regions Bank (In re Westbury Cmty. Hosp., LLC)*,
    2013 WL 6054798 (Bankr. S.D. Tex. Nov. 15, 2013)...........................23

*Mack v. Newton*,
    737 F.2d 1343 (5th Cir. 1984) ..........................................................38

*Midwest Feeders, Inc. v. Bank of Franklin*,
    886 F.3d 507 (5th Cir. 2018) ..................................................6, 16, 21

*In re MortgageAmerica Corp.*,
    714 F.2d 1266 (5th Cir. 1983) ..........................................................25

*In re NC12, Inc.*,
    478 B.R. 820 (Bankr. S.D. Tex. 2012) ...............................................25

*Official Comm. of Unsec. Creditors v. Meltzer*,
    2018 WL 2123558 (D. Me. 2018) ......................................................13

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ..............................................................7

*S.E.C. v. Resource Dev. Int'l, LLC*,
    487 F.3d 295 (5th Cir. 2007) ......................................................11, 18

*SEC v. Platinum Mgmt. (NY) LLC*,
    No. 16-6848 (E.D.N.Y.).................................................................7, 9

*In re Southmark Corp.*,
    95 F.3d 53 (5th Cir. 1996) ...............................................................26

*Steinberg v. Barclay's Nominees, Ltd.*,
    2008 WL 4601043 (S.D. Fla. 2008) ...................................................18

*Taylor v. Cmty. Bankers Sec., LLC*,
    2013 WL 3166336 (S.D. Tex. 2013) ..................................................17

*In re United Airlines, Inc.*,
    368 F.3d 720 (7th Cir. 2004) ............................................................26

*Wing v. Horn*,
    2009 WL 2843342 (D. Utah 2009)....................................................18

*In re Xtreme Power Inc.*,
  563 B.R. 614 (Bankr. W.D. Tex. 2016) ............................................................... *passim*

**State Cases**

*Auriga Cap. Corp. v. Gatz Props.*,
  40 A.3d 839 (Del. Ch. 2012) ................................................................................28

*Bear Research, Inc. v. Kates*,
  8 A.3d 573 (Del. Ch. 2010) ..................................................................................27

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993) ................................................................................27, 28

*Essex Crane Rental Corp. v. Carter*,
  371 S.W.3d 366 (Tex. App.—Houston [1st Dist.] 2012, no pet.) .........................38

*Ivanhoe Partners v. Newmont Mining Corp.*,
  535 A.2d 1334 (Del. 1987) ..............................................................................27, 28

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*,
  2018 WL 1440625 (Tex. 2018) ............................................................................11

*Kahn v. Lynch Commc'n Sys., Inc.*,
  638 A.2d 1110 (Del. 1994) ..............................................................................31, 32

*In re KKR Fin. Holdings LLC S'holder Litig.*,
  101 A.3d 980 (Del. Ch. 2014) ..........................................................................13, 14

*Laxson v. Giddens*,
  48 S.W.3d 408 (Tex. App.—Waco 2001, pet. denied) ...........................................38

*McMullin v. Beran*,
  765 A.2d 910 (De. 2000) .......................................................................................32

*Miramar Firefighters Pension Fund v. AboveNet, Inc.*,
  2013 WL 4033905 (Del. Ch. July 31, 2013) ..........................................................13

*Orman v. Cullman*,
  794 A.2d 5 (Del. Ch. 2002) ..........................................................................13, 28, 31

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) .......................................................................................30

*In re Tri-Star Pictures, Inc. Litig.*,
  634 A. 2d 319 (Del. 1993) ................................................................................28, 30

*In re W. Nat. Corp. Shareholders Litig.*,
  2000 WL 710192 (Del. Ch. 2000) .........................................................................30

*Walker v. Anderson*,
    232 S.W.3d 899 (Tex. App.—Dallas 2007, no pet.)...........................................10, 11

**Federal Statutes**

11 U.S.C. §101(5)...........................................................................................................25

11 U.S.C. §365(c)(2)..................................................................................................25, 26

11 U.S.C. §541(a)(1).......................................................................................................25

11 U.S.C. §544(b).........................................................................................................6, 9

11 U.S.C. §548(a)(1).................................................................................................6, 24, 25

11 U.S.C. §§548(a)(1)(A), (B)........................................................................................24

**State Statutes**

Tex. Bus. & Com. Code §24.002(2)(A)...........................................................................17

Tex. Bus. & Com. Code §24.002(7)................................................................................19

Tex. Bus. & Com. Code §§24.005-.006......................................................................10, 12

Tex. Bus. & Com. Code §§24.005(a), (b).......................................................................19

Tex. Bus. & Com. Code §§24.005(b)(1), (9)..................................................................18

Tex. Bus. & Com. Code §24.006(a)................................................................................21

**Rules**

Fed. R. Civ. P. 8........................................................................................................12, 19

Fed. R. Civ. P 9(b)...............................................................................11, 12, 17, 18, 19

Fed. R. Civ. P. 12(b)(6)...................................................................................1, 6, 7, 14, 16

The Motions should be denied for several reasons. They ignore the standard of review, which requires a court to accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff. Instead, the Motions repeatedly dispute facts alleged in the Complaint as if this were a summary-judgment process, even attaching new "exhibits" not referenced in the suit. Moreover, the Motions misread plaintiff's allegations, draw inferences in Defendants' favor, and seek to erect legal obstacles irrelevant to the claims. In short, they present a backwards approach to Rule 12(b)(6).

In fact, the Complaint raises valid – if troubling – assertions of self-dealing, malfeasance, and improper transfers at the expense of Northstar and its creditors. These allegations are amply sufficient under Rule 12(b), Plaintiff respectfully submits, so that the Motions may be denied, discovery proceed, and the Trust's significant claims resolved expeditiously.

## I.    OVERVIEW AND SUMMARY

Through counsel, James Katchadurian ("Trustee"), the Trustee of the Northstar Litigation Trust ("Trust") established by Order of this Court, opposes the motions to dismiss filed by Defendants. Dkts. 19 & 23.[1]

The Trustee seeks to recover for breaches of contract, breaches of fiduciary duty, avoid fraudulent transfers, and recover losses suffered by Northstar Offshore Group, L.L.C. ("Northstar"), which was forced into bankruptcy in August 2016. Beginning in 2012, NGP used its control over Northstar's Board of Managers ("Board") to cause Northstar to significantly overpay for assets purchased from another NGP affiliate, Propel Energy L.L.C. ("Propel") and to

---

[1]    "Defendants" refers to NGP Energy Capital Mgmt., L.L.C. ("NGP Capital"), NGP X US Holdings L.P. ("NGP X US"), NGP Natural Resources X, L.P. ("NGP X"), NGP X Parallel Holdings, L.P. ("NGP Parallel"), NGP Natural Resources X Parallel Fund, L.P. ("NGP Parallel Fund"), NOG Royalty Holdings, L.P. ("NGP-NOG") (collectively, "NGP"); Tomas Ackerman, David Albin, Jesse Bomer, David Hayes, and Christopher Ray (collectively, "NGP Directors"); and Glynn Roberts, Gaylon Freeman, Mark Stevens, and James Ulm (collectively, "Northstar Directors").

prevent Northstar from exercising rights to millions in capital calls from Defendants. With Northstar in financial straits, Defendants arranged its sale to a subsidiary of Platinum Partners, which is a bankrupt Ponzi scheme. Before closing, NGP-NOG promised to "eliminate" Northstar's $140 million in bank debt and working capital deficit through a combination of proceeds from the Platinum sale and NGP-NOG's own funds. NGP-NOG promised to do so in exchange for taking a valuable net profits interest in Northstar's most promising oil and gas fields. Instead, NGP-NOG reneged. It took the profits interest and then breached its contract and left Northstar with a $15 million working capital deficit. As a result, Northstar suffered millions in losses when it was forced to unwind prematurely a valuable commodity hedge to pay vendors and ultimately to enter bankruptcy.

Accordingly, the Trustee filed suit to secure compensation for the Trust for fraudulent transfers, contract breaches, and self-dealing at the expense of Northstar and its creditors. Dkt. #1. On June 4, 2018, NGP and NGP Directors moved to dismiss the Complaint. Dkt. #19. The same day, Northstar Directors filed a motion that largely duplicates the NGP arguments. Dkt. #23.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The Court is deeply familiar with the issues and allegations surrounding this debtor, but Plaintiff provides the following background for the Court's convenience.

### A.    The Parties

Northstar is a Houston-based oil and gas exploration and production company. On August 12, 2016, creditors filed an involuntary Chapter 11 bankruptcy petition against Northstar in this Court. Dkt. #1 ¶29. Northstar filed a voluntary Chapter 11 petition on December 2, 2016. *Id.* On November 22, 2017, Northstar filed its Second Amended Plan of Liquidation. *Id.* ¶30. The following month, the Court entered its Order approving the Plan. *Id.* ¶30. The Plan and the Confirmation Order established the Trust and appointed James Katchadurian as Litigation Trustee

to pursue claims, including the claims set forth in the Complaint, on behalf of the Trust. *Id.* ¶¶13, 31.

NGP is a multi-billion-dollar fund that invests in the energy industry through affiliates like the NGP affiliates that are defendants in this case. *Id.* ¶2. In the past, NGP has partnered with Northstar executives in lucrative oil and gas investments. Together they sold two prior iterations of "Northstar" for a combined $480 million. *Id.* ¶¶2, 33-34. Northstar Offshore Group, LLC was the third investment undertaken by NGP with the Northstar executive team. *Id.* ¶3. Northstar was a closely held company that was majority owned by NGP-NOG and NGP X US. *Id.* ¶¶36, 71. Through these affiliates, NGP owned the vast majority of Northstar. *Id.* ¶36.

