**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 16-34028 |
| | § | |
| NORTHSTAR OFFSHORE GROUP, LLC | § | |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |

| | | |
|---|---|---|
| JAMES KATCHADURIAN, Litigation | § | |
| Trustee, on behalf of Northstar Litigation | § | |
| Trust, | § | |
| | § | ADVERSARY NO. 18-03079 |
| Plaintiff, | § | |
| v. | § | |
| | § | Jury |
| NGP ENERGY CAPITAL | § | |
| MANAGEMENT, LLC; NGP X US | § | |
| HOLDINGS, L.P.; NGP NATURAL | § | |
| RESOURCES X, L.P.; NGP X PARALLEL | § | |
| HOLDINGS, L.P.; NGP NATURAL | § | |
| RESOURCES X PARALLEL FUND, L.P.; | § | |
| NOG ROYALTY HOLDINGS, LP; | § | |
| CHRISTOPHER RAY; JESSE BOMER; | § | |
| TOMAS ACKERMAN; DAVID ALBIN; | § | |
| DAVID HAYES; S. GLYNN ROBERTS; | § | |
| GAYLON FREEMAN; MARK STEVENS; | § | |
| and JAMES P. ULM, II, | § | |
| | § | |
| Defendants. | § | |

**REPLY IN SUPPORT OF
<u>MOVANTS' MOTION TO DISMISS PLAINTIFF'S ORIGINAL COMPLAINT</u>**
[Relates to Dkt. Nos. 19, 39]

Defendants NGP Energy Capital Management, L.L.C., NGP X US Holdings L.P., NGP

Natural Resources X, L.P., NGP X Parallel Holdings, L.P., NGP Natural Resources X Parallel

Fund, L.P., and NOG Royalty Holdings, L.P. (together, "<u>Entity Movants</u>"), and Christopher Ray,

Jesse Bomer, Tomas Ackerman, David Albin, and David Hayes (together, "<u>Individual Movants</u>")

(collectively, "<u>Movants</u>") file their Reply in support of their Motion to Dismiss Plaintiff's

Original Complaint [Dkt. 19].  Movants ask that this Court dismiss with prejudice all claims

asserted against them by James Katchadurian, Trustee of the Northstar Litigation Trust

("Plaintiff") in Plaintiff's Original Complaint [Dkt. 1] (the "Complaint").

## I.      Introduction

Plaintiff fails to address in his Response[1]—nor can he cure—at least the following fatal

defects that the Complaint contains:

1.  Control:  Plaintiff's legal conclusion that Movants "controlled" Northstar requires
    the impermissible factual leap that, merely because Individual Movants held an
    unspecified *affiliation* with Entity Movants, Individual Movants could not act
    independently of Entity Movants in decisions that Individual Movants made as
    managers of Northstar.   Plaintiff's bald conclusion of control is a factual
    insufficiency under Rule 8 warranting dismissal of Plaintiff's fraudulent-transfer
    claims that rely on such an unjustified inference of "control."

2.  Rule 9(b):  Plaintiff's allegations that Movants "caused" Northstar to make
    fraudulent transfers renders *Movants'* actual intent a necessary element of
    Plaintiff's actual fraudulent-transfer claims.  Plaintiff claims that Movants' actual
    fraudulent intent—via Movants' alleged "control" over Northstar—was
    Northstar's actual fraudulent intent.  Because he fails to plead Movants' actual
    intent with the particularity Rule 9(b) requires, Plaintiff fails to state claims for
    actual fraudulent transfer.

3.  Rule 8(a):  Plaintiff's failure to distinguish Defendants' individual roles in the
    alleged fraudulent transfers violates Rule 8(a)'s prohibition against group
    pleading.  Plaintiff *admits* in his Response that he pleads his fraudulent-transfer
    claims using "groups."  His fraudulent-transfer claims should be dismissed.

4.  Standing under 11 U.S.C. § 544(b):  Plaintiff fails to plead the existence of a
    single unsecured creditor necessary to give him standing to assert fraudulent-
    transfer claims under 11 U.S.C. § 544(b).  Not one of the creditors that he
    improperly alleges for the first time in his Response existed at the time of the
    transfers that are the basis for his fraudulent-transfer claims.  So, no creditor could
    have been defrauded by any of the alleged transfers.  Plaintiff lacks standing to
    assert claims under 11 U.S.C. § 544(b).

5.  Benefit from transfers:  Plaintiff admits that no Movant was a transferee of the
    purchase price that Northstar paid to Propel Energy L.L.C. ("Propel Energy") for
    oil and gas assets in the Creole Field (the "Creole Assets").  He has no legal basis

---

[1] Trustee's Consolidated Opposition to Defendants' Motion to Dismiss [Dkt. 39] (Plaintiff's "Response").

for recovery from Movants when he pleads no facts supporting his naked conclusion that Movants "benefitted" from that purchase. His fraudulent-transfer claims against Movants based on Northstar's payment to Propel Energy should be dismissed.

6.    <u>Transferees of capital commitments</u>:  Plaintiff's claim that Northstar's release of capital commitments was a fraudulent transfer is facially implausible against any Movant other than NOG Royalty Holdings, L.P. ("<u>NGP-NOG</u>").  The pleadings demonstrate that no other Movants owed a capital commitment to Northstar at the time of the release.  Plaintiff's fraudulent-transfer claims based on Northstar's release of capital commitments should be dismissed against all Movants other than NGP-NOG.

7.    <u>Transfer of NGP-NOG's capital commitment</u>:  Northstar's release of NGP-NOG's capital commitment is not subject to a fraudulent-transfer claim under the Texas Uniform Fraudulent Transfer Act ("<u>TUFTA</u>").  Public records show that Wells Fargo Bank held a valid lien on that capital commitment that fully encumbered it.  Because a debtor's property that is encumbered by a valid lien is not a "transfer" under TUFTA, Northstar's release of NGP-NOG's capital commitment cannot be legally actionable under TUFTA.

8.    <u>Discovery rule</u>:  Plaintiff's improper attempt to allege the discovery rule for the first time in his Response cannot save his fraudulent-transfer claim under Tex. Bus. & Com. Code § 24.006(b).  The Complaint contains not a single fact supporting the discovery rule's application.  Nor can the discovery rule ever apply to defer the accrual of a claim under § 24.006(b).  The one-year statute of limitations bars Plaintiff's claim under § 24.006(b).

9.    <u>Insolvency</u>:  Plaintiff merely regurgitates his legal conclusion that Northstar was "insolvent" at the time of the transfers he alleges.  Plaintiff has access to Northstar's financial records, yet he pleads *no facts whatsoever* supporting his conclusion of "insolvency."  And his own allegations in the Complaint render any claim of insolvency facially implausible.  Plaintiff's claims for constructive fraudulent transfer should be dismissed.

10.    <u>Fiduciary duty of loyalty</u>:  Plaintiff's allegation—improperly raised for the first time in his Response—that Individual Movants "were employed with NGP" is exactly the type of affiliation that Delaware law rejects as insufficient to rebut the business-judgment rule.  Plaintiff alleges no facts explaining how Individual Movants appeared on both sides of any alleged transactions or received any personal financial benefit from them.  Nor is there a single fact explaining how Individual Movants' alleged, but unspecified, "financial interests" in Entity Movants sterilized Individual Movants' discretion as Northstar managers. Plaintiff's claims for breach of the fiduciary duty of loyalty should be dismissed.

11. <u>Fiduciary duty of care</u>:  Plaintiff fails to plead even elements—much less facts—of a claim for breach of the duty of care.  The Complaint alleges breaches of the duty of loyalty only.  And there is no allegation *anywhere* that Individual Movants acted with gross negligence—an essential element of a claim for breach of the duty of care—in the process by which they made decisions as Northstar managers.  Plaintiff fails to plead a cause of action for breach of the duty of care.

12. <u>Breach of contract</u>:  The contract at issue does not contain the obligation Plaintiff claims NGP-NOG breached.  Rather, Plaintiff wrongly contends that a *recital* in the contract can expand the actual contractual obligations.  Plaintiff has not pleaded that NGP-NOG breached its obligation to pay the amount of money the contract required it to pay at the closing of the sale of Northstar to Lafitte Energy Corp. ("<u>Lafitte Energy</u>").  Plaintiff fails to state a claim for breach of a term of the contract.

13. <u>Conspiracy</u>:  There is no cause of action for conspiracy to commit fraudulent transfers under Texas law.  And Individual Movants cannot, as a matter of law, conspire with Entity Movants to the extent that Plaintiff alleges Individual Movants were Entity Movants' officers or agents.  Plaintiff's bald conclusion of an "agreement" fails to plausibly allege elements of a conspiracy claim.  His conspiracy claim should be dismissed.

14. <u>Aiding and abetting</u>:  There is no cause of action for aiding and abetting fraudulent transfers.  Plaintiff mistakes the ability to recover from transferees under TUFTA with a cause of action under an aiding and abetting theory.  Plaintiff fails to state a claim for aiding and abetting.

Faced with the insurmountable hurdle of salvaging these legally and factually deficient claims, Plaintiff resorts to (1) creating new factual allegations not pleaded anywhere in the Complaint; (2) masquerading legal conclusions as factual allegations; and (3) hoping that discovery will uncover facts to support his unfounded legal conclusions.  Plaintiff cannot rely on new allegations that he did not plead in his Complaint.[2]  Plaintiff also rebrands the Complaint's conclusory allegations as factual allegations, claiming that this Court must accept them as true.[3] But "the tenet that a court must accept as true all of the allegations contained in a complaint is

---

[2] *Gipson v. Deutsche Bank Nat. Tr. Co.*, No. 3:13-CV-4820-L, 2015 WL 2079514, at *1 (N.D. Tex. May 4, 2015) ("[T]hese specific allegations of fraud raised in Plaintiff's response to Defendant BDFTE's motion, and again in his objections, are not a part of his pleadings and therefore not properly before the court.").

[3] *See* Plaintiff's Response at 1, 16, 21.

inapplicable to legal conclusions."[4]  Legal conclusions must be accepted as true only when they are supported by factual allegations—which are exactly what the Complaint entirely omits.[5]  Nor can any reasonable inference result from Plaintiff's naked conclusions.  It is only "*factual* content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[6]

Plaintiff claims that his pleading deficiencies are "fodder for discovery" and that discovery "will bear on these issues at the appropriate stage."[7]  But there is no "appropriate stage" for discovery on claims that violate Rule 8.[8]  Plaintiff's claims are implausible on their face—and thus violate Rule 8—because (1) the Complaint contains only conclusions absent factual allegations; and (2) the pleadings demonstrate that Plaintiff's claims are legally invalid.  "Because [Plaintiff's] complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise."[9]

The legal and factual deficiencies inherent in Plaintiff's claims reflect their base absurdity.  The transactions in question predate Northstar's bankruptcy case by a number of years, and the latest of those transactions provided tens of millions of dollars of additional capital to Northstar.  In fact, Plaintiff has not alleged that a single creditor in existence at the time of the transactions was in existence as of the petition date of Northstar's bankruptcy.  And Plaintiff now

---

[4] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (explaining that the burden rests on the plaintiff to provide a complaint with "enough factual matter (taken as true) to suggest that [the plaintiff] is entitled to relief.").

