

ENTERED
04/20/2020

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| **NORTHSTAR OFFSHORE GROUP, LLC** | § | **CASE NO: 16-34028** |
| Debtor(s) | § | |
| | § | **CHAPTER 11** |
| | § | |
| **JAMES KATCHADURIAN** | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 18-03079** |
| | § | |
| **NGP ENERGY CAPITAL** | § | |
| **MANAGEMENT, LLC,** *et al* | § | |
| Defendant(s) | § | |

## <u>MEMORANDUM OPINION</u>

James Katchadurian, as Litigation Trustee of Northstar's Litigation Trust, initiated this adversary proceeding asserting claims against NGP Energy Capital Management, *et al.*[1]   The Trustee's claims against the Defendants stem from two separate points in time—(i) a 2012 purchase and a 2014 sale.

In 2012, Northstar Offshore Group, LLC ("Northstar") created a Board comprised of nine board members.   As part of the decisions undertaken by the Board, Northstar purchased assets, including oil and gas leases and wells, in an area known as the Creole Field from Propel Energy, LLC in mid-2012.   Thereafter, in November 2013, Northstar obtained a $120 million short-term bank loan from Wells Fargo.   As part of the loan, NGP made a $75 million capital commitment,

---

[1] The Defendants in this adversary proceeding are: NGP Energy Capital Management, L.L.C. ("NGP Capital"), NGP X US Holdings, L.P. ("NGP X US"), NGP Natural Resources X, L.P. ("NGP X"), NGP X Parallel Holdings, L.P. ("NGP Parallel"), NGP Natural Resources X Parallel Fund, L.P. ("NGP Parallel Fund"), NOG Royalty Holdings, L.P. ("NGP-NOG"), Christopher Ray, Jesse Bomer, Tomas Ackerman, David Albin, David Hayes, S. Glynn Roberts, Gaylon Freeman, Mark Stevens, and James P. Ulm.   (*See* ECF No. 1).

which could be accessed upon request by Northstar, along with individual capital commitments from several of the directors sitting as board members of Northstar.

On July 2016, NGP-NOG, and the minority shareholders of Northstar, signed a Purchase and Sale Agreement with Lafitte Energy Corp. As part of that sale, NGP-NOG agreed to pay off Northstar's bank debt and working capital deficit in exchange for a net profits interest in Northstar's fields, and the release of the obligations concerning both the $75 million capital contribution and the individual director capital contributions.

On April 9, 2018, the Trustee filed its Complaint, which sets forth six causes of action against the Defendants: (i) a fraudulent transfer claim against all defendants pursuant to 11 U.S.C. § 544(b) and TUFTA §§ 24.005–24.006; (ii) a fraudulent transfer claim against all defendants pursuant to 11 U.S.C. § 548(a)(1); (iii) a breach of fiduciary duty claim against the NGP Directors, the Northstar Directors, and NGP-NOG; (iv) a breach of contract claim against NGP-NOG; (v) a conspiracy claim against the NGP Entities; and (vi) an aiding and abetting claim against the NGP Entities, the Northstar Directors, and NGP-NOG. Thereafter, on June 4, 2018, NGP Energy Capital Management, L.L.C., *et al* filed a motion to dismiss the Trustee's Complaint, setting forth fourteen reasons for which the Court should dismiss the Trustee's Complaint. NGP Energy's motion to dismiss attached various exhibits to support its argument for dismissal of the Trustee's Complaint.

Subsequently, on June 21, 2018, NGP Energy filed a jury demand in which it declined to consent to a jury trial in bankruptcy court, or the entry of a final order by this Court. On July 13, 2018, the Trustee filed a motion to strike five of the six exhibits attached to NGP Energy's motion to dismiss along with a motion opposing NGP Energy's motion to withdraw the reference.

The Court held a hearing on (i) the Defendants' motions to dismiss, (ii) the Trustee's motion to strike, (iii) NGP Energy's motion to stay discovery, and (iii) NGP Energy's motion to withdraw the reference on September 1, 2018. Thereafter, the Court issued a report and recommendation to the district court recommending that the district court withdraw the reference of this adversary proceeding, but only upon this Court's certification that all pre-trial and dispositive matters have been concluded and are ready for trial. The district court issued a Memorandum and Order adopting this Court's report and recommendation on November 9, 2019.

For the reasons set forth below, the Court: (i) grants the Trustee's motion to strike in part and denies the motion in part; (ii) grants NGP Energy's motion to dismiss in part and denies the motion in part; (iii) and allows the Trustee to amend his Complaint.

## **Background[2]**

Northstar was an oil and gas company headquartered in Houston, Texas, focused on offshore oil and gas exploration. (Case No. 16-34028, ECF No. 106 at 6–7). In 2012, Northstar shifted the focus of its business from actively producing oil and gas wells to the discovery of new oil fields and began leveraging debt to finance its exploration and test drilling. (Case No. 16-34028, ECF No. 106 at 25).

By the second half of 2014, oil prices began to drop, which also coincided with a criminal fraud investigation into the Platinum Partner entities that formed Northstar's parent organization. (Case No. 16-34028; ECF No. 106 at 25). These events caused Northstar to experience a liquidity crisis and made it difficult to continue operating in the Gulf of Mexico. (Case No. 16-34028; ECF No. 106 at 25).

---

[2] A substantial portion of this background section was written in reliance on the parties' briefing. It is included solely for background. The statements in this background section do not constitute findings by the Court.

Northstar's financial situation came to head on August 12, 2016, when three creditors filed an involuntarily bankruptcy petition against Northstar pursuant to 11 U.S.C. § 303. (Case No. 16-34028; ECF No. 106 at 25). At Northstar's request, the Court granted relief and converted Northstar's case to a voluntary case under Chapter 11 on December 2, 2016. (Case No. 17-03448; ECF No. 15 at 7). The Court confirmed Northstar's Second Amended Plan of Liquidation on December 22, 2017. (*See* Case No. 16-34028; ECF No. 1078). The terms of the Second Amended Plan created the Northstar Litigation Trust (the "Trust"), which received all of Northstar's causes of action on the effective date of the Plan. (Case No. 16-34028; ECF No. 969 at 17–18). The terms of the Plan also established James Katchadurian as the administrator of the Trust. (Case No. 16-34028; ECF No. 969 at 11).

*Relationship between NGP and Northstar*

NGP is a multi-billion-dollar hedge fund that invests in the energy industry through affiliates. (ECF No. 39 at 10). In the past, NGP has partnered with Northstar executives on oil and gas investments, selling two prior Northstar companies for a combined $480 million. (ECF No. 1 at 2).[3] Northstar was the third investment undertaken by NGP with the "Northstar executive team." (ECF No. 1 at 2).

Northstar's Board was formed in February 2012. (ECF No. 39 at 10). The Board was composed of nine directors: Christopher Ray, Jesse Bomer, Tomas Ackerman, David Albin, David Hayes, S. Glynn Roberts, Gaylon Freeman, Mark Stevens, and James P. Ulm. (ECF No. 39 at 10). The Litigation Trustee refers to the first five of these directors—Ray, Bomer,

---

[3] In 2006, NGP formed Northstar GOM, LLC. The first Northstar-related company combined oilfield interests from a company called, "Northstar interests" with an NGP investment from its affiliate Natural Gas Partners VIII. (ECF No. 1 at 7). In 2008, NGP sold Northstar GOM to Dynamic Offshore for $265 million. (ECF No. 1 at 7). Subsequently, NGP created Northstar Offshore Energy Partners with the same Northstar officers and another affiliate, Natural Gas Partners IX. (ECF No. 1 at 8). In 2011, NGP sold Northstar Offshore Energy Partners to Ankor Energy for $215 million. (ECF No. 1 at 8).

Ackerman, Albin and, Hayes—as "NGP Directors" and the last four—Roberts, Freeman, Stevens, and Ulm—as "Northstar Directors" or officers.  (ECF No. 1 at 8).

In mid-2012, Northstar purchased assets, including oil and gas leases and wells in an area of the Gulf known as the Creole Field (the "Creole Field Assets") from Propel Energy, LLC.  (ECF No. 1 at 8).  Northstar initially proposed an $80 million-dollar bid for the Creole Field Assets; however, Northstar later increased that bid and paid Propel Energy $113 million.  (ECF No. 1 at 2, 8).  Northstar alleges that NGP, using its control of Northstar through the NGP Directors, caused the bid increase, which resulted in an overpayment on the part of Northstar for the Creole Field Assets.  (ECF No. 1 at 8).

In November 2013, Northstar obtained a $120 million-dollar short-term loan from Wells Fargo.  (ECF No. 39 at 10).  As part of the loan, Wells Fargo required that NGP commit to funding $75 million in additional capital to Northstar upon Northstar's request.  (ECF No. 39 at 10).  On the same day the loan was executed, NGP Entities—NGP X, NGP Parallel, and NGP X US—entered into a contract with Northstar solidifying NGP's commitment to provide Northstar with $75 million at Northstar's request.  (ECF No. 39 at 10).  Along with the NGP entities, the Northstar Directors also provided individual capital contributions to Northstar as part of the Wells Fargo loan.  (ECF No. 56 at 126).  For reasons for which the parties disagree, Northstar did not call upon NGP's commitment in full, and later released the Northstar Directors from their individual capital commitments.  (ECF Nos. 1 at 3; 19 at 19–20).

On July 16, 2014, NGP-NOG and the minority shareholders of Northstar signed a Purchase and Sale Agreement with Lafitte Energy Corp., a subsidiary of Platinum Partners.  (ECF No. 1 at 11).  On August 1, 2014, NGP-NOG and NGP X US signed a contract with Northstar under which NPG-NOG agreed to pay off Northstar's "Bank Debt and eliminate the

Working Capital Deficit" at the closing of the Lafitte Sale in exchange for: (i) a "significant net profits interest in [Northstar's] most promising fields" and (ii) the release of both NGP-NOG's $75 million capital contribution and the Northstar Directors' individual capital contributions ("the Contract").  (ECF Nos. 1 at 11–12; 39 at 12).

On September 22, 2014, the date of the closing of the Lafitte Sale, Platinum Partners made an $80 million-dollar payment directly to Wells Fargo, while NGP funded $40 million of its $75 million capital contribution commitment.  (ECF Nos. 1 at 11; 56 at 63).  NGP and Northstar disagree on the extent of NGP's obligation as to the working capital deficit under the terms of the Contract.  Northstar argues that NGP failed to comply with its commitment to pay off the bank debt and *eliminate* its "working capital deficit."  (ECF No. 1 at 4).  In contrast, NGP claims that it provided Northstar with an amount sufficient to pay the Northstar's "Working Capital Deficit", as defined in the Final Settlement Statement and therefore, provided an amount "sufficient to pay [Northstar's] existing liabilities" at the time of the Lafitte Sale in compliance with their agreement.  (ECF Nos. 1 at 11; 19 at 13; 46 at 8).  Thus, the Trustee's breach of contract claim against the Defendants turns on the meaning or definition of working capital deficit at the time the parties entered into the Contract.

On April 19, 2018, James Katchadurian, the Litigation Trustee, filed this adversary proceeding against NGP Energy Capital Management, L.L.C. ("NGP Capital"), NGP X US Holdings, L.P. ("NGP X US"), NGP Natural Resources X, L.P. ("NGP X"), NGP X Parallel Holdings, L.P. ("NGP Parallel"), NGP Natural Resources X Parallel Fund, L.P. ("NGP Parallel Fund"), NOG Royalty Holdings, L.P. ("NGP-NOG"), Christopher Ray, Jesse Bomer, Tomas

Ackerman, David Albin, David Hayes, S. Glynn Roberts, Gaylon Freeman, Mark Stevens, and

James P. Ulm.  (*See* ECF No. 1).[4]

The Trustee's Complaint sets forth six claims against the Defendants:[5]

(i)   Count I.  A fraudulent transfer claim against Defendants pursuant to 11 U.S.C. § 544(b) and TUFTA §§ 24.005–24.006 based on Northstar's overpayment to Propel Energy for the Creole Field Assets in 2012, and the improper release of capital contributions on behalf of both Northstar and the Northstar Directors in 2014.  (ECF No. 1 at 13–14).

(ii)   Count II.  A fraudulent transfer claim against Defendants pursuant to 11 U.S.C. § 548(a)(1) for agreeing to release "Defendants" from their contractual obligations to provide more than $75 million in capital to Northstar and the Northstar Directors' individual funding obligations.  (ECF No. 1 at 15–16).

(iii)   Count III. A breach of fiduciary duty claim against the NGP Directors, the Northstar Directors, and NGP-NOG for breaching their duties of loyalty and care to Northstar in causing Northstar to overpay for the Creole Field Assets, refusing to exercise Northstar's contractual right to call on capital, and allowing a release and waiver of the Defendants' capital commitments to Northstar without consideration.  (ECF No. 1 at 16).

(iv)   Count IV. A breach of contract claim against NGP-NOG for failing to eliminate Northstar's working capital deficit.  (ECF No. 1 at 17).

(v)   Count V. A conspiracy claim against the NGP Entities[6] for working with the Northstar Directors and the NGP Directors to commit the above fiduciary breaches and fraudulent transfers.  (ECF No. 1 at 7).

(vi)   Count VI. An aiding and abetting claim against the NGP Entities, the Northstar Directors, and NGP-NOG for overpaying for the Creole Field Assets, releasing Northstar's capital obligations, breaching fiduciary duties, and engaging in fraudulent transfers.  (ECF No. 1 at 17–18).

In essence, the Trustee claims that NGP conspired with the NPG Directors and the

Northstar Directors to cause Northstar to: (i) overpay for the Creole Field Assets in mid-2012;

---

[4] The Litigation Trustee divides the Defendants into three subgroups: (i) the NGP entities, (ii) the NGP-related Directors (Ackerman, Albin, Bomer, Hayes, and Ray); and (iii) the Northstar Directors (Roberts, Freeman, Stevens, and Ulm).  (ECF No. 39 at 13, 26).

[5] The term "Defendants" refers to all three subgroups.

[6] These NGP Entities are: NGP Capital, NGP X US, NGP Parallel, NGP Parallel Fund, and NGP-NOG. (ECF No. 1 at 17).

and (ii) release NGP and the Northstar Directors from their capital commitments to Northstar prior to the Lafitte Sale in 2014 without receiving reasonably equivalent value for the exchange. (ECF No. 1 at 1–2).[7]

On June 4, 2018, NGP Energy Capital Management, L.L.C., *et al* ("NGP Energy")[8] filed a motion to dismiss the Trustee's Complaint.  (*See* ECF No. 19).  NGP Energy argues that the Trustee's Complaint fails to:

(i) Allege facts that establish NGP Energy's purported "control" over Northstar, rendering the Complaint factually insufficient under Rule 8;

(ii) Demonstrate how the payment to Propel Energy for the Creole Field Assets in 2012 benefitted NGP Energy, such that NGP Energy would qualify as a transferee of the purchase price;

(iii) Plead NGP Energy's actual intent with particularity as required by Rule 9(b) when stating a claim for an actual fraudulent transfer;

(iv) Meet the requirements of Rule 8(a), because the Complaint impermissibly "lumps" the Defendants into groups rather than specifying each Defendants' individual roles in the transfers;

(v) Plead the existence of a "triggering" unsecured creditor in order to establish standing under 11 U.S.C. § 544(b);

(vi) Establish a claim against a Defendant other than NGP-NOG for the capital commitment release, because no other Defendant owed a capital commitment at the time of the release;

(vii) Establish a fraudulent transfer claim under TUFTA, because Wells Fargo Bank held a valid lien on NGP-NOG's capital commitment to Northstar, fully encumbering the capital commitment, such that it was not an "asset" of Northstar's estate;

(viii) Support the application of the "discovery rule," nor can the discovery rule apply to defer the accrual of a claim under TEX. BUS. & COM. CODE § 24.006(b);

---

[7] In a hearing on the Defendants' motion to dismiss Trustee's Original Complaint, the Trustee clarified that the only directors which owed individual capital commitments are the Northstar Directors.  (ECF No. 56 at 128).

[8] "NGP Energy" encompasses both the NGP Entities and the NGP Directors.  In the analysis section, "NGP Energy" will encompass three groups or parties: the NGP Entities, the NGP Directors, and the Northstar Directors, given that their arguments are nearly identical.

