IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NORTHSTAR OFFSHORE GROUP LLC, | § | Case No. 16-34028 |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |
| JAMES KATCHADURIAN, Litigation Trustee, on behalf of Northstar Litigation Trust, | § § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | Adversary No. 18-03079 |
| NGP ENERGY CAPITAL MANAGEMENT, LLC; NGP X US HOLDINGS, L.P.; NGP NATURAL RESOURCES X, L.P.; NGP X PARALLEL HOLDINGS, L.P.; NGP NATURAL RESOURCES X PARALLEL FUND, L.P.; NOG ROYALTY HOLDINGS, LP; CHRISTOPHER RAY; JESSE BOMER; TOMAS ACKERMAN; DAVID ALBIN; DAVID HAYES; S. GLYNN ROBERTS; GAYLON FREEMAN; MARK STEVENS; and JAMES P. ULM, II, | § § § § § § § § § § § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Through counsel, James Katchadurian ("Trustee"), the Trustee of the Northstar Litigation Trust (the "Trust"), files this First Amended Complaint against NGP Energy Capital Management, L.L.C. ("NGP Capital"), NGP X US Holdings L.P. ("NGP X US"), NGP Natural Resources X, L.P. ("NGP X"), NGP X Parallel Holdings, L.P. ("NGP Parallel"), NGP Natural Resources X Parallel Fund, L.P. ("NGP Parallel Fund"), NOG Royalty Holdings, L.P. ("NGP-NOG") (collectively, "NGP"), Christopher Ray, Jesse Bomer, Tomas Ackerman, David Albin, David Hayes, S. Glynn Roberts, Gaylon Freeman, Mark Stevens, and James P. Ulm, II, based on

personal knowledge as to the Trust and its actions and on information and belief as to all other persons and events, and respectfully asserts the following:

**Nature of this Action**

1. This lawsuit against the former owners and directors of Northstar Offshore Group L.L.C. ("Northstar") is necessary to avoid fraudulent transfers and secure compensation for losses based on claims transferred by Northstar, as Chapter 11 debtor in possession, to the Northstar Litigation Trust under the terms of the Chapter 11 plan confirmed by this Court on December 22, 2017.

2. NGP is a multi-billion-dollar hedge fund that uses its affiliates to invest in the natural gas industry. It has had a lucrative history of partnering with Northstar executives on oil and gas investments, selling two prior companies for a combined $480 million.

3. Northstar is the third investment that NGP undertook with the Northstar executive team. At all relevant times, NGP controlled the Northstar board of managers, comprised of five NGP-related directors – Defendants Ackerman, Albin, Bomer, Hayes, and Ray (together, "NGP Directors"), and four directors from management – Defendants Roberts, Freeman, Stevens, and Ulm (together, the "Northstar Directors").

4. Reflecting NGP's control of the Northstar board of managers, all of the NGP Directors were also senior NGP employees. Defendant Ackerman was a "Managing Director and Head of the Houston office of [NGP]." https://carnelianenergy.com/our-team/tomas-ackerman/. He "served as Co-Chair of NGP's Monitoring Committee, served on NGP's Investment Committee and served on the boards of more than 25 oil and gas companies." *Id.* Defendant Ray "joined NGP in 2003 and currently serves [for NGP] as an Advisory Partner, having served the firm previously for 15 years in various roles. [He was] actively involved in portfolio

management." https://ngpenergycapital.com/christopher-d-ray/. Defendant Albin "co-founded NGP in 1988 and serves [for NGP] as Advisory Partner. He assists the firm with portfolio management and investment sourcing." https://ngpenergycapital.com/david-r-albin/. Defendant Bomer "was General Counsel at NGP." https://www.edgenr.com/. Finally, Defendant Hayes "joined NGP in 1998 and serves as Partner of the NGP funds. He concentrates on NGP's transaction sourcing and execution as well as the monitoring of active portfolio companies." https://ngpenergycapital.com/david-w-hayes/. The NGP Directors were NGP's designees on Northstar's board of managers and had a continuing employment relationship with NGP at the time.