Northstar's Board was formed in February 2012. *Id.* ¶37. NGP controlled Northstar through NGP's control of the Board. *Id.* ¶¶3, 37. Five of the Board's nine directors were NGP-related: defendants Ackerman, Albin, Bomer, Hays, and Ray. *Id.* ¶3. NGP admits that these five directors were its officers and agents when arguing that it cannot conspire with its own employees. Dkt. #19 at 43-44. The other four directors—defendants Roberts, Freeman, Stevens, and Ulm—were Northstar employees in senior management positions. *Id.* ¶¶3, 71.

As controlling owners or directors, NGP-NOG, NGP Directors, and Northstar Directors owed fiduciary duties of loyalty and care to Northstar and its creditors. *Id.* ¶71. These duties included putting Northstar's interests ahead of their personal interests and those of NGP. *Id.* ¶¶71-72.

### B.     Actions giving rise to the claims

Defendants' manipulation of Northstar to benefit NGP companies and themselves began shortly after Northstar was created, giving rise to the claims in the Complaint.

### 1.    Defendants conspire to cause Northstar to overpay for NGP assets.

In 2012, NGP used its control of the Board to overpay for assets owned by NGP-affiliate Propel Energy, LLC. *Id.* ¶38. These assets included oil and gas leases and wells in an area of the Gulf known as the Creole Field. *Id.* Initially, Northstar proposed offering Propel $80 million for the Creole assets. *Id.* ¶39. But this bid was insufficient for NGP, which used its control over the Board to increase Northstar's bid to the NGP-affiliated company by 40%, to over $113 million. *Id.* This was tens of millions higher than the next-highest bidder for these assets. *Id.* ¶40. Given their financial interests in NGP, the NGP Directors personally benefitted from the overpayment by Northstar to an NGP affiliate, *id.* ¶¶4, 40, which also resulted in financial benefits and a reputational boost to NGP in raising funds for other investments. *Id.* ¶38.

### 2.    Defendants saddle Northstar with $120 million in debt.

Having overpaid by tens of millions for the Creole assets, Northstar was left in 2013 with insufficient capital to conduct operations. *Id.* ¶41. But rather than inject the needed equity capital into Northstar, NGP chose to saddle the Company with bank debt. *Id.*

In November 2013, Wells Fargo agreed to lend Northstar $120 million in short-term debt. *Id.* The bank required NGP to commit to fund $75 million in capital to Northstar on Northstar's request. *Id.* Accordingly, on the same day as the loan, NGP X, NGP Parallel, and NGP X US entered into a contract with Northstar that obligated NPG to inject another $75 million into Northstar upon its request. *Id.* ¶¶41-42. NGP Directors and Northstar Directors also made capital commitments to Northstar. *Id.* ¶¶5-6, 54. Despite Northstar's deepening insolvency, NGP prevented Northstar from calling on the capital funding duties of NGP, NGP Directors, or Northstar Directors, benefitting Defendants at the expense of debt-burdened Northstar. *Id.* ¶43.

-4-

### 3.    In selling Northstar, Defendants promise to pay off and eliminate its debt and working capital deficit.

In 2014, Northstar was in "survival mode" and facing bankruptcy. *Id.* ¶44. But instead of allowing a call on the NGP $75 million capital commitment, NGP crippled the Company by stopping all expenditures and asset development. *Id.* ¶45.

NGP was looking for an exit plan to avoid its $75 million capital obligation and the impact of a Northstar bankruptcy on NGP's ability to raise investor capital for its other funds. *Id.* ¶¶46-48. Led by the NGP Directors, Northstar pursued a sale of its assets, but the offers were well below its short-term debt. *Id.* ¶46. Defendants decided to sell Northstar to troubled Platinum Partners. *Id.* ¶¶48-51. NGP knew that Platinum had questionable ability to do the deal. *Id.* ¶50. In fact, Platinum repeatedly failed to obtain financing for the purchase and postponed the closing date. *Id.*

Despite the red flags, Defendants pressed forward with a sale to Platinum. With the sale pending, NGP-NOG signed a contract to pay the insolvent Northstar's debt and give it a fresh start. On closing of the Platinum sale, NGP-NOG was "to pay off the [Northstar] Bank Debt and eliminate the Working Capital Deficit." *Id*. ¶53. In return, Northstar gave a significant net profits interest in its most promising fields to NGP and released NGP-NOG's $75 million commitment, along with the commitments of NGP Directors and Northstar Directors. *Id*. ¶¶53-54.

### 4.    Northstar goes into bankruptcy after Defendants breach their duties.

Despite Defendants' promises, NGP-NOG did not "pay off the [Northstar] Bank Debt and eliminate the Working Capital Deficit." *Id.* ¶54. Instead, NGP left Northstar without its net profits interest in valuable prospects (which NGP-NOG retained) and with $15 million in immediately payable working capital deficit. *Id.* ¶¶54, 67. This included $7 million in vendor debts where Northstar had previously negotiated payment extensions until after the closing of the Platinum sale, when Northstar thought NGP-NOG would "eliminate" Northstar's debts. *Id.* ¶55. With a $15

million working capital deficit not eliminated and unable to pay creditors, Northstar was forced to raise cash by unwinding a hedge agreement early, losing millions. *Id.* ¶56. But for Defendants' breaches of contract and fiduciary duty, Northstar would have received the full value of the hedge, allowing it to avoid the cost and disruption of bankruptcy. *Id.*

### C.   Procedural Posture of this Litigation

In light of these facts, the Trustee filed suit on behalf of the Trust in April 2018 against NGP, NGP Directors, and Northstar Directors. The Complaint asserts six counts: fraudulent transfers pursuant to 11 U.S.C. §544(b) and the Texas Uniform Fraudulent Transfer Act ("TUFTA") (Count 1); fraudulent transfers pursuant to 11 U.S.C. §548(a)(1) (Count 2); breach of fiduciary duty against NGP Directors, Northstar Directors, and NGP-NOG (Count 3); breach of contract against NGP-NOG (Count 4); conspiracy against all Defendants (Count 5); and aiding and abetting against all Defendants (Count 6). *See* Dkt. #1. On June 4, 2018, NGP and NGP Directors moved to dismiss the Complaint under Rule 12(b)(6). Dkt. #19. Northstar Directors filed a parallel motion on the same day. Dkt. #23.

### D.   Governing Legal Standards

Motions to dismiss for failure to state a claim are, of course, disfavored. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (cites omitted).

Because a Rule 12(b)(6) motion tests the legal sufficiency of a pleading, "It is not a procedure for resolving contests about the facts or the merits of the case." *Jolly v. Klein*, 923 F. Supp. 931, 942 (S.D. Tex. 1996). In deciding such a motion, a court is to "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 513 (5th Cir. 2018) (cite omitted); *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). The court will "examine the complaint

to determine whether the allegations provide relief on any possible theory." *Ramming v. United States*, 281 F.3d 158, 162 (5th Cir. 2001) (cites omitted).

Dismissal is proper only when a pleading fails to state a claim based on "either a lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *122261 Fondren, LLC v. Riverbank Realty GP*, 2010 WL 1741071, at *1 (S.D. Tex. 2010) (cite omitted). The complaint "does not need detailed factual allegations," but must allege sufficient facts "to raise a right to relief above the speculative level," assuming that "all the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### III.     ARGUMENT AND AUTHORITIES

The Court should deny the Motions because the Complaint amply pleads its claims.

#### A.     Defendants may not rely on outside documents for their Motions.

As an initial matter, Plaintiff objects to various items of evidence attached to the motion of the NGP entities and NGP Directors, Dkt. #19, which also are incorporated in the Northstar Directors' motion. Dkt. #23 at 3 n.4. With one exception (Exh. D, Aug. 1, 2014 Letter Agreement), none of the exhibits that Defendants attach to their Motions are referenced in the Complaint or central to its claims. It is "inappropriate" at this stage to consider documents outside of the four corners of a complaint and not "central" to its claims. *In re Xtreme Power Inc.*, 563 B.R. 614, 630 (Bankr. W.D. Tex. 2016). As a rule, courts "may not go outside the pleadings" in reviewing a motion under Rule 12(b)(6). *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990).

Specifically, the improper exhibits to the Motions are:

- Exh. A, Complaint, *SEC v. Platinum Mgmt. (NY) LLC*, No. 16-6848 (E.D.N.Y.);

- Exh. B, amended and restated LLC agreement for Northstar (Nov. 8, 2013);

- Exh. C, "Assignment of Interests" between NGP X US Holdings, L.P. and NOG Royalty Holdings, LP (July 7, 2014);

- Exh. E, financing statement;

- Exh. F, "UCC Financing Amendment"; and

- Exh. G, "Final Settlement Statement" between Northstar and LaFitte Energy Corp.

The Motions rely on external documents to dispute the Complaint's fact allegations. They cite to allegations in the Platinum SEC suit (Exh. A) to dispute whether Defendants had notice of any Platinum financial issues before closing the sale of Northstar. Dkt. #19 at 3; Dkt. #23 at 3. They refer to a Northstar LLC Agreement and Assignment (Exhs. B-C) to dispute whether Defendants other than NGP-NOG owed capital commitments to Northstar. Dkt. #19 at 13-14; Dkt. #23 at 8. They cite a financing statement and amendment (Exhs. E-F) to dispute whether Defendants' capital commitments were Northstar assets for purposes of a fraudulent transfer claim. Dkt. #19 at 16-20; Dkt. #23 at 13-16. And they cite to a statement for the Northstar sale (Exh. G), to dispute whether NGP-NOG breached the Letter Agreement by failing to "pay off the Bank Debt and eliminate the Working Capital Deficit," Dkt. #19 at 41 & Exh. D ¶J, and to dispute whether Defendants' capital commitments were Northstar assets subject to fraudulent-transfer laws. Dkt. #23 at 16.

Except for the Letter Agreement, which is the basis for the breach of contract claim, the exhibits are outside the four corners of the Complaint and not "central" to any claim. *See Xtreme Power*, 563 B.R. at 630 ("Although the Amended Complaint alleges facts that can be found in the APRS Minutes, it neither quotes nor explicitly refers to the document in question.").