[6] *Ashcroft*, 556 U.S. at 678 (emphasis added).  *See also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) ("[W]e will not strain to find inferences favorable to the plaintiffs and we will not accept conclusory allegations, unwarranted deductions, or legal conclusions.").

[7] Plaintiff's Response at 16, 29.

[8] *See Ashcroft*, 556 U.S. at 678-79 (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

[9] *Id.* at 686.

apparently has abandoned his allegations in the Complaint that Movants knew or should have known that Lafitte Energy's parent company, Platinum Partners, was a "Ponzi scheme"[10]—a fraud that was only uncovered in 2016.[11]  Plaintiff acknowledges that, in connection with the September 22, 2014, sale of Northstar to Lafitte Energy, Northstar paid off its existing bank debt.[12]  Plaintiff further acknowledges that NGP-NOG contracted with Northstar to fund at the closing of the sale—and did in fact fund—a contractually agreed-upon amount sufficient to pay off Northstar's major bank creditor in full and to provide additional working capital for Northstar.[13]  It was Platinum Partners that apparently chose not to use the funds NGP-NOG provided at closing to pay Northstar's debts.  It was Platinum Partners that chose to unwind Northstar's hedge agreement.[14]  If any of Northstar's creditors were later defrauded, it was Platinum Partners that defrauded them.  Thus, the only plausible explanation for Northstar's bankruptcy is that, in the midst of the global crash in commodity prices, unbeknownst to everyone and this Court, Platinum Partners' actions subsequent to the 2014 transaction resulted in the circumstances which precipitated Northstar's filing of a Chapter 11 bankruptcy case. There is no legal theory that would make Movants liable for a bankruptcy that happened *two years after* Movants provided Northstar with tens of millions of dollars in additional working capital and left Northstar in a financial position as to which no facts are alleged—nor could they be alleged—to support a claim of insolvency.  Plaintiff's claims against Movants should be dismissed because Plaintiff fails to state plausible claims against them.

---

[10] *See* the Complaint ¶ 50.

[11] *See* Complaint filed in Cause No. 16-cv-6848 in the United States District Court for the Eastern District of New York, Exhibit A to Movants' Motion to Dismiss.

[12] The Complaint ¶¶ 41, 51, 53-54.

[13] *Id*. ¶¶ 51, 53.

[14] *See id*. ¶ 56 (alleging that, *after* the sale of Northstar to Lafitte Energy, "Northstar agreed with BP to unwind its hedge agreement prematurely at a significant loss.").

## II.    Argument and Authorities

**A.    Plaintiff fails to state a claim for fraudulent transfer against Movants.**

**1.    Plaintiff's conclusion that Movants caused Northstar to make fraudulent transfers is implausible without factual allegations demonstrating that Movants controlled Northstar.**

Plaintiff ignores the premise underlying his fraudulent-transfer claims against Movants when claiming that Movants' conduct is not an element of a fraudulent-transfer claim.[15]  The underlying premise of Plaintiff's fraudulent-transfer claims is that Movants used their "control" over Northstar to "cause" Northstar to make fraudulent transfers.[16]  But absent factual allegations showing that Movants *could cause* Northstar to make fraudulent transfers, such a premise that Movants "caused" Northstar to make fraudulent transfers is implausible on its face.

Plaintiff mistakes a factual insufficiency for a legal insufficiency when arguing that only Northstar's conduct is an element of a fraudulent-transfer claim under TUFTA and 11 U.S.C. § 548.    Plaintiff's failure to plead *facts* that would allow a reasonable inference of control is a factual insufficiency under Rule 8.[17]  Plaintiff makes plausibly alleging Movants' control over Northstar relevant—and necessary to pleading plausible fraudulent-transfer claims—by claiming that Movants "caused" Northstar to make the fraudulent transfers he alleges.[18]

Movants could only "cause" Northstar to make fraudulent transfers if Movants "controlled" Northstar.  But Plaintiff pleads nothing more than bald allegations of control.  He pleads that Individual Movants had an unspecified *affiliation* with Entity Movants—that Individual Movants were "NGP-related directors"[19]—but pleads no facts indicating *how* that

---

[15] Plaintiff's Response at 12.

[16] The Complaint ¶¶ 38-39, 45, 61, 67.

[17] *See Ashcroft*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

[18] *See* The Complaint ¶¶ 38-39, 45, 61, 67.

[19] The Complaint ¶ 3.

affiliation influenced Individual Movants.[20]  For example, there are no allegations regarding what financial interest, if any, Individual Movants held in Entity Movants, whether Entity Movants had any influence over compensation that Individual Movants received for serving as managers of Northstar, whether Entity Movants owned any of Northstar's clients or customers, or whether Individual Movants received any extraordinary compensation from Entity Movants for serving as Northstar managers.[21]  There are simply no "particularized facts" necessary to allow any reasonable inference that Movants "controlled" Northstar.[22]

And despite Plaintiff's incorrect attempt to limit Delaware law, the allegation that some Entity Movants were investors in Northstar does not make Plaintiff's conclusory allegations regarding control plausible.  "It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."[23]  Plaintiff stresses that *one* Delaware case applying this "well-settled Delaware law"—*In re KKR Financial Holdings LLC Shareholder Litig.*—involved a nominating stockholder who owned

---

[20] *See Official Committee of Unsecured Creditors v. Meltzer*, 1:17-CV-256-NT, 2018 WL 212 3558, at *6 (D. Me. May 8, 2018) ("Allegations that a director has a relationship with a third party do not suffice absent some indication of how that affiliation influenced the director's decision-making.") (applying Delaware law).

[21] *See, e.g.*, *Friedman v. Beningson*, No. 12232, 1995 WL 716762, at *5-*6 (Del. Ch. Dec. 4, 1995) (holding that plaintiff pleaded facts indicating a "reasonable doubt" sufficient to excuse demand in shareholder derivative suit alleging that one director dominated board where the plaintiff pleaded that the director held 36% percent of company's stock; served as company's Chairman, CEO, and President; determined the amount of consulting fees another director received; served as general partner of and owned 25% of the company's principal customer; received "very large interest-free loans" from the company that "approximate[d] 50% of [the company's] total revenues" for that year; and settled a federal class action lawsuit in which he was a named defendant using only company funds and no personal contribution); *In re MAXXAM, Inc.*, 659 A.2d 760, 774 (Del. Ch. 1995) (lack of independence found on five-member special committee where plaintiff pleaded that owner of controlling shareholder of company—who also served as chairman of the board and CEO of company—compensated one director—who had just emerged from a personal bankruptcy—through annual lucrative consulting contract; another director received annual income and multi-million-dollar bonus as chairman of a different company owned by owner of controlling shareholder; and third director received lucrative consulting fees).

[22] *See Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) (under Delaware law, a plaintiff asserting the "control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling'").

[23] *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014), *aff'd sub nom*, *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015) (citing cases).

only a small amount of stock.[24]   But *KKR* never held—nor did it imply—that a director's independence was contingent on the amount of stock the nominating stockholder owned.   In fact, *KKR* cited to multiple cases finding that a director does not lack independence merely because a stockholder—even a controlling stockholder—nominated him.[25]

Absent the "particularized facts" necessary to plausibly allege Movants' "control" over Northstar's board, Plaintiff's fraudulent-transfer claims dependent on that theory fail to state a claim.[26]

### 2.   Rule 9(b) applies to Plaintiff's actual fraudulent-transfer claims because Plaintiff seeks to impute Movants' intent to Northstar.

Plaintiff's contention that only Northstar's intent is relevant to his actual fraudulent-transfer claims under Tex. Bus. & Com. Code § 24.005(a)(1) and 11 U.S.C. § 548(a)(1)(A) ignores the premise underlying those claims.[27]   Plaintiff alleges that *Movants' intent is Northstar's intent* by claiming that "NGP," the "NGP Directors," and "Defendants" "caused" Northstar to make the alleged fraudulent transfers.[28]   Because of that underlying factual premise

---

[24] Plaintiff's Response at 13.  *See KKR*, 101 A.3d at 983.

[25] *See KKR*, 101 A.3d at 996 (citing *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (finding that directors who were "personally selected" by a 47% stockholder did not lack independence); *Frank v. Elgamal*, 2014 WL 957550, at *22 (Del. Ch. Mar. 10, 2014) ("Merely because a director is nominated and elected by a large or controlling stockholder does not mean that he is necessarily beholden to his initial sponsor."); *Blaustein v. Lord Baltimore Capital Corp.*, 2013 WL 1810956, at *18 n.114 (Del. Ch. Apr. 30, 2013) (stating that allegations that a director was appointed to the board by and has consistently voted with alleged controller are insufficient to challenge the director's independence), *aff'd*, 84 A.3d 954 (Del. 2014); *Western Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *15 (Del. Ch. May 22, 2000) ("As a preliminary matter, I note that even if American General nominated some of the outside directors ... such nomination, without more, does not mandate a finding that these directors were beholden to American General....")).

[26] *See Orman*, 794 A.2d at 22 (under Delaware law, a plaintiff asserting the "control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling'"); *Miramar Firefighters Pension Fund v. AboveNet, Inc.*, 7376-VCN, 2013 WL 4033905, at *3 (Del. Ch. July 31, 2013) (allegations that directors "succumbed" to a party's desire or "acquiesced in" that party's plan are "insufficient to raise a reasonable inference that [the directors] were beholden to, or controlled by, [that party]").

[27] *See* Plaintiff's Response at 17-18.

[28] The Complaint ¶ 38 ("In 2012, using its control over Northstar, *NGP* caused the Board to overpay for NGP assets for *NGP's* benefit…. Padding its profits from the sale of this field would give *NGP* both immediate accounting benefits and a reputational boost in raising funds.") (emphasis added); ¶ 40 ("The *NGP Directors* benefitted

---

seeking to impute Movants' intent to Northstar, *Movants'* alleged "actual intent to hinder, delay, or defraud any creditor"—which Plaintiff claims was Northstar's alleged intent—is an element of Plaintiff's actual fraudulent-transfer claims.[29]

In each of the cases Plaintiff cites where a court declined to apply Rule 9(b), the intent of the defendant transferees was irrelevant to the fraudulent-transfer claim at issue because the plaintiff in those cases alleged that the defendant transferees were merely passive recipients of fraudulently transferred funds.[30]  There was no allegation that the defendant transferees "caused" the debtor to make the transfers at issue.  Here, however, Plaintiff *asserts that the actual fraudulent intent of Movants is the actual fraudulent intent of the debtor, Northstar*.[31]  So, under Plaintiff's actual fraudulent-transfer claims *as he has alleged them*, Plaintiff can only plausibly allege Northstar's "actual intent to hinder, delay, or defraud any creditor" by plausibly alleging Movants' "actual intent to hinder, delay, or defraud any creditor" of Northstar.[32]  Courts in the

---

personally by this self-dealing….") (emphasis added); ¶ 61 ("*Defendants* used their control of Northstar to transfer those funds out of Northstar for the benefit of *Defendants*.") (emphasis added); ¶ 68 ("Northstar's release of the funding obligations of *NGP* and individual directors was intended to hinder, delay, or defraud Northstar's creditors and avoid *NGP* being tainted with a Northstar bankruptcy.") (emphasis added).