(ix) Establish Northstar's insolvency, for either transaction, which is necessary for a constructive fraudulent transfer claim;

(x) Plead facts sufficient to demonstrate violations of the duties of loyalty and care, or even rebut the presumption of the business judgment rule;

(xi) Allege that NGP-NOG was a controlling shareholder of Northstar, such that it would owe Northstar fiduciary duties;

(xii) Establish a violation of a specific provision of the Contract, demonstrating that NGP-NOG breached its obligation to Northstar to pay the amount required under the Contract at the closing of the Lafitte Sale; and

(xiii) Set forth claims for conspiracy and aiding and abetting in the alleged fraudulent transfers, for which there exist no cause of action under Texas law; and

(xiv) Set forth claims for conspiracy and aiding and abetting breaches of fiduciary duty, for which no breach exists.

(ECF Nos. 19 at 16–17; 47 at 3–4). NGP Energy's motion to dismiss attached various exhibits to support its argument for dismissal of the Trustee's Complaint. (*See* ECF No. 19). On June 4, 2018, the Northstar Directors also filed a motion to dismiss the Trustee's Complaint. (*See* ECF No. 23). The Northstar Directors' argument largely tracks NGP Energy's argument. (*See* ECF No. 48).

Subsequently, on June 21, 2018, NGP Energy filed a jury demand in which it declined to consent to a jury trial in bankruptcy court, or the entry of a final order by this Court. (*See* ECF No. 32). Concurrently with its jury demand, NGP Energy filed a motion to withdraw the reference to the district court and a motion to stay discovery pending its motion to dismiss. (*See* ECF Nos. 30, 33). In its motion to withdraw the reference, NGP Energy argued that withdrawal of the reference was mandatory in light of its Seventh Amendment right to a jury trial. (ECF No. 33 at 8–16). Alternatively, NGP Energy claimed that permissive withdrawal of the reference is appropriate pursuant to 11 U.S.C. § 157(d). (ECF No. 33 at 16). Specifically, NGP Energy argued that permissive withdrawal is appropriate here, where: (i) a substantial portion of the Trustee's claims are state law claims; (ii) the Defendants have not consented to a jury trial in

bankruptcy court; (iii) no discovery has taken place; (iv) the Liquidating Plan has been confirmed; (v) withdrawal will not affect Northstar's resources; and (vi) no specialized knowledge through this Court is required to adjudicate the underlying claims.  (ECF No. 33 at 18–19).

On July 13, 2018, the Trustee filed a motion to strike five of the six exhibits attached to NGP Energy's motion to dismiss.  (*See* ECF No. 41).  The Trustee argues that consideration of the documents is inappropriate at a Rule 12(b)(6) stage because the exhibits are "outside of the four corners of the complaint and not 'central' to its claims."  (ECF No. 41 at 2).  Concurrently with his motion to strike, the Trustee filed an opposition to NGP Energy's motion to withdraw the reference.  (*See* ECF No. 40).  The Trustee argued that a jury demand does not warrant immediate withdrawal of the reference, suggesting instead that this Court maintain the reference through all pre-trial and dispositive motions.  (ECF No. 40 at 3).  The Trustee reasoned that in light of this Court's familiarity with the case it is in the best position to resolve all pre-trial issues before withdrawing the reference.  (ECF No. 40 at 4).

On August 3, 2018, NGP Energy filed a response to the Trustee's motion to strike, claiming that the attached exhibits could properly be considered by the Court because some were part of the pleadings and central to the Trustee's claim and others were public records of which the Court could take judicial notice.  (*See* ECF No. 46).  Concurrently with its response, NGP Energy filed a reply in support of its motion for summary judgment.  (*See* ECF No. 47).  The Northstar Directors also filed a response to the Trustee's motion to strike, which largely mirrored NGP Energy's motion.  (*See* ECF No. 49).

The Court held a hearing on (i) the Defendants' motions to dismiss, (ii) the Trustee's motion to strike, (iii) NGP Energy's motion to stay discovery, and (iii) NGP Energy's motion to

withdraw the reference on September 1, 2018.  (*See* ECF No. 56).  At the hearing, the Court orally granted NGP Energy's motion to stay discovery, "subject to reconsideration once" there is "a new complaint on file."  (ECF No. 56 at 173).  The Court found NGP Energy's jury demand appropriate, subject to potential changes in light of future pleadings.  (ECF No. 56 at 173).  The Court further stated that it would issue a report and recommendation to the district court, recommending that the district court deny withdrawal until the issues are ready for trial.  (ECF No. 56 at 171–174).  Neither party objected to the Court's preliminary ruling regarding NGP Energy's motion to withdraw the reference.  (ECF No. 56 at 174).

Thereafter, the Court issued a report and recommendation to the district court recommending that the district court withdraw the reference of this adversary proceeding, but only upon this Court's certification that all pre-trial and dispositive matters have been concluded and are ready for trial.  (*See* ECF No. 71).  The district court issued a Memorandum and Order adopting this Court's report and recommendation on November 9, 2019.  (*See* ECF No. 73).

## Jurisdiction

The District Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O).  Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.

## Analysis

### I.  Motion to Strike

The Trustee filed a motion to strike five of the six exhibits attached to NGP Energy's motion to dismiss.  (*See* ECF No. 41).  The Trustee argues that consideration of the five documents is inappropriate at a Rule 12(b)(6) stage because the exhibits are "outside of the four

corners of the complaint and not 'central' to its claims."  (ECF No. 41 at 2).  NGP Energy counters that the attached exhibits can properly be considered by the Court because some of the documents are part of the pleadings and central to the Trustee's claim, and others are public records of which the Court can take judicial notice.  (*See* ECF No. 46).  The Northstar Directors also filed a response to the Trustee's motion to strike, which largely mirrors NGP Energy's arguments.  (*See* ECF No. 49).[9]

When ruling on a motion to dismiss under Rule 12(b)(6), a court may generally only consider factual allegations contained within the "four corners" of the complaint.  *Xtreme Power Plan Trust v. Schindler (In re Xtreme Power Inc.)*, 563 B.R. 614, 629 (Bankr. W.D. Tex. 2016) (citing *Morgan v. Swanson*, 659 F.3d 359, 401 (5th Cir. 2011)); *see Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) ("Generally, in considering a motion to dismiss under Rule 12(b)(6), the Court 'must limit itself to the contents of the pleadings, including attachments thereto.'").  "If the Court is presented with matters outside the pleadings and does not exclude them," the motion would then be treated as one for summary judgment, and all parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion."  *Kaye v. Lone Star Fund V (U.S.) L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011) (citations omitted); *see* Fed. R. Civ. P. 12(b).

The Fifth Circuit, however, has recognized a limited exception to the general rule.  *Id*.  Under the Fifth Circuit's incorporation-by-reference exception, a court may consider extrinsic documentary evidence in the context of a Rule 12(b)(6) motion, thereby incorporating the document into the pleadings, if: (1) the document is attached to a defendant's motion to dismiss; (2) the document is referred to in the plaintiff's complaint; and (3) the document is central to the

---

[9] In light of the fact that the Northstar Directors' arguments are fairly similar to that of NGP Energy's arguments, the Court will reference both Defendants as "NGP Energy," except where arguments differ.

plaintiff's claims. *In re Xtreme Power Inc.*, 563 B.R. at 629; *Kaye*, 453 B.R. at 662. "Although the first two elements are easily determinable, the Fifth Circuit has not articulated a test for determining when a document is 'central' to the plaintiff's claims." *In re Xtreme Power Inc.*, 563 B.R. at 629 (citation omitted). "Lower courts interpreting" the third element "have defined it to include only those documents 'necessary to establish an element of one of the plaintiff's claims.'" *Id.* "Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Kaye*, 453 B.R. at 662; *see In re Katrina Canal Beaches Lit.*, 495 F.3d 191, 205 (5th Cir. 2007) (noting that a court may consider at the motion to dismiss stage, those contracts central to the plaintiff's breach of contract suit). "However, if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint." *Kaye*, 453 at 662. Moreover, "documents used to support a defendant's affirmative defense appear not to fall within the exception." *In re Xtreme Power Inc.*, 563 B.R. at 629.

Additionally, "[a] court may take judicial notice of relevant facts in the context of a Rule 12(b)(6) motion." *Id.*; *Norris v. Hearst Trust,* 500 F.3d 454, 461 n.9 (5th Cir. 2007) (noting it is "clearly proper in deciding a 12(b)(6) motion, to take judicial notice of matters of public record"); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (directing courts to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"). "Under Rule 201(b)(2) of the Federal Rules of Evidence, a court may judicially notice a fact not subject to reasonable dispute when the fact 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *In re Xtreme Power Inc.*, 563

B.R. at 629 (quoting Fed. R. Evid. 201(b)).  For example, in the context of a Rule 12(b)(6) motion, courts may take judicial notice under Rule 201(b)(2) of "public disclosure documents required by law to be filed."  *In re Xtreme Power Inc.*, 563 B.R. at 630 (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).  "Applying the language of Rule 201(d), the Fifth Circuit has permitted lower courts to take judicial notice at the motion to dismiss stage of a proceeding."  *See In re Think3, Inc.*, 529 B.R. 147, 171 (Bankr. W.D. Tex. 2015) (citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (recognizing that a court is permitted to rely on documents incorporated into the complaint by reference, and matters of which a court may take judicial notice)); *see also Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (taking judicial notice of public disclosure documents filed with the Securities and Exchange Commission).

NGP Energy attached the following exhibits to its motion to dismiss:

(i)      Exhibit A: The complaint filed in Cause No. 16-cv-6848, in the United States District Court for the Eastern District of New York ("the SEC Complaint");

(ii)     Exhibit B: The Amendment to the Amended and Restated Limited Liability Company Agreement of Northstar Offshore Group LLC dated November 8, 2013 ("the Amendment to the Northstar Agreement");

(iii)    Exhibit C: The Assignment of Interests to NGP-NOG dated July 7, 2014 ("the NGP-NOG Assignment");

(iv)     Exhibit D: The 2014 Letter Agreement ("the Letter Agreement");[10]

(v)      Exhibit E: The financing statement filed with the Delaware Secretary of State on November 8, 2013 ("the Financing Statement");

(vi)     Exhibit F: The termination filed with the Delaware Secretary of State on April 1, 2015 ("the Termination"); and

(vii)    Exhibit G: The final settlement statement prepared in accordance with the Purchase and Sale Agreement for the sale of Northstar to Lafitte Energy Corp.,

---

[10] The Trustee does not object to the inclusion of the Letter Agreement.  (ECF Nos. 41 at 2; 39 at 15 ("Except for the Letter Agreement, which is the basis for the breach of contract claim, the exhibits are outside the four corners of the Complaint and not 'central' to any claim." (citation omitted))).

dated July 16, 2014, as amended on July 23, 2014 ("the Final Settlement
Statement").

(ECF Nos. 19; 41 at 2; 46 at 2).

NGP Energy's motion to dismiss attached all of the documents listed.  (*See* ECF No. 19).
Accordingly, the first element of the exception is met as to all documents.  *In re Xtreme Power
Inc.*, 563 B.R. at 629 (listing all three required elements).  The remaining questions are whether:
(i) the Complaint refers to the document at issue *and* the document is central to Northstar's
claims; (ii) or, in the alternative, whether the Court may take judicial notice of such document.
The Court will take each document in turn.

*Exhibit A: The SEC Complaint*

NPG Energy argues that the SEC Complaint is "relevant to reveal that the Complaint's
allegations regarding Platinum Partners lack any legal or factual basis" therefore, "this Court
may take judicial notice of the SEC Complaint as a public record."  (ECF No. 46 at 4).

In the Complaint, the Trustee alleges that:

*But NGP had an exit strategy*.  NGP negotiated a sale to Platinum Partners
("Platinum"), a dubious buyer of ill-repute, which is now a bankruptcy Ponzi
scheme with founders who are under criminal indictment for securities fraud. . . .

NGP knew Platinum was not a credit-worthy purchaser.  NGP agreed to delay the
closing multiple times when Platinum proved unable to come up with the
promised funds.  As Platinum missed deadlines and asked for deductions from the
purchase price, NGP saw the red flags yet persisted with its exit plan. . . .

*To avoid their capital obligations and risk of reputational harm of a bankruptcy*,
Defendants agreed to sell Northstar to an obviously risky, non-creditworthy buyer
. . . Platinum was a Ponzi scheme.  Its subsidiaries are now bankrupt, and its
founders are now facing criminal indictment.  NGP saw the red flags about
Platinum's financial stability, as it repeatedly failed to obtain financing, which
resulted in continually postponing the closing date.  *But NGP feared the risk of
financial and reputational harm if it failed to sell Northstar*.  As NGP put it, if the
sale delayed beyond the debt cut-off, "we will have a difficult decision to make."

(ECF No. 1 at 4, 11) (emphasis added).

Although the Complaint alleges that Platinum Partners is a Ponzi scheme, whose founders are "facing criminal indictment," it does not make reference to or quote the SEC Complaint.  (ECF No. 1 at 4); *see In re Xtreme Power Inc.*, 563 B.R. at 630 ("Although the Amended Complaint alleges facts that can be found [in the document at issue], it neither quotes nor explicitly refers to the document in question.").  Additionally, the SEC Complaint is not central to Northstar's claim.  Northstar claims that NGP Energy made the sale to Platinum Partners, despite the clear signs that it should not, in order to "avoid its $75 million capital" commitment to Northstar.  (ECF No. 39 at 12).  Central to Northstar's claim is NGP Energy's faulty decision-making in neglecting to address the alleged red flags, rather than Platinum Partner's criminal indictment.  The SEC Complaint would not operate to establish an element of Northstar's claim against NGP Energy.

Moreover, although the Court may take judicial notice that the SEC Complaint exists, it may not take judicial notice that its contents are accurate.  *In re Xtreme Power Inc.*, 563 B.R. at 631 ("A court may properly take judicial notice of the fact that related litigation or filings exist in a different forum.  It may not, however, judicially notice the facts alleged in the other court's pleadings." (citations omitted)).

Accordingly, the Court cannot properly consider the SEC Complaint in ruling on NGP Energy's and the Northstar Directors' request for dismissal under Rule 12(b)(6).

*Exhibit E: The Financing Statement & Exhibit F: The Termination*

NGP Energy argues the Court may consider and take judicial notice of both the Financing Statement and the Termination given that they are central to the Trustee's fraudulent transfer claim under TUFTA.  (ECF No. 46 at 4).  Specifically, NGP Energy argues that both the Financing Statement and the Termination "demonstrate that Wells Fargo held a valid lien that

fully encumbered Northstar's capital commitments as of the effective date of Northstar's release of its capital commitments" and therefore "Northstar's release of those capital commitments was not a transfer under TUFTA."  (ECF No. 46 at 5).

Neither the Financing Statement or the Termination are referenced or quoted in the Complaint.  (*See* ECF No. 1).  As with the SEC Complaint, the second element is not met.  Thus, neither the Financing Statement or the Termination fall within the Fifth Circuit's exception.

A court may take judicial notice of public disclosure documents filed with the Secretary of State.  *See In re Xtreme Power Inc.*, 563 B.R. at 631 (taking judicial notice of the Xtreme Power's certificate of incorporation, which "is a public document filed with the Delaware Secretary of State," that bore "a government seal or signature" such that its accuracy could not be reasonably questioned (citing *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,* 959 F. Supp. 476, 496 (S.D.N.Y. 2013)); *Schott v. Nobilis Health Corp.,* 211 F. Supp. 3d 936, 947 (S.D. Tex. 2016) ("In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with agency." (quoting *Lovelace*, 78 F.3d at 1018 n.1)); *In re Think3, Inc.,* 529 B.R. at 171 ("In the context of the Motions filed by Defendants under Rule 12(b)(6), this Court will only take judicial notice of public documents that have been filed with the Delaware Secretary of State . . .  [T]hese documents bear a governmental seal or signature, and their accuracy is beyond reasonable dispute." (citation omitted)).