5. The Northstar Directors faced conflicts of interest concerning transactions that could benefit NGP because they were officers and managing executives of Northstar, which was 87% owned by Defendant NGP-NOG. The Northstar Directors were beholden to NGP because NGP, through the NGP Directors, were a majority of Northstar's board and controlled decisions concerning the compensation and other benefits of Northstar employees, including the Northstar Directors. NGP, through the NGP Directors, could vote the Northstar Directors out of a job or cut their pay. Further, NGP required its approval of every Northstar expenditure.

6. From the outset, NGP used its control of Northstar to manufacture inflated profits for NGP at Northstar's expense. In mid-2012, NGP wanted Northstar to buy an offshore oil field from one of NGP's other investments. The NGP Directors caused Northstar to overpay for the asset so that Northstar bought the field from the NGP affiliate for $113 million, much higher than the offer received from the next highest bidder. This inflated price benefited the NGP Directors, who had financial interests in NGP.

7. This type of deliberate self-dealing continued throughout the next two years. Even though the NGP Directors and the Northstar Directors acknowledged the company was insolvent, inadequately capitalized, and unable to pay its debts as they came due, these directors conspired with NGP to cause Northstar to release the individual directors and NGP from millions of dollars of commitments, without receiving equivalent value in return, and decline to enforce Northstar's contractual right to demand tens of millions of dollars in capital obligations from NGP and the directors.

8. For example, NGP directed Northstar to take out $120 million in short-term bank debt. To justify the loan, the bank required NGP to commit to provide additional capital to Northstar. As a result, Defendants NGP X, NGP Parallel, and NGP X US signed a contract with Northstar that obligated NGP to provide $75 million to Northstar upon Northstar's request. Northstar lacked funds to pay its debts and racked up a debilitating $20 million working capital deficit. Yet the NGP-controlled board refused to call NGP's contractually committed $75 million obligation. Instead, NGP and the Northstar board agreed to have Northstar forgive and release the contractual obligations of NGP and the board members without receiving reasonably equivalent value.

9. By 2014, Northstar was insolvent, inadequately capitalized, and unable to pay its debts as they came due. For example, the company needed to repay the $120 million bank debt, as well as a $20 million working capital deficit. NGP recognized that Northstar could not pay these bills, even if all of Northstar's assets were sold, and that NGP was on the contractual hook for major capital obligations to Northstar. NGP seized control of all Northstar expenditures and worried that a Northstar bankruptcy would bring serious reputational harm to NGP's ability to raise funds in the future.

10. But NGP had an exit strategy. NGP negotiated a sale to Platinum Partners ("Platinum"), a dubious buyer of ill-repute, which is now a bankrupt Ponzi scheme with founders who were criminally indicted for securities fraud. Before closing, NGP made sure to expunge all of its obligations and take for itself a profit interest in Northstar's most valuable fields. In August 2014, NGP-NOG and NGP X US signed a contract with Northstar that acknowledged Northstar's inability to meet its bank debt and working capital deficit, even if the Platinum purchase price was used to pay the debts. NGP-NOG promised to pay off the bank debt and eliminate Northstar's working capital deficit after closing, in exchange for an ongoing profit interest in Northstar's most promising fields.

11. NGP knew Platinum was not a credit-worthy purchaser. NGP agreed to delay the closing multiple times when Platinum proved unable to come up with the promised funds. As Platinum missed deadlines and asked for deductions from the purchase price, NGP saw the red flags yet persisted with its exit plan. The sale closed in September of 2014. Anxious to abandon its insolvent company, NGP did not eliminate the Northstar working capital deficit, instead leaving it with a crippling $15 million deficit in immediately payable debt. Northstar was balance-sheet insolvent at the time of and after the sale. Indeed, Northstar's own financial statements showed negative members' equity as of September 30, 2014.