Further, judicial notice is inappropriate as to facts alleged in a complaint like Exhibit A, since they are only allegations. *Id.* at 631 (a court may take judicial notice of the "fact that related litigation or filings exist in a different forum," but not of "the facts alleged in the other court's pleadings"). In any event, Defendants' attachment of the Platinum SEC Complaint and extensive discussion of it raises issues irrelevant to Plaintiff's claims and the allegations. *See* Dkt. #19 at 3-

6. The Complaint never alleges that Defendants "should have known that Platinum Partners was a Ponzi scheme at the time of the sale of Northstar to Platinum Partners' subsidiary," as the Motions argue. *Id.* at 3 (emph. removed). Rather, the Complaint alleges that "NGP knew Platinum was not a credit-worthy purchaser" because "NGP agreed to delay the closing multiple times when Platinum was unable to come up with the promised funds" for the Northstar purchase. Dkt. #1 ¶9.

That Platinum subsequently went bankrupt and its founders were indicted is background and not the "central feature" of the Complaint. Dkt. #19 at 3. The Motions' preoccupation with Platinum and the SEC complaint appears only to suggest, by extrinsic evidence and contrary to the well-pleaded allegations in the Complaint, that "[a]ny claims that Plaintiff possesses are against Platinum," so Defendants allegedly have no liability. *Id.* at 4. To the contrary, they are liable for their own actions, and the Complaint contains no allegation that non-party Platinum did or failed to do anything for which Defendants are "vicariously liable." *Id.* Nor do the Motions present any basis to "strike" the Complaint's allegations relating to Platinum, *id.* at 5, when Defendants do not even challenge the allegations that they knew before and at the time of Northstar's sale to Platinum that Platinum was not creditworthy and struggled to come up with the funds.

Accordingly, Plaintiff respectfully has filed this date a motion to strike and disregard the improper Exhibits A-C and E-G for purposes of deciding the Motions.

In any event, the Complaint amply states the claims alleged in its counts.

### B.      Count 1: Fraudulent transfers under TUFTA

By Count 1, the Trustee seeks avoidance and recovery of the value of certain transfers under 11 U.S.C. §544(b) and TUFTA. Dkt. #1 ¶¶57-64. The transfers are Northstar's overpayment to NGP-affiliate Propel for the Creole assets and its release of contractual capital funding obligations of NGP, NGP Directors, and Northstar Directors. *Id.* ¶61. They also represent improper, self-interested transactions amounting to fiduciary breaches.

As the Court is aware, TUFTA provides remedies to creditors of debtors that transfer assets under certain "fraudulent" circumstances, Tex. Bus. & Com. Code §§24.005-.006:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

*Id.* §24.005. Whether a transfer was made "with actual intent to hinder, delay, or defraud" for the purposes of Sec. 24.005(a)(1) is determined based on facts and circumstances, including "badges of fraud" listed in Sec. 24.005(b), such as whether the transfer was to an "insider." *Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. App.—Dallas 2007, no pet.). Generally, an insider is "an entity whose close relationship with the debtor subjects any transactions made between the debtor and the insider to heavy scrutiny." *Fulcrum*, 20 F. Supp. 3d at 604 (cite omitted).

In addition, TUFTA defines fraudulent transfers to include:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
>
> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

*Id.* §24.006.

Of course, a claim under TUFTA is not a typical *fraud* claim. "A claim for fraudulent transfer is a separate cause of action from fraud." *Walker*, 232 S.W.3d at 913 (cite omitted). A common-law fraud claim provides remedies when a defendant causes injury by knowingly making false statements of material fact, and intending that the plaintiff rely on the misrepresentations. *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 2018 WL 1440625, at *4 (Tex. 2018). By contrast, a TUFTA claim does not involve misrepresentation (or causation, reliance, or damages), and it focuses on the debtor's intent and conduct, not on a defendant's:

> Contrary to the Defendants' assertions . . . "the transferees' knowing participation is irrelevant under the statute" for purposes of establishing the premise of (as opposed to liability for) a fraudulent transfer. The statute requires only a finding of fraudulent intent on the part of the "debtor" . . . .

*S.E.C. v. Resource Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (cite omitted).

Indeed, TUFTA is based on a modified version of the Uniform Fraudulent Transfer Act. *See* Dole & Teofan, *The Nonuniform Texas "Uniform" Fraudulent Transfer Act*, 42 Sw. L.J. 1029, 1030 (1988) (discussing Act's history). In 2014, the title of the model act was changed to *Uniform Voidabl*e *Transactions Act,* to reflect that a fraudulent-transfer claim under the model act is *not* a fraud claim *nor* subject to higher pleading standards, such as Fed. R. Civ. P 9(b):

> [A] procedural rule that imposes extraordinary pleading requirements on a claim of "fraud," without further gloss, should not be applied to a claim for relief under §4(a)(1). The elements of a claim for relief under §4(a)(1) are very different from the elements of a claim of common-law fraud. Furthermore, the reasons for such extraordinary pleading requirements do not apply to a claim for relief under §4(a)(1). Unlike common-law fraud, a claim for relief under §4(a)(1) is not usually susceptible to abusive use in a "strike suit," nor is it apt to be of use to a plaintiff seeking to discover unknown wrongs. Likewise, a claim for relief under §4(a)(1) is unlikely to cause significant harm to the defendant's reputation, for the defendant is the transferee or obligee, and the elements of the claim do not require the defendant to have committed even an arguable wrong.

Uniform Voidable Transactions Act §4, cmt. 10 (cites omitted). The title of the model act was changed not for substantive reasons, but because "the word 'Fraudulent' in the original title . . . was a misleading description of the Act as it was originally written. Fraud is not, and never has been, a necessary element of a claim for relief under the Act." *Id.* §15, cmt. 1. The prior title "led to confusion in the courts." *Id.*

The Motions raise a host of purported barriers to the claims for TUFTA violations:

1. the Complaint fails to plead facts "showing that Movants caused—and indeed even had the ability to cause—Northstar to make fraudulent transfers";

2. TUFTA does not permit recovery for the overpayment to NGP-affiliate Propel for the Creole assets from NGP, NGP Directors, or Northstar Directors;

3. only NGP-NOG owed a funding commitment in September 2014, so only it is liable under the statute for Northstar's release;

4. NGP-NOG's capital commitment "was not a transfer" or an "asset" under the statute because it was "fully encumbered by a valid lien";

5. the Complaint fails meet the heightened pleading standard of Rule 9(b);

6. the claims violate Rule 8(a) by "impermissibly grouping together Defendants";

7. the Complaint fails to plead that Northstar received less than reasonably equivalent value for its release of the capital commitments;

8. it fails to plead Northstar's "insolvency at the time of each alleged transfer";

9. the statute of limitations bars the claims; and

10. the Complaint fails to identify a creditor with standing to pursue a TUFTA claim.

*See* Dkt. #19 at 9-31; Dkt. #23 at 9-28. Each argument fails.

### 1. Defendants need not "cause" Northstar to make fraudulent transfers.

The Motions argue that the Complaint does not adequately allege that Defendants "caused" the transfers or "controlled" Northstar. Dkt. #19 at 9-11; Dkt. #23 at 9-11. They cite no authority that requires pleading these facts for a TUFTA claim. Nowhere in the Act is a *defendant's* conduct relevant to the claim, as opposed to the conduct of the *debtor* like Northstar. Tex. Bus. & Com.

Code §§24.005-.006. Accordingly, each of the cases cited by the Motions concerning failure to plead "causation" or "control" involved breach of fiduciary duty claims, not fraudulent transfers.[2]

And even if causation or control by a defendant were required elements of the TUFTA claims (they are not), the Complaint adequately pleads such facts.[3]

Nor is NGP's denial of control over Northstar plausible. Majority owners appoint most board members to control the company. Here, NGP owned most of Northstar's stock. *Id.* ¶¶36-37. Indeed, the Motions cite *KKR Financial Holdings* for the proposition that the mere fact that a director is nominated by an "investor" does not show control or a lack of director independence. Dkt. #19 at 10. But *KKR* involved a claim that "a holder of *less than one percent* of the stock of a Delaware corporation was a controlling stockholder and thus owed fiduciary obligations." 101 A.3d at 983 (emph. added). But a "less than 1% position . . . obviously would create no concern in the mind of [the] directors that [the 1% owner] possessed sufficient voting power to remove them from their positions if they rejected" actions the owner did not like. *Id.* at 994. Here, by contrast, NGP is not a mere "investor." It owned the "vast majority" of Northstar and appointed a controlling

---

[2]   *See* Dkt. #19 at 10 nn.39-43. They cite *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002), which was a class action involving allegations of breach of fiduciary duty); *Miramar Firefighters Pension Fund v. AboveNet, Inc.*, 2013 WL 4033905, at *5 (Del. Ch. July 31, 2013), also concerning breach of fiduciary duty claims; *Official Comm. of Unsec. Creditors v. Meltzer*, 2018 WL 2123558, at *6 (D. Me. 2018), where the court's discussion of influences on director decision-making was in reference to fiduciary breach claims, not fraudulent transfers; and *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014), which concerned only fiduciary breach claims.

[3]   *See, e.g.*, Dkt. #1 ¶3 ("NGP controlled the Northstar board of managers, comprised of five NGP-related directors . . . ."), ¶4 ("NGP used its control of Northstar to manufacture inflated profits for NGP at Northstar's expense."), ¶4 ("The NGP Directors caused Northstar to overpay for the [Creole Field assets] . . . ."), ¶5 (NGP Directors and Northstar Directors "conspired with NGP" to "cause" the releases of capital commitments, refuse to enforce those commitments, and overpay for the Creole assets), ¶6 ("NGP and the Northstar board agree to have Northstar forgive and release" the capital commitments), ¶40 ("The Northstar Directors and NGP Directors approved [the] transaction that caused Northstar to drastically overpay for its interest in the field."), ¶45 (NGP exercised "complete control over Northstar" by causing Northstar to "stop all expenditures and requiring any cash outflow to be pre-approved by NGP's representatives").