[29] *See In re Life Partners Holdings, Inc.*, No. 15-40289-RFN11, 2017 WL 5599485, at *5 (N.D. Tex. Nov. 17, 2017) (acknowledging that actual fraudulent-transfer claims under Tex. Bus. & Com. Code § 24.005(a)(1) and 11 U.S.C. § 548(a)(1)(A) require that Plaintiff plead facts showing that a debtor transferred assets "with actual intent to hinder, delay, or defraud any of the debtor's creditors").

[30] *Taylor v. Cmty. Bankers Sec.*, LLC, CIV.A. H-12-02088, 2013 WL 3166336, at *7 (S.D. Tex. June 20, 2013) ("Notably, the receiver has not alleged that any of the defendants in this action committed fraudulent acts, only that they received proceeds gained by fraud."); *Fawaz v. Byers*, CIV.A. H-13-0897, 2014 WL 1671746, at *5 (S.D. Tex. Apr. 28, 2014) (plaintiff alleged fraudulent intent of *debtors* in inducing the transfer of funds received by defendant transferee); *AAB Logistics, Inc. v. Forward Air, Inc.*, 3:15-CV-3840-G, 2016 WL 8672773, at *10 (N.D. Tex. Nov. 18, 2016) ("In a fraud claim, the plaintiff must show that the defendant had both 'knowledge' of the fraud and an 'intention to induce reliance.' In contrast, in a fraudulent transfer claim, the defendant's intent or conduct is irrelevant."); *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, 2009 WL 5173954, at *10 (N.D. Tex. 2009) ("Plaintiffs have merely alleged that Moving Defendants were the recipient of funds fraudulently obtained. Nothing in the complaint or record indicates that Moving Defendants committed any fraudulent act that caused the funds to be transferred."); *Janvey v. Alguire*, 846 F. Supp. 2d 662, 676 (N.D. Tex. 2011) (same).

[31] *See* the Complaint ¶¶ 38, 40, 61, 68.

[32] *See In re Life Partners*, 2017 WL 5599485, at *5.

Fifth Circuit have held that, when it is necessary to establish the actual intent of the debtor, as is the case with Plaintiff's actual fraudulent-transfer claims, Rule 9(b) should apply.[33]

In an attempt to allege Northstar's fraudulent intent, Plaintiff now claims, in conclusory fashion and improperly for the first time in his Response, that Northstar made fraudulent transfers to "insiders."[34] But Plaintiff never pleaded this "badge of fraud"[35] in the Complaint. Rather, the only "badges of fraud" that Plaintiff pleaded—that the consideration was not reasonably equivalent to the value of the asset transferred and that Northstar was insolvent—are not sufficient to allege actual intent to hinder, delay, or defraud creditors because those are elements of a constructive fraudulent-transfer claim.[36] And in any event, Plaintiff fails to state

---

[33] *Id.* at *7 ("With regard to the applicability of the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure to Counts 1 and 3, the court disagrees with the bankruptcy judge. Clearly, counts that involve claims of actual fraud, such as Counts 1 and 3, invoke the heightened pleading requirements of Rule 9(b)."); *Vision Bank v. Jordan*, 3:11-CV-2065-B, 2012 WL 716097, at *3 (N.D. Tex. Mar. 5, 2012) (citing cases) ("Although the Fifth Circuit has not definitively held that fraudulent transfer claims fall within the purview of Rule 9(b), this Court has noted that where plaintiffs seek to establish the actual intent of the debtor, the enhanced pleading requirements of Rule 9(b) should apply."); *Think3 Litig. Tr. v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 197 (Bankr. W.D. Tex. 2015) (following other courts in applying Rule 9(b) to actual fraudulent-transfer claims under 11 U.S.C. § 548(a)(1)(A)).

[34] Plaintiff's Response at 18.

[35] *See* Tex. Bus. & Com. Code Ann. § 24.005(b) (West 2017) (providing that, "[i]n determining actual intent…, consideration may be given, among other factors, to whether: (1) transfer or obligation was to an insider; (2) debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation incurred, the debtor had been sued or threatened with a suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the asset to an insider of the debtor"); *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 551 (D. Del. 2005) (badges of fraud under 11 U.S.C. § 548 are (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control, or dominion by the debtor; and (6) secrecy or concealment of the transaction).

[36] *See In re Brown Med. Ctr., Inc.*, 552 B.R. 165, 171 (S.D. Tex. 2016) (dismissing claim for actual fraudulent transfer under Texas Uniform Fraudulent Transfer Act and 11 U.S.C. § 548 because the only badges of fraud that the plaintiff pleaded with particularity were insolvency and lack of reasonably equivalent value, and the plaintiff therefore failed to state a claim for actual fraudulent transfer rather than constructive fraudulent transfer).

actual fraudulent-transfer claims because he fails to plead Movants' actual intent—which he claims to be Northstar's actual intent—with the particularity that Rule 9(b) requires.[37]

### 3.     Plaintiff violates Rule 8(a)'s prohibition against group pleading.

Even if Rule 9(b) did not apply to Plaintiff's actual fraudulent-transfer claims (which it does), Plaintiff's actual and constructive fraudulent-transfer claims violate Rule 8(a).  "[A]ny reference by a plaintiff to defendants collectively in a complaint fails to satisfy the pleading standards of Rule 8(a)."[38]   Plaintiff admits that he "uses three *groups* [of Defendants] for convenience" and that, "[f]or the specific transactions at issue, each *group* is addressed separately as to their roles in the events and benefits derived."[39]   This contention is false.  The Complaint repeatedly alleges that "Defendants"—defined as all Defendants in this action—caused Northstar to make the alleged fraudulent transfers:

- "*Defendants* used their control of Northstar to transfer those funds out of Northstar for the benefit of *Defendants*."[40]

- "*Defendants* also hindered Northstar's creditors by securing releases of capital contributions committed to Northstar…."[41]

- "*Defendants* signed an agreement for Northstar to release Defendants from their obligations to provide more than $75 million in capital to the desperate company. *Defendants* caused Northstar to sign the release of these valuable capital obligations…."[42]

---

[37] *See* Movants' Motion to Dismiss at 21-23.

[38] *In re Life Partners Holdings, Inc.*, 2017 WL 5599485, at *3 (citing *Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir. 1999)).  *See also Gurganus v. Furniss*, 3:15-CV-03964-M, 2016 WL 3745684, at *5 (N.D. Tex. July 13, 2016) ("In addition to being conclusory and formulaic, this type of group pleading fails to meet the pleading requirements of Federal Rule of Civil Procedure 8."); *Del Castillo v. PMI Holdings N. Am. Inc.*, 4:14-CV-3435, 2015 WL 3833447, at *6 (S.D. Tex. June 22, 2015) ("A complaint does not satisfy the requirements of *Iqbal* and *Twombly* by lumping together all defendants, while providing no factual basis to distinguish their conduct.").

[39] Plaintiff's Response at 19 (emphasis added).

[40] The Complaint ¶ 61 (emphasis added).

[41] *Id.* (emphasis added).

[42] *Id.* ¶ 67 (emphasis added).

Regardless, however, sub-grouping Defendants violates Rule 8(a) because, by definition, sub-grouping fails to distinguish Defendants' *individual* roles in the alleged fraudulent transfers.[43]   Plaintiff claims that, [w]hen the conduct of specific Defendants is relevant, the Complaint names them individually."[44]   But the only citations to these alleged individual references are to causes of action *other than Plaintiff's fraudulent-transfer claims*.[45]   Plaintiff's fraudulent-transfer claims violate Rule 8(a)'s proscription against group pleading.   They should be dismissed.

### 4.   Plaintiff lacks standing to assert fraudulent-transfer claims under 11 U.S.C. § 544(b).

Plaintiff claims standing to assert his TUFTA claims in Count 1 of the Complaint under 11 U.S.C. § 544(b).   But Plaintiff's standing to avoid a fraudulent transfer under § 544(b) is "derivative of an actual unsecured creditor's rights."[46]   Thus, to have standing to assert a claim under § 544(b)—a threshold issue—Plaintiff must first establish the existence of an actual creditor holding an allowable unsecured claim who could have avoided the alleged transfer under state law.[47]   "[T]he cases make clear that the facts must be pleaded sufficient to identify at least

---

[43] *See Freuler v. Parker*, CIV.A. H-10-3148, 2012 WL 896414, at *2 (S.D. Tex. Mar. 14, 2012) ("Moreover Plaintiff continues to fail to distinguish Defendants' individual roles with respect to all the claims and continues to indulge in prohibited group pleading, alleging identical facts against each."), *aff'd*, 517 F. App'x 227 (5th Cir. 2013).

[44] Plaintiff's Response at 19.

[45] *See id*. at 19 (citing to allegations regarding Plaintiff's claims for breach of fiduciary duty and breach of contract).

[46] *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 479 B.R. 405, 410 (N.D. Tex. 2012).

[47] *In re Tryit Enterprises*, 121 B.R. 217, 222 (Bankr. S.D. Tex. 1990) (chapter 11 debtors, which sought to avoid alleged transfers as fraudulent conveyances under Texas law, failed to allege that they had standing to pursue cause of action under 11 U.S.C. §544 permitting debtor to avoid transfer that is voidable under applicable law by unsecured creditor because they did not allege or present any evidence at trial that there existed a creditor who could have brought action and to whose status debtors could succeed); *In re Panama Williams, Inc.,* 211 B.R. 868, 872 (Bankr. S.D. Tex. 1997) (chapter 11 debtor-corporation could not avoid liens placed on its property by lender, under TUFTA, applicable by 11 U.S.C. §544, because debtor failed to prove by preponderance of evidence that any unsecured creditor held unsecured claim against debtor on dates on which transfers occurred).

the class or categories of creditors that could assert a [§ 544] fraudulent transfer claim."[48] Therefore, where, as here, a plaintiff fails to identify at least one unsecured creditor that could assert a fraudulent transfer claim in its complaint, dismissal is required.[49]

On the face of the Complaint, Plaintiff has not only failed to plead a *single fact* to reflect that a "triggering" unsecured creditor exists to permit an action under § 544, but he also has failed to even *allege* the existence of a triggering unsecured creditor.  Apparently recognizing this pleading defect, Plaintiff now alleges—improperly for the first time in his Response—that "there are numerous creditors holding an allowable unsecured claim who could avoid the transfers in question, as reflected on the Claims Register in this case."[50]  He cites to certain alleged unsecured creditors as apparent "examples" of triggering creditors.[51]  But Plaintiff's attempt to now establish the existence of a triggering creditor only emphasizes the fatality of that omission in the Complaint.