Both the Financing Statement and the Termination were filed with the Delaware Secretary of State, bear a government seal, and are the type of public documents that the law requires to be filed with government agencies.  *See* DEL. CODE ANN. Tit. 6, § 9-516(a) (2013) (noting what constitutes a filing); *see also* DEL. CODE ANN. Tit. 6, § 9-513 (2001) ("Except as

otherwise provided in Section 9-510, upon the filing of a termination statement with the filing office, the financing statement to which the termination statement relates ceases to be effective.").

However, "these documents may be considered *only* for the purpose of determining what statements they contain, not for proving the truth of their contents."  *Id.* (emphasis added); *see Senior Unsecured Creditors' Comm. of First Republicbank Corp. v. Fed. Deposit Ins. Corp.*, 749 F. Supp. 758, 772 n.20 (noting that the Fifth Circuit "generally adheres to the restrictive rule that a Rule 12(b)(6) motion to dismiss is to be evaluated only on the pleadings").  Therefore, although the Court may take judicial notice of the fact that Wells Fargo filed a UCC-1 financing statement with the Delaware Secretary of State and later filed a termination statement that related to the same, the Court may not take notice of the documents' contents or evaluate the truth of the statements within the two documents.  Neither document establishes, as a matter of law, the creation or validity of a lien.  Of course, the termination statement is dispositive that the UCC-1 statement was terminated.  But that fact—without more—does not relate to any essential element.

Accordingly, the Court cannot properly consider the Financing Statement and the Termination in ruling on NGP Energy's and the Northstar Directors' request for dismissal under Rule 12(b)(6).

*Exhibit B: The Amendment to the Northstar Agreement &*
*Exhibit C: The Assignment of NGP-NOG*

The Trustee has asserted a fraudulent transfer claim pursuant to 11 U.S.C. § 548(a)(1) against "Defendants" for causing Northstar to sign an agreement releasing "Defendants from their obligations to provide more than $75 million in capital to" Northstar.  (ECF No. 1 at 15).  NGP Energy argues that the Amendment to the Northstar Agreement and the Assignment of

NGP-NOG merit this Court's consideration because they are referenced in the Complaint and central to the Trustee's fraudulent transfer claims, which are themselves based on Defendants' capital commitment releases.  (ECF No. 46 at 5–6).  Specifically, NGP Energy argues that the Amendment to the Northstar Agreement is central to Northstar's "fraudulent transfer claims . . . because the Amendment created and defined the capital commitments that Plaintiff alleges were released."  (ECF No. 46 at 6).  NGP Energy therefore maintains that the releases cannot be considered without looking to the Amendment to the Northstar Agreement, because it provides a definition for those capital commitments.

Similarly, NGP Energy maintains that the Assignment of NGP-NOG is also "referenced in the Complaint by virtue of" Northstar's pleadings and is central to Northstar's claim because it demonstrates that "NGP-NOG is the only Movant that owed a Supplemental Commitment as of the effective date of the Contract."  (ECF No. 46 at 7).  In essence, the Assignment operates to show that the Trustee may only assert a fraudulent transfer claim against NGP-NOG because no other defendant owed a supplemental commitment at the time the release was made.

The Amendment to Northstar's Agreement is not referenced in the Trustee's Complaint.  (*See* ECF No. 1).  Nevertheless, NGP Energy maintains that the Amendment merits consideration because it defines the term "Supplemental Commitment" as laid out in the Contract, which is marked as Exhibit D.[11]  (ECF No. 46 at 7).  The Trustee does not object to the inclusion of the Contract.  (ECF No. 39 at 15 ("Except for the Letter Agreement, which is the basis for the breach of contract claim, the exhibits are outside the four corners of the Complaint and not 'central' to any claim." (citation omitted))).  NGP Energy, however, may not use a document referenced in the Contract rather than the Complaint to urge that the document is

---

[11] The parties refer to the Contract as "the Letter Agreement" in the pleadings on NGP Energy's motion to strike.  However, both terms refer to Exhibit D.

incorporated by reference.  Under the Fifth Circuit's exception, the document at issue must be "referred to in the *plaintiff's complaint*."  *In re Xtreme Power Inc.*, 563 B.R. at 629 (emphasis added).  In some instances, courts have incorporated by reference documents attached to the *plaintiff's* opposition to the Defendant's motion to dismiss.  *Walch v. Adjutant Gen.'s Dept. of Texas*, 533 F.3d 289, 293–94 (5th Cir. 2008).  Even in that case, however, the document at issue was "referenced in the complaint, acknowledged in the answers, and attached to the plaintiff's" pleadings rather than the defendant's pleadings.  *Id*. at 294.  NGP Energy may only use the Complaint to incorporate documents by reference.  Thus, the second requirement as to the Amendment to Northstar's Agreement is not met.

Moreover, even though NGP Energy alleges that the Contract cannot be read without reference to the Amendment to Northstar's Agreement, "not all documents relevant to the contract may be considered" at the Rule 12(b)(6) stage.  *Phalanx Grp. Int'l v. Critical Sol. Int'l*, No. 3:18-CV-0244-B, 2019 WL 954727, *3 (N.D. Tex. Feb. 26, 2019).  "In fact, if the moving party attaches to its motion to dismiss an amendment to a contract when the amendment was neither attached to nor referenced in the non-movant's pleading, there is doubt whether even the amendment could be considered at the 12(b)(6) stage."  *Id*.

Accordingly, although the Amendment "may shed some light on the issues at play in the [] Complaint" it is inappropriate to consider the document at the Rule 12(b)(6) stage.  *In re Xtreme Power Inc.*, 563 B.R. at 630.

The Assignment of NGP-NOG is also not referenced or quoted within the Complaint.  (*See* ECF No. 1).  Thus, the second element is not met as to the Assignment.  NGP Energy, however, argues that the Assignment is "referenced by virtue of [the] pleadings," which allege that NGP X US had an obligation to make a $75 million supplemental commitment.  (ECF No.

46 at 7). NGP Energy notes that the Assignment of NGP-NOG serves to show that NGP-NOG rather than NGP X US, or any other Defendant, owed a supplemental commitment. (ECF No. 46 at 7). However, this is not the standard. *In re Xtreme Power Inc.*, 563 B.R. at 630 (denying consideration of a document where the amended complaint *neither quoted nor explicitly referred* to the document in question).

Furthermore, the Assignment of NGP-NOG, like the Amendment, is not necessary to establish an element of Northstar's claim. Documents that may be incorporated by reference through the Fifth Circuit's exception may be used by a defendant "simply [to provide] additional notice of the basis of the suit to the plaintiff" and further "aid[] the court in determining whether a claim has been stated." *Cox v. Bank of Am., N.A.*, No. H-16-2624, 2017 WL 1622043, *2 (S.D. Tex. May 2, 2017) (citation omitted). "The attachments may also provide the context from which any quotation or reference in the motion is drawn to aid the court in correctly construing that quotation or reference." *Id.*; *see Havens v. Victoria of Ltd. P'ship*, No. V-06-119, 2007 WL 2255215, *3 n.1 (S.D. Tex. Aug. 2, 2007) ("As the *Collins* court noted, '[i]n so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been satisfied.'" (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000))). NGP Energy seeks the incorporation of the Assignment of NGP-NOG in order to contradict the allegations in the Complaint, rather than to merely assist the Trustee in establishing the basis of his contract claim. *In re Xtreme Power Inc.*, 563 B.R. at 630 ("[D]ocuments used to support a defendant's affirmative defense appear not to fall within the exception."). In fact, at the evidentiary hearing, the Trustee noted that he was not aware of the Assignment at the time the Complaint was filed.

(ECF No. 56 at 81 (noting NGP Energy had "attached the Assignment to the Court, which [was] the first time that [the Trustee] had actually seen" it)).

Accordingly, the Court cannot properly consider the Assignment of NGP-NOG at the Rule 12(b)(6) stage.  The Court remains puzzled as to why this is not more appropriate to consider at summary judgment.

*Exhibit G: The Final Settlement Statement*

The Trustee asserts a breach of contract claim against NGP-NOG for its alleged failure to "eliminate the working capital deficit."  (ECF No. 1 at 17).  NGP Energy argues that the Final Settlement Statement merits this Court's consideration because it demonstrates that the obligation under the Contract "was not an obligation to 'eliminate the working capital deficit' of Northstar but was instead an obligation to pay the Working Capital Deficit—a term defined as a specific amount of money."  (ECF No. 46 at 8).  In essence, NGP Energy contends that the Final Settlement Statement evidences that the Trustee "does not allege a breach of any term that the Contract actually contains," and therefore "fails to state a claim for breach of the Contract." (ECF No. 46 at 8).

The Final Settlement Statement is not referred to or quoted in the Complaint.  (*See* ECF No. 1).  Nevertheless, NGP Energy maintains that the Final Settlement Statement is incorporated into the Complaint by virtue of references to the Final Settlement Statement in both the Contract and the Purchase and Sale Agreement, which was attached to the Contract.  (ECF No. 46 at 8). As noted earlier, the Trustee does not object to the inclusion of the Contract.  (ECF No. 39 at 15 ("Except for the Letter Agreement, which is the basis for the breach of contract claim, the exhibits are outside the four corners of the Complaint and not 'central' to any claim." (citation omitted))).  Utilizing the Trustee's consent to the incorporation of the Contract, NGP Energy

notes that the Contract makes specific reference to the Purchase and Sale Agreement when addressing the working capital deficit.  (ECF No. 46 at 8).  NGP Energy further highlights that the Purchase and Sale Agreement, which was attached to the Contract, includes a provision which requires that, as a part of the purchase and sale, "a final statement and balance sheet . . . be prepared  . . .  based on actual amounts of all final adjustments made to the Purchase Price (including the actual Effective Time Working Capital) and shows the resulting Purchase Price (the 'Final Price')."  (ECF No. 17 at 28).[12]  Thus, the Final Settlement Statement "shows that the Working Capital Deficit" is an amount certain, rather than a shifting amount as the Trustee alleges.  (ECF No. 46 at 9).

NGP Energy again attempts to use a document other than the Complaint to incorporate a document.  NGP Energy urges the Court's consideration and incorporation by reference of the Final Settlement Statement solely through a reference to the document made in the Purchase and Sale Agreement, which was attached to the Contract—the incorporation of which the Trustee did not object to in its motion to strike.  That is not the standard.  Under the Fifth Circuit's exception, the document at issue must be "referred to in the *plaintiff's complaint*."  *In re Xtreme Power Inc.*, 563 B.R. at 629 (emphasis added).  NGP Energy may not use a document referenced in the Purchase and Sale Agreement rather than the Complaint to urge that the document is incorporated by reference.

Moreover, this presents a situation in which "a defendant attempts to add to or contradict the facts pleaded by the plaintiff in order to support a motion to dismiss" rather than one in which a document is "necessary to establish an element of one of the plaintiff's claims."  *Kaye v. Lone Star Fund V (U.S.) L.P.*, 453 B.R. 645, 662–63 (N.D. Tex. 2011) (citations omitted).  NGP Energy seeks the incorporation of the Final Settlement Statement in order to contradict the

---

[12] This is a sealed document.

allegations in the Complaint, rather than to merely assist the Trustee in establishing the basis of his contract claim. (ECF No. 46 at 8 ("[T]he Final Settlement Statement shows that the obligation the Contract actually contained was not an obligation to 'eliminate the working capital deficit' of Northstar but was instead an obligation to pay the Working Capital Deficit—a term defined as a specific amount of money.")). The Fifth Circuit's decision in *Scanlan*, "plainly prohibits district courts from incorporating documents that are mere evidence for the defense." *Id*. at 664 (citing *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 537 (5th Cir. 2003) ("Although the plaintiffs rely on the Final Report in their complaints, certainly the report alone is not central to their claims. Indeed, it is much more central to the University Officials' defenses.")); *see In re Xtreme Power Inc.*, 563 B.R. at 630 ("[D]ocuments used to support a defendant's affirmative defense appear not to fall within the exception."). NGP Energy attempts to use the Final Settlement Statement to contest the Trustee's allegations that NGP failed to comply with its obligations under the Contract. NGP Energy may not use a motion to dismiss to do so. That is an issue for summary judgment.

Accordingly, the Court may not properly consider the Final Settlement Statement in ruling on NGP Energy's and the Northstar Directors' request for dismissal under Rule 12(b)(6).

## II. Motion to Dismiss

Both NGP Energy and the Northstar Directors have moved to dismiss the Trustee's Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Under Rule 12(b)(6), this Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

In evaluating a complaint under 12(b)(6), a court examines whether the pleading states a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A

plausible claim arises when the complaint pleads sufficient facts to allow a court to draw a "reasonable inference" of the opposing party's liability for the misconduct alleged.  *Id*. at 678.  Such inferences are context-specific and require the "reviewing court to draw on its experience and common sense" when making a determination.  *Id*. at 663–64.  Although the standard rejects the equation of plausibility with probability, the complaint must contain more than just a "sheer possibility" of unlawful action to survive.  *Id*. at 678.

In determining plausibility, a court accepts all well-pleaded facts in a complaint as true and views those facts in "the light most favorable to the plaintiff."  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citations omitted).  Threadbare recitals of the elements of a cause of action or mere conclusory statements, on the other hand, will not save the complaint.  *Iqbal*, 556 U.S. at 678.  Similarly, a court should not give legal conclusions couched as factual allegations any weight.  *Id*.; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Thus, while recognizing that a motion to dismiss is "viewed with disfavor and is rarely granted," a court will only liberally construe those statements constituting actual well-pleaded facts in favor of the plaintiff.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

On June 4, 2018, NGP Energy filed a motion to dismiss the Trustee's Complaint.  (*See* ECF No. 19).  NGP Energy argues that the Trustee's Complaint fails to:

(i)   Allege facts that establish NGP Energy's purported "control" over Northstar, rendering the Complaint factually insufficient under Rule 8;

(ii)  Demonstrate how the payment to Propel Energy for the Creole Field Assets in 2012 benefitted NGP Energy, such that NGP Energy would qualify as a transferee of the purchase price;

(iii) Plead NGP Energy's actual intent with particularity as required by Rule 9(b) when stating a claim for an actual fraudulent transfer;

(iv)  Meet the requirements of Rule 8(a), because the Complaint impermissibly "lumps" the Defendants into groups rather than specifying each Defendants' individual roles in the transfers;

(v)    Plead the existence of a "triggering" unsecured creditor in order to establish standing under 11 U.S.C. § 544(b);

(vi)    Establish a claim against a Defendant other than NGP-NOG for the capital commitment release, because no other Defendant owed a capital commitment at the time of the release;

(vii)    Establish a fraudulent transfer claim under TUFTA, because Wells Fargo Bank held a valid lien on NGP-NOG's capital commitment to Northstar, fully encumbering the capital commitment, such that it was not an "asset" of Northstar's estate;

(viii)  Support the application of the "discovery rule," nor can the discovery rule apply to defer the accrual of a claim under TEX. BUS. & COM. CODE § 24.006(b);

(ix)    Establish Northstar's insolvency, for either transaction, which is necessary for a constructive fraudulent transfer claim;

(x)    Plead facts sufficient to demonstrate violations of the duties of loyalty and care, or even rebut the presumption of the business judgment rule;

(xi)    Allege that NGP-NOG was a controlling shareholder of Northstar, such that it would owe Northstar fiduciary duties;

(xii)    Establish a violation of a specific provision of the Contract, demonstrating that NGP-NOG breached its obligation to Northstar to pay the amount required under the Contract at the closing of the Lafitte Sale;

(xiii)  Set forth claims for conspiracy and aiding and abetting fraudulent transfers, for which there exist no cause of action under Texas law; and

(xiv)  Set forth claims for conspiracy and aiding and abetting breaches of fiduciary duties, for which no breach exists.

(*See* ECF Nos. 19, 47).