12. Because of NGP's bad acts, Northstar was insolvent and in dire financial straits. This required Northstar to take desperate measures to pay its debts and stay afloat. Shortly after the NGP sale, Northstar had to sell a valuable hedge prematurely, losing benefits from the hedge on declining oil prices and suffering a material loss. This was a crippling blow. If Northstar had been stable enough to keep the hedge in place through its contractual term, it would have received substantial guaranteed revenue and avoided bankruptcy altogether.

**Jurisdiction and Venue**

13. This action is brought on pre-confirmation claims and causes of action transferred to the Northstar Litigation Trust under the terms of the Chapter 11 plan confirmed by this Court on December 22, 2017. This Court has jurisdiction under 28 U.S.C. §157 and §1334.

14. Venue is proper pursuant to 28 U.S.C. §1408 and §1409. Pursuant to Local Rule 7008-1, the Trustee consents to entry of final orders or judgment by the Bankruptcy Judge if it is determined that the Bankruptcy Judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the U.S. Constitution.

**Parties**

15. Plaintiff James Katchadurian is the duly appointed Litigation Trustee in this Chapter 11 case, *In re Northstar Offshore Group LLC*, No. 16-34028 (the "Bankruptcy Case"). He has standing and authority to bring this action under the terms of the confirmed Chapter 11 plan.

16. Defendant NGP Energy Capital Management, L.L.C. is a Texas limited liability company. It has appeared in this case through counsel.

17. Defendant NGP X US Holdings L.P. is a Delaware limited partnership. It has appeared in this case through counsel.

18. Defendant NGP Natural Resources X, L.P. is a Delaware limited partnership. It has appeared in this case through counsel.

19. Defendant NGP Natural Resources X Parallel Fund, L.P. is a Delaware limited partnership. It has appeared in this case through counsel.

20. Defendant NGP X Parallel Holdings, L.P. is a Delaware limited partnership. It has appeared in this case through counsel.

21. Defendant NOG Royalty Holdings, L.P. is a Delaware limited partnership. It has appeared in this case through counsel.

22. Defendant Christopher Ray is a resident of Texas. He has appeared in this case through counsel.

23. Defendant Jesse Bomer is a resident of Texas. He has appeared in this case through counsel.

24. Defendant Tomas Ackerman is a resident of Texas. He has appeared in this case through counsel.

25. Defendant David Albin is a resident of New Mexico. He has appeared in this case through counsel.

26. Defendant David Hayes is a resident of Texas. He has appeared in this case through counsel.

27. Defendant S. Glynn Roberts is a resident of Texas. He has appeared in this case through counsel.

28. Defendant Gaylon Freeman is a resident of Texas. He has appeared in this case through counsel.

29. Defendant Mark Stevens is a resident of Texas. He has appeared in this case through counsel.

30. Defendant James P. Ulm, II is a resident of Texas. He has appeared in this case through counsel.

## Relevant Background

31. On August 12, 2016, three petitioning creditors initiated the Bankruptcy Case by filing an involuntary bankruptcy petition against Northstar under Chapter 11 of the U.S. Code in this Court. On December 2, 2016, Northstar filed a voluntary Chapter 11 bankruptcy petition.

32. On November 22, 2017, Northstar filed its Second Amended Plan of Liquidation. On December 22, 2017, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Approving Debtor's Second Amended Chapter 11 Plan of Liquidation.

33. Pursuant to the confirmation order, James Katchadurian was appointed and approved to serve as Litigation Trustee, with full authority to prosecute this action.

**A. NGP Enjoyed a Lucrative History with Prior Northstar Investments.**

34. NGP had a track record of selling earlier iterations of Northstar investments for hundreds of millions of dollars.

35. In 2006, NGP formed Northstar GOM L.L.C. This first Northstar-related company combined oilfield interests from a company called Northstar Interests with an NGP investment from its affiliate Natural Gas Partners VIII. In 2008, NGP sold Northstar GOM to Dynamic Offshore for $265 million.

36. NGP immediately created another investment, Northstar Offshore Energy Partners, with the same Northstar officers and another affiliate, Natural Gas Partners IX. In 2011, NGP sold Northstar Offshore Energy Partners to Ankor Energy for $215 million.