-13-

number of directors. The Motions' cite to *KKR* shows why there should be no doubt in this case concerning NGP's "control" of Northstar and its Board.

        2.      **Relief is available against NGP and NGP Directors, who benefitted from Northstar's overpayment for the Creole assets.**

The Motions argue, in effect, that the Complaint should have filed TUFTA claims against Propel, the nominal transferee of Northstar's overpayment. Dkt. #19 at 11-12; Dkt. #23 at 11-13.

While Plaintiff certainly could sue Propel, Defendants admit that TUFTA remedies are available against "the person for whose benefit the transfer was made," not just the first transferee. Dkt. #19 at 11 (cites omitted). Propel is not a mere "third party" or "separate entity" that would render it implausible under Rule 12(b)(6) that NGP and NGP Directors benefitted from the Northstar overpayment to Propel. *See* Dkt. #19 at 12. Propel is an investment owned and controlled by NGP, as documented in SEC filings.

In any case, the Complaint adequately alleges that Northstar's overpayment to Propel was made to benefit NGP and NGP Directors.[4] Discovery is needed to show the exact proportion of the Creole Field sale proceeds that went to each NGP entity and director. Plaintiff has served document requests on Defendants to explore these very issues.[5]

In short, the Complaint states a TUFTA claim against NGP and NGP Directors for the huge Northstar overpayment to NGP-affiliate Propel for the Creole assets.

---

[4]     *See, e.g.*, Dkt. #1 ¶4 ("NGP used its control of Northstar to manufacture inflated profits for NGP at Northstar's expense."), *id.* (the inflated price to NGP-affiliate Propel for the Creole assets "benefitted the NGP Directors, who had financial interests in NGP."), ¶38 ("NGP caused the Board to overpay for NGP assets for NGP's benefit."), *id.* ("Padding its profits from the sale of this field would give NGP both immediate accounting benefits and a reputational boost in raising future funds."), ¶40 ("NGP Directors benefitted personally by this self-dealing . . . .").

[5]     For example, on July 6, 2017, Plaintiff requested documents relating to Northstar's purchase of the Creole assets from Propel, ownership interests of NGP companies in Propel, and money received directly or indirectly by any NGP entity in connection with Northstar's purchase from Propel.

### 3.	The Motions raise fact disputes over releases of capital commitments.

Using exhibits outside of the Complaint, Defendants challenge claims as to Northstar's releases of capital commitments, saying that only NGP-NOG "owed a capital commitment as of September 22, 2014," which they call "the effective date" of the Letter Agreement. Dkt. #19 at 13.

First, the amended/restated LLC agreement and assignment document (Exhs. B-C) are extrinsic evidence to be disregarded in deciding these Motions. Matters outside the pleadings are inappropriate at this stage unless such matters "are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (cites omitted). Extrinsic evidence may be considered in this context "if: (1) the document is attached to a defendant's motion to dismiss; (2) the document is referred to in the plaintiff's complaint; *and* (3) the document is 'central' to the plaintiff's claims." *Xtreme Power*, 563 B.R. at 629 (citing *Collins*) (emph. added).

In a footnote, the Motions say Exhibit B is "referenced in the Complaint" paragraphs 53-54. But those paragraphs do not refer to the LLC agreement, amended or otherwise. *See* Dkt. #19 at 14 n.65. The exhibits are not referenced in the Complaint and should be disregarded.

Moreover, this improper evidence is simply used to dispute well-pleaded facts in the Complaint. The Motions raise no pleading deficiency. The Complaint seeks TUFTA remedies for Northstar releases of NGP, NGP Directors, and Northstar Directors for millions of dollars of capital commitments. *See, e.g.*, Dkt. #1 ¶¶5-6, 54, 61. The Motions dispute these facts, arguing that their attached "evidence" somehow proves that only NGP-NOG owed a commitment.[6] Dkt.

---

[6]	To the contrary, even Defendants' cherry-picked "evidence" shows that several Defendants, directly or indirectly through holding companies, owed supplemental commitments to Northstar. *See* Dkt. #19, Exh. B at Exh. A (Defendants Roberts, Freeman, Ulm, Stevens, and NGP X US owed $75 million in capital commitments as of Nov. 8, 2013).

#19 at 14. This is contrary to the standard of review on a Rule 12(b)(6) motion to dismiss, by which a court takes the complaint's allegations as true and reads them in the light most favorable to the plaintiff. *Midwest Feeders*, 886 F.3d at 513.

At best, this evidence is fodder for discovery, not these Motions.

### 4.   Defendants' other TUFTA arguments relating to the releases fail.

The Motions assert that the release of NGP-NOG was not a "transfer under TUFTA" since the capital commitment was "fully encumbered." Dkt. #19 at 16; Dkt. #23 at 13.

Again, the Motions run headlong into the *Collins* rule that documents not referenced in a complaint are disregarded at this dismissal stage. 224 F.3d at 498. Because the Complaint does not refer to the "financing statement" and "termination" (Exh. E-F), they should be disregarded in deciding the Motions. *Id.*

In any event, the Motions misread the Complaint in, at best, raising fact disputes (not a pleading deficiency) over whether releases of Defendants' capital commitments were TUFTA transfers. The Complaint presents more than sufficient allegations of improper transfers. *See, e.g.*, Dkt. #1 ¶61 ("These transfers and releases were fraudulent" and actionable under TUFTA).

The Motions cite no case requiring a complaint to plead further details to state a TUFTA claim. Yet, using improper evidence, they dispute the fact allegations by claiming there could be no "transfer" because the releases were not "assets" under the statute since they were "encumbered by a valid lien." Dkt. #19 at 16-17 (*citing* Tex. Bus. & Com. Code §24.002(2)(A)). The argument is confusing. If Northstar had no right to the commitments because they were "fully encumbered by a valid lien" to Wells Fargo, then how could Northstar have signed the Letter Agreement, to which Wells Fargo is not a party, *releasing* NGP, NGP Directors, and Northstar Directors from the capital commitments?

Further, the Motions omit what TUFTA actually says. Property is not an "asset . . . *to the extent* encumbered by a valid lien." Tex. Bus. & Com. Code §24.002(2)(A) (emph. added). They do not explain how their outside evidence shows that the commitments were "fully" encumbered by a Wells Fargo lien. If the lien is relevant at all, the Motions simply identify a fact dispute over the extent to which the commitments were encumbered, if at all.

In short, the Motions raise no valid objection to the claims relating to capital commitment releases of NGP, NGP Directors, and Northstar Directors under the Letter Agreement.

### 5.    Rule 9 does not apply to the TUFTA claims.

The Motions say the Rule 9(b) pleading standard applies to "actual fraudulent-transfer claims," including TUFTA claims, and that the Complaint fails to meet the higher standard. Dkt. #19 at 20-24; Dkt. #23 at 16-20.

First, Rule 9 pleading standards do not apply to TUFTA claims. As the Motions admit in a footnote, "the Fifth Circuit has not definitively held that fraudulent transfer claims fall within the purview of Rule 9(b)." Dkt. #19 at 21 n.97 (cite omitted). But numerous federal courts inside and outside Texas have held that Rule 9 does not apply to fraudulent-transfer claims.[7]

---

[7]    *See, e.g., Taylor v. Cmty. Bankers Sec., LLC*, 2013 WL 3166336, at *7 (S.D. Tex. 2013) ("The receiver has pled two TUFTA counts . . . alleging actual and constructive fraud in Evolution's operation of a Ponzi scheme that defrauded the Noteholders . . . . Notably, the receiver has not alleged that any of the defendants in this action committed fraudulent acts, only that they received proceeds gained by fraud. The court thus sees no reason why Rule 9(b) . . . should apply to fraudulent transfer cases in which the transferee's conduct is not alleged to be fraudulent."); *Fawaz v. Byers*, 2014 WL 1671746, at *5 (S.D. Tex. 2014) ("[T]his court has determined that Rule 9(b) does not apply to fraudulent transfer cases against a transferee where the plaintiff has not properly alleged a fraud claim against that Defendant."); *AAB Logistics,   Inc. v. Forward Air, Inc.*, 2016 WL 8672773, at *10 (N.D. Tex. 2016) ("[T]he trend in this district is to conclude that fraudulent consideration claims are not subject to Rule 9(b)'s pleading requirements."); *Janvey v. Alguire*, 846 F. Supp. 2d 662, 676 (N.D. Tex. 2011) ("[T]he Court can find no principled reason for applying Rule 9's pleading requirements to . . . the Receiver's fraudulent transfer claims."); *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, 2009 WL 5173954, at *10 (N.D. Tex. 2009) ("[Plaintiffs have] not alleged fraud against PlainsCapital or Moving Defendants, which is the contemplation of Rule 9(b). Plaintiffs have merely alleged that Moving Defendants were the recipient of funds fraudulently obtained. Nothing in the complaint or record indicates that Moving

-17-

This is because TUFTA claims, unlike fraud claims, are not based on a defendant's bad intent but focus on the *debtor's* acts and intent. Tex. Bus. & Com. Code. §24.005(a)(1) (transfer is "fraudulent as to a creditor" if "the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor"). The Act requires no pleading of scienter by a defendant. *See Resource Dev.*, 487 F.3d at 301 (Sec. 24.005(a)(1) claim involves intent of the "debtor," not a defendant). It requires no misrepresentations by a defendant. Indeed, the *debtor's* intent may be inferred from a non-exclusive list of "badges of fraud," such as that the transfer was made to an "insider" and that the debtor "was insolvent or became insolvent shortly after the transfer was made." Tex. Bus. & Com. Code §§24.005(b)(1), (9).