Notably, *Lange v. Regions Bank (In re Westbury Community Hospital LLC)*,[52] the one case Plaintiff cites, did not address the issue here: Plaintiff's failure to allege the existence of a triggering creditor for purposes of establishing standing under 11 U.S.C. § 544(b).  Instead, in *In re Westbury Community Hospital LLC*, this Court held that creditors did not have standing to

---

[48] *Jacobs v. American Safe Retirements, LLC (In re Life Partners Holdings, Inc.)*, Case No. 15-04110, 2017 WL 5591632 at *6 (N.D. Tex. Nov. 17, 2017) *accord. In re Petters Co*., 550 B.R. 438, 444 (Bankr. D. Minn. 2016) ("[T]o meet the plausibility standard for fact-pleading under current Supreme Court precedent, a trustee must identify in his complaint, by name, one or more such predicate creditors.") (citing *Twombly*, 550 U.S. at 547 and *Ashcroft*, 556 U.S. at 678).

[49] *See e.g., Jacobs*, 2017 WL 5591632 at *6 (dismissing § 544 fraudulent transfer counts where complaint failed "sufficient[ly] to identify at least the class or categories of creditors that could assert a fraudulent transfer claim"); *Jacobs v. 72 Vest Level Three LLC (In re Life Partners Holdings, Inc.)*, Case No. 15-40289, 2017 WL 5599485 at *6 (N.D. Tex. Nov. 17, 2017) (dismissing fraudulent transfer counts where "plaintiffs simply [made] the conclusory statement that 'Life Partners' creditors, or the Investors, could have brought the state law fraudulent transfer claims now asserted'") *accord. In re Petters Co*., 550 B.R. at 444 (dismissing complaint where Chapter 11 trustee failed to plead existence of predicate unsecured creditor under § 544).

[50] Plaintiff's Response at 23.

[51] *Id*. at 23 n.8.

[52] Adv. Pro. No. 12-03476, 2013 WL 6054798, at *2 (Bankr. S.D. Tex. Nov. 15, 2013).

pursue fraudulent-transfer actions because the claims were part of the debtor's estate and, therefore, the chapter 11 trustee was the proper party to assert such claims.[53]   While § 544 *permits* a trustee to assert a fraudulent-transfer action under state law, nothing in the Bankruptcy Code negates a trustee's burden to sufficiently plead its cause of action, including the assertion and supporting facts to establish the existence of a triggering unsecured creditor under § 544(b), and thus proper standing to actually assert the claim.[54]   Accordingly, Plaintiff's untimely attempt to now plead the existence of triggering creditors is fatal to his TUFTA claims asserted under § 544(b), and they must be dismissed.[55]

> ### 5.   Plaintiff cannot recover from Movants for the purchase price paid to Propel Energy for the Creole Assets absent factual allegations demonstrating that Movants received a direct and quantifiable benefit.

Plaintiff concedes that Movants were not transferees of Northstar's payment of the purchase price for the Creole Assets to Propel Energy.[56]   Therefore, TUFTA and the Bankruptcy Code would allow recovery from Movants for the purchase price paid to Propel Energy *only* if Northstar paid the purchase price to Propel Energy for the benefit of Movants.[57]   To plausibly allege—as Rule 8 requires—that the payment of the purchase price to Propel Energy was made

---

[53] *Id.*

[54] *See Jacobs*, 2017 WL 5591632 at *6 (dismissing § 544 fraudulent transfer counts where litigation trustee's complaint failed "sufficient[ly] to identify at least the class or categories of creditors that could assert a fraudulent transfer claim"); *72 Vest Level Three LLC*, 2017 WL 5599485 at *6 (same); *In re Petters Co*., 550 B.R. at 444 (dismissing complaint where Chapter 11 trustee failed to plead existence of predicate unsecured creditor under § 544); *In re Coors of North Mississippi, Inc.*, 66 B.R. 845, 859 (Bankr. N.D. Miss. 1986) ("[T]he proposition that the debtor in possession can resort to § 544(b) without the benefit of the 'triggering unsecured creditor' is simply erroneous.").

[55] Notably, even if this Court were to consider the alleged triggering creditors listed in the Plaintiff's Response – which it should not – Plaintiff still fails to allege that any such creditor's unsecured claim existed as of September 2012 or September 2014, the dates of the alleged fraudulent transfers.  And, in any event, a review of the cited creditors' corresponding proof of claims reflects that *none* of the claims existed as of the dates of the alleged fraudulent transfers.

[56] Plaintiff's Response at 14.

[57] *See* Tex. Bus. & Com. Code Ann. §§ 24.008, 24.009 (West 2017) (allowing recovery for fraudulent transfers against a transferee or the person for whose benefit the transfer was made); 11 U.S.C. § 550(a)(1)-(2) (allowing recovery for a transfer avoided under 11 U.S.C. § 544(b) only from a transferee or the entity for whose benefit the transfer was made).

for the benefit of Movants, Plaintiff must allege *facts* explaining how or why that purchase was made for Movants' benefit.[58]  Plaintiff wholly fails to do so.

In the Complaint, Plaintiff alleges *no facts whatsoever* supporting his conclusory allegations that Individual Movants "benefitted personally" from the purchase of the Creole Assets or that the purchase was made "for [Entity Movants'] benefit."[59]  Plaintiff now improperly alleges for the first time in his Response that Propel Energy "is an investment owned and controlled by [Entity Movants], as documented in SEC filings."[60]  But this new allegation—which is nothing more than a legal conclusion—cannot satisfy Plaintiff's burden under Rule 8 to plead supporting *facts*.[61]

And regardless, at most, Plaintiff's new conclusory allegation implies only that Entity Movants "benefitted" in some incidental, unquantifiable manner because money was paid to one of their investments.  The connection is even more remote and tenuous between any "benefit" that Plaintiff implies Individual Movants received from the money paid to Propel Energy.  Plaintiff alleges—again in conclusory fashion and without any supporting facts—that Individual Movants "had financial interests in [Entity Movants]."[62]  Thus, at most, Plaintiff implies only that Individual Movants "benefitted" from money paid to an investment belonging to entities in which Individual Movants held unspecified "financial interests."

Even assuming these conclusory allegations of "benefits" are true—which this Court is not bound to do—these alleged benefits are not the kind of "tangible or quantifiable benefit[s]"

---

[58] *See Clapper v. Am Realty Inv'rs, Inc.*, 3:14-CV-2970-D, 2016 WL 302313, at *12-13 (N.D. Tex. Jan. 25, 2016) (dismissing claim under TUFTA against defendants who were not transferees of assets fraudulently transferred when there were no facts explaining how the alleged fraudulent transfers resulted in any benefit to any defendant).

[59] *See* the Complaint ¶¶ 38, 40.

[60] Plaintiff's Response at 14.

[61] *See Clapper*, 2016 WL 302313, at *12-13.

[62] The Complaint ¶ 4.

needed to support recovery against Movants.[63]  Nor do they bear "the necessary correspondence to the value of the property" Plaintiff alleges was transferred to Propel Energy.[64]  Because Plaintiff concedes that Movants were not transferees of the purchase price paid to Propel Energy and fails to plead facts alleging any direct or quantifiable resulting "benefit" to Movants, Plaintiff has failed to plausibly allege any legal basis that would allow him to recover from Movants.  Plaintiff's fraudulent-transfer claims based on Northstar's payment to Propel Energy should be dismissed.

### 6.  Plaintiff's claim that the release of any Movant from a capital commitment, except NGP-NOG, was a fraudulent transfer is implausible when the pleadings demonstrate that no other Movant owed a capital commitment at the time of the release.

Plaintiff does not dispute the *fact* that NGP-NOG was the only Movant that owed a capital commitment as of September 22, 2014, which was the effective date of the Contract[65] containing Northstar's releases of capital commitments.[66]  Instead, Plaintiff challenges the

---

[63] *See In re Int'l Mgmt. Assoc.*, 399 F.3d 1288, 1292-93 (11th Cir. 2005) (whatever benefit one shareholder obtained when, in order to satisfy condition placed by lender on extension of credit to bankrupt corporation, corporation repurchased its allegedly worthless stock from its other shareholder for sum of $100,000 and thereby enabled this first shareholder to gain sole control over corporation's assets, as reduced by its $100,000 payment to second shareholder, was not the kind of quantifiable benefit needed to support recovery against first shareholder, following avoidance of this stock repurchase transaction as fraudulent transfer, on theory that first shareholder was "entity for whose benefit" the fraudulent transfer was made).  *See also id.* at 1292 ("The paradigm case of a benefit under § 550(a) is the benefit to a guarantor by the payment of the underlying debt of the debtor."); *In re Finley, Kumble,* 130 F.3d 52, 57 (2d Cir. 1997) (stating that the phrase "entity for whose benefit such transfer was made" usually "references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds").

[64] *See, e.g., Mack v. Newton,* 737 F.2d 1343, 1359-60 (5th Cir. 1984) (rejecting as too broad the trustee's allegation that the principals in a partnership had received an incidental benefit from auctioning off cattle and using the proceeds to operate their dairy enterprise, deeming this "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received").

[65] The Contract is Exhibit D to Movants' Motion to Dismiss [Dkt. 19].  Plaintiff claims in a footnote that "several Defendants" owed capital commitments to Northstar "as of Nov. 8, 2013."  Plaintiff's Response at 15 n.6.  But four of the Defendants Plaintiff identifies—Roberts, Freeman, Ulm, and Stevens—are not Movants.  The only Movant that Plaintiff identifies—NGP X US—did owe a capital commitment to Northstar as of November 8, 2013 but, as explained in Movants' Motion to Dismiss, no longer owed a capital commitment as of September 22, 2014—the effective date of the releases of the capital commitments—because it assigned its capital commitment to NGP-NOG in a prior assignment.  *See* Movants' Motion to Dismiss at 14; Exhibit C to Movants' Motion to Dismiss.

[66] *See* Plaintiff's Response at 15.  Curiously, Plaintiff comments that Movants "call" September 22, 2014 the effective date of the Contract.  *Id.*  But the Contract—which Plaintiff concedes is part of the pleadings—provides that it is conditioned upon the closing of the sale of Northstar to Lafitte Energy Corp.  The Contract ¶ 8, Exhibit D to

---

admissibility of the pleadings demonstrating that fact and claims that fact is not a "pleading deficiency" violating Rule 8.[67]  But Plaintiff's fraudulent-transfer claims based on the releases are implausible on the face of the pleadings against any Movant other than NGP-NOG and for that reason violate Rule 8.