### A. *NGP Energy's Purported Control over Northstar*

The Court will first take the issue of NGP's purported control over Northstar. NGP Energy contends that the Complaint fails to establish "control" in accordance with Federal Rule of Civil Procedure 8 and therefore the Trustee's fraudulent transfer claims are implausible on the

face of the Complaint.  (ECF No. 47 at 7–8).[13]  NGP Energy argues that although the Trustee "pleads that [the NGP Directors] had an unspecified *affiliation* with [the NGP Entities]" in that the directors were "NGP-Related Directors," the Trustee does not specify "facts indicating *how* that affiliation influenced" the NGP Directors.  (ECF No. 47 at 7–8).  For example, there are no facts showing whether: (i) the NGP Directors had any influence over the compensation they received for serving as managers of Northstar; (ii) the NGP Entities owed any of Northstar's clients or customers; or (iii) the NGP Directors received any extraordinary compensation from NGP Entities for serving as Northstar's managers.  (ECF No. 47 at 8).  Moreover, according to "well-settled Delaware law" a director's independence "is not compromised simply by virtue of being nominated to a board by an interested stockholder."  (ECF No. 47 at 8) (citation omitted).

At the hearing on NGP Energy's motion to dismiss the Trustee's Complaint, the Trustee made an oral motion to amend the Complaint to add "publicly available documents" from which the Court could take judicial notice regarding the NGP Directors' employment relationship with NGP.  (ECF No. 56 at 87).  The Trustee noted that the proposed documents would show the following:

  i.   Tomas Ackerman was managing director and head of NGP's Houston office;

  ii.  Christopher Ray joined NGP in 2003 and is currently serving as an advisory partner;

  iii. Jesse Bomer was NGP's general counsel;

  iv.  David Albin was one of NGP's co-founders in 1988 and also served as advisory partner; and

  v.   David Hayes is a partner at NGP.

---

[13] The Court takes the issue of "control" separate and apart from other issues and at the beginning of its analysis, because the issue of control—along with the entangled issue of director independence, or lack thereof—permeates other areas of this Memorandum Opinion.  The Court will refer back to this ruling when applicable.

(ECF No. 56 at 88–89).  In demonstrating that the NGP Directors had a continuing employment relationship with NGP at the time they were board members, the documents would evidence that the NGP Directors lacked independence.  (ECF No. 56 at 87–95); *see Joseph v. Frank (In re Troll Commc'n, LLC),* 385 B.R. 110, 119 (Bankr. D. Del. 2008) (holding directors lacked independence where three of the directors held positions of power in companies involved in the transaction, and where the fourth director was hired by the three other interested directors and therefore was beholden to those directors).[14]

Rule 15 governs motions to amend a complaint made before trial and provides that "[t]he court should freely give leave when just so requires."  Fed. R. Civ. P. 15(a)(2).  Bankruptcy Rule 7015 makes Rule 15 applicable in contested matters in bankruptcy court.  The Fifth Circuit observed that "Rule 15(a) 'evinces a bias in favor of granting leave to amend.'"  *Herrmann Holdings Ltd. v. Lucent Techs. Inc*., 302 F.3d 552, 566 (5th Cir. 2002) (quoting *Dussouy v. Gulf Coast Inv. Corp*., 660 F.2d 594, 598 (5th Cir. 1981)).  A movant is required to give the court some notice of the nature of his or her proposed amendments.  *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016).  "[I]n order to take advantage of the liberal amendment rules as outlined in the Federal Rules of Civil Procedure, the party requesting amendment, even absent a formal motion, need only 'set forth with particularity the grounds for the amendment and the relief sought.'"  *United States ex. Re. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330–31 (5th Cir. 2003) (quoting *United States ex re. Willard v. Humana Health Plan of Tex., Inc*., 336 F.3d 375, 386–87 (5th Cir. 2003)).  Although no strict guidelines exist as to what constitutes a sufficient request for leave to amend, it is clear that some specificity is required.  *Thomas*, 832 F.3d at 590.

---

[14] The Trustee similarly argues that the Northstar Directors were beholden to NGP Energy and the NGP Directors by virtue of their appointments.  (ECF No. 39 at 36).

Here, the Trustee provided adequate notice of what his proposed amendments would show by reciting the substance of his proposed amendments at the hearing on NGP Energy's motion to dismiss and further including them in an earlier reply to NGP Energy's motion to dismiss.  (ECF Nos. 39 at 37–38; 56 at 88–89).

"If proper notice was given, the court may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment when deciding whether to grant leave to amend."  *Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, 88 F.3d 311, 314 (5th Cir. 1996) (citations omitted).  The Trustee made the oral motion for leave to amend during the hearing on NGP Energy's motion to dismiss.  This does not constitute undue delay.  *See, e.g. Thomas*, 832 F.3d at 588 (allowing the amendment of a complaint after the filing of a motion for summary judgment).  Additionally, no evidence demonstrates that the Trustee's motion was in bad faith or dilatory conduct.  Moreover, the Trustee has not previously sought amendments to cure deficiencies—this would constitute the Trustee's first amended complaint.

Finally, the proposed amendments would not be futile.  To determine whether the amendment would be futile, courts apply "the same standard of legal sufficiency as applies under Rule 12(b)(6)."  *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000) (quotation omitted).  In order to state a claim under Rule 12(b)(6), a plaintiff must meet Rule 8(a)(2)'s pleading requirements.  Rule 8(a)(2) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  In *Ashcroft v. Iqbal*, the Supreme court held that Rule 8(a)(2) requires that "well-pleaded facts" must "permit the court to infer more than a mere possibility of misconduct."  556 U.S. 662, 679 (2009).  Here, the Trustee

set forth documents that adequately explained its factual allegations that the NGP Directors have an employment relationship with NGP, such that it precludes independence from the transactions in question and allows the NGP Directors an opportunity to exert control over the Northstar Directors and Northstar, generally.

Accordingly, the Court grants the Trustee's oral motion to amend the Complaint regarding the NGP Directors' employment relationship with NGP, as applied to the issues of control and director independence.

### B. Counts 1 & 2: Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)

In Count 1, the Trustee brings actual and constructive fraudulent transfer claims under § 544(b) of the Bankruptcy Code, seeking to avoid several transfers under the Texas Uniform Fraudulent Transfer Act, ("TUFTA"). (ECF No. 1 at 13–14). The Trustee's claims are brought under the TUFTA §§ 24.005–24.006.

Section 24.005(a) provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or *within a reasonable time after the transfer was made or the obligation was incurred*, if the debtor made the transfer or incurred the obligation:

    (1) with an actual intent to hinder, delay, or defraud any creditor of the debtor; or

    (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

        (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

        (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE § 24.005 (emphasis added).

Additionally, under TUFTA:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Tex. Bus. & Com. Code § 24.006.

"[T]he elements of an actual fraudulent transfer under TUFTA are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) with actual intent to hinder, delay, or defraud any of the debtor's creditors." *Matter of Life Partner Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019) (citation omitted); *see* Tex. Bus. & Com. Code § 24.005(a)(1). Meanwhile, the "elements of a constructive fraudulent transfer under Texas law are the same as actual fraudulent transfer except instead of pleading fraudulent intent, the plaintiff must plead facts demonstrating: (1) lack of reasonably equivalent value for the transfer; and (2) the transfer was 'financially vulnerable' or insolvent at the time of the transaction. *Id.* at 120 (first citing *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 562, 566 & n.21 (Tex. 2016); then citing Tex. Bus. & Com. Code § 24.006(a)); *see* Tex. Bus. & Com. Code § 24.005(a)(2).

The Trustee's fraudulent transfer claim pursuant to 11 U.S.C. § 544(b) against the Defendants stems from the same two points in time as all other claims: (i) the September 2012 purchase of the Creole Field Assets, and (ii) the September 2014 sale of Northstar to Platinum Partners. (ECF No. 1 at 13–14). The Trustee claims that the "Defendants acknowledged that Northstar was insolvent, inadequately capitalized, and unable to pay debts as they came due."

(ECF No. 1 at 13).  Even with this alleged knowledge, the Trustee argues that the "Defendants" caused Northstar to overpay Propel Energy for the Creole Field Assets in September 2012.  (ECF No. 1 at 14 (noting Northstar paid "tens of millions of dollars more than the next highest bidder")).  The Trustee contends that the "Defendants used their control [over] Northstar to transfer" the tens of millions of dollars from Northstar to Propel Energy "for the benefit of Defendants."  (ECF No. 1 at 14).

The Trustee further claims that "Defendants also hindered Northstar's creditors by securing releases of capital contributions committed to Northstar as part of the September 2014 sale of Northstar to Platinum Partners," which included NGP's $75 million capital commitment obligation, and the Northstar Directors' individual capital contribution obligations.  (ECF No. 1 at 11, 14).  The Trustee maintains that the releases were given at a time when the Defendants "acknowledged in writing" that Northstar was incurring debt which it could not pay, and at a time when Northstar was subject to a working capital deficit.  (ECF No. 1 at 14).  Moreover, the "self-dealing transfers" were either made while Northstar was insolvent or became insolvent as a result, and for which Northstar did not receive a reasonably equivalent value as part of the exchange.  (ECF No. 1 at 14).

In Count 2, the Trustee brings actual and constructive fraudulent transfer claims against Defendants pursuant to 11 U.S.C. § 548(a)(1) for agreeing to release Defendants from their contractual obligations to provide more than $75 million in capital to Northstar and the Northstar Directors' individual funding obligations.  (ECF No. 1 at 15–16).

NGP Energy maintains that the Trustee's actual and fraudulent transfer claims in Counts 1 and 2 under §§ 544(b)(1) and 548(a)(1)(B) should be dismissed because the Complaint fails to:

(i)    Meet the requirements of Rule 8(a), because the Complaint impermissibly "lumps" the Defendants into groups rather than specifying each Defendants' individual roles in the transfers;

(ii)    Plead NGP Energy's actual intent with particularity as required by Rule 9(b) when stating a claim for an actual fraudulent transfer;

(iii)    Demonstrate how the payment to Propel Energy for the Creole Field Assets in 2012 benefitted NGP Energy, such that NGP Energy would qualify as a transferee of the purchase price;

(iv)    Plead the existence of a "triggering" unsecured creditor in order to establish standing under 11 U.S.C. § 544(b);

(v)    Establish a claim against a Defendant other than NGP-NOG for the capital commitment release, because no other Defendant owed a capital commitment at the time of the release;

(vi)    Support the application of the "discovery rule," nor can the discovery rule apply to defer the accrual of a claim under TEX. BUS. & COM. CODE § 24.006(b);

(vii)    Establish Northstar's insolvency, for either transaction, which is necessary for a constructive fraudulent transfer claim; and

(viii)    Demonstrate that NGP-NOG's capital commitment to Northstar was an "asset" of Northstar's estate in light of Wells Fargo Bank's lien.

(ECF Nos. 19 at 16–17; 47 at 3–4; 47 at 7–24).

### i.  Rule 8 Violation

NPG Energy argues that the Trustee's Complaint violates Federal Rule of Civil Procedure 8(a)'s prohibition against group pleading, because it impermissibly "lumps" the Defendants into groups rather than specifying each Defendants' individual roles in each of the fraudulent transfers.  (ECF Nos. 19 at 16; 47 at 2).  The Trustee disagrees noting that, "[t]he Complaint does not lump Defendants together to create doubt about the claim against each of them."  (ECF No. 39 at 26).  Rather, the Trustee creates "three groups for convenience," and for "the specific transactions at issue, each group is addressed separately as to their roles in the events and benefits derived."  (ECF No. 39 at 26).

Where more than one defendant allegedly committed the same act together, a complaint is not defective for the reason that it asserts that all defendants committed the same act, without identifying each individual defendant." *Wilson v. Deutsche Bank Trust Co.*, No. 13:18-CV-0854-D, 2019 WL 175078, at *7 (N.D. Tex. Jan. 10, 2019).   In dismissing certain claims, however, the court in *Wilson* noted that the Complaint impermissibly grouped defendants where the acts alleged "inherently could have been committed by only *one* defendant." *Id*.   Therefore, so long as a group act was alleged, so could the complaint assert that all defendants committed the same act.   *Id*.   The court in *Clapper* expressed the same sentiment when assessing a fraudulent transfer claim:

> The Court declines to dismiss plaintiffs' amended complaint on the basis that they have engaged in group pleading.  Plaintiffs contend that, where paragraphs in the amended complaint refer to multiple defendants, they intend to allege that each defendant committed the alleged acts.  Except, for example, where a statute otherwise requires, plaintiffs are permitted under federal procedure to allege that more than one defendant (i.e., a group of named defendants) committed the same alleged act.

*Clapper v. Am. Realty Inv'r, Inc.,* No. 3:14-CV-2970-D, 2015 WL 3504856, at *4 (N.D. Tex. June 3, 2015).

Here, the Trustee asserts fraudulent transfer claims against various NGP Entities, the Northstar Directors, and the NGP Directors.  (ECF Nos. 1 at 13–16).  A fraudulent transfer is not an act that "inherently could have been committed by only *one* defendant.  *Wilson*, 2019 WL 175078, at *7.   To the contrary the Trustee's allegations are that each of the Defendants participated in the transfers alleged.  Moreover, the Trustee notes that it created those groups for convenience rather than doubt and has asserted that the Defendants all committed the alleged act.  The Complaint does not violate Federal Rule of Procedure 8(a)'s prohibition against group pleading.

*ii. Standing*

NGP Energy argues that the Trustee lacks standing to assert a fraudulent transfer claim pursuant to § 544(b), because the Trustee has not established "the existence of an actual creditor holding an allowable unsecured claim who could have avoided the alleged transfer under state law." (ECF No. 47 at 13). NGP Energy maintains that none of the creditors listed by the Trustee provide standing under TUFTA's reasonable time requirement at least with regard to the 2012 Propel Energy Payment. (ECF No. 61 at 6).

Although not explicitly stated, the Trustee does not contest that an unsecured creditor is not listed in the Complaint as part of his fraudulent transfer claim. Rather, in pleadings following the hearing on NGP Energy's and the Northstar Directors' motions to dismiss, the Trustee lists various unsecured creditors which held "claims that arose 'within a reasonable time after'" the 2012 Propel Energy Payment and the 2014 Capital Commitment Releases. (ECF No. 59 at 3–5). The Trustee recognized that although the listed creditors all held different claims at the time of the 2012 Propel Energy Payment, the 2014 Capital Commitment Releases, and Northstar's bankruptcy filing in 2016, such was not fatal to his standing. (ECF No. 59 at 2). All that is required is that the same creditor hold a claim at the time of the transfer in question and at the time of the debtor's bankruptcy filing. (ECF No. 59 at 2).

Subsection 544(b)(1) of the Bankruptcy Code "gives the trustee the right to avoid any transfer of the interest of a debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under the Bankruptcy Code. . . ." 5 COLLIER ON BANKRUPTCY ¶ 544.06 (Richard Levin & Henry J. Sommer eds., 16th ed.). "The burden is on the trustee seeking to take advantage of this provision to demonstrate the existence of an actual creditor with an allowable claim against the debtor."

*Id*.  "Under section 544(b)(1), the trustee succeeds to the rights of an unsecured creditor in existence at the commencement of the case who may avoid the transfer under applicable" federal, state, or local law.  *Id*. at ¶ 544.06[1]–[2].  "The unsecured creditor need not exist at the time the action is filed."  *Id*. at ¶ 544.06[1].  "Further, while the so-called 'triggering' creditor must be the same creditor on both the transfer date and the date of commencement of the case, '*it need not hold the same claim* at these two essential points in time.'"  *Id*. (emphasis added) (citations omitted).  "If there is no creditor against whom the transfer is voidable under the applicable law, the trustee is powerless to act under section 544(b)(1)."  *Id*.

Accordingly, contrary to NGP Energy's argument, that the claim asserted by the Trustee is different on the transfer date than the claim on the petition date is not determinative to the issue of standing under § 544(b)(1).  Rather, in order to establish standing, the Trustee must identify an unsecured creditor with a claim, which is avoidable under Texas law, on both the transfer date and the petition date, even if that claim at those two points in time is different.

*The September 2012 Propel Energy Payment*

The Trustee identified eleven unsecured creditors, which he claims were creditors at the time of the Propel Energy Payment in September 2012[15] and at the time Northstar's bankruptcy petition was filed in August 2016.  (ECF No. 59 at 3).

    i.  **A&B Valve & Piping, LLC:** The statement of the claim provides that A&B Valve & Piping furnished materials, labor, and services to Northstar "[d]uring the months of July 2016 and August 2016."

    ii.  **Dulan, LLC:** Dulan, LLC and Northstar entered into a Monitoring Agreement in October 26, 2012, for which there appear to be monthly rates.  The invoices provided in Dulan's proof of claim, however, commence as of May 2016.