37. After receiving proceeds of $480 million from the two sales, NGP partnered again with the Northstar officers to create Northstar Offshore Group L.L.C.

38. NGP owned the vast majority of the company, through affiliates NGP-NOG and NGP X US. A small percentage was owned by Northstar officers, primarily four Northstar directors, Roberts, Freeman, Stevens, and Ulm.

39. In February of 2012, Northstar formed its Board of Managers (the "Board"), which was controlled by NGP. The Board was comprised of five NGP directors – Ackerman, Albin, Ray, Bomer, and Hayes (together, "NGP Directors") and four Northstar directors – Roberts, Freeman, Stevens, and Ulm (together, "Northstar Directors").

**B. Defendants Conspire to Make Northstar Overpay for NGP Assets.**

40. In 2012, using its control over Northstar, NGP caused the Board to overpay for NGP assets for NGP's benefit. Another NGP company, Propel Energy L.L.C. ("Propel"), owned interests in oil and gas leases and wells in an area of the Gulf known as the Creole Field. NGP wanted Northstar to buy the Creole Field interests from Propel for an inflated price. Padding its profits from the sale of this field would give NGP both immediate accounting benefits and a reputational boost in raising future funds. NGP used its control of Northstar to cause it to overpay another NGP portfolio company, Propel, for the benefit of NGP. The NGP Directors used this control of Northstar to their personal benefit by virtue of their financial ties to NGP as current employees. The NGP Directors benefitted from this self-dealing because as employees of NGP, their NGP compensation would have been impacted in part by the profits of and distributions from Propel.

41. On August 1, 2012, NGP Director Ackerman told Northstar Director Roberts to "think about where you love the deal and let me know and I can back channel." Northstar initially proposed a bid value of $80 million for the asset. Through its NGP Directors, NGP caused Northstar to increase its bid by 40% to over $113 million. In September of 2012, Northstar and Propel signed the sale agreement significantly overpaying for the Creole Field interests.

42. The NGP Directors benefited personally by this self-dealing, as the next highest bidder was tens of millions below the Northstar purchase price. The Northstar Directors and NGP Directors approved this transaction that caused Northstar to drastically overpay for its interest in the field.

**C. NGP Leverages Northstar and Contracts to Provide Capital Commitment.**

43. In 2013, Northstar needed additional capital to conduct operations. NGP wanted Northstar to build its operations through bank debt rather than providing Northstar with capital directly. In November 2013, Northstar obtained a $120 million short-term bank loan from Wells Fargo. To enable Northstar to procure the loan, NGP had to commit to provide $75 million in capital whenever requested by Northstar. Thus, on the same day as the Wells Fargo loan, NGP affiliates NGP X, NGP Parallel, and NGP X US signed a contract with Northstar that obligated NGP to provide an additional $75 million upon request by Northstar.

44. Specifically, they agreed that upon any Northstar capital call, NGP X and NGP Parallel would provide capital to NGP X US, which would then make the required contribution to Northstar, up to $75 million. NGP X and NGP Parallel further covenanted to set aside the $75 million in reserve, so as to assure its availability in the event of a Northstar capital call.

45. The Northstar governing agreement gave the Board authority to call for committed Supplemental Capital Contributions up to a certain amount. Through its NGP Directors, NGP prevented these capital calls, benefitting itself and the NGP Directors at the expense of Northstar.

**D. NGP Recognizes Northstar Insolvency and Controls All Northstar Expenses.**

46. A month later, NGP admitted Northstar was in dire financial straits. NGP Director Ackerman prepared an assessment of Northstar, noting that "Northstar is in ***SURVIVAL MODE***. The goal is to salvage as much equity value as we can ***without going bankrupt***."

47. NGP exercised complete control over Northstar. NGP decided "to do everything we can to get as much of [its investment] back without more drilling risk." It crippled the company from developing its assets by demanding that Northstar stop all expenditures and requiring any cash outflow be pre-approved by NGP's representatives. For NGP, the key issue

was to "stay ahead of the banks" so that its $75 million capital obligation would not be triggered. With control of the Board, NGP conspired with the directors to breach duties to Northstar and let NGP off its contractual hook to pay in more equity, despite Northstar's obvious need for the capital.