Second, even if Rule 9(b) pleading applied to a TUFTA claim (and it should not), the Complaint alleges ample facts. It alleges when and how Northstar did specific transactions that depleted its assets for the benefit of insiders that caused or deepened its insolvency. This includes a critical overpayment to an NGP-affiliate for the Creole assets, a sale in September 2012 that was far higher than the next-highest bidder. Dkt. #1 ¶¶38-40. The Complaint alleges specific releases by insider-controlled Northstar of insider funding commitments and its earlier refusals to call the commitments, all despite its financial deterioration. *See, e.g.*, *id.* ¶¶41-47. Each transfer involved Sec. 24.005(b)(1) "insiders," meaning that a "badge of fraud" exists to show the debtor's intent to defraud. *See* Tex. Bus. & Com. Code §24.002(7) (defining insider as a "director" or "officer of the debtor," a "person in control of the debtor," or "an affiliate, or an insider of an affiliate as if the affiliate were the debtor").

---

Defendants committed any fraudulent act that caused the funds to be transferred."); *Wing v. Horn*, 2009 WL 2843342, at *5 (D. Utah 2009) (in the context of fraudulent transfers, "[t]here is no allegation that the Defendant committed any act of fraud; indeed, the defendant's conduct is simply not an element of the Receiver's claim"); *Steinberg v. Barclay's Nominees, Ltd.*, 2008 WL 4601043, at *12 (S.D. Fla. 2008) ("the heightened pleading standard of Rule 9(b) does not apply to claims brought under the [Florida act]").

These allegations amply provide the "who, what, when, where, and how" of the fraudulent transfers at issue, Dkt. #19 at 22, to the extent that a pleading principle for *common-law* fraud even applies to TUFTA claims, whose elements include no misrepresentations, reliance, causation, or damages. *See* Tex. Bus. & Com. Code §§24.005(a), (b). Accordingly, even if it were required, the Complaint provides sufficient notice under Rule 9 concerning its well-pleaded TUFTA claims.

6.      **The Complaint satisfies Rule 8, including as to the TUFTA claims.**

Pressing the fiction that the Complaint fails to provide fair notice, the Motions argue that the TUFTA claim violates Rule 8 by "impermissibly grouping together Defendants." Dkt. #19 at 24-25; Dkt. #23 at 20-21. Under Rule 8(a), a claim for relief must contain a "short and plain statement" as to jurisdiction, the claim, and the relief sought. Fed. R. Civ. P. 8(a).

The Complaint does not lump Defendants together to create doubt about the claim against each of them. Naming each one individually, it uses three groups for convenience: the various NGP entities, like NGP Capital, NGP X US, NGP X, NGP Parallel, NGP Parallel Fund, and NGP-NOG; the NGP-related directors Ackerman, Albin, Bomer, Hayes, and Ray; and the Northstar management directors Roberts, Freeman, Stevens, and Ulm. *See* Dkt. #1 at 1-2 ¶3. For the specific transactions at issue, each group is addressed separately as to their roles in the events and benefits derived. *See, e.g., id.* ¶38 (NGP Defendants gained "immediate accounting benefits and a reputational boost" from Northstar's overpayment to NGP-affiliate Propel for the Creole assets); ¶40 ("Northstar Directors and NGP Directors approved this transaction"). When the conduct of specific Defendants is relevant, the Complaint names them individually. *See, e.g., id.* ¶41 ("on the same day as the Wells Fargo loan, NGP affiliates NGP X, NGP Parallel, and NGP X US signed a contract with Northstar that obligated NGP to provide an additional $75 million upon request"), ¶42 (same), ¶43 ("NGP Directors" prevented the capital calls, benefitting NGP "and the NGP

Directors"). The Complaint distinguishes who is liable for which claims. *Id.* ¶¶70-73 (identifying which defendants owed fiduciary duties); ¶¶74-76 (same with the claim of contract breach).

This is not a situation where a lone defendant is lumped into a group and has no notice of his role in the allegations. The Complaint's allegations against NGP, NGP Directors, and Northstar Directors are collective where appropriate because the entities and individuals acted *as a group* with respect to events at issue. For example, NGP Directors acted as a block in using their majority control to force transactions on Northstar to benefit NGP at Northstar's expense.

In short, the Complaint gives fair notice to Defendants of the fraudulent transfer claims.

### 7.    The Complaint adequately pleads that Northstar got less than reasonably equivalent value for releases of capital commitments.

The Motions argue that the Complaint fails to state a claim that Northstar received less than reasonably equivalent value for releasing the capital commitments. Dkt. #19 at 26-28; Dkt. #23 at 22-24. This is a fact dispute, at best, not a failure to state a claim. Indeed, the Motions betray this by stating that the Complaint "fails to plausibly establish" that Northstar got less than reasonably equivalent value for the transfers, Dkt. #19 at 26, rather than fails to plausibly *plead*.

Further, to press their fact argument that Northstar *did* get reasonably equivalent value for releasing millions in capital commitments, the Motions refer to evidence outside the Complaint, an amended Northstar LLC agreement (Exh. B). Dkt. #19 at 27 & n.136, n.137. The agreement is not referenced in the Complaint and should be disregarded. *Collins*, 224 F.3d at 498; *Xtreme Power*, 563 B.R. at 629. Further, the Complaint plausibly alleges that Northstar did not receive "reasonably equivalent value." For giving NGP-NOG a net profits interest in Northstar's most promising fields and releasing Defendants from $75 million in capital commitments, Northstar got in return only half that amount from NGP, resulting in a $15 million working capital deficit and

ultimately bankruptcy. Dkt. #1 ¶¶6, 51, 54-55. While the Motions dispute these allegations, they must be taken as true today. *Midwest Feeders*, 886 F.3d at 513.

### 8.    The Complaint adequately pleads Northstar's insolvency.

The Motions assert that the Complaint fails to plead Northstar's "insolvency at the time of each alleged transfer." Dkt. #19 at 28-30; Dkt. #23 at 25-26. This element is relevant to the fraudulent-transfers claim, which requires that the debtor be "insolvent at that time" or "became insolvent as a result of the transfer or obligation." Tex. Bus. & Com. Code §24.006(a).

The Complaint directly pleads insolvency at the time of the transactions in issue or that the transactions resulted in insolvency. It alleges:

> Even though the NGP Directors and the Northstar Directors *acknowledged the company was insolvent*, inadequately capitalized, and unable to pay its debts as they came due, these directors conspired with NGP to (1) cause Northstar to release the individual directors and NGP from millions in dollars of commitments without receiving equivalent value in return; (2) decline to enforce Northstar's contractual right to demand tens of millions in capital obligations from NGP and the directors; and (3) have Northstar overpay for assets owned by other NGP companies to inflate NGP's profits at the expense of Northstar.

Dkt. #1 ¶5 (emph. added). "Throughout this time, Northstar was insolvent, inadequately capitalized, and unable to pay its debts as they came due." *Id.* ¶7. Using reasonable inferences, a fair reading of the Complaint shows that the disputed events—from the overpayment to an NGP affiliate for oil and gas assets and to the releases of critical funding rights while its financial condition spiraled downward—at a minimum "result[ed]" in Northstar's insolvency.

These pleadings are amply sufficient under TUFTA.

### 9.    The discovery rule tolls limitations for the fraudulent-transfer claims.

Next, the Motions argue that any Section 24.006(b) claims are barred by the one-year statute of limitations and "other fraudulent-transfer claims are barred to the extent they seek to avoid transfers beyond the relevant statutes of limitations." Dkt. #19 at 30-31; Dkt. #23 at 26-28.

Time limits under Sec. 24.010 are tolled by the discovery rule when "the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred but may be objectively verified." *Janvey v. Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d 825, 833-34 (N.D. Tex. 2011). "The discovery rule's application here turns on whether the facts giving rise to the Receiver's claims were inherently undiscoverable to" creditors. *Id.* at 833. *See Janvey v. Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 195 (5th Cir. 2013) (noting the majority of other jurisdictions "have consistently held that the one-year savings provision does not begin to accrue until the creditor discovers or could have reasonably discovered the nature of the fraudulent transfer").

The Fifth Circuit has repeatedly noted that "with respect to TUFTA's one-year repose period, this Court has held that a fraudulent-conveyance claim does not accrue until the claimant knew or reasonably could have known *both* of the transfer *and* that it was fraudulent in nature." *Janvey v. Romero*, 817 F.3d 184, 188 (5th Cir. 2016) (original emph.). Moreover, the question of when the claimant discovered or reasonably could have discovered the transfer "is generally a question of fact for the fact-finder." *Id.* at 189.

Here, the facts at issue were inherently undiscoverable to creditors, which were injured in objectively verifiable ways. They had no way of knowing at the time that Northstar significantly overpaid for the Creole assets or released $75 million in capital commitments without reasonably equivalent value in return. Indeed, in this case Defendants wanted to seal the Letter Agreement with the releases, along with the attached Purchase and Sale Agreement and related documents. *See* Dkt. #19, Exh. D §9; Dkt. #15 (Defs.' Mot. to Seal ¶9, ¶14) ("The Contract, including the Final Settlement Statement, is confidential by its terms . . . . Movants seek a sealing order that would maintain the protection of the confidential information contained in the Confidential Exhibits.").

Accordingly, the Motions fail to show that any TUFTA claims is time-barred.

**10.    The Trust has standing to pursue TUFTA claims.**

Lastly, the Motions argue that standing requires an unsecured ("triggering") creditor that could have brought the fraudulent-transfer claim when bankruptcy was filed and complain that the Complaint does not identify a class of creditors which had that standing. Dkt. #19 at 25-26. As an initial matter, the Trustee clearly has standing pursuant to Bankruptcy Code section 544(b)(1), which provides that:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable under section 502(e) of this title.

11 U.S.C. § 544(b)(1); *see Lange v. Regions Bank (In re Westbury Cmty. Hosp., LLC)*, 2013 WL 6054798, at *5-*6 (Bankr. S.D. Tex. Nov. 15, 2013). In addition, there are numerous creditors holding an allowable unsecured claim who could avoid the transfers in question, as reflected on the Claims Register in this case.[8] *See In re* Northstar Offshore Group, LLC, No. 16-34028 (Bank. S.D. Tex. 2016), Claims Register. In short, the standing argument is meritless.