As fully explained in Movants' Motion to Dismiss, documents that are part of the pleadings—and therefore can be considered by this Court in deciding a Rule 12(b)(6) motion—demonstrate that NGP-NOG was the only Movant who owed a capital commitment to Northstar as of the effective date of the Contract containing the releases.[68]  Because NGP-NOG was the only Movant owing a capital commitment when Northstar released the capital commitments, the capital commitments were not property that could be transferred to any Movants except NGP-NOG.[69]  Likewise, because no Movants except NGP-NOG were transferees of the releases of the capital commitments or benefitted from the releases, Plaintiff cannot recover against any Movant other than NGP-NOG for the capital commitment.[70]

The pleadings demonstrate that Plaintiff's fraudulent-transfer claims based on the releases are facially implausible against Movants (except NGP-NOG).  By definition, facial implausibility is a pleading deficiency under Rule 8.  Under Rule 8, the pleadings must state a

---

Movants' Motion to Dismiss.  Plaintiff pleads that the closing occurred on September 22, 2014, and further pleads that the Contract "became effective upon the sale closing in September 2014."  The Complaint ¶¶ 51, 67.  And to the extent that Plaintiff claims that September 22, 2014 is not the effective date of the Contract for purposes of determining the accrual date for a fraudulent-transfer claim, he cannot recover for any transfer that occurred prior to August 12, 2014, the date that is two years prior to the petition date of Northstar's bankruptcy.  *See* 11 U.S.C. § 548.

[67] Plaintiff's Response at 15-16.

[68] *See* Movants' Motion to Dismiss at 13-16; Exhibits B, C, and D to Movants' Motion to Dismiss.  For the reasons explained in Movants' Motion to Dismiss and in Movants' Response to Plaintiff's Motion to Strike, filed simultaneously with this Reply, Exhibits B and C are admissible as part of the pleadings that this Court may consider in determining Movants' Motion to Dismiss.

[69] *See* TEX. BUS. & COM. CODE ANN. § 24.002(2) (West 2017) (defining an "asset" subject to a fraudulent-transfer claim under TUFTA as property of the debtor); *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58 (1990) (defining "an interest of the debtor in property" under the Bankruptcy Code as "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.").

[70] *See* TEX. BUS. & COM. CODE ANN. §§ 24.008, 24.009 (West 2017); 11 U.S.C. § 550(a) (both allowing recovery for fraudulent transfers only against a transferee or the person or entity for whose benefit the transfer was made).

claim that is "plausible on its face."[71]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[72]  Here, the factual content of the pleadings does not allow any inference that Northstar *could release* Movants (except NGP-NOG) from capital commitments because no Movant other than NGP-NOG owed a capital commitment.  Because Counts 1 and 2 of the Complaint alleging that the releases of capital commitments were fraudulent transfers are implausible on the face of the pleadings against any Movant other than NGP-NOG, they should be dismissed against all Movants except NGP-NOG.

> **7.  NGP-NOG's capital commitment was not an asset subject to transfer under TUFTA because it was fully encumbered by a valid lien.**

Plaintiff's fraudulent-transfer claims in Count 1 of the Complaint based on the release of NGP-NOG's capital commitment are implausible on their face because public records— documents of which this Court may take judicial notice—show that the release of NGP-NOG's capital commitment was not a "transfer" under TUFTA.[73]   So, contrary to Plaintiff's recycled objection that this legal defect is not a "pleading deficiency,"[74] the facial implausibility of those fraudulent-transfer claims renders them deficient under Rule 8 and warrants their dismissal.

Plaintiff questions how Northstar could have released capital commitments "[i]f Northstar had no right to the commitments because they were 'fully encumbered by a valid lien.'"[75]  This assertion wrongly assumes that, under TUFTA, property encumbered by a valid lien is not property belonging to the debtor.  But TUFTA simply limits *what property belonging*

---

[71] *Twombly*, 550 U.S. at 570.

[72] *Ashcroft*, 556 U.S. at 678.

[73] *See* Movants' Motion to Dismiss at 16-18; Exhibits E-F to Movants' Motion to Dismiss.  As explained in Movants' Motion to Dismiss and Movants' Response to Plaintiff's Motion to Strike, this Court may take judicial notice of Exhibits E-F because they are public records.

[74] Plaintiff's Response at 16.

[75] *Id.*

*to a debtor* is subject to a fraudulent-transfer claim.  It does not define or determine what property a debtor owns.  TUFTA provides that only "assets" can be transferred.[76]  TUFTA defines an "asset" as "property of a debtor," but explains that "the term does not include…property to the extent it is encumbered by a valid lien."[77]  So the term "asset"—the only property that is subject to a "transfer" under TUFTA—does not include property of the debtor that is encumbered by a valid lien.  Nothing in this definition provides or implies that a debtor, such as Northstar, does not own property such as a capital commitment that is encumbered by a valid lien.   In fact, such a definition would be nonsensical because a lender, such as Wells Fargo, could not create a lien on property that Northstar did not own.

Plaintiff further claims that the UCC financing statement that Wells Fargo filed with the Delaware Secretary of State on November 8, 2013 does not show that Northstar's capital commitments were "fully" encumbered by Wells Fargo's lien.[78]  But on its face, the financing statement covers "all assets of the Debtor [identified as Northstar], whether now existing or hereafter arising."[79]  The termination of Wells Fargo's security interest was not filed until April 1, 2015.[80]  Therefore, as of September 22, 2014—the effective date of Northstar's release of NGP-NOG's capital commitment—Wells Fargo held a valid lien that fully encumbered the capital commitment.  For that reason, Northstar's release of NGP-NOG's capital commitment

---

[76] Tex. Bus. & Com. Code Ann. § 24.002(12) (West 2017) (A "transfer" "means every mode,…of disposing of or parting with an *asset or an interest in an asset*….") (emphasis added).
[77] *Id*. at § 24.002(2)(A) (West 2017).
[78] Plaintiff's Response at 17.
[79] *See* Exhibit E to Movants' Motion to Dismiss.
[80] *See* Exhibit F to Movants' Motion to Dismiss.

was not a "transfer" under TUFTA.[81]  Absent any "transfer" under TUFTA, Plaintiff's claims

under TUFTA based on that release are not plausible claims for relief and should be dismissed.

> **8.      The discovery rule cannot save Plaintiff's fraudulent-transfer claim under Tex. Bus. & Com. Code § 24.006(b).**

The discovery rule cannot defer the accrual of the one-year statute of limitations barring

Plaintiff's constructive fraudulent-transfer claim under Tex. Bus. & Com. Code § 24.006(b).  As

an initial matter, Plaintiff cannot rely on the discovery rule because he never pleaded it—or a

*single fact* that would support it—in the Complaint.[82]

But more importantly, the discovery rule cannot, as a matter of law, apply to defer the

accrual of the statute of limitations for claims under § 24.006(b).  Section 24.010, which

provides limitation periods for TUFTA claims, is a statute of repose rather than a statute of

limitations.[83]   While statutes of limitation bar enforcement of a right, a statute of repose

extinguishes the right altogether.[84]  Because it is impossible to defer the accrual of a right that

has been extinguished, the discovery rule cannot apply to a statute of repose, such as § 24.010.[85]

Section 24.010(a)(1) does, however, expressly preserve a limited one-year discovery rule

*only* for actual fraudulent-transfer claims under § 24.005(a)(1).[86]  Courts uniformly hold that this

---

[81] *See Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 414-16 (5th Cir. 2009) (holding that, because sale proceeds were encumbered by a valid lien, the payment of the sale proceeds was not a transfer under TUFTA and vacating the district court's judgment on the plaintiff's fraudulent transfer claim).

[82] *See Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 625, 640 (S.D. Tex. 2007) ("Under Federal Rule of Civil Procedure 8 Plaintiffs' simple allegation of their 'discovery of the scheme to defraud' is insufficient, especially as there is no suggestion that Plaintiffs were unaware of their injuries at the time, or very soon after, they were suffered."); *Resolution Tr. Corp. v. Boyar, Norton & Blair*, 796 F. Supp. 1010, 1014 (S.D. Tex. 1992) ("Since the RTC failed to plead facts showing that it could not have discovered, in the exercise of reasonable care and diligence, the facts establishing the elements of this cause of action, the discovery rule is not a proper defense to a limitations bar.");

[83] *Nathan v. Whittington*, 408 S.W.3d 870, 874 (Tex. 2013).

[84] *Vega v. U.S.*, 512 F. Supp. 2d 853, 860 (W.D. Tex. 2007).

[85] *See id.*

[86] Tex. Bus. & Com. Code Ann. § 24.010(a)(1) (West 2017) (providing that claims "under Section 24.005(a)(1)" are "extinguished" unless brought within four years or "if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant[.]").

limited discovery rule does not apply to any fraudulent-transfer claims except claims under § 24.005(a)(1).[87]  Consistent with this black-letter law, each of the cases Plaintiff cites addresses the discovery rule solely with regard to claims under § 24.005(a)(1).[88]  Plaintiff cites no case— nor can he—applying the discovery rule to claims under § 24.006(b).  Because the discovery rule cannot preserve Plaintiff's claim under § 24.006(b), that claim is barred and should be dismissed.

### 9.    Plaintiff pleads only conclusions devoid of facts regarding Northstar's insolvency at the time of each alleged transfer.

Plaintiff claims that "the Complaint directly pleads insolvency" but quotes nothing more than bald conclusions.[89]  The legal term "insolvent" is not a factual allegation, and this Court need not accept as true such a legal conclusion nor make any inference from it.[90]  Plaintiff's constructive fraudulent-transfer claims require that Northstar was insolvent at the time of the

---

[87] *Janvey v. Suarez*, 978 F. Supp. 2d 685, 705 (N.D. Tex. 2013) ("Section 24.010(a)(2) of TUFTA expressly references constructive fraud claims brought under section 24.006(a), and states that such an action is extinguished unless it is brought "within four years after the transfer was made or the obligation was incurred." Unlike the preceding subsection (a)(1), which only references actual intent fraud claims brought under section 24.005(a)(1), section 24.010(a)(2) does not include a one-year discovery rule…. It is therefore apparent that Plaintiffs' pleading of facts to invoke the discovery rule has no application to their constructive fraud claim under TUFTA's statute of limitations."); *Walker v. Anderson*, 232 S.W.3d 899, 909–10 (Tex. App.—Dallas 2007, no pet.) ("Although similar to subsection 24.010(a)(1), subsections 24.010(a)(2) and (3) do not prevent claims from being extinguished when they are brought within one year after the transfer or obligation was or could reasonably have been discovered. That last provision in section 24.010(a)(1), which states "or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant," is unique to section 24.005(a)(1)."); *Ching Enters., Inc. v. Barahona*, No. 14-14-00171-CV, 2016 WL 4706074, at *4 (Tex. App.—Houston [14th Dist.] Sept. 8, 2016, pet. denied) ("The TUFTA statute of repose provides that a cause of action brought under either section 24.005(a)(2) or section 24.006(a) is extinguished if not brought within four years after the transfer was made. This section of the statute does not contain a discovery rule.").

[88] *See* Plaintiff's Response at 22 (citing *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 195 (5th Cir. 2013) (recognizing that "a claim under section 24.005(a)(1) of TUFTA has been held to accrue only when the claimant discovers or reasonably could have discovered the fraudulent nature of the conveyance."); *Janvey v. Romero*, 817 F.3d 184, 188 (5th Cir. 2016) (discussing the one-year discovery rule under § 24.010(a)(1), which only applies to claims "under Section 24.005(a)(1) of [TUFTA]…."); *Janvey v. Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d 825, 829 (N.D. Tex. 2011) (acknowledging that "the Receiver brings his claim under section 24.005(a)(1)" and discussing the application of the one-year discovery rule in § 24.010(a)(1)).