---

[15] In his pleadings on the issue, the Trustee states that the Propel Energy Payment occurred in October 2012; however, in the Complaint, he notes that Northstar and Propel Energy signed the Purchase & Sale Agreement in September 2012, "significantly overpaying for the Creole Field" Assets.  (*See* ECF Nos. 1 at 8–9; 59 at 3).  The Court will follow the timeline set out in the Complaint.

iii. **J. Connor Consulting, Inc.:** The accounts receivable report for J. Connor Consulting, Inc. begins on November 30, 2015, and ends in December 2016.

iv. **Martin Energy Services:** An attachment to the proof of claim shows that Northstar was initially invoiced in September 2014 through July 2016.

v. **Quality Construction & Production, LLC**: The Court was unable to locate an unsecured claim for Quality Construction & Production, LLC.

vi. **Quality Production Management**: The Court was unable to locate an unsecured claim for Quality Production Management.

vii. **RigNet, Inc.:** Exhibit A in RigNet, Inc.'s proof of claim shows that the first invoice came due on March 2015 and the last came due on January 2017.

viii. **Stallion Offshore Quarters, Inc.:** The lien claimant's affidavit shows various dates of performance, the first of which occurs on April 2016. The invoice dates continue post-petition and several fall in August 2016.

ix. **Transcontinental Gas Pipeline LLC:** The invoice detail statement provides accounting periods starting in May 2016 (for work that began in March 2016), and also for August 2016.

x. **United Vision Logistics**: The invoice period begins in April 2016 and ends in July 2016.

xi. **Wood Group PSN, Inc.:** The notice of lien claim and privilege shows various dates of performance, the first of which begins in September 2015 and lasts through August 2016.

(ECF No. 59 at 3).

As an initial matter, none of the creditors listed by the Trustee show invoice amounts which arose prior to the 2012 Propel Energy Payment. Therefore, the Trustee must show that a claim arose "within a reasonable time" after the September 2012 payment. Although all invoice dates within the creditors list vary, the closest in time is Martin Energy Services, which invoiced Northstar in September 2014, two years after the 2012 Propel Energy Payment.

Pursuant to TUFTA § 24.005, a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor" if the "creditor's claim arose before *or within a reasonable time* after the transfer was made or the obligation was incurred . . . ." TEX. BUS. & COM. CODE § 24.005(a) (emphasis added). Therefore, here, in order to establish standing pursuant to § 544(b), the

Trustee must show that a creditor's claim, which arose two years after the transfer at issue, falls under the "within a reasonable time" standard as set out in TUFTA § 24.005(a).  The crux of the issue before the Court is what § 24.005(a) means when it says, "within a reasonable time."

NGP Energy argues that the Trustee has not met the "within a reasonable time" standard required by § 24.005(a) for the 2012 Propel Energy Payment.  (ECF No. 61 at 2 ("Plaintiff has not properly identified a single creditor whose claim arose even within two years of the alleged transfer to Propel Energy L.L.C. that Plaintiff alleges in his Complaint occurred in September 2012.")).  On the other hand, the Trustee suggests that in light of the creditors' "ongoing commercial relationship with" Northstar, "the creditor's right to avoid a transaction arises from th[e] relationship rather than the balance owed at any particular time."  (ECF No. 59 at 2).  Moreover, since all of the claims arose within the four-year statute of limitations for § 24.005(a) claims" they fall within the "reasonable time standard."  (ECF No. 59 at 5).  Accordingly, the creditors' ongoing commercial relationship with Northstar along with a four-year reasonable time period provided in § 24.005(a) allows for Trustee standing on both transfers.

TUFTA does not provide a definition for "reasonable time", nor have any Texas opinions analyzed the length of time or circumstances that render a future creditor a viable plaintiff in a case under TUFTA.  (ECF No. 61 at 2–3 ("[N]o Texas case—nor TUFTA itself—defines what is a 'reasonable time after the transfer was made' for purposes of asserting a TUFTA § 24.005 action based on post-transfer claims.")).  Nevertheless, the Trustee relies on a footnote in *West v. Seiffert (In re Houston Drywall, Inc.),* No. 05-95161-H4-7, 2008 WL 2754526, at *20 n.23 (Bankr. S.D. Tex. July 10, 2008) for the proposition that "within a reasonable time" means "within the four-year statute of limitations for § 24.005(a) claims."  (ECF No. 59 at 5).  Although the court in *Houston Drywall* briefly mentions the "reasonable time" standard in a footnote, such

discussion is not controlling.  Notably, the court in *In re Houston Drywall* held that a claim

which arose *less than a year after the transfer* took place, fell within "the reasonable time"

standard in § 24.005(a):

> TUFTA also requires a showing that the plaintiff's claim—here, the Trustee's
> claim—occurred within a reasonable time after the assignments of the TIRZ
> receivables.  Classica's bankruptcy petition was filed on February 6, 2017—less
> than one year after the assignment took place. . . .  The Court concludes that the
> Trustee's claim arose within a reasonable time after the assignments took place.
> Although the definition of "reasonable time" under TUFTA is not specifically
> defined, the four year statute of limitations suggests that a "reasonable time" is
> within four years."

*In re Houston Drywall, Inc.,* 2008 WL 2754526, at *20 n.23 (citing *Williams v. Performance*

*Diesel, Inc.*, No. 14-00-00063-CV, 2002 WL596414, at *4 (Tex. App.—Houston [14th Dist.]

2002, no pet.)).  Similarly, the court in *Williams,* as cited by the *Houston Drywall* court, also

briefly discussed the standard:

> The Commissioner does not argue that claims arising in 1998 or 1999 would be
> within a reasonable time of transfers occurring in 1993.  However, even if she did,
> such argument would not have merit.  Although we have found no cases giving a
> definition of 'reasonable time' under TUFTA, the statute itself imposes a four-
> year statue of repose (based on the date of the transfers at issue) on the filing of
> lawsuits pursuing claims under the act . . . .  *A claim that does not even arise until*
> *after the running of the statute of repose most certainly does not arise within a*
> *reasonable time under that statute.*

*Williams v. Performance Diesel, Inc.*, No. 14-00-00063-CV, 2002 WL596414, at *4 (Tex.

App.—Houston [14th Dist.] 2002, no pet.) (emphasis added).  Although the *Williams* court

expressed that a claim arising past the four-year statute of repose would not be "within a

reasonable time", it did not hold that "within a reasonable time" under § 24.005(a)(1) was to be

defined as the four-year statute of repose period.

In light of the fact that Texas courts have not yet addressed or defined "within a

reasonable time" under § 24.005(a), the Court turns to statutory language.  In particular, the

Court examines the purpose of TUFTA's statute of repose in § 24.010 contrasted with the purpose of TUFTA's fraudulent transfer statute in § 24.005(a). The TUFTA statute of repose states:

> Except as provided by Subsection (b) of this section, a cause of action with respect to a fraudulent transfer or obligation under this chapter is *extinguished* unless action is brought: (1) under Section 24.005(a)(1) of this code, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant; (2) under Section 24.005(a)(2) or 24.006(a) of this code, within four years after the transfer was made or obligation was incurred; or (3) under Section 24.006(b) of this code, within one year after the transfer was made.

TEX. BUS. & COM. CODE ANN. § 24.010 (emphasis added). "Unlike a statute of limitations, a statute of repose does not only 'procedurally bar an untimely claim, it substantively "extinguishes" the cause of action.'" *Clapper v. Am. Realty Inv'r, Inc.,* No. 3:14-CV-2970-D, 2018 WL 3868703, at *12 (N.D. Tex. Aug. 14, 2018) (quoting *Nathan v. Whittington*, 408 S.W.3d 870, 874 (Tex. 2013)). In explaining the difference between a statute of repose and a statute of limitations, the Supreme Court noted:

> Statutes of repose also encourage plaintiffs to bring actions in a timely manner, and for many of the same reasons [as those found for statutes of limitations]. But the rationale has a different emphasis. Statutes of repose effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time. Like a discharge in bankruptcy, a statute of repose can be said to provide a fresh start or freedom of liability.

*CTS Corp. v. Waldburger*, 134 S.CT. 2175, 2183 (2014). "Thus, the purpose of a statute of repose is to provide absolute protection to certain parties from the burden of indefinite potential liability." *Walter O'Cheskey v. CitiGroup Global Mkt, Inc., (In re Am. Hous. Found.)*, 543 B.R. 245, 256 (Bankr. N.D. Tex. 2015) (quoting *Galbraith Eng'g Consultants, Inc. v. Pochucha,* 290 S.W.3d 863, 863 (Tex. 2009)).

TUFTA's four-year statute of repose, therefore, is meant to provide a fixed amount of time, after which point a party is free from "potential liability." Meanwhile, § 24.005(a)(1) provides a method by which a claim may be identified as a fraudulent transfer, which then can be avoided once other requirements are met. Accordingly, the purpose behind TUFTA's four-year statute of repose in § 24.010 is not the same as the limitations imposed on a creditor's claim in § 24.005(a). Had the Texas Legislature intended to set a four-year limitation period under § 24.005(a), as it did in § 24.010, it would have used TUFTA's four-year limitation language instead of the phrase, "within a reasonable time after the transfer."

Reasonableness is, by its nature, fact specific. It cannot be defined precisely as the contours of a situation must guide the reasonableness standard. The Complaint neither establishes nor defeats reasonableness. This will be a matter for trial, or perhaps summary judgment. It is definitively not a matter to be decided at the Rule 12(b)(6) stage of this proceeding.

### *The September 2014 Capital Commitment Releases*

The Trustee lists twenty-two unsecured creditors, which he maintains held claims at the time of the September 2014 Capital Commitment Releases and the filing of Northstar's bankruptcy petition in August 2016. Eleven of the creditors listed are the same as those listed under the 2012 Propel Energy Payment section above. The additional eleven creditors can be found below:

i. **American Eagle Logistics, LLC:** the accounts receivable report attached to American Eagle's proof of claim shows invoices dates dating from January 2016 to August 2016.

ii. **Archrock Partners:** the proof of claim indicates that invoices commenced in June 2016 and continued until December 2016.

    iii.    **Atchafalaya Measurement Controls, Inc.:** the "A/R Aging Detail" document attached to Atchafalaya's proof of claim shows invoices which begin in June 2016 and end in December 2016.

    iv.    **Coastal Crewboats, Inc.:** invoices from Coastal Crewboats begin in March 2016 and continue until August 2016.  However, Coastal Crewboats claims that the entire claim is secured rather than unsecured as listed in Northstar's schedules.

    v.    **Gulf-Pro Services:** the proof of claim filed attaches customer balance sheets as well as invoices for February, March, and April 2016.

    vi.    **Halliburton Energy Services, Inc.:** the statement of privilege attached to Halliburton Energy's proof of claim asserts amounts owed for work provided in June and July 2016.  Halliburton Energy, however, claims some portion of its claim as secured.

    vii.    **Measurement Technologies, Inc.:** statements attached to the proof of claim assert amounts owed for work provided from February 2016 to May 2016.

    viii.    **Offshore Rental, LLC:** an account statement attached to Offshore Rental's proof of claim asserts amounts beginning in January 2015 and which continue until December 2016.

    ix.    **Petronyx, LLC:** general unsecured claim has been expunged.

    x.    **SempCheck Services Inc.:** proof of claim shows invoices for payments owed in April 2016, November 2016, and December 2016.

    xi.    **Traco Production Services, Inc.:** invoice dates show payments due in April, June, July, August, and October 2016.

(ECF No. 59 at 3).

As noted above, pursuant to TUFTA § 24.005, a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor" if the "creditor's claim arose *before or within a reasonable time* after the transfer was made or the obligation was incurred . . . ."  TEX. BUS. & COM. CODE § 24.005(a) (emphasis added).  "[W]hile the so-called 'triggering' creditor must be the same creditor on both the transfer date and the date of commencement of the case, '*it need not hold the same claim* at these two essential points in time.'"  5 COLLIER ON BANKRUPTCY ¶ 544.06 (Richard Levin & Henry J. Sommer eds., 16th ed.) (emphasis added) (citations omitted).

The Trustee lists various creditors with claims that arose less than or within a year after the September 2014 Capital Commitment Releases were made, and which also have claims (although different) on the date of commencement of the case in August 2016.  The creditors are as follows:

> **RigNet, Inc.:** Exhibit A in RigNet, Inc.'s proof of claim shows that the first invoice came due on March 2015 and the last came due on January 2017.

> **Wood Group PSN, Inc.:** The notice of lien claim and privilege shows various dates of performance, the first of which begins in September 2015 and lasts through August 2016.

> **Offshore Rental, LLC:** an account statement attached to Offshore Rental's proof of claim asserts amounts beginning in January 2015 and which continue until December 2016.

The Trustee need only demonstrate the existence of *a* triggering unsecured creditor, not multiple.  However, as noted in this Court's holding in the preceding section, the issue of whether a claim arose within a reasonable period of time after the transfer is fact specific.  The Complaint neither establishes nor defeats reasonableness.

Accordingly, the Court will not resolve this issue at the 12(b)(6) stage.

### iii.   Transferee

NGP Energy argues that the Complaint fails to demonstrate how the payment to Propel Energy for the Creole Field Assets in 2012 benefitted NGP Energy, such that NGP Energy would qualify as a transferee of the purchase price.  (ECF No. 47 at 15).  Specifically, NGP Energy contends that "TUFTA and the Bankruptcy code would allow recovery from" NGP Energy "only if Northstar paid the purchase price to Propel Energy for the benefit" of NGP Energy, which the Complaint does not.  (ECF No. 47 at 15 ("Plaintiff must allege facts explaining *how or why* that purchase was made for Movants' benefit.  Plaintiff wholly fails to do so." (emphasis in original))).  "[A]t most, [the Trustee] implies that [the NGP Directors] 'benefitted' from money

paid to an investment belonging to entities in which [the NGP Directors] held unspecified 'financial interests.'" (ECF No. 47 at 16). In light of the fact that the Complaint "fails to plead facts alleging any direct or quantifiable resulting 'benefit'" the claim fails. (ECF No. 47 at 17).

The Trustee contends that the "Complaint adequately alleges that Northstar's overpayment to Propel [Energy] was made to benefit NGP and [the] NGP Directors," citing the following:

> From the outset, NGP used its *control* of Northstar to manufacture inflated profits for NGP at Northstar's expense. . . . This inflated price benefitted the NGP Directors, who had *financial interests* in NGP.

> In 2012, NGP *caused* the Board to overpay for NGP assets for NGP's benefit. . . . Padding its profits from the sale of this field would give NGP both immediate accounting benefits and a reputational boost in raising future funds.

> The NGP Directors benefitted personally by this *self-dealing,* as the next highest bidder was tens of millions below the Northstar purchase price.

(ECF No. 39 at 21 (citing ECF No. 1 at 2, 8, 40)) (emphasis added). Moreover, the Trustee maintains that "[d]iscovery is needed to show the exact proportion of the Creole Field [Assets'] sale proceeds that went to each NGP entity and director." (ECF No. 39 at 21).

"Determining liability under TUFTA is a two-step process." *Tow v. Speer*, No. H-11-3700, 2015 WL 1058080, at *7 (S.D. Tex. Mar. 10, 2015). "The first step is to determine whether a debtor committed a fraudulent transfer under § 24.005." *Id.* "The second step is to determine whether recovery of that fraudulent transfer, or its value, from the transferee is appropriate under §§24.008 and 24.009." *Tow*, 2015 WL 1058080, at *7 (citing *Spring St. Partners–IV, L.P. v. Lam*, 730 F.2d 427, 436 (5th Cir. 2013)). "TUFTA not only creates liability against the person for whose benefit the transfer was made, such as the debtor, but also against the first transferee of the asset, or any subsequent transferee." *Id.* (quoting *Trigeant Holdings,*

*Ltd. v. Jones*, 183 S.W.3d 717, 726 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)) (internal quotations omitted).