48. In 2014, the NGP Directors took the lead in selling Northstar. Potential offers came in well below Northstar's short-term bank debt. Offers for the Creole Field portion came in at $85 million, roughly the same amount as Northstar's initial bid before the NGP Directors got the company to inflate its bid. By June, NGP noted that "we have busted bank covenants, we run out of cash in July, and most importantly – the value of the company is significantly below total debt and negative working capital." NGP would have to fund $75 million, but was "just worried about that not being enough." It needed a sale closing soon or "that ***means bankruptcy***."

49. NGP knew that a potential offer from Platinum was already below debt and would likely decrease even more once Platinum saw Northstar's recent production reports. In NGP's words, "Our equity is gone. NGP has back stopped another $75 mm that will likely also have to be flushed. We have no more time, we don't want to bankrupt this company for the sake of all of our reputations." NGP was desperate for an exit plan.

**E. Looking to Exit, Defendants Sell Northstar to a Non-Creditworthy Buyer.**

50. To avoid their capital obligations and risk of reputational harm of a bankruptcy, Defendants agreed to sell Northstar to an obviously risky, non-creditworthy buyer.

51. On July 16, 2014, NGP-NOG and the minority shareholders of Northstar signed a Purchase & Sales Agreement with a subsidiary of Platinum called Lafitte Energy Corp. The sale price was below Northstar's bank debt and working capital deficit.

52. Platinum was a Ponzi scheme. Its subsidiaries are now bankrupt, and its founders were criminally indicted. NGP saw the red flags about Platinum's financial stability, as it

repeatedly failed to obtain financing, which resulted in continually postponing the closing date. But NGP feared the risk of financial and reputational harm if it failed to sell Northstar. As NGP put it, if the sale delayed beyond the debt cut-off, “we will have a difficult decision to make.”

53. The closing was on September 22, 2014. Northstar was balance-sheet insolvent at the time of and after the closing. Northstar incurred significant net losses before and after the closing, and its own financial statements indicated negative members’ equity as of September 30, 2014. Tellingly, no one was willing to invest any new equity or capital into Northstar in connection with or following the closing. As Northstar was insolvent, inadequately capitalized, and unable to pay its debts, Platinum paid $80 million directly to the bank. NGP added just over half of its $75 million capital obligation, avoiding the rest. Northstar was insolvent with a crippling working capital deficit.

**F. Before Leaving, NGP Took Assets and Contracted to Pay Northstar Debts.**

54. While under contract to sell to Platinum, NGP secured from Northstar a valuable net profits interest in Northstar’s most promising fields.

55. On August 1, 2014, NGP-NOG and NGP X US signed a contract with Northstar. They acknowledged that Northstar was insolvent, even if the Platinum sale proceeds were applied to the bank debt: “the Parties agree that the Company has insufficient funds to meet its obligations with respect to the Bank Debt and the Working Capital Deficit.” Despite this insolvency, NGP-NOG took significant net profit interests in Northstar fields with proven undeveloped reserves of over $80 million in value. In consideration, NGP-NOG agreed upon closing “to pay off the [Northstar] Bank Debt and eliminate the Working Capital Deficit.”

56. NGP breached this commitment and left Northstar insolvent with a $15 million working capital deficit, while NGP-NOG retained the net profits interest in the Northstar fields. In addition, NGP-NOG secured a release of its prior capital obligations to Northstar, and the

Northstar Directors piggybacked on the opportunity to secure a release of their own capital commitments to the insolvent company.

**G. Because of NGP's Bad Acts, Northstar Loses a Key Hedge and Enters Bankruptcy.**

57. Because NGP fraudulently avoided its $75 million obligation and never paid the $15 million working capital deficit, Northstar was balance-sheet insolvent, inadequately capitalized, and unable to pay creditors after the sale. In the preceding months, Northstar extended payments to its vendors based on assurances that NGP would pay the working capital deficit. In fact, over $7 million of the deficit was for previously negotiated settlements with three vendors which had already agreed to postpone collections until the closing was done.