---

[8]    The following are just a few examples: Gulf-Pro Services, LLC [Creditor No. 9574564], American Express Travel Related Services Co, Inc. [Creditor No. 9574422], Measurement Technologies, Inc. [Creditor No. 9602446], Dulan, LLC [Creditor No. 9602398], Chapman Consulting, Inc. [Creditor No. 9602387], Atchafalaya Measurement Controls, Inc. [Creditor No. 9602370], IHS Markit [Creditor No. 9623721], Safety Controls, Inc. [Creditor No. 9602496], Extreme Power Resources, LLC [Creditor No. 9629255], Pinnacle Engineering, Inc. [Creditor No. 9602469], Process Solutions & Products [Creditor No. 9602478], EPS Logistics Company [Creditor No. 9602408], Offshore Rental, Ltd. [Creditor No. 9602461], Blackwater Diving, LLC [Creditor No. 9602375], United Vision Logistics [Creditor No. 9637875], Performance Cleaning Services, LLC [Creditor No. 9602466], Failsafe Controls, LLC [Creditor No. 9602412], American Eagle Logistics [Creditor No. 9602361], Quality Energy Services, Inc. [Creditor No. 9602484], A&B Valve & Piping, LLC [Creditor No. 9785128], Stallion Offshore Quarters, Inc. [Creditor No. 9602507], Diverse Scaffold Solutions, LLC [Creditor No. 9602396], Coastal Crewboats, Inc. [Creditor No. 9602390], ArkLaTex Wireline Services, LLC [Creditor No. 9790958], Wood Group PSN, Inc. [Creditor No. 9602540], Cased Hole Well Services [Creditor No. 9602385], Predator Pressure Control and Crane Services, LLC [Creditor No. 9792106], and ANKOR E&P Holdings Corporation [Creditor No. 9792850].

C.      **Count 2: Fraudulent transfers under 11 U.S.C. §548(a)(1)**

The Complaint seeks avoidance and recovery of the value relating to the releases of the capital commitments under 11 U.S.C. §548(a)(1). *Id.* ¶¶65-69. It provides that a "Trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition." *Id.* Avoidance is authorized if the debtor "voluntarily or involuntarily":

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)
>
> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)
>
>> (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>>
>> (II) was engaged in business or a transaction, or was about the engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>>
>> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>>
>> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. §§548(a)(1)(A), (B).

Because the Motions argue that the Complaint fails to state a claim under section 548(a)(1) largely for the same reasons as the TUFTA claims, Plaintiff will not repeat those responses here.

As to the section 548 fraudulent-transfer claim, however, the Motions assert that releases of capital commitments cannot be a basis for the claim because they are not "property" that could

be transferred. Dkt. #19 at 18. This is incorrect. The Motions concede that for purposes of the definition of "transfer" in Bankruptcy Code section 101(54), whether something is "property" or not should be analyzed under Bankruptcy Code section 541.

Section 541 broadly defines property of the estate to include "all legal or equitable interests of the debtor." 11 U.S.C. §541(a)(1); *see In re MortgageAmerica Corp.*, 714 F.2d 1266, 1274 (5th Cir. 1983) ("Even on its face, section 541(a)(1) is all encompassing, and Congress meant for it to be construed commensurately."). Property of the estate includes rights to payment.[9] There are even examples of bankruptcy trustees asserting an estate's right to make capital calls on parties, clearly demonstrating that such a right is a property of a bankruptcy estate. *See, e.g.*, *Dayton Sec. Assoc. v. Sec. Grp. 1980*, 74 F.3d 1103, 1106 (11th Cir. 1996).

The Motions further argue that 11 U.S.C. §365(c)(2) prohibits a trustee from assuming a contract for "financing, such as a . . . capital contribution." Dkt. #19 at 19. But the issue is whether Northstar's release of capital commitments is a transfer, not whether a particular executory contract may be assigned. Section 365(c)(2) only prohibits assumption and assignment of certain types of executory contracts—it does not speak to whether a right to demand a capital contribution is property, or whether a release of that obligation can be a transfer under section 548. Moreover, section 365(c)(2) concerns *loans*, not capital commitments. *See* 11 U.S.C. §365(c)(2) ("The trustee may not assume . . . any executory contract . . . if . . . such contract is to make a loan, or extend other debt financing or financial accommodations . . . ."). "Section 365(c)(2) prevents the assumption of a *loan commitment or equivalent promise* because the cost of future credit depends

---

[9]    11 U.S.C. §101(5) defines "claim" to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." There can be no dispute that claims are property of the estate. *See In re NC12, Inc.*, 478 B.R. 820, 831 (Bankr. S.D. Tex. 2012).

on the probability of repayment . . . ." *In re United Airlines, Inc.*, 368 F.3d 720, 723 (7th Cir. 2004) (emph. added). "The purpose of §356(c)(2) is to protect a party who has made an unperformed *lending* commitment." *In re Charrington Worldwide Enters., Inc.*, 110 B.R. 973, 975 (Bankr. M.D. Fla. 1990) (emph. added). Capital commitments do not fall within this section and are "property" for purposes of fraudulent-transfer claims.

Further, the argument that NGP-NOG's commitment was "not Northstar's property" as it was "conditional and restricted" fails. Dkt. #19 at 19. The argument is based on an alleged lien and Northstar agreement (Exhs. E and B) that are not referenced in the Complaint and inappropriate at this stage. *Collins*, 224 F.3d at 498. In any event, the only "restrictions" identified were that the Northstar Board had to call for the funding and only use it for operations. Dkt. #19 at 20. In other words, the one party needed to call on the capital was Northstar, the debtor. This is in contrast to the case cited in the Motions, *In re Southmark Corp.*, 95 F.3d 53, at *5 (5th Cir. 1996), where the debtor's control of a note "was not unfettered" because its subsidiary had control of it. Here, Northstar had unrestricted control of whether to call the capital commitments.

### D.   Count 3: Breach of fiduciary duty (NGP Directors, Northstar Directors, and NGP-NOG)

Count 3 alleges fiduciary breaches against NGP Directors, Northstar Directors, and NGP-NOG. *Id.* ¶70-73. The Complaint alleges that these Defendants violated their duties of loyalty and care to Northstar and its creditors by having it overpay for the Creole assets; refusing to allow it to exercise its rights to millions of capital committed by NGP, NGP Directors, and Northstar Directors; and causing Northstar to release the capital commitments without receiving equivalent value in return. *Id.* ¶72.

A claim for fiduciary breach requires a plaintiff to prove two elements: a duty existed, which the defendant breached. *Bear Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).

These include the duties of good faith, loyalty, and care. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993). Directors "unquestionably owe[] fiduciary duties" to a company on whose board they serve, *Bear Research*, 8 A.3d at 601, and "are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders." *Cede*, 634 A.2d at 360. Shareholders owe a fiduciary duty if they own "a majority interest in or exercise[] control over the business affairs" of the company. *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987).

The Motions challenge the Complaint for not stating a claim for fiduciary breach against NGP Directors, Northstar Directors, and NGP-NOG. Dkt. #19 at 31-39; Dkt. #23 at 28-32. Each argument lacks merit.

> ### 1. The Complaint pleads facts to render the business judgment rule inapplicable.

The Motions argue that "Plaintiff fails to plead facts sufficient to rebut the presumption of the business-judgment rule because the facts alleged do not raise the reasonable inference that Individual Movants breached their duties of loyalty or care to Northstar." Dkt. #19 at 31; *see also* Dkt. #23 at 28 (same argument as to Northstar Directors).

The duty of loyalty "embodies not only an affirmative duty to protect the interests of the corporation, but also an obligation to refrain from conduct which would injure the corporation and its stockholders or deprive them of profit or advantage. In short, directors must eschew any conflict between duty and self-interest." *Ivanhoe*, 535 A.2d at 1345. This duty includes "the duty to address in good faith known, material risks that threaten the viability of the business." *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 860-61 (Del. Ch. 2012). The duty of care "requires a director, when making a business decision, to proceed with a 'critical eye' by acting in an informed and deliberate manner respecting the corporate merits of an issue before the board." *Ivanhoe*, 535 A.2d at 1345.

The business judgment rule creates a presumption that directors act on an informed basis (*i.e.*, with due care), in good faith, and in the honest belief that the actions taken are in the best interests of the company. *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993) (cite omitted). The presumption is overcome when a plaintiff pleads facts showing that the board "was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of the company and all of its shareholders." *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002). A showing of "any one of the *triads* of their fiduciary duty—good faith, loyalty or due care," rebuts the presumption. *Cede*, 634 A.2d at 345.

In addition, there is "no 'safe harbor' for . . . divided loyalties":

> When directors . . . are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain . . . . The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.

*Tri-Star Pictures*, 634 A.2d at 333 (cites omitted).

Here, there is no presumption of the business judgment rule. Defendant directors were on both sides of the disputed transactions. Moreover, the Complaint alleges facts that support the inference that these directors breached their fiduciary duties. The five NGP Directors (a majority of the Board) "caused Northstar to overpay for the [Creole assets]," and this "inflated sales price benefitted the NGP Directors, who had financial interests in NGP." Dkt. #1 ¶4. They "benefited personally by this self-dealing, as the next highest bidder was tens of millions below the Northstar purchase price." *Id.* ¶40. The "seller" of the Creole assets was Propel, "[a]nother NGP company," not an arm's-length seller. *Id.* ¶38. Acting in their own interests and those of NGP, the Defendant directors prevented Northstar from calling $75 million in funding from them and NGP, *id.* ¶42-43, and caused Northstar "to forgive and release the contractual obligations of NGP and the board

members without receiving reasonably equivalent value." *Id.* ¶6. The facts alleged raise the inference that the five NGP Directors controlled the Board, since Northstar's officers (also Northstar Directors) were beholden to NGP Directors, who could vote them out of a job or cut their pay. The allegations show a Board rife with potential conflicts, where interested directors with majority control used their control to benefit their employer/majority owner.