[89] Plaintiff's Response at 21 (quoting the Complaint ¶ 5 (alleging Defendants "acknowledged the company was insolvent, inadequately capitalized, and unable to pay its debts as they came due"); ¶ 7 ("Throughout this time, Northstar was insolvent, inadequately capitalized, and unable to pay its debts as they came due.")).

[90] *See Ashcroft*, 556 U.S. at 678-79.

transfer or became insolvent as a result of the transfer.[91]  Insolvency can be proven in two ways: (1) by showing that "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation," or (2) by showing that the debtor "is generally not paying the debtor's debts as they become due."[92]  At most, the Complaint merely *recites* these legal tests when alleging that "Northstar was insolvent, inadequately capitalized, and unable to pay its debts as they came due."[93]  There is *not a single fact* pleaded that establishes either of these tests.

Nor can Plaintiff rely on any allegation that Movants "acknowledged [Northstar] was insolvent."[94]  This allegation, as with Plaintiff's other conclusory allegations that Northstar was "insolvent," is a legal conclusion not entitled to any presumption of truth.[95]  It alleges no facts showing that Northstar *was actually insolvent*.  As the litigation trustee of Northstar's bankruptcy estate, Plaintiff has access to Northstar's financial records.  Yet he fails to present *any* financial data showing that Northstar was actually insolvent *at any point in time* when Movants were affiliated with Northstar.  "Without a specific reference to [Northstar's] financial condition at the time—which [Plaintiff] should be capable of making in light of his access to [Northstar's] financial books and records—[Plaintiff] cannot plausibly show that [Northstar] was insolvent at the time of the transfers."[96]

Indeed, Plaintiff's own allegations render any claim of insolvency at the time of the alleged transfers facially implausible.  Plaintiff does not even *allege*—much less plead facts showing—that Northstar was insolvent when it purchased the Creole Assets or became insolvent

---

[91] *See* Tex. Bus. & Com. Code Ann. § 24.006 (West 2017); 11 U.S.C. § 548(a)(1)(B).

[92] *Id*. at § 24.003(a), (b) (West 2017); *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 387 (5th Cir. 2017).

[93] The Complaint ¶¶ 5, 7.

[94] *Id*. at ¶ 5.

[95] *See Ashcroft*, 556 U.S. at 678.

[96] *In re ATP Oil & Gas Corp.*, 711 F. App'x 216, 223 (5th Cir. 2017) (finding that "Plaintiff cannot plausibly show that ATP was insolvent at the time of the transfers" when "Plaintiff failed to present any financial data showing that ATP was actually insolvent or had little capital when making the [transfers]").

as a result of that purchase.  Plaintiff pleads that Northstar purchased the Creole Assets in September 2012.[97]  Yet over *a year later*, as Plaintiff pleads, "[i]n November 2013, Northstar obtained a $120 million short-term bank loan from Wells Fargo."[98]  Common sense dictates that no bank would loan any money to Northstar—much less $120 million—if Northstar was insolvent or was in any danger of becoming insolvent.  Indeed, Northstar was able to pay off the $120 million loan in 2014 after the sale closed, further undermining any possibility of insolvency at that time.  And in fact, Northstar did not file for bankruptcy for nearly *four years* after it purchased the Creole Assets and nearly *two years* after it released NGP-NOG's capital commitment.[99]  Not only has Plaintiff failed to plausibly allege that Northstar was insolvent at the time of the alleged transfers that are basis for his fraudulent-transfer claims, but he *cannot* plausibly allege insolvency.  Plaintiff therefore fails to state claims for constructive fraudulent transfer in Counts 1 and 2 of the Complaint.

**B.** **Plaintiff fails to state a claim for breach of fiduciary duty against Individual Movants.**

Plaintiff's legal conclusions and new allegations—allegations appearing *nowhere* in the

---

[97] The Complaint ¶ 39.

[98] *Id.* ¶ 41.

[99] *In re Northstar Offshore Group, LLC*, Case No. 16-34028, Doc. 1 (S.D. Tex. Aug. 12, 2016) (Involuntary Petition).  *See e.g., Committee of Unsec. Creditors v. Motorola (In re Iridium Operating, LLC)*, 373 B.R. 283, 349 (Bankr. S.D.N.Y. 2007) ("Courts examining the question of adequate capital also place great weight on the ability of the debtor to obtain financing.  The fact that [the debtor] closed on three syndicated bank loans and raised over $2 billion in the capital markets [after the alleged fraudulent transfer] is an indication of both solvency and capital adequacy."); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1071 (3d Cir. 1992) (finding no fraudulent transfer and stating that lower court property considered debtor's availability to obtain financing after the alleged fraudulent transfer).  Further, after the 2014 sale of Northstar, on or about April 2, 2015, the First National Bank of Central Texas ("FNBCT") entered into that certain Letter of Credit Loan Agreement with Northstar GOM Holdings Group LLC ("Northstar Holdings") and the Debtor, whereby FNBCT agreed to cause other financial institutions to issue up to $30 million in letters of credit for the benefit of Northstar Holdings and/or the Debtor.  *See* Debtor's Disclosure Statement [Bankr. Dkt. 983] at Art. C (1)(b).  Also after the 2014 sale, Argonaut Insurance Company ("Argonaut") issued 5 bonds totaling $23,139,586.10 to the Debtor as a principal or indemnitor, which bonds are supported by two letters of credit obtained by the Debtor on April 6, 2015 from BBVA Compass and Comerica Bank for the benefit of Argonaut.  Debtor's Disclosure Statement [Bankr. Dkt. No. 983] at Art. C (1)(c).  *See also*, Argonaut Proof of Claim filed in the Northstar bankruptcy case [Claim No. 48]; Argonaut Sale Objection [Bankr. Dkt. No. 615].  *See Mellon Bank, N.A. v. Metro Comms., Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) (considering debtor's ability to obtain financing after the alleged fraudulent transfer in concluding that there was no fraudulent transfer).

Complaint—fail to rebut the business-judgment rule protecting Individual Movants.  To rebut the business-judgment rule on a 12(b)(6) motion to dismiss, the alleged *facts* must raise the reasonable inference that the board of directors breached either its (1) duty of loyalty; or (2) duty of care.[100]  Because he pleads *no such facts*, Plaintiff fails to rebut the business-judgment rule and thus fails to state a claim for breach of fiduciary duty against Individual Movants.

> **1.**   **Plaintiff fails to plead facts plausibly suggesting that Individual Movants breached their duty of loyalty.**

To rebut the presumption that directors always act in a loyal manner, a plaintiff must allege *facts* demonstrating that the individual directors were either (1) interested in the transaction at issue; or (2) lacked independence to oppose its consummation.[101]

> **a.**   **There are no facts showing that Individual Movants were interested in any transaction at issue.**

The only allegations Plaintiff pleads regarding Individual Movants' "interest" are exactly the type of allegations Delaware law rejects as insufficient to rebut the business-judgment rule. "Interest," for purposes of rebutting the business-judgment rule, means "that directors can neither appear on both sides of the transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[102]  But Delaware law "reject[s] the proposition that a plaintiff can rebut the business judgment rule…by alleging that the directors own material amounts of common stock, *or are dual-fiduciaries who owe competing duties to a large equity holder or even a sole or controlling stockholder*."[103]

---

[100]  *In re Xtreme Power Inc.*, 563 B.R. 614, 642 (Bankr. W.D. Tex. 2016).

[101]  *Id.* at 632.

[102]  *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002).

[103]  *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 190 (Del. Ch. 2014) (emphasis added).

Plaintiff claims—improperly for the first time in his Response—that Individual Movants were "'interested' in deals benefitting NGP" because they "were employed by NGP[.]"[104]  But at most, this allegation demonstrates only that Individual Movants could have owed *competing duties* to Entity Movants—precisely what will *not* rebut the business-judgment rule.  There are no factual allegations whatsoever explaining how Individual Movants appeared on both sides of any transactions at issue or received any personal financial benefits from them.[105]

In particular, Plaintiff alleges no facts explaining how any Individual Movant appeared on both sides of Northstar's purchase of the Creole Assets from Propel Energy or received any personal financial benefit from it.  There is no allegation that any Individual Movant held any position with or ownership interest in Propel Energy.  Plaintiff claims that Individual Movants "were financially interested in the sale and incentivized to have Northstar overpay for the assets."[106]  But he alleges no facts that would explain *how* Individual Movants could personally financially benefit from a price paid to an entity—Propel Energy—that Plaintiff does not claim Individual Movants owned any interest in.

Plaintiff alleges no facts explaining how Individual Movants appeared on both sides of, or received any personal financial benefit from, Northstar's release of capital commitments or

---

[104] Plaintiff's Response at 29.  Plaintiff claims that Movants' Motion to Dismiss "implicitly acknowledges" that Individual Movants were employed by Entity Movants when "arguing that [Entity Movants] cannot conspire with [Individual Movants]. *Id.*  To the contrary, Movants expressly made that argument contingent on whether Plaintiff actually claimed that Individual Movants were officers or agents of Entity Movants.  *See* Movants' Motion to Dismiss at 44 ("Therefore, to the extent that Plaintiff claims that Individual Movants were officers or agents of Entity Movants, Individual Movants cannot, as a matter of law, conspire with Entity Movants.").

[105] The two cases Plaintiff cites further highlight the insufficiency of Plaintiff's conclusory allegations regarding interest.  *See* Plaintiff's Response at 30.  In *Rales v. Blasband*, the Delaware Supreme Court held that, for purposes of determining whether demand was excused in shareholder derivative lawsuit, "the amended complaint alleges *particularized facts* sufficient to create a reasonable doubt that Sherman and Ehrlich, as members of the Board, are capable of acting independently of the Rales brothers.") 634 A.2d 927, 937 (Del. 1993) (emphasis added).  In the other case—*In re Western National Corp. Shareholders Litig.*—the court expressly noted "the dearth of evidence sullying these inside directors' independence from American General" but determined that it "will not consider [the directors] disinterested based on the stipulated facts outlined above for purposes of this summary judgment motion.").  No. 15927, 2000 WL 710192, at *15 (Del. Ch. May 22, 2000).

[106] Plaintiff's Response at 29.

any alleged refusal to cause Northstar to enforce capital commitments.   No Individual Movant owed capital commitments to Northstar.[107]   Apparently recognizing this fact, Plaintiff suggests for the first time in his Response that Individual Movants owed capital commitments "through" NGP-NOG, the only Movant that owed a capital commitment at the time of the release.[108]   But Plaintiff's vague allegation that Individual Movants were "affiliated with" NGP-NOG fails to plausibly suggest that Individual Movants personally benefitted from a release of NGP-NOG's capital commitment.[109]   There are no facts alleged allowing any reasonable inference that Individual Movants were interested in any transaction made the basis for Plaintiff's claim for breach of fiduciary duty.

> ### b.   There are no facts showing that Individual Movants lacked independence.