"The Bankruptcy Code also provides a two-step process for recovering a money judgment for a fraudulent transfer." *Tow*, 2015 WL 1058080, at *7. "Section 544 of the Bankruptcy Code permits a claim for avoidance of a transfer found under state law." *Id*. Moreover, "[s]ection 550 of the Bankruptcy Code prescribes the rights and liabilities of a transferee of an avoided transfer, and authorizes the trustee to recover the property or value of the property transferred." *In re Pace*, 456 B.R. 253, 276 (Bankr. W.D. Tex. 2011). "As such, § 550 stands as a recovery statute rather than a primary avoidance basis for action, and provides an avenue of recovery for the trustee who prevails under an avoidance section of the Code." *Id*. (citing *Southmark Corp. v. Schulte, Roth & Zabel, LLP*, 242 B.R. 330, 337 (N.D. Tex. 1990)). Pursuant to Section 550 of the Bankruptcy Code:

> [T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a); *see Tow*, 2015 WL 1058080, at *8 ("Section 550(a)(1) imposes liability on *both* the initial transferees and beneficiaries of fraudulent transfers." (quoting *In re Red Dot Scenic, Inc.*, 293 B.R. 116, 121 (S.D.N.Y.), *aff'd* 351 F.3d 57 (2d Cir. 2003) (emphasis in original) (internal quotations omitted))). The Plaintiff's power to recover property under section 550(a), however, is limited by section 550(b):

> which prevents recovery from immediate or mediate transferees of the initial transfer under § 550(a)(2) who 'take[] for value . . ., in good faith, and without knowledge of the voidability of the transfer avoided.' 11 U.S.C. § 550(b)(1). No such good faith defense is available to the initial transferee *or the 'entity for whose benefit such transfer was made*' under § 550(a)(1); the trustee may always

recover from the initial transferee regardless of good faith, value, or lack of knowledge of the voidability of the transfer.

*In re Pace*, 456 B.R. at 276 (citing *Rupp v. Markgraf*, 95 F.3d 936 (10th Cir. 1996); *Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1419 (5th Cir. 1997)) (emphasis added).

NGP Energy has not set forth a good faith argument.  Rather, NGP Energy claims that it is not the initial transferee of the 2012 Propel Energy Payment; therefore, in order to recover under TUFTA or the Bankruptcy Code, the Trustee must show that NGP Energy received a benefit from such transfer, which it alleges the Trustee has not done.

The Trustee argues that the payment to Propel Energy for the Creole Field Assets was made for the benefit of the Defendants.  This necessarily implicates the issues of control and director independence.  (*See* ECF No. 39 at 21 (citing ECF No. 1 at 2, 8, 40 (noting that "NPG used its control" over Northstar to "manufacture inflated profits" which "benefitted the NGP Directors" in light of their financial interests", and further maintaining that the "NGP Directors benefitted from" such "self-dealing"))).  Moreover, NGP Energy's own defenses also necessarily implicate issues of control.  (*See* ECF No. 47 at 16 ("[A]t most, [the Trustee] implies that [the NGP Directors] 'benefitted' from money paid to an investment belonging to entities in which [the NGP Directors] held unspecified 'financial interests.'")).

As noted above, the Court has granted the Trustee leave to amend the Complaint on the issues of control and director independence.  In light of the fact that the issue of control and director independence, or lack thereof, directly affect the question of whether NGP Energy received a benefit from the alleged fraudulent transfers, the Court will reserve ruling on this issue at this time.

iv.  *NGP-NOG Capital Commitment Release*

NGP Energy does not dispute that NGP-NOG owed a capital commitment to Northstar as of September 22, 2014.  (ECF No. 47 at 17).  Rather, NGP Energy claims that the Trustee may not assert a fraudulent transfer claim based on the 2014 Capital Commitment Releases against anyone other than NGP-NOG because "the only Movant who owed a capital commitment as of September 22, 2014—the effective date of the Contract—was NGP-NOG."  (ECF No. 19 at 24). Moreover, "the capital commitments were not property that could be transferred to any Movants except NGP-NOG."  (ECF No. 47 at 18).  Therefore, the Trustee's fraudulent transfer claim based on the 2014 Capital Commitment Releases fails as to every Defendant other than NGP-NOG.

As evidence of its claim, NGP Energy argues that the following documents demonstrate that only NGP-NOG owed a capital commitment at the time of the 2014 Capital Commitment Releases: (i) the Contract,[16] (ii) the Amendment to the Northstar Agreement, and (iii) the Assignment of NGP-NOG.  (ECF No. 19 at 24).  Specifically, NGP Energy argues that the Amendment to the Northstar Agreement and the Assignment of NGP-NOG merit this Court's consideration because they are referenced in the Complaint and central to the Trustee's fraudulent transfer claims, which are themselves based on Defendants' capital commitment releases.  (ECF No. 46 at 5–6).  As noted in this Court's discussion on the Trustee's motion to strike, the Court cannot properly consider the Amendment to the Northstar Agreement or the Assignment of NGP-NOG, because although they "may shed some light on the issues at play in the [] Complaint" they were neither referenced nor quoted within the Trustee's Complaint, and further are not necessary to establish an element of Northstar's claim.  *In re Xtreme Power Inc.*,

---

[16] The Trustee does not object to the inclusion of the Letter Agreement.  (ECF Nos. 41 at 2; 39 at 15 ("Except for the Letter Agreement, which is the basis for the breach of contract claim, the exhibits are outside the four corners of the Complaint and not 'central' to any claim." (citation omitted))).

563 B.R. at 630. Therefore, both documents are inappropriate to consider at the Rule 12(b)(6) stage. *Id.* ("[D]ocuments used to support a defendant's affirmative defense appear not to fall within the exception.").

Accordingly, the Court will not consider NGP Energy's argument at this time.

### v. *Rule 9(b) Violations*

NGP Energy argues that the Trustee's actual fraudulent transfer claims pursuant to § 24.005(a)(1) and § 548(a)(1)(A) require a higher pleading standard—specifically, that those claims must plead with particularity under Federal Rule of Civil Procedure 9(b). (ECF No. 19 at 31). NGP Energy alleges that the Trustee has failed to properly plead its claims in both Counts 1 and 2 in accordance with Rule 9(b) by: (i) "lumping" the defendants together, and (ii) failing to adequately plead the intent element of the Trustee's actual fraudulent transfer claims. (ECF No. 19 at 32–33).

The Trustee disagrees, noting that "the Fifth Circuit has not definitively held that fraudulent transfer claims fall within the purview of Rule 9(b)" and therefore, Rule 9 pleading standards do not apply to his TUFTA claims. (ECF No. 39 at 25 (citing NGP Energy's pleading)). The Trustee highlights the disagreement between district courts' both inside and out of Texas on the application of Rule 9(b) to fraudulent transfer claims. (ECF No. 39 at 24 (citations omitted)). "This is because TUFTA claims, unlike fraud claims, are not based on a defendant's bad intent but focus on the debtor's acts and intent." (ECF No. 39 at 25 (citing TEX. BUS. & COM. CODE § 24.005(a)(1)). Moreover, even if Rule 9(b) applied to the Trustee's TUFTA claims, the Complaint alleges sufficient facts to meet the standard. (ECF No. 39 at 35).

"Rule 9(b) imposes a heightened pleading standard in cases where the plaintiff alleges fraud or mistake: particularity." *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir.

2019) (citing Fed. R. Civ. P. 9(b)).   "When the Rule 9(b) pleading standard applies, the complaint must contain factual allegations stating the 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what [that person] obtained thereby.'"   *Id.* (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)) (alteration in original).   "In other words, to properly allege fraud under Rule 9(b), the plaintiff must plead the who, what, when, where, and why as to the fraudulent conduct."   *Id.*

As noted above, Count 1 in the Trustee's Complaint sets forth an actual fraudulent transfer claim pursuant to § 24.005(a)(1).   "The elements of an actual fraudulent transfer under TUFTA are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) with actual intent to hinder, delay or defraud any of the debtor's creditors."   *In re Life Partners Holdings, Inc.*, 926 F.3d at 117 (citing *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 204–05 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)).   Count 2 relies on the Bankruptcy Code's actual fraudulent transfer doctrine, set out in § 548:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (A) made such a transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . ., indebted[.]

11 U.S.C. § 548(a)(1)(A).   The Trustee's fraudulent transfer claims are rooted in his allegations that the Defendants' improperly: (i) caused Northstar to overpay Propel Energy, an NGP affiliate, in 2012 for the Creole Field Assets, and (ii) secured "releases of capital contributions committed to Northstar, including" the relinquishment of NGP's $75 million capital obligation

and the elimination of the Northstar Directors' individual capital commitments. (ECF No. 1 at 14).

The Trustee is correct in that the Fifth Circuit has "not previously addressed the question of whether an actual fraudulent transfer claim is subject to Rule 9(b)'s heightened pleading requirements." *In re Life Partners Holdings, Inc.*, 926 F.3d at 118 (citing *Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011)). In *Life Partners Holdings, Inc.,* the Fifth Circuit noted, as the Trustee did in his pleading, that "the district courts in this circuit are not in unanimity on this question." *Id*; *compare Guff v. Brown (In re Brown Medical Center, Inc).*, 552 B.R. 165, 167 (S.D. Tex. 2016) (applying Rule 9(b)'s heightened standard to actual fraudulent transfer claims), *with Janvey v. Suarez*, 978 F. Supp. 2d 685, 700 (N.D. Tex. 2013) (declining to apply Rule 9's heightened pleading requirements in light of the lack of "controlling Fifth Circuit authority" on the question). Ultimately, the Fifth Circuit in *Life Partners Holdings, Inc.* determined it need not decide the question of whether Rule 9(b)'s heightened requirements applied, because the complaint at issue satisfied both Rule 8 and Rule 9's requirements. *In re Life Partners Holdings, Inc.*, 926 F.3d at 118 ("Here, because Creditors' Trust's Count 1 and 3 allegations are sufficient under either standard we need not weigh in on this vexing question.").

Although the Fifth Circuit has not weighed in on the issue, this Court will apply Rule 9(b)'s heightened pleading standards to actual fraudulent transfers. *See In re Brown Medical Center, Inc*, 552 B.R. at 167; *see also In re NE 40 Partners, Ltd*., 411 B.R. 352, 364–65 (Bankr. S.D. Tex. 2009) (applying Rule 9(b) requirements to fraudulent transfer claims). Rule 9 applies whenever fraud is an essential part of the claim. In an *actual* fraudulent transfer case, fraud is an essential element. The Fifth Circuit has applied this reasoning in the § 523 fraud context. *AT&T Universal Card Serv. v. Mercer (In re Mercer),* 246 F.3d 391, 401–02 (5th Cir. 2001).

As noted above, under Rule 9, the Trustee "must plead the who, what, when, where, and why as to the fraudulent conduct." *In re Life Partners Holdings, Inc.*, 926 F.3d at 117 (citation omitted).  There is no question that the Trustee has satisfied the "what, when, and where" required by Rule 9(b).  (*See* ECF No. 1 at 14–16).  NGP Energy, however, takes issue with the "who" and the "why."  (ECF No. 56 at 35–36).  Specifically, NGP Energy argues that in lumping defendants together, the Trustee fails to adequately establish the "who."  (*See* ECF No. 56 at 35–36 (arguing that the "who" has not been satisfied given that the allegations have been made on a "group" basis)).  Moreover, NGP Energy further contends that the Trustee fails to adequately plead the "why" given that the Complaint does not properly establish an allegation of "control" as noted in this Court's discussion above.  (*See* ECF No. 56 at 36 ("This gets back to control. . . . [The Trustee is] alleging that NGP fraudulently obtained these releases.  [He has] to allege *how* that happened.  The 'how' can't be satisfied by saying that these people were appointed by NGP. This where you loop back into the control and independence issues." (emphasis added))).  The Court will take each issue in turn.

### Group Pleading

"[G]eneral allegations, which lump all defendants together failing to segregate the alleged wrongdoing of one from those of another do not meet the requirements of Rule 9(b)." *In re Franklin Bank Corp. Securities Litigation.*, 782 F. Supp. 364, 382 (S.D. Tex. 2011).  The Trustee's Complaint sets forth the following:

> In 2012, using its control over Northstar, NGP caused the Board to overpay for NGP assets for NGP's benefit. . . .  NGP wanted Northstar to buy the Creole Field [Assets] from Propel [Energy] for an inflated price. . . .  Through its NGP Directors, NGP caused Northstar to increase its bid by 40% to over $113 million. . . .  The NGP directors benefitted personally by this self-dealing, as the next highest bidder was tens of millions below the Northstar purchase price.  The Northstar Directors and NGP Directors approved this transaction that caused Northstar to drastically overpay for its interest in the field.

In August of 2014, NGP-NOG, NGP X US, Northstar, Roberts, Freeman, Stevens and Ulm acknowledged that Northstar was in dire financial straits, with insufficient funds to meet its obligations. Nevertheless, Defendants signed an agreement for Northstar to release Defendants from their obligations to provide more than $75 million in capital to the desperate company. Defendants caused Northstar to sign the release of these valuable capital obligations without receiving reasonably equivalent value in return. The agreement became effective upon the sale closing in September 2014. Defendants believed that Northstar was incurring debts beyond its ability to repay as the debts matured, as evidenced by the millions of dollars in immediately payable working capital deficit.

(ECF No. 1 at 8–9, 15). "Rule 9(b) exists to ensure that the Defendants have notice of the precise act or conduct that is being questioned as fraudulent so they have ample opportunity to defend their good name." *In re NE 40 Partners, Ltd.*, 411 B.R. at 365. Here, the Trustee has set forth who the Defendants are—who he is make his allegations against—including the date and subject of the transfer. The Trustee has given enough notice to allow the Defendants to "defend their good name." *Id.*

Accordingly, the Trustee has sufficiently plead the "who" as required by Rule 9(b).

*Actual Intent*

The Trustee argues, as did the Creditors' Trust in *Life Partners Holdings, Inc.*, that § 24.005(a)(1) does not require a "pleading of scienter by a defendant"; rather, the claim involves the intent of the debtor. (ECF No. 39 at 25); *see In re Life Partners Holdings, Inc.*, 926 F.3d at 118 ("Creditors' Trust emphasizes that its actual fraudulent transfer claims do not require any allegation that the defendant Licensees engaged in fraud; only the fraudulent conduct of the debtor [] is relevant to Counts 1 and 3."). NGP Energy, however, argues that the Trustee's pleading necessarily makes the Defendants' intent relevant. (ECF No. 47 at 9 ("Plaintiff alleges that *Movants' intent is Northstar's intent* by claiming that 'NGP,' the 'NGP Directors,' and

'Defendants' 'caused' Northstar to make the alleged fraudulent transfers." (emphasis in original))).

As NGP Energy noted at the hearing on its motion to dismiss, this issue makes relevant the issues of control and independence of the directors.  (*See* ECF No. 56 at 36 ("This gets back to control. . . . [The Trustee is] alleging that NGP fraudulently obtained these releases.  [He has] to allege how that happened.  The 'how' can't be satisfied by saying that these people were appointed by NGP.  This where you loop back into the control and independence issues.")).  Moreover, the Court has granted the Trustee's oral motion for leave to amend its Complaint on the issues of control and independence.  In light of the fact that those issues directly affect the "why" that NGP Energy alleges is missing, the Court will reserve ruling on this issue until the Trustee files a first amended complaint.  *See Patel v. Holiday Hospitality Franchising, Inc.*, 172 F. Supp. 2d 821, 825 (N.D. Tex. 2001) ("[A] court may dismiss a claim for failing to comply with Rule 9(b), but 'it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so.'" (quoting *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000))).