58. Unable to pay creditors, the deficit left by NGP forced Northstar to unwind a valuable hedge agreement to raise the necessary money. On December 11, 2014, Northstar agreed with BP to unwind its hedge agreement prematurely at a significant loss. The hedge agreement had guaranteed Northstar a fixed price per barrel of oil through the end of 2017, ranging from $94.13 to $88.90 a barrel. At that point, the crash in oil prices was in full swing, and the hedge guaranteeing peak prices was a key Northstar asset. BP paid Northstar a discounted price to terminate the agreement three years early. The full value of the hedge through its contract term would have provided Northstar tens of millions in guaranteed revenue and allowed Northstar to pay its bills and avoid the major costs and disruption of bankruptcy.

**Claims for Relief**
**Count 1 – Fraudulent Transfers Pursuant to 11 U.S.C. § 544(b)**

59. The preceding material factual allegations are incorporated here.

60. Section 544(b) of the Bankruptcy Code allows the Trustee to avoid a transfer that is avoidable under applicable law, such as the Texas Uniform Fraudulent Transfer Act. *See also* 26 U.S.C. §6502(a)(1) & 6901(a)(1)(A). Section 550(a) of the Bankruptcy Code allows the

Trustee to recover the property transferred or the value of the property transferred in violation of sections 544(b). Northstar had creditors holding claims at or within a reasonable time of the transfers and releases described herein and the date of the commencement of Northstar's bankruptcy case.[1]

61. The Texas Uniform Fraudulent Transfer Act permits recovery of the property or the value of any transfers made with "actual intent to hinder, delay, or defraud any creditor of the debtor," as well as those made "without receiving a reasonably equivalent value in exchange for the transfer or obligation." Tex. Bus. & Com. Code §24.005-§24.006.

62. The statute defines fraudulent transfers as:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

[1] These creditors include but are not limited to: Cameron Parish Tax Collector [Creditor No. 9602384], Gulf-Pro Services, LLC [Creditor No. 9574564], American Express Travel Related Services Co, Inc. [Creditor No. 9574422], Measurement Technologies, Inc. [Creditor No. 9602446], Dulan, LLC [Creditor No. 9602398], Chapman Consulting, Inc. [Creditor No. 9602387], Atchafalaya Measurement Controls, Inc. [Creditor No. 9602370], IHS Markit [Creditor No. 9623721], Safety Controls, Inc. [Creditor No. 9602496], Extreme Power Resources, LLC [Creditor No. 9629255], Pinnacle Engineering, Inc. [Creditor No. 9602469], Process Solutions & Products [Creditor No. 9602478], EPS Logistics Company [Creditor No. 9602408], Offshore Rental, Ltd. [Creditor No. 9602461], Blackwater Diving, LLC [Creditor No. 9602375], United Vision Logistics [Creditor No. 9637875], Performance Cleaning Services, LLC [Creditor No. 9602466], Failsafe Controls, LLC [Creditor No. 9602412], American Eagle Logistics [Creditor No. 9602361], Quality Energy Services, Inc. [Creditor No. 9602484], A&B Valve & Piping, LLC [Creditor No. 9785128], Stallion Offshore Quarters, Inc. [Creditor No. 9602507], Diverse Scaffold Solutions, LLC [Creditor No. 9602396], Coastal Crewboats, Inc. [Creditor No. 9602390], ArkLaTex Wireline Services, LLC [Creditor No. 9790958], Wood Group PSN, Inc. [Creditor No. 9602540], Cased Hole Well Services [Creditor No. 9602385], Predator Pressure Control and Crane Services, LLC [Creditor No. 9792106], and ANKOR E&P Holdings Corporation [Creditor No. 9792850].

> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code §24.005.