Remarkably, the Motions deny that the Complaint alleges the directors were "interested" in the transactions at issue. Dkt. #19 at 33. As to Northstar's purchase of the Creole assets, it states that the seller was an "NGP company," *id.* ¶38; NGP Directors thus were financially interested in the sale and incentivized to have Northstar overpay for the assets. The Motions argue that the Complaint "does not explain *how* Propel Energy is affiliated with any Entity Movant," Dkt. #19 at 33 (emph. added), but cite no case requiring such a pleading, nor would the exact ownership structure be readily available prior to discovery given the NGP companies' closely-held status and complex structures. On July 6, Plaintiff served document requests on Defendants relating to Propel, including the ownership interests of NGP-affiliated entities in Propel, that will bear on these issues at the appropriate stage.

Here, NGP Directors and Northstar Directors were "interested" in deals benefitting NGP. First, NGP Directors were employed by NGP, as its Motion implicitly acknowledges in arguing that it cannot conspire with related directors. Dkt. #19 at 43-44. At the time, NGP Directors were senior executives of NGP: Albin was co-founder, Ackerman was Managing Director, Hayes and Ray were Partners, and Bomer was General Counsel. These relationships make them "interested" on behalf of NGP. *See In re Tri-Star Pictures, Inc. Litig.*, 634 A. 2d 319, 328-29 (Del. 1993). Similarly, Northstar Directors were Northstar officers whose employment would be dictated by the Board controlled by NGP, making them also interested in deals benefitting NGP. Dkt. #1 ¶¶3-

7, 71; *see Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993) (director was not independent from third-party shareholders which indirectly owned a majority of the stock of the director's employer); *In re W. Nat. Corp. Shareholders Litig.*, 2000 WL 710192, at *14-15 (Del. Ch. 2000) (directors were interested because of employment contracts with shareholder). And, of course, each director was personally interested in releases of their individual capital commitments.

Ignoring these realities, the Motions claim that the Complaint does not allege that the Defendant directors "held any specific position with or ownership interest in any Entity Movant alleged to have owed the Supplemental Commitment or alleged to have been released from the Supplemental Commitment." Dkt. #19 at 34. On the contrary, it is not disputed that Northstar was owed capital commitments by NGP-NOG, an NGP company affiliated with NGP Directors, who controlled the Board and Northstar Directors through control over their jobs and salaries. The Complaint alleges that Northstar had a right to enforce "millions of dollars in capital obligations from NGP *and the directors*." Dkt. #1 ¶5 (emph. added). Nothing requires that it further identify whether the directors held these obligations through another entity they controlled. Indeed, the Motions indicate that many directors' capital commitments were held through special-purpose entities they controlled. *Compare* Dkt. #19, Exh. D at 1-2 (defining "Management Team Members" owing capital commitments as including multiple entities) *with* 8-14 (showing signature lines for directors Roberts, Freeman, Ulm, and Stevens on behalf of "Management Team Members'). This is no pleading deficiency, but at most shows fact issues for discovery. Plaintiff's recent document requests to Defendants seek documents and communications relating to the release of the capital commitments, which will shed light on these issues.

The Motions argue that the Complaint fails to allege that the "Individual Movants lacked independence." Dkt. #19 at 35. It alleges that a majority of the Board were NGP Directors and

NGP controlled the Board through its appointed directors, who had "financial interests in NGP." Dkt. #1 ¶¶3-4. It further alleges that all Northstar Directors and NGP owed capital commitments to Northstar that it released for less than reasonably equivalent value. *Id.* ¶¶5-6. In so doing, it alleges that five "individual members" of the Board—NGP Directors—lacked independence, and a majority had financial interests in the transactions at issue. This is sufficient. *See Orman v. Cullman*, 794 A.2d 5, 22 (plaintiff must plead facts showing "a *majority* of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director"). Here, all directors lacked independence as to the overpayment to Propel and release of capital commitments in connection with the Platinum sale.

## 2.    Plaintiff sufficiently alleges NGP-NOG's control of Northstar.

The Motions say the Complaint "does not plausibly allege that NGP-NOG was a controlling shareholder of Northstar." Dkt. #19 at 31-32. On the contrary, the Complaint alleges that NGP-NOG was "the controlling shareholder" of Northstar. Dkt. #1 ¶71. Nor is this allegation "implausible." With affiliate NGP X US, NGP-NOG owned "the vast majority" of Northstar. *Id.* ¶36. Indeed, the Purchase and Sale Agreement that the Motions attach shows that NGP-NOG owned over *87%* of Northstar. Dkt. #19, Exh. D, Purchase Agreement Sch. 4.3(d).

The Complaint alleges that NGP-NOG owned most of Northstar and exercised control over it. *See* Dkt. #1 ¶¶36, 45, 71. Either is sufficient to show that NGP-NOG owed fiduciary duties to Northstar. A "shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (cites/emph. omitted). The Motions cite *Xtreme Power* for the proposition that Plaintiff must allege that NGP owns "more that 50% of the voting power." Dkt. #19 at 37-38 & n.194. The Complaint does that. It alleges that NGP-NOG was the controlling and majority shareholder. Indeed, *Xtreme Power* relied on the *Kahn* decision, which states that a shareholder

owes a fiduciary duty "if it owns a majority interest." 563 B.R. at 643 (citing *Kahn*, 638 A.2d at 1113-14). NGP-NOG was a "controlling shareholder" of Northstar by any definition.

          **3.**       **The Complaint states a claim for breach of the duty of care.**

Contrary to the argument in the Motions, Dkt. #19 at 36-37, Dkt. #23 at 30-31, the Complaint plausibly alleges breaches by NGP Directors and Northstar Directors of their duty of care.

In agreeing to purchase the Creole Field assets from an NGP affiliate for over 40% more than the next-highest bidder and failing to obtain reasonably equivalent value for the release of over $75 million in capital commitments owed by NGP and the directors, one can reasonably infer that NGP Directors' and Northstar Directors' deliberative process was compromised through their efforts to benefit NGP and themselves at Northstar's expense. *See McMullin v. Beran*, 765 A.2d 910, 922 (De. 2000) ("One can reasonably infer from the factual allegations in [the] Complaint that the [Board] compromised its deliberative process by seeking to accommodate [the majority shareholder's] immediate need for cash."). The dramatic overpayment for the Creole assets by itself would raise the inference that the directors failed to adequately inform themselves about the transaction, when a much cheaper option was available. In combination with the fact that the overpayment was to an *affiliate* of NGP, the Complaint more that adequately alleges that the Board failed to exercise due care and was grossly negligent in circumstances where heightened scrutiny was required to ensure that the Board fully considered the potential conflicts and maximized value for Northstar.

The same inferences hold with respect to the release of capital commitments. In light of Northstar's severe financial deterioration and need for the more than $75 million in capital promised by NGP and the directors, it was of utmost importance for the Board to carefully consider the value Northstar obtained through release of those commitments, particularly where the releases

were provided to the Board itself and NGP. That Northstar obtained nowhere near the value committed by NGP and the directors, and was left with a $15 million working capital deficit after having provided not only the releases but a valuable net profits interest to NGP-NOG, it is reasonable to infer that the Board violated its duty of care and was grossly negligent by failing to fully inform itself of the consequences to Northstar of these insider transactions.

Further, it is noteworthy that despite elsewhere in the Motions raising inappropriate fact issues and presenting "evidence" with respect to the claims, the Motions make no attempt to justify these self-dealing transactions as the result of an adequately informed Board acting in Northstar's best interests. The Complaint states a claim for breach of the directors' duty of care.

### E.    Count 4: Breach of contract (NGP-NOG)

Count 4 alleges breach by NGP-NOG of its 2014 Letter Agreement with Northstar. Dkt. #1 ¶¶74-76. The Agreement required NGP-NOG, upon closing of the Northstar sale to Lafitte, to "pay off the [Northstar] Bank Debt and eliminate the Working Capital Deficit." *Id.* ¶53. This was in exchange for Northstar agreeing to provide a profits interest in its most promising fields to NGP-NOG. *Id.* ¶52. Instead, NGP-NOG took the profits interest, arranged for Northstar to release NGP of its substantial capital commitments, breached its contract, and left Northstar insolvent with a $15 million working capital deficit. *Id.* ¶54. Although fact disputes are irrelevant at this stage, Plaintiff vigorously disputes assertions in the Motions that NGP-NOG *did* pay Northstar what the contract required. Dkt. #19 at 42. NGP-NOG substantially underpaid that amount and did not "eliminate" the working capital deficit.

The Motion has three arguments for why the Complaint fails to state a contract claim. Dkt. #19 at 39. First, it says the Letter Agreement required NGP-NOG to eliminate a "Working Capital Deficit," not the lower-case "working capital deficit." *Id.* There is no confusion about NGP-NOG's duty. Under the Letter Agreement, it was "to pay off the [Northstar] Bank Debt and eliminate the

*Working Capital Deficit.*" *Id.*, Exh. D ¶J; Dkt. #1 ¶53 (emph. added). Indeed, the obligation was "to fully pay, satisfy and discharge the Bank Debt and eliminate the Working Capital Deficit." *Id.*, Exh. D ¶G. The Bank Debt and Working Capital Deficit at the time totaled $140 million, with $120 million in Bank Debt and $20 million of Working Capital Deficit. *Id.* ¶C. The Purchase Proceeds from the sale were stated as $103 million, *id.* ¶F, meaning that NGP-NOG "currently *estimated*" that it would have to pay $40 million to pay off the Bank Debt and Working Capital Deficit.