Plaintiff's "[g]eneral allegations of domination over [Northstar's board] are simply not sufficient under Delaware law to state a traditional duty of loyalty claim."[110]   The inquiry relevant to determining whether a director is independent "asks not whether the director has derived some benefit from the transaction, but rather whether the director's decision resulted from the director being controlled by another."[111]   To raise a question concerning the independence of a particular board member, a plaintiff asserting the "control of one or more directors must allege *particularized facts* manifesting 'a direction of corporate conduct in such a

---

[107] *See supra*, discussion in II(A)(6).

[108] Plaintiff's Response at 30.

[109] *Id.*

[110] *Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, CIV.A. 20228-NC, 2004 WL 1949290, at *10 (Del. Ch. Aug. 24, 2004).  *See also Miramar Firefighters Pension Fund v. AboveNet, Inc.*, C.A. 7376-VCN, 2013 WL 4033905, at *3 (Del. Ch. July 31, 2013) (allegations that directors "succumbed" to a party's desire or "acquiesced in" that party's plan are "insufficient to raise a reasonable inference that [the directors] were beholden to, or controlled by, [that party]").

[111] *In re Xtreme Power Inc.*, 563 B.R. at 632 (applying Delaware law).

way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'"[112]

Plaintiff alleges that Individual Movants had "financial interests in [Entity Movants]."[113] But without particularized facts explaining *what* financial interests Individual Movants held in Entity Movants or *how* those unspecified financial interests rendered Individual Movants under the control of Entity Movants, Plaintiff cannot plausibly allege that Individual Movants' decisions as Northstar managers were compromised.[114]

Plaintiff further alleges that "a majority [of the Northstar board] had financial interests in the transactions at issue."[115]   But this allegation—which in any event is conclusory—indicates nothing about whether the board was controlled by *someone else*.   Plaintiff has pleaded no facts explaining how any Individual Movant was dominated by any Entity Movant or beholden to any Entity Movant and has therefore failed to plausibly allege that Individual Movants lacked independence.

### 2.      Plaintiff fails to plead elements of a claim for breach of the duty of care.

Plaintiff cannot plausibly allege a claim for breach of the duty of care without a showing of gross negligence.[116]   The duty of care requires directors and officers to inform themselves fully and in a deliberate manner before making a business decision.[117]   But a failure to make an

---

[112] *Orman*, 794 A.2d at 22 (emphasis added).

[113] Plaintiff's Response at 31.

[114] *See, e.g.*, *Official Committee of Unsecured Creditors v. Meltzer*, 1:17-CV-256-NT, 2018 WL 2123558, at *6 (D. Me. May 8, 2018) ("Allegations that a director has a relationship with a third party do not suffice absent some indication of how that affiliation influenced the director's decision-making." (applying Delaware law)).

[115] Plaintiff's Response at 31.

[116] *See Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) (noting "a corporate director is only considered to have breached his duty of care in instances of gross negligence"); *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 985 (Del. Ch. 2000) ("[T]o overcome the presumption that the director defendants acted on an informed basis plaintiffs must show gross negligence.").   *See also In re Think3, Inc.*, 529 B.R. 147, 172 (Bankr. W.D. Tex. 2015) (Under Delaware law, breach of the duty of care is "predicated upon concepts of gross negligence.").

[117] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 368 (Del. 1993).

informed business decision will only result in a breach of the duty of care if the directors' decision-making process was committed with gross negligence.[118]  Gross negligence, in the duty-of-care context, has been defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[119]

Plaintiff has failed to plead even a "formulaic recitation" of the elements of a claim for breach of the duty of care.[120]  Rather, the Complaint alleges—in conclusory fashion—that Movants "violated their fiduciary duties through acts of self-dealing and conflicting interests…."[121]  These are allegations of breaches of the duty of loyalty only.[122]  There is no allegation *anywhere* in the Complaint that Individual Movants acted with gross negligence in the process by which they made any business decision.  In particular, there is no allegation that Individual Movants failed to review *any* sort of financial analysis or other documentation, or conduct *any* sort of meaningful deliberation.

In an apparent attempt to "allege" the gross negligence that he pleads nowhere in the Complaint, Plaintiff now claims the *ultimate decisions* of the Northstar board "would raise the inference that the directors failed to adequately inform themselves."[123]  But a breach of the duty of care involves a deficiency in the *process employed* in order to reach a decision—namely that the directors failed to inform themselves of available material facts *before* reaching the decision.[124]  So, Plaintiff's allegation that Northstar overpaid Propel Energy for the Creole

---

[118] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008); *see also In re Xtreme Power Inc.*, 563 B.R. at 640 (applying Delaware law).

[119] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006).

[120] *See Ashcroft*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'").

[121] The Complaint ¶ 71.

[122] *See In re Xtreme Power Inc.*, 563 B.R. at 632 (applying Delaware law).

[123] Plaintiff's Response at 32.

[124] *See, e.g.*, *Cede & Co. v. Technicolor, Inc.*, 634 A.2d at 368, *decision modified on other grounds*, 636 A.2d 956 (Del. 1994) ("[A] trial court will not find a board to have breached its duty of care unless the directors individually

Assets says nothing about whether Movants failed to inform themselves when making the decision to buy the Creole Assets.[125]   Nor does Plaintiff's allegation that Northstar released capital commitments owed by NGP-NOG (the only Movant owing a capital commitment) raise any inference about the decision-making *process* leading to that release.[126]

Accordingly, the sole case Plaintiff cites—*McMullin v. Beran*—found a deficiency in the decision-making process that was grossly negligent.[127]   And notably, the standard under which the Delaware Supreme Court in *McMullin* evaluated the complaint was the pre-*Twombly* standard that no longer applies to federal pleadings.[128]   Even under that more liberal standard, the court pointed to *specific factual allegations* in the complaint showing a deficiency in the decision-making *process*.[129]

Here, there are no factual allegations—or even conclusions—in the Complaint referencing or discussing a deficiency in the deliberative process leading to the decisions that are the basis for Plaintiff's breach-of-fiduciary-duty claim.   Thus, there is no cause of action pleaded for a breach of the duty of care.

---

and the board collectively have failed to inform themselves fully and in a deliberate manner *before* voting as a board….") (emphasis added); *In re RJR Nabisco, Inc. Shareholders Litig.*, CIV.A. 10389, 1989 WL 7036, at *13 (Del. Ch. Jan. 31, 1989) ("The business judgment form of judicial review encompasses three elements: a threshold review of the objective financial interests of the board whose decision is under attack (*i.e.*, independence), a review of the board's subjective motivation (*i.e.*, good faith), and *an objective review of the process by which it reached the decision under review (i.e., due care).*") (emphasis added).

[125] *See* Plaintiff's Response at 32.

[126] *See id.*

[127] 765 A.2d 910, 921–22 (Del. 2000).

[128] *Id.* at 916 ("This Court, like the trial court, 'must determine whether it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief.'").

[129] *See id.* at 921-22 ("McMullin alleges that the Chemical Board authorized ARCO to unilaterally negotiate the merger agreement without establishing any procedural safeguards to protect the interests of the minority shareholders….The Amended Complaint alleges that the Chemical Board met only once to consider the Transaction negotiated by ARCO with Lyondell. At that meeting, ARCO's financial advisor, Salomon Smith Barney, made a presentation to the Chemical Board regarding the terms of Lyondell's proposal and the sale process conducted by ARCO. The Chemical Board approved the Transaction with Lyondell at that one meeting on the basis of the disclosures made to them by ARCO's financial advisor.").   *See also id.* at 922 ("The business judgment rule is rebutted if the plaintiff shows that the directors failed to exercise due care in informing themselves *before* making their decision.") (emphasis added).

**C.      Plaintiff fails to state a claim for breach of a term of the Contract.**

      **1.      Plaintiff mistakes NGP-NOG's obligation under the Contract.**

Plaintiff bases his claim that NGP-NOG breached the Contract on a term that the Contract does not contain.  Plaintiff claims that NGP-NOG breached the Contract by "failing to eliminate the working capital deficit" of Northstar.[130]  But there is no such term in the Contract. Rather, the Contract required NGP-NOG to fund the "Working Capital Deficit"—a term unambiguously defined as a *specific amount of money*.

Plaintiff quotes—indeed *misquotes*—the phrase "eliminate the working capital deficit" from a recital of the Contract.  A "recital" is "[a] preliminary statement in a contract or deed explaining the reasons for entering into it or the background of the transaction, showing the existence of particular facts."[131]  The recital Plaintiff relies on provides the reason for the contractual obligation to fund the Working Capital Deficit—"to be used, along with the Purchase Proceeds, to pay off the Bank Debt and eliminate the Working Capital Deficit."[132]  Recitals are not contractual obligations, and they cannot operate to extend or enlarge contractual obligations.[133]  Regardless, however, even if the recital's phrase "eliminate the Working Capital Deficit" were construed to qualify as a contractual obligation, Plaintiff has not alleged that NGP-NOG failed to "eliminate the Working Capital Deficit" because there is no allegation that NGP-NOG failed to eliminate the *specific amount of money* that the Contract delineates *is* the Working Capital Deficit.

---

[130] The Complaint ¶ 76.

[131] *Furmanite Worldwide, Inc. v. NextCorp, Ltd.*, 339 S.W.3d 326, 336 (Tex. App.—Dallas 2011, no pet.).

[132] The Contract ¶ J, Exhibit D to Movants' Motion to Dismiss.

[133] *See Furmanite Worldwide*, 339 S.W.3d at 336 ("Recitals in a contract are not strictly part of the contract, and they will not control the operative phrases of the contract unless those phrases are ambiguous…. [W]here the recitals are broader than the contract stipulations, the former will not extend the latter.").

The Contract provides that Northstar "hereby releases each of the Members [defined to include NGP-NOG] with a Supplemental Commitment *(other than [NGP-NOG] to the extent of the NOG Contribution)* from any obligation to fund any Supplemental Capital Contribution."[134] The Contract defines "NOG Contribution" as "an amount equal to the Bank Debt and the Working Capital Deficit (currently estimated to be approximately $40,000,000) (the "NOG Contribution")…."[135]   The Contract defines "Working Capital Deficit" as Northstar's "net negative working capital of approximately $20,000,000 calculated as of July 1, 2014 *(such actual amount required to be paid pursuant to the Purchase Agreement (as defined below)….*"[136] So as defined in the Contract, Working Capital Deficit refers to a *specific numerical amount* that can be ascertained through the Purchase Agreement.  The Final Settlement Statement that is part of the Purchase Agreement provides that the Working Capital Deficit is $20,022,920.00.[137]

Plaintiff claims—improperly for the first time in his Response—that, "in a later side agreement, NGP and the Platinum subsidiary agreed to lower the sales price to $80 million, not $103 million."[138]  But this alleged "side agreement" is irrelevant to NGP-NOG's obligation to pay the "Working Capital Deficit" because the "Working Capital Deficit" is an exact numerical amount that was not dependent on the purchase price.  In effect, Plaintiff argues that NGP-NOG should have *amended* the Contract to define Working Capital Deficit as a different numerical amount.  But there was no amendment.  NGP-NOG was contractually obligated to pay only the

---

[134] The Contract ¶ 2 (emphasis added), Exhibit D to Movants' Motion to Dismiss.