> ### vi.   *"Transfer" under TUFTA*

"TUFTA first requires that a 'transfer [is] made or [an] obligation [is] incurred by a debtor." *Sourcing Mgmt, Inc. v. Simclar, Inc.*, 118 F. Supp. 3d 899, 914 (N.D. Tex. 2015) (citing TEX. BUS. & COM. CODE § 24.005(a)).  TUFTA defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or *other encumbrance*."  *U.S. ex rel Small Bus. Admin. v. Commercial Tech.*, 354 F.3d 378,

385 (5th Cir. 2003) (citing Tex. Bus. & Com. Code § 24.002(12)) (emphasis in original). "TUFTA defines 'asset' as all property of the debtor but expressly excludes 'property to the extent it is encumbered by a valid lien.'" *Sourcing Mgmt, Inc.*, 118 F. Supp. at 914 (citing § 24.002(2)(A)). "A 'valid lien' is defined as 'a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 414 (5th Cir. 2009) (citing § 24.002(13)). "A lien includes a security interest." *Sourcing Mgmt.*, 118 F. Supp. 3d at 914 (citing § 24.002(8)). Moreover, a transfer of legal title is sufficient to qualify as a "transfer" under TUFTA. *See In re Contractor Tech., Ltd.*, 345 B.R. 800, 804 (Bankr. S.D. Tex. 2006), *aff'd*, 229 F. App'x 294 (5th Cir. 2007) ("To the extent that the Trustee holds only legal title, he is only recovering legal title; to the extent that the Trustee holds legal and equitable title, he is recovering both.").

NGP Energy argues that the Trustee's fraudulent transfer claims are implausible "because public records—documents of which this Court may take judicial notice—show that the release of NGP-NOG's capital commitment was not a 'transfer' under TUFTA." (ECF No. 47 at 19). Specifically, NGP Energy argues that both the Financing Statement and the Termination "demonstrate that Wells Fargo held a valid lien that fully encumbered Northstar's capital commitments as of the effective date of Northstar's release of its capital commitments" and therefore "Northstar's release of those capital commitments was not a transfer under TUFTA." (ECF No. 46 at 5).

The Trustee argues that the Financing Statement and the Termination are beyond this Court's consideration at a motion to dismiss stage, and NGP Energy's arguments merely raise "a fact dispute over the extent to which the capital commitments were encumbered, if at all." (ECF No. 39 at 24). The Trustee notes that Northstar's participation in signing the Letter Agreement

and releasing NGP, the NGP Directors, and the Northstar Directors from their capital commitments demonstrates that Northstar owned those capital commitments, and that therefore, those capital commitments were property of Northstar and subject to transfer at the time of the 2014 Capital Commitment Releases.  (ECF No. 39 at 23–24).

As noted in this Court's discussion above on the Trustee's motion to strike, although the Court may take judicial notice that the Financing Statement and that the Termination exist, such notice is limited to "determining what statements they contain, not for proving the truth of their contents."  *Schott v. Nobilis Health Corp.,* 211 F. Supp. 3d 936, 947 (S.D. Tex. 2016 (quoting *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 n.1 (5th Cir. 1996)).  Moreover, neither Wells Fargo's UCC-1 financing statement filing, nor its subsequent termination establish the creation or validity of a lien on Northstar's property.  They establish, at most, perfection.  They do not establish attachment of a lien, nor the outstanding amount of any attached lien.

Accordingly, the Court cannot properly consider the Financing Statement and the Termination in ruling on NGP Energy's and the Northstar's request for dismissal under Rule 12(b)(6).

### vii.   Discovery Rule

NGP Energy argues that the Trustee's fraudulent transfer claims pursuant to TEX. BUS. COM. CODE § 24.006(b) are barred by the one-year statute of limitations.  (ECF No. 19 at 41). The Trustee responds that his claims pursuant to § 24.006(b) are not barred because "the facts at issue were inherently undiscoverable to creditors."  (ECF No. 39 at 29).  Specifically, the Trustee argues that creditors "had no way of knowing at the time that Northstar significantly overpaid for the Creole [Field A]ssets or released $75 million in capital commitments without reasonably equivalent value in return."  (ECF No. 39 at 29).

As noted in the Court's discussion above, the TUFTA statute of repose states:

(a)   Except as provided by Subsection (b) of this section, a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:

    (1)   under section 24.005(a)(1) of this code, within four years after the transfer was made or the obligation was incurred, *or if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant*;

    (2)   under section 24.005(a)(2) or 24.006(a) of this code, within four years after the transfer was made or the obligation was incurred; or

    (3)   under section 24.006(b) of this code, within one year after the transfer was made.

Tex. Com. & Bus. Code § 24.010 (emphasis added).  "Unlike a statute of limitations, a statue of repose does not only 'procedurally bar an untimely claim, it substantively "extinguishes" the action.'"  *Clapper v. Am. Realty Inv'r, Inc.,* No. 3:14-CV-2970-D, 2018 WL 3868703, at *12 (N.D. Tex. Aug. 14, 2018) (quoting *Nathan v. Whittington*, 408 S.W.3d 870, 874 (Tex. 2013)). "The TUFTA statue of repose provides that plaintiffs may bring a fraudulent transfer claim under § 24.005(a)(1) within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."  *Id.*  Notably, that language is only found in § 24.005(a)(1) of the TUFTA's statute of repose.

The Trustee argues that the "Fifth Circuit has repeatedly noted that 'with respect to TUFTA's one-year repose period . . . a fraudulent-conveyance claim does not accrue until the claimant knew or reasonable could have known *both* of the transfer *and* that it was fraudulent in nature.'"  (ECF No. 39 at 29 (quoting *Janvey v. Romero*, 817 F.3d 184, 188 (5th Cir. 2016)). Moreover, he notes that creditors "had no way of knowing at the time that Northstar significantly overpaid for the Creole [Field A]ssets or released $74 million in capital commitments without reasonably equivalent value in return."  (ECF No. 39 at 29).  The allegations as found in the

Trustee's Complaint are sufficient to avoid dismissal at the Rule 12(b)(6) stage. *See Taylor v. Rothstein Kass & Co.*, PLLC, No. 3:19-CV-1594-D, 2020 WL 554583, at *11 (N.D. Tex. Feb. 4, 2020) (noting that the plaintiff explicitly plead that he "did not discover" and could not have reasonably discovered the defendant's "connection to . . . the fraudulent scheme" because the "wrongful acts were inherently undiscoverable") (citation omitted); *Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.*, No. 3:17-CV-1147-D, 2019 WL 329545, at *7 n.7 (N.D. Tex. Jan. 25, 2019) (finding that the discovery rule is a factual question generally inappropriate for resolution on a motion to dismiss) (citation omitted); *Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384-N, 2015 WL 13034513, at *4 (N.D. Tex. Apr. 21, 2015) ("The Court has previously declined to dismiss potential claims when plaintiffs have asserted the discovery rule, which necessarily raises consideration of factual questions."). Therefore, the Court finds that the discovery rule preserves § 24.005(a)(1) claims in the Trustee's Complaint.

However, the Trustee has failed to address the question of whether the discovery rule can be extended to claims brought pursuant to § 24.006(b). "There is no similar tolling provision for claims under §§ 24.005(a)(2) and 24.006(b)." *Rotstain*, 2015 WL 13034513, at *4. "The court declines to read a discovery rule into the TUFTA statute of repose where it clearly states that claims 'under section 24.006(b) of this code, [must be brought] within one year after the transfer *was made.*'" *Clapper*, 2018 WL 3868703, at *12.

Accordingly, the Court grants NGP Energy's motion to dismiss regarding the discovery rule's application to claims other than those brought under §24.005(a)(1).

### viii. Insolvency

NGP Energy argues that the Trustee fails to adequately plead insolvency as to both the Creole Field Assets Purchase in 2012, and the Capital Commitment Releases in 2014. (ECF No.

47 at 22–24).  Specifically, NGP Energy claims that even with "access to Northstar's financial records," the Trustee "fails to present *any* financial data showing that Northstar was actually insolvent *at any point in time* when Movants were affiliated with Northstar."  (ECF No. 47 at 23) (emphasis in original).  "Northstar did not file for bankruptcy nearly *four years* after it purchased the Creole [Field] Assets and nearly *two years* after it released NGP-NOG's capital commitment."  (ECF No. 47 at 24) (emphasis in original).

The Trustee argues that the Complaint "directly pleads insolvency at the time of the transactions" when it states:

> Even though the NGP Directors and the Northstar Directors *acknowledged the company was insolvent,* inadequately capitalized, and unable to pay its debts as they came due, these directors conspired with NGP to (1) cause Northstar to release the individual directors and NGP from millions in dollars of commitments without receiving equivalent value in return; (2) decline to enforce Northstar's contractual right to demand tens of millions in capital obligations from NGP and the directors; and (3) have Northstar overpay for assets owned by other NGP companies to inflate NGP's profits at the expense of Northstar.

(ECF No. 39 at 28 (citing ECF No. 1 at 3)).  "Using reasonable inferences, a fair reading of the Complaint shows that the disputed events . . . at a minimum resulted in Northstar's insolvency."  (ECF No. 39 at 28) (internal quotations omitted).

Under the Bankruptcy Code, "insolvency" is defined as "a financial condition such that the sum of such entity's debts is greater than all of such entity's property at a fair valuation."  11 U.S.C. § 101(32)(A).  TUFTA provides a similar definition, stating that "a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at fair valuation."  TEX. BUS. & COM. CODE § 24.003(a).  "Thus 'under both Texas law and the Bankruptcy Code, a debtor is insolvent if the sum of its liabilities is greater than the sum of its assets at fair valuation.'"  *Osherow v. Nelson Hensley & Consolidated Fund Mgmt., LLC (In re Pace)*, 456 B.R. 253, 273 (Bankr. W.D. Tex. 2011) (citation omitted).  However, in contrast to the definition

under the Bankruptcy Code, § 24.003 provides a rebuttable presumption of insolvency. TUFTA states that "a debtor who is generally not paying the debtor's debts as they come due is presumed to be insolvent." TEX. BUS. & COM. CODE § 24.003(b). "To prevail on a constructively fraudulent transfer claim, the Trustee must prove insolvency *on the date of the transfer*." *Rodriguez v. Cyr (In re Cyr)*, 602 B.R. 315, 326 (Bankr. W.D. Tex. 2019) (citing 11 U.S.C. § 548(a)(1)(B)(ii)(I)) (emphasis added).

At the hearing on NGP Energy's motion to dismiss, the Court addressed the issue of insolvency as to both the 2012 Creole Field Assets Purchase and the 2014 Capital Commitment Releases. (ECF No. 56 at 139–51). In addressing the 2014 Capital Commitment Releases, the Court noted that although Exhibit D's,[17] statement, which is a part of the Complaint, that "the company had insufficient funds to meet its obligations with respect to the bank and the working capital deficit under the purchase agreement" might fulfill the insolvency presumption under § 24.003(b), the statement did not affirmatively plead insolvency as defined in § 24.003(a). (ECF No. 56 at 144). Accordingly, an amendment affirmatively pleading that Northstar remained balance-sheet insolvent after the 2014 Capital Commitment Releases is needed. (ECF No. 56 at 143 ("There needs to be an affirmative statement that Mr. Katchadurian is willing to allege under Rule 11 that [] the Debtor remained balance-sheet insolvent after the transaction.")).

Moreover, the Complaint also failed to affirmatively plead that Northstar's liabilities exceeded its assets subsequent to the Creole Field Assets Purchase in September 2012. (*See* ECF No. 56 at 148). Although Northstar affirmatively plead that the 2012 purchase should not have been carried through, for various reasons, the Complaint failed to explain Northstar's financial condition subsequent to or at the time of the purchase. (*See* ECF No. 1 at 9 (pleading that NGP

---

[17] Exhibit D is the Contract. Exhibit D is referred to interchangeably by the parties as the "Letter Agreement" and as the "Contract."

Energy caused Northstar "to overpay" for the Creole Field Assets in 2012, and later "[i]n 2013, Northstar needed additional capital to conduct operations[,]" which it "obtained [through] a $120 million short-term bank loan from Wells Fargo")).  The connection, as plead, between the two transactions is far too tenuous and does not appropriately allege insolvency as of the date of the 2012 purchase.  (ECF No. 56 at 150 ("I'm not going to leap from 2012 to 2014 and say, 'Well, [Northstar] then borrowed money because [of] the transaction back in 2012.'")).

Accordingly, further amendment is needed with regard to both the 2012 Creole Field Assets Purchase and the 2014 Capital Commitment Releases in order to properly allege insolvency under § 24.003(a).  Leave to amend on this issue is granted.

### C.  Count 3: Breach of Fiduciary Duty

The Trustee asserts breaches of fiduciary duty against the NGP Directors, the Northstar Directors, and NGP-NOG.  (ECF No. 1 at 16).  The Trustee claims that the Defendants "violated their fiduciary duties through acts of self-dealing" and through their "conflicting interests," which included: (i) Northstar's overpayment to Propel Energy, an NGP affiliate, for the Creole Field Assets; (ii) refusal to exercise Northstar's contractual right to "call for tens of millions in committed capital"; and (iii) Northstar's release and waiver of the Defendant's capital commitments "without receiving equivalent value in return."  (ECF No. 1 at 16).

NGP Energy[18] argues that the Trustee's claim for breach of fiduciary duty fails on account of both the duty of loyalty and the duty of care.  (ECF No. 47 at 24–30).  NGP Energy maintains that the Trustee has failed to properly plead a breach of the duty of loyalty where the Complaint pleads no facts showing that NGP Directors were interested in the transactions at issue or that the directors lacked independence in either of the transactions.  (ECF No. 47 at 25–

---

[18] As noted previously, NGP Energy refers to the NGP Entities, the NGP Directors, and the Northstar Directors.  The Court will only differentiate between the three Defendants when arguments differ, which they mostly do not.

28).   Moreover, NGP Energy contends that the Trustee has failed to properly plead a breach of duty of loyalty where the Complaint does not assert facts, which would show gross negligence in the directors' decision-making process.[19]   (ECF No. 47 at 28–30).

NGP Energy argues that the decisions made by the NGP Directors are protected by the business judgment rule.   (ECF No. 47 at 25).   "The business judgment rule is an affirmative defense and should not be considered at the motion to dismiss juncture."   *Miller v. Bradley (In re W.J. Bradley Mortg. Capital, LLC)*, 598 B.R. 150, 163 (Bankr. D. Del. 2019) (citing *Stanziale v. Nachtomi (In re Tower Air, Inc.),* 416 F.3d 229, 238 (3d Cir. 2005)).   "However, an exception exists if the issue appears on the face of the complaint.   *Id*. (citing *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994)).   "To survive a motion to dismiss when the issue appears within the complaint itself, the plaintiff must 'plead around the business judgment rule' to show it is inapplicable.'"   *Id.* (quoting *Joseph v. Frank (In re Troll Commc'n, LLC),* 385 B.R. 110, 118 (Bankr. D. Del. 2008)).   "A plaintiff can rebut the rule by showing that the fiduciaries 'in reaching [their] challenged decision, violated any one of [the] triad of fiduciary duties: due care, loyalty, or good faith."   *Id.*   The business judgment rule has been described in Delaware case law as follows:

> The rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action take was in the best interests of the company."   Therefore, the judgment of a properly functioning board will not be second-guessed and "absent an abuse of discretion, that judgment will be respected by the courts."   Because a board is presumed to have acted properly, "the burden is on the party challenging the decision to establish facts rebutting the presumption."

---

[19] In NGP Energy's motion to dismiss it makes the argument that the Trustee has failed to establish that NGP-NOG is a controlling shareholder such that it owes fiduciary duties to Northstar.   (ECF No. 19 at 48–50).   NGP Energy does not reassert the same claim in its later pleadings.   (*See* ECF No. 47).   Further, at the hearing on NGP Energy's motion to dismiss, the Trustee asserts that the Contract demonstrates that NGP-NOG owned 87% of Northstar.   (ECF No. 56 at 86).   NGP Energy does not contest this assertion.

*In re Troll Commc'n,* 385 B.R. at 118 (quoting *Orman v. Cullman,* 794 A.2d 5, 19–20 (Del. Ch. 2002)). "The United States District Court for the District of Delaware likewise recognized the import of the business judgment rule: 'in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.'" *In re Troll Commc'n,* 385 B.R. at 118 (citation omitted).

> *i.   Duty of Loyalty*

The Trustee alleges that the business judgment rule presumption does not apply in this case because the "[d]efendant directors were on both sides of the disputed transactions." (ECF No. 39 at 35). Specifically, the Trustee alleges that the facts in the Complaint "raises the inference that the five NGP Directors controlled the Board," in light of the fact that the Northstar Directors "were beholden to NGP Directors, who could vote them out of a job or cut their pay." (ECF No. 39 at 36). The Trustee explains the Defendants' relationship to NPG as follows:

> At the time, NGP Directors were senior executives of NGP: Albin was co-founder, Ackerman was Managing Director, Hayes and Ray were partners, and Bomer was General Counsel. These relationships made them "interested" on behalf of NGP. Similarly, Northstar Directors were Northstar officers whose employment would be dictated by the Board controlled by NGP, making them also interested in deals benefitting NGP. And, of course, each director was personally interested in releases of their individual capital commitments.