63. As set forth above, Defendants acknowledged that Northstar was balance-sheet insolvent, inadequately capitalized, and unable to pay debts as they came due. This dire financial condition began in 2012 with Defendants causing Northstar to pay an NGP affiliate tens of millions of dollars more than the next highest bidder for the Creole assets. Defendants used their control of Northstar to transfer those funds out of Northstar for the benefit of Defendants. Defendants also hindered Northstar's creditors by securing releases of capital contributions committed to Northstar, including relinquishing a $75 million capital obligation owed by NGP and eliminating the contribution obligations of the individual Northstar board members. These releases came on the eve of Defendants' efforts to sell all of Northstar's assets, and at a time when they acknowledged in writing that the company was and had been incurring debts beyond its ability to pay and was subject to a working capital deficit. The 2012 and 2014 transfers and releases were made with actual intent to hinder, delay, or defraud creditors are actionable under the Texas Uniform Fraudulent Transfer Act, §24.005(a)(1). The 2014 transfers and releases were also fraudulent and are actionable under the Texas Uniform Fraudulent Transfer Act, §24.005(a)(2)(A) &(B).

64. In addition, the statute defines fraudulent transfers as:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Tex. Bus. & Com. Code §24.006.

65. The 2014 self-dealing transfers and releases of Defendants' funding commitments were made while Northstar was insolvent or became insolvent as a result of those transfers, and Northstar did not receive a reasonably equivalent value in exchange. These actions are likewise a violation of §24.006.

66. Accordingly, the Court should avoid these transfers as actual and/or constructive fraudulent transfers and permit the Trustee to recover the value of the transferred property.

**Count 2 – Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)**

67. The preceding material factual allegations are incorporated here.

68. Pursuant to §548(a)(1)(B) of the Bankruptcy Code, a trustee may avoid a transfer of an interest of the debtor in property that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer and was insolvent on the date that such transfer was made or became insolvent as a result of such transfer or believed that the debtor would incur debts beyond the debtor's ability to pay.

69. In August of 2014, NGP-NOG, NGP X US, Northstar, Roberts, Freeman, Stevens, and Ulm acknowledged that Northstar was in dire financial straits, with insufficient funds to meet its obligations. Nevertheless, Defendants signed an agreement for Northstar to release Defendants from their obligations to provide more than $75 million in capital to the desperate company. Defendants caused Northstar to sign the release of these valuable capital obligations without receiving reasonably equivalent value in return. The agreement became

effective upon the sale closing in September of 2014. Defendants believed that Northstar was incurring debts beyond its ability to repay as the debts matured, as evidenced by the millions of dollars in immediately payable working capital deficit. Northstar was balance-sheet insolvent at the time of and after these 2014 transactions, with negative members' equity as of September 30, 2014.

70. In addition, pursuant to §548(a)(1)(A) of the Bankruptcy Code, a trustee may avoid a transfer of an interest of the debtor in property, or any obligation incurred by the debtor that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. The 2012 Transfer and Northstar's 2014 transfers and releases of the funding obligations of NGP and individual directors were intended to hinder, delay, or defraud Northstar's creditors and avoid NGP being tainted with a Northstar bankruptcy.

71. The Court should avoid these transfers as actual and/or constructive fraudulent transfers and permit the Trustee to recover the value of the released funding commitments.

**Count 3 – Breach of Fiduciary Duty**

72. The preceding material factual allegations are incorporated here.

73. Defendants Ackerman, Albin, Bomer, Hayes, Ray, Roberts, Freeman, Stevens, and Ulm were members of Northstar's Board from 2012 through the time of the sale to Platinum in September of 2014. All of these NGP Directors were also senior NGP employees. Defendants Roberts, Freeman, Stevens, and Ulm were also employed as Northstar's senior officers. Each of them owed fiduciary duties of loyalty and care to Northstar and to its creditors when the

company became insolvent, as did NGP-NOG as the controlling shareholder of the closely held company.

74. The NGP Directors, Northstar Directors, and NGP-NOG violated their fiduciary duties through acts of self-dealing and conflicting interests, including having Northstar overpay NGP affiliates for the Creole Field assets; refusing to exercise contractual rights to call for tens of millions in committed capital when needed by Northstar; and causing Northstar to release and waive their own personal commitments, as well as those of the other NGP Defendants, to pay money to Northstar without receiving equivalent value in return.

75. These breaches benefitted the Northstar board members and NGP-NOG (as well as the other released NGP entities) and seriously injured Northstar.

**Count 4 – Breach of Contract**

76. The preceding material factual allegations are incorporated here.

77. As mentioned above, NGP-NOG and NGP X US recognized that Northstar was insolvent and would be unable to meet its obligations to creditors without additional payment. They saw the red flags and understood that Platinum was a non-creditworthy buyer who lacked the financial ability to adequately support the company.

78. In August 2014, Defendants NGP-NOG, NGP X US, Roberts, Freeman, Stevens, and Ulm entered into a contract with Northstar to pay off Northstar's bank debt and eliminate the working capital deficit at the time of the Platinum closing. NGP-NOG breached the contract by failing to eliminate the working capital deficit. After the closing, Northstar retained an unpaid working capital deficit of $15 million. The breach caused Northstar significant direct and consequential damages.

**Count 5 – Conspiracy**

79. The preceding material factual allegations are incorporated here.

80. NGP Capital, NGP X US, NGP X, NGP Parallel, NGP Parallel Fund, and NGP-NOG conspired with the Northstar Directors and NGP Directors to commit the above fiduciary breaches and fraudulent transfers, including self-interested transactions that harmed Northstar in buying overpriced assets, releasing obligations, and abandoning valuable contract rights without receiving equivalent value.

81. Defendants not only agreed to commit these breaches and transfers, but then executed their plan to benefit themselves and NGP affiliates. Defendants controlled Northstar and caused it to take overt acts and failures to act that harmed the company in significant respects.

**Count 6 – Aiding and Abetting**

82. The preceding material factual allegations are incorporated here.

83. NGP Capital, NGP X US, NGP X, NGP Parallel, NGP Parallel Fund, NGP-NOG, the NGP Directors, and the Northstar Directors also knowingly participated and aided and abetted the fiduciary breaches and fraudulent transfers, including the above self-interested transactions that harmed Northstar in buying overpriced assets, releasing obligations, and abandoning valuable contract rights. Defendants controlled Northstar and caused it to take overt acts and failures to act that harmed the company while benefiting themselves.

**Exemplary Damages**

84. These wrongs were aggravated by the kind of fraud and breaches for which the law allows the imposition of exemplary damages. The Trust has incurred significant expenses,

including attorney fees and costs, in the investigation and prosecution of this action. The Trustee requests that appropriate exemplary damages be awarded against Defendants.

**Prayer for Relief**

For these reasons, the Trustee respectfully requests that, after trial or final hearing, the Court enter final judgment against Defendants, jointly and severally, and the Trust be awarded all actual, consequential, and compensatory damages; rescission or rescissionary damages; exemplary damages; avoidance, forfeiture or disgorgement damages; reasonable and necessary attorney fees; pre- and post-judgment interest as permitted by law; taxable costs; and all other relief at law or in equity to which it is entitled.

Date: June 9, 2020

Respectfully submitted,

YETTER COLEMAN LLP

By: ________________________________

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Tracy N. Leroy
State Bar No. 24062847
tleroy@yettercoleman.com
Wyatt J. Dowing
State Bar No. 24074152
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (Fax)

Bob B. Bruner
State Bar No. 24062637
Bob.bruner@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010
(713) 651-5151
(713) 651-5246 (Fax)

ATTORNEYS FOR PLAINTIFF
JAMES KATCHADURIAN, LITIGATION TRUSTEE
NORTHSTAR LITIGATION TRUST

**CERTIFICATE OF SERVICE**

I certify that on June 9, 2020, a true and correct copy of the foregoing Amended Complaint was served on all parties via the Court's electronic filing system.

*/s/ Wyatt J. Dowling*

Wyatt J. Dowling