NGP allowed Platinum to delay the closing as the financially unsound purchaser was unable to raise enough money, but NGP was anxious to abandon the insolvent company. Dkt. #1 ¶9. Consequently, in a later side agreement, NGP and the Platinum subsidiary agreed to lower the sales price to $80 million, not $103 million. *Id.* ¶51. Northstar was not a party to that side deal. So, despite agreeing to *less* sale proceeds to apply to the Bank Debt and Working Capital Deficit, NGP-NOG did not *increase* its contribution to make up for the shortfall. Rather, NGP-NOG breached its independent obligation to Northstar by choosing *not* to "pay off" and "eliminate" both debts, leaving Northstar with about $15 million in Working Capital Deficit. *Id.* ¶¶C, G, J & §1; Dkt. #1 ¶¶8, 53, 76. The following chart summarizes these issues:

| Letter Agreement | NGP-NOG's Breach |
|---|---|
| Bank Debt ($120 million) | Bank Debt ($120 million) |
| Working Capital Deficit ($20 million) | Working Capital Deficit ($20 million) |
| Expected Platinum Proceeds of $103 million | NGP lowered Platinum Proceeds *$80 million* |
| NGP-NOG Contribution "currently estimated" at $40 million | NGP-NOG fails to *increase* its Contribution to account for less sale proceeds |
| Working Capital Deficit as a result of NGP-NOG contribution: **zero** | Working Capital Deficit remains due to NGP-NOG shortfall: (*~$20 million*) |

By not increasing its contribution after it agreed to lower the sale price to Platinum by approximately $23 million, NGP-NOG left Northstar deep in debt and breached the contract by

failing to "to fully pay, satisfy and discharge the Bank Debt and eliminate the Working Capital Deficit." Dkt. #19, Exh. D ¶G, J.

The Motions ignore NGP-NOG's obligations, in part through using an ellipsis in quoting the Letter Agreement that omits the word "eliminate" from the relevant obligation. *See* Dkt. #19 at 40 & n.26 (citing Letter Agreement ¶J, but omitting through ellipsis that paragraph J provides further that the NOG Contribution would be "used, along with the Purchase Proceeds, to pay off the Bank Debt and *eliminate* the Working Capital Deficit."). The Complaint properly alleges that NGP-NOG did not "eliminate" the working capital deficit and breached the Letter Agreement.

Second, NGP-NOG repeats its first argument that "Plaintiff has not alleged that NGP-NOG failed to pay the Working Capital Deficit—as that term is defined in the Contract—that it was required to pay at the closing." Dkt. #19 at 41. Again, the Complaint alleges that NGP-NOG "breached the contract by failing to eliminate the working capital deficit," and quotes the Letter Agreement's use of the upper-case "Working Capital Deficit." Dkt. #1 ¶7, ¶53. NGP-NOG cannot claim to be confused by the terms of an agreement that it cites in its Motion. *See, e.g.*, Dkt. #19 at 40 (citing Letter Agreement ¶¶C, J).

Finally, NGP-NOG argues that the Complaint fails to state a claim for breach because it "has not alleged that NGP-NOG failed to pay the NOG Contribution that the Contract required it to pay," "[n]or can it make that allegation because NGP-NOG did in fact pay the NOG Contribution." *Id.* at 42. The argument is meritless. The Complaint does not need to use the term "NOG Contribution"—which the contract defines as the amount to pay off the Bank Debt and eliminate the Working Capital Deficit—because the Complaint repeatedly alleges that NGP-NOG failed to "eliminate the working capital deficit." Dkt. #1 ¶76. By definition, NGP-NOG failed to pay the NOG Contribution by failing to eliminate the working capital deficit.

The Letter Agreement defines the required payment from NGP-NOG as follows:

> In order to facilitate the closing of the transactions contemplated in the Purchase Agreement (the "Closing"), and in satisfaction of the obligations of the Members with respect to the Bank Debt and Working Capital Deficit thereunder, NOG shall contribute to [Northstar] an amount equal to the Bank Debt and the Working Capital Deficit (currently estimated to be approximately $40,000,000) (the "NOG Contribution") contemporaneously with the Closing to be used, along with the Purchase Proceeds, to pay off the Bank Debt and eliminate the Working Capital Deficit.

Dkt. #19, Exh. D ¶J (emph. removed). In other words, the parties agreed that "NOG Contribution," then "estimated" at $40 million, would be whatever was needed when combined with the Platinum purchase funds (then expected to be $103 million) to "pay off the Bank Debt and eliminate the Working Capital Deficit." This never happened. NGP-NOG's payment did not eliminate the working capital deficit, Dkt. #1 ¶76, and accordingly the NOG Contribution was not made. It is not necessary to describe it as not paying the "NOG Contribution," as opposed to not eliminating the "Working Capital Deficit"; the breach is the same. At most, this argument presents fact issues on whether the Working Capital Deficit was "eliminated" and NOG Contribution sufficient.

### F.      Count 5: Conspiracy (all Defendants)

Count 5 alleges a conspiracy among NGP, NGP Directors, and Northstar Directors to commit fiduciary breaches and cause fraudulent transfers. *Id.* ¶¶77-79.

The Motion argues that NGP-affiliated directors could not conspire with NGP entities to the extent the Complaint alleges that Ackerman, Albin, Bomer, Ray, and Hayes were officers or agents of NGP. *See* Dkt. #19 at 44. Tellingly, this contradicts the Motion's earlier argument that the Complaint does not allege how NGP Directors were affiliated with NGP. *Id.* at 10. In any event, the argument fails because it ignores other members of the conspiracy. The Complaint alleges that NGP and NGP Directors conspired with Northstar officers Roberts, Freeman, Stevens,

and Ulm. And the Motion does not dispute that NGP defendants can conspire with non-NGP defendants.

Moreover, the Complaint does not allege that NGP Directors were acting as NGP agents when they breached their fiduciary duties to Northstar and caused fraudulent transfers. Indeed, they were acting as *Northstar* directors. There is nothing inconsistent with claiming that NGP Directors were acting for Northstar but improperly acted in their own and NGP's interests. That NGP Directors can act in other capacities, such as agents of NGP, does not insulate them from liability for conspiracy to commit fiduciary breach and fraudulent transfers. Otherwise, a director would be insulated from liability simply by employment with another company.

The Motions argue that the Complaint fails to specify the illicit agreement among Defendants. Dkt. #19 at 44. Agreements to conspire may be inferred from the circumstances. *See In re Enron Corp. Sec., Derivs., & ERISA Litig.*, 761 F. Supp. 2d 504, 562 (S.D. Tex. 2011). Plaintiff will not repeat the relevant allegations here, but the Complaint's allegations show a common purpose among Defendants to benefit NGP and themselves at the expense of Northstar. It details how Defendants agreed to act and carried through with those actions. In many instances leading up to Northstar's bankruptcy, Defendants jointly caused it to overpay for assets of an NGP affiliate; refused to permit it to call on capital commitments of Defendants, even when its financial condition had deteriorated substantially; and caused it to release over $75 million in funding commitments owed by Defendants for less than reasonably equivalent value. These circumstances show concerted self-dealing and actions to benefit themselves and NGP at Northstar's expense, approved by the Defendant directors.

They say, "There is no cause of action for conspiracy to commit a fraudulent transfer." Dkt. #19 at 44. Actually, Texas law does recognize a claim for conspiracy to cause fraudulent

transfers. *See, e.g., Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 384 (Tex. App.—
Houston [1st Dist.] 2012, no pet.) ("We hold that Essex has raised a material fact issue on each of
the elements of its claim against Beverly for conspiracy to violate TUFTA."); *Biliouris v.
Sundance Resources, Inc.*, 559 F. Supp. 2d 733, 740 (N.D. Tex. 2008) ("Plaintiffs have stated a
claim for fraudulent transfer under TUFTA. Therefore, Plaintiffs' surviving claim for fraudulent
transfer serves as a sufficient predicate for derivative liability."); *Laxson v. Giddens*, 48 S.W.3d
408, 410-11 (Tex. App.—Waco 2001, pet. denied) (violation of a Texas statute is an "unlawful
act" sufficient to support a claim for civil conspiracy). At a minimum, Defendants are liable to the
extend they benefitted, directly or indirectly, from the fraudulent transfers. *Mack v. Newton*, 737
F.2d 1343, 1361 (5th Cir. 1984).

### G.      Count 6: Aiding and abetting (all Defendants)

Finally, Count 6 alleges aiding and abetting liability as to all Defendants for fiduciary
breaches and fraudulent transfers. *Id.* ¶¶80-81. Defendants' main attack is their earlier (mistaken)
argument that there was no breach of fiduciary duty. Dkt. #19 at 45.

The Motions also argue, incorrectly, that Texas law does not recognize a claim for aiding
and abetting fraudulent transfers. *Id*. In this Circuit, aiding and abetting liability for fraudulent
transfers permits "recovery of the property transferred or its value from one who is, directly or
indirectly, a transferee or the recipient itself." *Mack v. Newton*, 737 F.2d 1343, 1361 (5th Cir.
1984). All Defendants got direct or indirect benefits from the fraudulent transfers at issue. NGP
and NGP Directors benefitted directly or indirectly from Northstar's overpayment to Propel for
the Creole assets. All Defendants benefitted directly or indirectly from Northstar's releases of
NPG-NOG and Defendant directors from the capital commitments. Accordingly, all Defendants
at least have aiding and abetting liability to the extent they benefitted from fraudulent transfers.

## CONCLUSION

For these reasons, Defendants' Motions to Dismiss should be denied in their entirety.

Date: July 13, 2018

Respectfully submitted,

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Robert K. Ellis
State Bar No. 24076367
rellis@yettercoleman.com
Wyatt J. Dowling
State Bar No. 24074152
wdowling@yettercoleman.com
YETTER COLEMAN LLP
811 Main, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (Fax)

John F. Higgins
State Bar No. 09597500
jhiggins@porterhedges.com
Eric M. English
State Bar No. 24062714
eenglish@porterhedges.com
PORTER HEDGES LLP
1000 Main St., 36th Floor
Houston, Texas 77002
(713) 226-6000
(713) 226-6248 (fax)

ATTORNEYS FOR PLAINTIFF
JAMES KATCHADURIAN, LITIGATION TRUSTEE
NORTHSTAR LITIGATION TRUST

## CERTIFICATE OF SERVICE

It is certified that on this July 13, 2018, a copy of the foregoing was served through the Court's Electronic Case Filing System to all parties who have entered an appearance in this adversary proceeding, in accordance with Federal Rule of Bankruptcy Procedure 7005.

*/s/ Robert K. Ellis*

Robert K. Ellis