[135] The Contract ¶ J, Exhibit D to Movants' Motion to Dismiss.

[136] The Contract ¶ C, Exhibit D to Movants' Motion to Dismiss (emphasis added).

[137] Final Settlement Statement, Exhibit G to Movants' Motion to Dismiss.  Because the Purchase Agreement expressly required the Final Settlement Statement to be prepared, the Final Settlement Statement is part of the Purchase Agreement, which is part of the Contract.  *See* Movants' Motion to Dismiss at 40-41.  For the reasons explained in Movants' Motion to Dismiss and in Movants' Response to Plaintiff's Motion to Strike, the Final Settlement Statement is part of the pleadings that this Court may consider in determining a Rule 12(b)(6) motion.

[138] Plaintiff's Response at 34.  Plaintiff cites to ¶ 51 of the Complaint, but nowhere does that paragraph—or any other allegation in the Complaint—discuss or mention any agreement to decrease the purchase price.

Working Capital Deficit that the Final Settlement Statement—which reflected the purchase price of $80 million—provided was $20,022,920.00.[139]

### 2. Plaintiff has not alleged that NGP-NOG breached its obligation to pay the NOG Contribution.

Plaintiff claims that, "[b]y definition, NGP-NOG failed to pay the NOG Contribution by failing to eliminate the working capital deficit."[140]  But "working capital deficit" is not part of the definition of NOG Contribution.  The NOG Contribution is defined as "an amount equal to the Bank Debt and the Working Capital Deficit."[141]  Plaintiff does not claim—nor can he—that NGP-NOG failed to pay the Bank Debt.  Plaintiff does not claim that NGP-NOG failed to pay the Working Capital Deficit—the numerical amount of $20,022,920.00.  So there is no part of the NOG Contribution that Plaintiff claims NGP-NOG failed to fund.  His failure to identify an actual provision in the Contract that NGP-NOG purportedly breached dooms his claim for breach of the Contract.[142]

### D. Plaintiff fails to state a claim for conspiracy against Movants.

### 1. There is no cause of action for conspiracy to commit fraudulent transfers.

Contrary to Plaintiff's contention, Texas law does not provide a cause of action for conspiracy to commit fraudulent transfers.  In *Official Stanford Investors Committee v.*

---

[139] *See* the Final Settlement Statement, Exhibit G to Movants' Motion to Dismiss.

[140] Plaintiff's Response at 35.

[141] The Contract ¶ J, Exhibit D to Movants' Motion to Dismiss.

[142] *Baker v. Great N. Energy, Inc.*, No. 3:14-CV-0240, 2014 WL 6805483, at *4 (N.D. Tex. Dec. 3, 2014) ("This Court and others throughout this Circuit have consistently indicated that, as a general rule, 'a plaintiff suing for breach of contract must point to a specific provision in the contract that was breached by the defendant.'"); *Lucas v. Ocwen Home Loan Serv.*, No. 3:13-CV-1057, 2014 WL 7059274, at *3 (N.D. Tex. Nov. 21, 2014), *report and recommendation adopted*, 2014 WL 7146033 (N.D. Tex. Dec. 12, 2014) (dismissing with prejudice breach-of-contract claim alleging that defendant breached requirements of Real Estate Settlement Procedures Act ("RESPA") when the plaintiff "failed to identify…the existence of a valid contract…that incorporate[d] RESPA provisions or require[d] [defendant] to comply with the terms of RESPA" and the plaintiff "fail[ed] to identify any provisions of the deed of trust that incorporate provisions of RESPA….").

*Greenberg Traurig, LLP*, the United States District Court for the Northern District of Texas recognized that "TUFTA does not provide for secondary liability."[143]

Not one of the three cases Plaintiff cites supports allowing recovery for fraudulent transfers under a conspiracy theory.[144]  *Essex Crane Rental Corp. v. Carter* did not raise the issue of whether a claim for conspiracy to commit fraudulent transfer could exist.[145]  Rather, the only issue was whether there was evidence to support such a claim.[146]  And as the court in *Greenberg Traurig* noted, the *Essex Crane* court acknowledged that a conspiracy claim was restricted to defendants who were parties to the transfer.[147]  *Laxson v. Giddens* involved a claim for conspiracy under the Deceptive Trade Practices Act, not TUFTA.[148]  And notably, both of the individuals alleged to have conspired "split the profits" and thus obtained a benefit from violation of the statute.[149]  The court in *Greenberg Traurig*—the same court that previously decided *Biliouris v. Sundance Resources, Inc.*[150]—acknowledged that its "decision in [*Biliouris*] was reached without the benefit of briefing on this particular issue [whether a claim exists for conspiracy to commit fraudulent transfers]," thus abrogating its decision in *Biliouris*.[151]

### 2.    Individual Movants cannot conspire with Entity Movants.

Plaintiff claims that Entity Movants conspired with Individual Movants.[152]  The Complaint alleges only that Individual Movants were "NGP-related directors" and offers no

---

[143] No. 3:12-CV-4641-N, 2014 WL 12572881, at *10 (N.D. Tex. Dec. 17, 2014).

[144] *See* Plaintiff's Response at 38.

[145] *See Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 377 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

[146] *See id.* at 377-79.

[147] *Greenberg Traurig*, 2014 WL 12572881, at *11 (citing *Essex Crane*, 371 S.W.3d at 386-87).

[148] *See Laxson v. Giddens*, 48 S.W.3d 408, 411 (Tex. App.—Waco 2001, pet. denied).

[149] *Id.* at 410.

[150] 559 F. Supp. 2d 733 (N.D. Tex. 2008).

[151] *Greenberg Traurig*, 2014 WL 12572881, at *11.

[152] *See* The Complaint ¶ 78.

factual allegations explaining how Individual Movants were affiliated with Entity Movants.[153] Precisely because the Complaint is entirely devoid of such factual allegations, Movants' Motion to Dismiss explained that no claim that Individual Movants conspired with Entity Movants can exist "to the extent that Plaintiff claims that Individual Movants were officers or agents of Entity Movants."[154]

Plaintiff points to irrelevant allegations in an attempt to rebut this law.[155]  But whether Individual Movants can conspire with *other parties*, such as the other Defendants, is irrelevant to whether they can conspire with Entity Movants.  Similarly, whether or not Individual Movants were "acting as NGP agents when they [allegedly] breached their fiduciary duties" is immaterial if Plaintiff claims that Individual Movants were officers or agents of Entity Movants.  If that is the relationship that Plaintiff alleges existed between Individual Movants and Entity Movants, then Individual Movants, cannot, as a matter of law, conspire with Entity Movants.[156]

### 3.    Plaintiff fails to allege elements of a conspiracy claim.

To state a claim for conspiracy, among other elements, a plaintiff must plead facts that support (1) a meeting of the minds on the object or course of action; and (2) one or more unlawful overt acts.[157]  Plaintiff claims that the Complaint "details how Defendants agreed to act and carried through with those actions."[158]   But nowhere does the Complaint allege any agreement or even imply one.  And there is not "enough *factual* matter (taken as true) to suggest

---

[153] *Id.* ¶ 3.

[154] Movants' Motion to Dismiss at 43-44.

[155] *See* Plaintiff's Response at 36-37.

[156] A corporation generally cannot be deemed to have conspired with its wholly owned subsidiary, or its officers and agents.  *In re Transamerica Airlines, Inc*., CIV.A. 1039-N, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006); *Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc*., 300 S.W.3d 348, 381 (Tex. App.—Dallas 2009, pet. denied).

[157] *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *In re Transamerica Airlines, Inc*., 2006 WL 587846, at *6.

[158] Plaintiff's Response at 37.

that an [unlawful] agreement was made."[159]   Nor can Plaintiff allege an unlawful act because its claim for breach of fiduciary duty fails and its fraudulent-transfer claims cannot serve as a basis for a conspiracy claim.[160]

## E.   Plaintiff fails to state a claim for aiding and abetting against Movants.

There is no cause of action for aiding and abetting fraudulent transfers.[161]   Plaintiff mistakes a cause of action under TUFTA—allowing recovery for fraudulent transfers from transferees—as a right to recover for fraudulent transfers under an aiding and abetting cause of action.[162]   But the sole case Plaintiff cites—*Mack v. Newton*—recognizes that Texas law "does not provide for recovery other than recovery of the property transferred or its value from one who is, directly or indirectly, a transferee or recipient thereof."[163]   Plaintiff cannot recover for fraudulent transfers under an aiding and abetting theory.

## III.   Conclusion

For these reasons and the reasons explained in Movants' Motion to Dismiss Plaintiff's Original Complaint [Dkt. 19], Movants ask that this Court enter an order dismissing with prejudice each of Plaintiff's causes of action asserted against Movants in Plaintiff's Original Complaint.

---

[159] *See Twombly*, 550 U.S. at 556 (emphasis added).

[160] *See Matter of ATP Oil & Gas Corp.*, 711 F. App'x 216, 223–24 (5th Cir. 2017) ("Moreover, because, as discussed *supra*, Plaintiff's fiduciary duty breach claims fail, Plaintiff cannot satisfy the 'unlawful act' requirement of civil conspiracy.").

[161] *Greenberg Traurig, LLP*, 2014 WL 12572881, at *10 (holding that Texas does not recognize a cause of action for aiding and abetting fraudulent transfers).

[162] *See* Plaintiff's Response at 38.

[163] *Mack v. Newton*, 737 F.2d 1343, 1361 (5th Cir. 1984).

Dated:   August 3, 2018.

Respectfully submitted,

THOMPSON & KNIGHT LLP

By: /s/ David M. Bennett
    David M. Bennett
    Bar No. 02139600
    Stephen C. Rasch
    Bar No. 16551420
    Cassandra Sepanik Shoemaker
    Bar No. 24070592
    Julie C. Abernethy
    Bar No. 24056947

    1722 Routh Street, Suite 1500
    Dallas, Texas 75201
    Telephone: (214) 969-1700
    Facsimile: (214) 969-1751

**ATTORNEYS FOR NGP ENERGY CAPITAL MANAGEMENT, LLC; NGP X US HOLDINGS, L.P.; NGP NATURAL RESOURCES X, L.P.; NGP X PARALLEL HOLDINGS, L.P.; NGP NATURAL RESOURCES X PARALLEL FUND, L.P.; NOG ROYALTY HOLDINGS, LP; CHRISTOPHER RAY; JESSE BOMER; TOMAS ACKERMAN; DAVID ALBIN; AND DAVID HAYES**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of August, 2018 a true and correct copy of the foregoing was served (i) on the parties via the Court's electronic notification system; and (ii) on the below parties by regular US mail.

/s/ *David M. Bennett*
David M. Bennett

R. Paul Yetter
Robert K. Ellis
Wyatt J. Dowling
811 Main, Suite 4100
Houston, Texas 77002

John F. Higgins
Eric M. English
1000 Main St., 36th Floor
Houston, Texas 77002

Stephen B. Edmundson
Gregory S. Hudson
1221 McKinney Street, Suite 2900
Houston, Texas 77010