(ECF No. 39 at 37).

"The duty of loyalty mandates that the best interest of the corporation and its shareholders take[] precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *In re Troll Commc'n,* 385 B.R. at 119 (citation omitted). "To allege a breach of the duty of loyalty based on actions or omissions of the Board, the Plaintiff must 'plead facts demonstrating that a *majority* of a board that

approved the transaction in dispute was *interested and/or lacked independence*"   *In re Bridgeport Holdings, Inc*., 388 B.R. 548, 563 (Bankr. D. Del. 2008) (emphasis added) (citation omitted).  To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders."  *In re Troll Commc'n,* 385 B.R. at 119 (citing *Orman,* 794 A.2d at 23); *see In re Bridgeport Holdings, Inc*., 388 B.R. at 563–64 (noting the same).

The Trustee's claim for breach of the duty of loyalty brings to the forefront the issues of control and independence.  As noted above, NGP Energy contends that the Complaint fails to establish "control" in accordance with Rule 8 and therefore the Trustee's fraudulent transfer claims are implausible on the face of the Complaint.  (ECF No. 47 at 7–8).  At the hearing on NGP Energy's motion to dismiss, the Trustee made an oral motion to amend his Complaint to re-plead regarding the directors' relation to NGP and how that relationship allegedly established a lack of independence and NGP's control over the directors.  The Court has granted Trustee's oral motion to amend.

Accordingly, in light of the fact that issues of control, and particularly, the issue of independence or lack thereof, is pertinent to the Trustee's breach of loyalty claim, the Court will reserve ruling on this issue.

### i.  Duty of Care

NGP Energy argues that the Trustee has not plausibly alleged a claim for breach of the duty of care, because such requires "a showing of gross negligence" and the Complaint provides only allegations of breach of the duty of loyalty.  (ECF No. 47 at 28–29).  The Trustee, however, disagrees and contends that the NGP Directors' breach of the duty of care is found in both transactions, as follows:

> In agreeing to purchase the Creole [Field A]ssets from an NGP affiliate for over 40% more than the next highest bidder and failing to obtain reasonably equivalent value for the release of over $75 million in capital commitments owed by NGP and the directors, *one can reasonably infer* that NGP Directors' and the Northstar Directors' deliberative process was compromised through their efforts to benefit NGP and themselves at Northstar's expense. . . .  The dramatic overpayment for the Creole [Field A]ssets by itself would raise the inference that the directors failed to adequately inform themselves about the transaction, when a much cheaper option was available.
>
> The same inferences hold with respect to the release of capital commitments. . . . That Northstar obtained nowhere near the value committed by NGP and the directors, and was left with a $15 million working capital deficit after having provided not only the releases but a valuable net profits interest to NGP-NOG, *it is reasonable to infer that the Board violated its duty of care and was grossly negligent* by failing to inform itself of the consequences to Northstar of these insider transactions.

(ECF No. 39 at 39–40) (emphasis added).

"The duty of care requires directors to inform themselves, before making a business decision, of all material information reasonably available to them, including alternatives to the course of action being considered." *TVI Corp. v. Gallagher,* No. 7798-VCP, 2013 WL 5809271, at *13 (Del. Ch. Oct. 28, 2013); *see In re Zale Corp. Stockholders Litigation*, No. 9388-VCP, 2015 WL 6551418, at *4 (Del. Ch. Oct. 29, 2015) ("Delaware law instructs that the core inquiry in this regard is whether there was a real effort to be informed and exercise judgment."). "Director liability for breaching the duty of care 'is predicated upon concepts of gross negligence.'" *Gallagher*, 2013 WL 5809271, at *13 (quotation omitted).  "To support an inference of gross negligence, 'the decision has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion.'" *In re Zale Corp.*, 2015 WL 6551418, at *4.

In the context of a motion to dismiss . . . gross negligence 'requires the articulation of facts that suggest a *wide* disparity between the process the directors used . . . and [a process]

which would have been rational.'" *Id*. "The key issues in evaluating a duty of care claim under the gross negligence standard are 'whether there was a real effort to be informed and exercise judgment' and 'whether the directors informed themselves . . . of all material information reasonably available to them.'" *Id.* at \*5.

The Trustee alleges that overpayment of the Creole Field Assets along with the capital commitment releases, and the Defendants' failure to call upon the $75 million in full amounted to breaches of the duty of care. In particular, and in reference to the 2014 Capital Commitment Releases, the Trustee alleges:

> NGP directed Northstar to take out $120 million in short-term bank debt. To justify the loan, the bank required NGP to commit to provide additional capital to Northstar. As a result, Defendants NGP X, NGP Parallel, and NGP X US signed a contract with Northstar that obligated NGP to provide $75 million to Northstar upon Northstar's request. Northstar lacked funds to pay its debts and racked up a debilitating $20 million working capital deficit. *Yet the NGP-controlled board refused to call NGP's contractually committed $75 million obligation.* Instead, NGP and the Northstar board agreed to have Northstar forgive and release the contractual obligations of NGP and the board members without receiving reasonable equivalent value.

(ECF No. 1 at 3) (emphasis added).

"[T]o rebut the business judgment rule, it is not enough for a plaintiff simply to second-guess the reasonableness or prudence of a business judgment." *Zimmerman v. Crothal*, No. 6001-VCP, 2012 WL 707238, at \*7 (Del. Ch. Mar. 5, 2012). "Instead, to avoid application of the rule, a plaintiff must allege that *the process applied* by the board in making a business decision was so egregious as to constitute 'reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Id*. "This is an onerous standard, requiring the plaintiff to allege 'facts that suggest a *wide* disparity between the process the directors used . . . and that which would have been rational." *Id*; *see In re Zale Corp.*, 2015 WL 6551418, at \*5 (noting a prior decision in which the court found gross

negligence where a board of directors did not asses basic information upon which they could have learned of an error).

Here, the Trustee's allegations are focused on the outcome of the directors' decisions, rather than on the process of the directors' decisions. To properly allege a breach of the duty of care, such that it would rebut the business judgment rule presumption, the Complaint must allege facts, that taken as true, demonstrate egregiousness in the process, not the outcome. The outcome of a decision is exactly what the business judgment rule is intended to protect.

Moreover, the Trustee's allegations are predicated upon the directors own self-interest in preserving money for their benefit and the benefit of their reputations. (*See* ECF No. 1 at 8 ("Padding its profits from the sale of [the Creole Field Assets] would give NGP both immediate accounting benefits and a reputation boost in raising future funds . . . The NGP directors benefitted personally by this self-dealing, as the next highest bidder was tens of millions below the Northstar purchase prices . . . Through its NGP Directors, NGP prevented these capital calls, benefitting itself and the NGP Directors at the expense of Northstar.")). "The duty of care, however, is a process-oriented duty, and merely alleging that Defendants made poor business decision does not rebut the business judgment rule or state a claim for breach of the duty of care." *Gallagher*, 2013 WL 5809271, at *14. The Complaint does not allege any specific facts to support an inference that the NGP Directors' decision-making process was grossly negligent or uninformed. "Instead, the core of the Trustee's allegations are that the Defendants made decisions that were self-interested and motivated by bad faith." *Id*. at 13. "Such claims, however, invoke the duty of loyalty, not the duty of care." *Id*.

Accordingly, NGP Energy's motion to dismiss the Trustee's claim for breach of the duty of care is granted.

### D.  Count 4: Breach of Contract

The Trustee asserts a breach of contract claim against NGP-NOG for its alleged failure to "eliminate the working capital deficit."  (ECF No. 1 at 17).  NGP Energy argues that the Final Settlement Statement merits this Court's consideration because it demonstrates that the obligation under the Contract "was not an obligation to 'eliminate the working capital deficit' of Northstar but was instead an obligation to pay the Working Capital Deficit—a term defined as a specific amount of money."  (ECF No. 46 at 8).  In essence, NGP Energy contends that the Final Settlement Statement evidences that the Trustee "does not allege a breach of any term that the Contract actually contains," and therefore "fails to state a claim for breach of the Contract." (ECF No. 46 at 8).

As noted earlier in this Court's discussion on the Trustee's motion to strike certain documents, the Court may not properly consider the Final Settlement Statement in ruling on NGP Energy's motion to dismiss because the Final Settlement Statement does not fall within the Fifth Circuit's incorporation-by-reference exception.  Rather, NGP Energy attempts to use the Final Settlement Statement to contest the Trustee's allegations that NGP failed to comply its obligations under the Contract.  NGP Energy may not use a motion to dismiss to do so.  That is an issue for summary judgment.

### E.  Counts 5 & 6: Conspiracy and Aiding & Abetting

The Trustee has asserted conspiracy and aiding and abetting claims against the Defendants based on the Defendants' breaches of fiduciary duty and fraudulent transfers claims. (ECF No. 1 at 17–18).  NGP Energy argues that Counts 5 and 6 of the Trustee's Complaint should be dismissed for several reasons: (i) Texas law does not provide a cause of action for conspiracy to commit fraudulent transfers; (ii) to the extent that the Trustee has alleged a

relationship between the NGP Entities and the NGP Directors, no cause of action for conspiracy can exist between them, as a matter of law; (iii) the Trustee has failed to plead factual allegations that demonstrate the existence of an agreement; and (iv) Texas law does not provide a cause of action for aiding and abetting fraudulent transfers.  (ECF No. 47 at 33–36).

> i.      *Fraudulent Transfer Claims*

Previously, this Court in assessing a motion to remand, discussed the availability of aiding and abetting and conspiracy to commit fraudulent transfers.  *Ramirez v. Rodriguez (In re Ramirez),* 413 B.R. 621, 629 (Bankr. S.D. Tex. 2009).  In *Ramirez*, the debtors asserted TUFTA claims along with claims for common law fraud.  *Id.* at 62.  In analyzing the common law fraud claim, this Court noted:

> As to the common law fraud claim to which the Trustee and the Rodriguezes are co-party plaintiffs, the theory is that Debtors and the other defendants defrauded the Rodriguezes by participating in the alleged fraudulent transfers of Debtors' real and personal properties.  The Fourth Amended Petition states that the alleged fraudulent transfers were 'part of one continuous scheme, artifice and common law fraud upon' the Rodriguezes and 'were a joint effort by each Defendant to defraud Plaintiffs.'' . . .  While the Trustee and the Rodriguezes characterize this as a common law fraud claim, this claim is more aptly characterized as a claim for aiding and abetting or conspiracy to commit fraudulent transfers.

*Id*. at 628.  Therefore, NGP Energy's claims that the Texas law does not provide for causes of action for conspiracy or aiding and abetting to commit fraudulent transfers fail.  *Id*. at 629 ("Because the pled facts support an aiding and abetting or conspiracy claim, the Court re-characterizes the Trustee and the Rodriguezes' self-titled common law fraud claim as an aiding and abetting or conspiracy claim." (citations omitted)).

Accordingly, the Court will next address NGP Energy's arguments regarding the Trustee's claim for conspiracy to commit fraudulent transfer claims.

"The elements of a civil conspiracy are: (1) two or more persons; (2) an end to be accomplished; (3) meeting of the minds on the end or course of action; (4) one or more overt, unlawful acts; and (5) proximately resulting in injury." *Id.* (citing *Lane v. Halliburton,* 539 F.3d 548, 564 (5th Cir. 2008)).  "The agreement may be tacit and can be alleged and proven by circumstantial evidence." *Janvey v. Adams & Reese, LLP*, No. 3:12-CV-0495-N, 2013 WL 12320921, at *7 (N.D. Tex. Sept. 11, 2013) (citing *Bardt v. Sebek*, 14 S.W.3d 756, 766 (Tex. App.—Houston [1st Dist.] 2000, pet. denied)).  Moreover, a conspiracy claim is "simply an alternative theory by which [a] plaintiff" may seek to recover on a fraudulent transfer claim. *Id.* at 630–31.  "The theory is different, but the purpose and effect is the same." *Id.*  "The purpose is to return to estate property that was allegedly wrongfully removed from the estate and the effect is to make the estate whole." *Id.* at 631; *see Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 740 (N.D. Tex. 2008) ("Plaintiff's surviving claim for fraudulent transfer serves as sufficient predicate for derivative liability" for the plaintiff's conspiracy claim).

NGP Energy asserts that this claim fails as to the NGP Entities as well as to the NGP Directors because given the employment relationship alleged by the Trustee, the two cannot conspire as a matter of law.  NGP Energy cites to Delaware law to support its proposition that civil conspiracy cannot exist in this circumstance.  However, a conspiracy claim is "simply an alternative theory by which [a] plaintiff" may seek to recover on a fraudulent transfer claim. *Id.* at 630–31.  "The purpose is to return to estate property that was allegedly wrongfully removed from the estate and the effect is to make the estate whole." *Id.* at 631; *see Biliouris*, 559 F. Supp. 2d at 740.  Therefore, the conspiracy claim at issue is simply another theory by which the Trustee may recover on its fraudulent transfer claims under TUFTA—the conspiracy claim is derivative of the Trustee's fraudulent transfer claims.  Accordingly, Texas law applies to the

claim.  NGP Energy does not cite to, and the Court has not found, Texas law which holds that a conspiracy claim cannot be asserted between a corporation and its agents.  Therefore, NGP Energy's claim fails.

The Trustee's Complaint alleges that the NGP Directors, the Northstar Directors, and the NGP Entities with knowledge that Northstar was "insolvent, inadequately capitalized, and unable to pay its debts as they came due" continually made decisions that further deepened Northstar's insolvency.  (ECF No. 1 at 3).  These decisions, among others, included: (i) selling Northstar to a questionable seller; (ii) taking out the Wells Fargo loan; (iii) releasing capital commitments that were used to secure that loan; (iv) failing to invoke the full extent of the capital commitments when it could; and further (v) failing to aid Northstar to pay back the Wells Fargo loan.  (ECF No. 1 at 3–4).  The Trustee alleges that these decisions were based on the Defendants own self-interests and to their own benefit.  (ECF No. 1 at 17–18).  That the agreement was not explicitly set forth is inconsequential to the Trustee's claim.  *See Janvey*, 2013 WL 12320921, at *7.  The Trustee has sufficiently pled a claim for conspiracy to commit a fraudulent transfer.  *See In re Ramirez,* 413 B.R. at 628 ("The Fourth Amended Petition states that the alleged transfers were 'part of a continuous scheme, artifice and common law fraud upon' the Rodriguezes and 'were a joint effort by each Defendant to defraud Plaintiffs.'").

### ii.     Breach of Fiduciary Duty

"In order to establish a case for aiding and abetting breach of fiduciary duty, a plaintiff must establish: (1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the concerted action of the fiduciary and nonfiduciary."  *Miller v. Greystone Bus. Credit II, LLC (In re USA Detergents, Inc.),* 418

B.R. 533, 546 (Bankr. D. Del. 2009) (citing *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009)) (internal citations omitted).

Moreover, under "Delaware law, civil conspiracy is an independent wrong that occurs when there is: (1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damages." *In re USA Detergents, Inc.*, 418 B.R. at 547 (quoting *In re Am. Intern. Group, Inc.*, 965 A.2d 763, 805 (Del. Ch. 2009)) (internal quotations omitted). "State law [] suggests that there is an overlap between aiding and abetting a breach of fiduciary duty and civil conspiracy to breach fiduciary duties." *Id.* (citations omitted).

There is no question that a fiduciary relationship existed between the directors and Northstar, however, as noted above, the Trustee has not set out enough facts to survive dismissal on his breach of fiduciary duty claim. The Court has granted leave to amend the Trustee's breach of the duty of loyalty and granted dismissal on the Trustee's breach of the duty of care claim.

Accordingly, the discussion as to aiding and abetting or a conspiracy to commit a breach of a fiduciary duty is premature at this time.

### Conclusion

The Court will issue an order consistent with this Memorandum Opinion.

SIGNED **April 20, 2020.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE