**Exhibit A**

**PSA**

*Execution Version*

# PURCHASE AND SALE AGREEMENT

between

## PROPEL ENERGY, LLC

### AND

### EACH OF THE OTHER UNDERSIGNED SELLERS

**(collectively, as Seller)**

**and**

### NORTHSTAR OFFSHORE GROUP, LLC
**as Buyer**

**dated**

**September 27, 2012**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETATION ................................................................ 1

    1.1        Defined Terms .......................................................................................... 1
    1.2        References and Rules of Construction.................................................... 1

ARTICLE II PURCHASE AND SALE ...................................................................................... 2

    2.1        Purchase and Sale ................................................................................... 2
    2.2        Excluded Assets...................................................................................... 3
    2.3        Revenues and Expenses ......................................................................... 3

ARTICLE III PURCHASE PRICE .......................................................................................... 3

    3.1        Purchase Price ......................................................................................... 3
    3.2        Deposit .................................................................................................... 3
    3.3        Adjustments to Purchase Price .............................................................. 4
    3.4        Adjustment Methodology........................................................................ 5
    3.5        Preliminary Settlement Statement ......................................................... 5
    3.6        Final Settlement Statement .................................................................... 6
    3.7        Disputes .................................................................................................. 6
    3.8        Allocation of Purchase Price / Allocated Values.................................. 6
    3.9        Post-Closing Adjustments after Final Settlement Statement................. 7

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ................................. 7

    4.1        Organization, Existence and Qualification........................................... 7
    4.2        Authority, Approval and Enforceability................................................ 7
    4.3        No Conflicts............................................................................................ 8
    4.4        Consents.................................................................................................. 8
    4.5        Bankruptcy.............................................................................................. 8
    4.6        Foreign Person........................................................................................ 8
    4.7        Litigation ................................................................................................ 8
    4.8        Material Contracts .................................................................................. 8
    4.9        No Violation of Laws ............................................................................. 9
    4.10      Preferential Rights.................................................................................. 9
    4.11      Royalties, Etc. ........................................................................................ 9
    4.12      Imbalances/Suspense ............................................................................. 9
    4.13      Current Commitments ........................................................................... 10
    4.14      Environmental ...................................................................................... 10
    4.15      Production Taxes ................................................................................... 10
    4.16      Take-or-Pay Arrangements................................................................... 10
    4.17      Property Leases..................................................................................... 10
    4.18      All Material Assets ............................................................................... 11
    4.19      Undisclosed Liabilities ......................................................................... 11
    4.20      Brokers' Fees........................................................................................ 11

4.21      Plugging and Abandonment ..................................................................11
4.22      Credit Support.......................................................................................11
4.23      Permits ..................................................................................................11

ARTICLE V BUYER'S REPRESENTATIONS AND WARRANTIES ......................11

5.1       Organization, Existence and Qualification...........................................11
5.2       Authority, Approval and Enforceability................................................12
5.3       No Conflicts...........................................................................................12
5.4       Consents.................................................................................................12
5.5       Bankruptcy.............................................................................................12
5.6       Litigation...............................................................................................12
5.7       Financing ..............................................................................................12
5.8       Regulatory .............................................................................................12
5.9       Independent Evaluation .........................................................................13
5.10      Brokers' Fees.........................................................................................13
5.11      Accredited Investor...............................................................................13

ARTICLE VI CERTAIN AGREEMENTS ...............................................................13

6.1       Conduct of Business .............................................................................13
6.2       Operatorship .........................................................................................14
6.3       Intentionally Omitted............................................................................14
6.4       Governmental Bonds ............................................................................14
6.5       Record Retention ..................................................................................15
6.6       Guarantees ............................................................................................15
6.7       Amendment of Schedules .....................................................................15

ARTICLE VII BUYER'S CONDITIONS TO CLOSING...........................................16

7.1       Representations .....................................................................................16
7.2       Performance..........................................................................................16
7.3       No Legal Proceedings...........................................................................16
7.4       Title Defects and Environmental Defects.............................................16
7.5       Casualty Loss ........................................................................................16
7.6       Closing Deliverables.............................................................................16

ARTICLE VIII SELLER'S CONDITIONS TO CLOSING ........................................16

8.1       Representations .....................................................................................16
8.2       Performance..........................................................................................17
8.3       No Legal Proceedings...........................................................................17
8.4       Title Defects and Environmental Defects.............................................17
8.5       Casualty Loss ........................................................................................17
8.6       Replacement Bonds and Guarantees ....................................................17
8.7       Closing Deliverables.............................................................................17

ARTICLE IX CLOSING...........................................................................................17

9.1       Date of Closing .....................................................................................17

HN\933868.19

| 9.2 | Place of Closing | 17 |
| 9.3 | Closing Obligations | 17 |
| 9.4 | Records | 18 |

**ARTICLE X ACCESS/DISCLAIMERS** ................................................................. 19

| 10.1 | Access | 19 |
| 10.2 | Confidentiality | 20 |
| 10.3 | Disclaimers | 20 |

**ARTICLE XI TITLE MATTERS; CASUALTY; TRANSFER RESTRICTIONS** ..................... 22

| 11.1 | Seller's Title | 22 |
| 11.2 | Notice of Title Defects; Defect Adjustments | 23 |
| 11.3 | Casualty Loss | 27 |
| 11.4 | Preferential Purchase Rights and Consents to Assign | 27 |

**ARTICLE XII ENVIRONMENTAL MATTERS** ....................................................... 29

| 12.1 | Notice of Environmental Defects | 29 |
| 12.2 | NORM, Wastes and Other Substances | 31 |

**ARTICLE XIII ASSUMPTION; INDEMNIFICATION; SURVIVAL** ................................ 31

| 13.1 | Assumption by Buyer | 31 |
| 13.2 | Indemnities of Seller | 32 |
| 13.3 | Indemnities of Buyer | 33 |
| 13.4 | Limitation on Liability; Indemnity Escrow | 33 |
| 13.5 | Express Negligence | 34 |
| 13.6 | Exclusive Remedy | 34 |
| 13.7 | Indemnification Procedures | 34 |
| 13.8 | Survival | 36 |
| 13.9 | Waiver of Right to Rescission | 37 |
| 13.10 | Insurance, Taxes | 37 |
| 13.11 | Non-Compensatory Damages | 37 |
| 13.12 | Cooperation by Buyer - Retained Litigation | 37 |
| 13.13 | Disclaimer of Application of Anti-Indemnity Statutes | 37 |
| 13.14 | Several Obligations of Each Seller; No Waiver | 37 |

**ARTICLE XIV TERMINATION, DEFAULT AND REMEDIES** ..................................... 38

| 14.1 | Right of Termination | 38 |
| 14.2 | Effect of Termination | 38 |
| 14.3 | Return of Documentation and Confidentiality | 39 |

**ARTICLE XV MISCELLANEOUS** ....................................................................... 39

| 15.1 | Appendices, Exhibits and Schedules | 39 |
| 15.2 | Expenses and Taxes; 1031 Like-Kind Exchange | 39 |
| 15.3 | Assignment | 40 |
| 15.4 | Preparation of Agreement | 40 |

| 15.5 | Publicity | 41 |
| 15.6 | Notices | 41 |
| 15.7 | Further Cooperation | 43 |
| 15.8 | Filings, Notices and Certain Governmental Approvals | 43 |
| 15.9 | Entire Agreement; Conflicts | 44 |
| 15.10 | Parties in Interest | 44 |
| 15.11 | Amendment | 44 |
| 15.12 | Waiver; Rights Cumulative | 44 |
| 15.13 | Arbitration | 45 |
| 15.14 | Severability | 46 |
| 15.15 | Removal of Name | 46 |
| 15.16 | Counterparts | 46 |

HN\933868.19

## LIST OF APPENDICES, EXHIBITS AND SCHEDULES

| | | |
|---|---|---|
| Appendix 1 | — | Defined Terms |
| | | |
| Exhibit A | — | Leases |
| Exhibit A-1 | — | Wells |
| Exhibit A-2 | — | Easements and Rights-of-Way |
| Exhibit A-3 | — | Personal Property |
| Exhibit B | — | Form of Assignment and Bill of Sale |
| Exhibit C | — | Excluded Assets |
| Exhibit D | — | Escrow Agreement |
| Exhibit E | — | List of Additional Sellers |
| Exhibit F | — | Ownership Interest Among Seller |
| | | |
| Schedule 3.8 | — | Allocated Values |
| Schedule 4.4 | — | Consents |
| Schedule 4.7 | — | Litigation |
| Schedule 4.8 | — | Material Contracts |
| Schedule 4.9 | — | Violation of Laws |
| Schedule 4.10 | — | Preferential Rights |
| Schedule 4.13 | — | Current Commitments |
| Schedule 4.14 | — | Environmental |
| Schedule 4.15 | — | Production Taxes |
| Schedule 4.16 | — | Take-or-Pay Arrangements |
| Schedule 4.17 | — | Property Leases |
| Schedule 4.19 | — | Liabilities |
| Schedule 4.21 | — | Plugging and Abandonment |
| Schedule 4.22 | — | Credit Support |
| Schedule 6.1 | — | Conduct of Business |
| Schedule 6.6 | — | Guarantees |
| Schedule 13.1 | — | Retained Litigation |

HN\933868.19

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "*Agreement*") is executed as of this 27th day of September 2012, and is by and among Propel Energy, LLC, a Delaware limited liability company ("*Propel*"), and each of the other undersigned sellers identified on *Exhibit E* attached hereto (together with Propel, "*Seller*"), and Northstar Offshore Group, LLC, a Delaware limited liability company ("*Buyer*"). Seller and Buyer are each a "*Party*," and collectively the "*Parties*." Notwithstanding anything to the contrary contained in this Agreement, the obligations of Seller hereunder shall be several and shall not be joint and several and no Seller shall be liable for any obligation or breach by any other Seller.

## RECITALS

Seller desires to sell and assign, and Buyer desires to purchase and pay for, all of Seller's right, title and interest in and to the Assets (as defined hereinafter) effective as of the Effective Time (as defined hereinafter).

**NOW, THEREFORE**, for and in consideration of the mutual promises contained herein, the benefits to be derived by each Party hereunder, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**1.1    *Defined Terms.*** Capitalized terms used herein shall have the meanings set forth in *Appendix 1*, unless the context otherwise requires.

**1.2    *References and Rules of Construction.*** All references in this Agreement to Appendices, Exhibits, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Appendices, Exhibits, Schedules, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Articles, Sections, subsections and other subdivisions of this Agreement are convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection or other subdivision unless expressly so limited. The words "this Article," "this Section," and "this subsection," and words of similar import, refer only to Article, Section or subsection hereof in which such words occur. Wherever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limiting the foregoing in any respect." All references to "$" or "dollars" shall be deemed references to United States Dollars. Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the date of this Agreement. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise

requires.  Appendices, Exhibits and Schedules referred to herein are attached to and by this reference incorporated herein for all purposes.

## ARTICLE II
## PURCHASE AND SALE

*2.1*     *Purchase and Sale.*  Subject to the terms and conditions of this Agreement, Seller agrees to sell, and Buyer agrees to purchase and pay for all of Seller's right, title and interest in and to the assets described in *Section 2.1(a)* through *Section 2.1(h)* below (such assets, less and except the Excluded Assets, collectively, the "*Assets*"):

(a)      the oil and gas leases described in *Exhibit A*, subject to any reservations or depth restrictions described in *Exhibit A*, together with any and all other right, title and interest of Seller in and to the leasehold estates created thereby subject to the terms, conditions, covenants and obligations set forth in such leases and/or *Exhibit A*, and all other interests of Seller of any kind or character in such leases, subject (in each case) to any reservation or depth restrictions described in *Exhibit A* (such interest in such leases, the "*Leases*");

(b)      all wells located on any of the Leases or on any other lease with which any Lease has been unitized (such interest in such wells, including the wells set forth in *Exhibit A-1*, the "*Wells*"), and in all Hydrocarbons produced therefrom or allocated thereto;

(c)      all rights and interests in, under or derived from all unitization and pooling agreements in effect with respect to any of the Leases or Wells and the units created thereby (the "*Units*");

(d)      except for those that may not be assigned as set forth on *Schedule 4.4*, all Applicable Contracts and all rights thereunder;

(e)      except for those that may not be assigned as set forth on *Schedule 4.4*, all permits, licenses, servitudes, easements, rights-of-way and nonexclusive access rights to the extent used in connection with the ownership or operation of any of the Leases, Wells, Units or other Assets, including those described on *Exhibit A-2*;

(f)      all equipment, machinery, fixtures and other personal, moveable and mixed property, operational and nonoperational, known or unknown, located on any of the Leases, Wells, Units or other Assets or used in connection therewith, including pipelines, gathering systems, manifolds, buoys, well equipment, casing, tubing, pumps, motors, fixtures, machinery, compression equipment, flow lines, processing and separation facilities, platforms, structures, materials and other items used in the operation thereof, including those items described on *Exhibit A-3* (collectively, the "*Personal Property*");

(g)      all Imbalances relating to the Assets; and

(h)      all of the files, records, information and data, whether written or electronically stored, to the extent primarily relating to the Assets in Seller's or its Affiliates' possession, including: (i) land and title records (including abstracts of title, title opinions and title curative documents); (ii) Applicable Contract files; (iii) correspondence; (iv) operations,

2

environmental, production and accounting records and (v) facility and well records (collectively, "*Records*").

   **2.2     *Excluded Assets.*** Seller shall reserve and retain all of the Excluded Assets.

   **2.3     *Revenues and Expenses.*** Subject to the provisions hereof, Seller shall remain entitled to all of the rights of ownership (including the right to all production, proceeds of production and other proceeds) and shall remain responsible (by payment, through the adjustments to the Purchase Price hereunder or otherwise) for all Operating Expenses, in each case, attributable to the Assets for the period of time prior to the Effective Time. Subject to the provisions hereof, and subject to the occurrence of Closing, Buyer shall be entitled to all of the rights of ownership (including the right to all production, proceeds of production and other proceeds), and shall be responsible (by payment, through the adjustments to the Purchase Price hereunder or otherwise) for all Operating Expenses, in each case, attributable to the Assets for the period of time from and after the Effective Time. "*Operating Expenses*" means all operating expenses (including costs of insurance and ad valorem, property, severance, production and similar Taxes based upon or measured by or attributable to the ownership or operation of the Assets or the production of Hydrocarbons therefrom, but excluding any other Taxes) and capital expenditures incurred in the ownership and operation of the Assets in the ordinary course of business and, where applicable, in accordance with the relevant operating or unit agreement, if any, and overhead costs charged to the Assets under the relevant operating agreement or unit agreement, if any, but excluding Liabilities attributable to (i) personal injury or death, property damage or violation of any Law, (ii) Decommission obligations, (iii) environmental matters, including obligations to remediate any contamination of water or Personal Property under applicable Environmental Laws, (iv) obligations with respect to Imbalances, or (v) obligations to pay Working Interests, royalties, overriding royalties or other interest owners revenues or proceeds attributable to sales of Hydrocarbons relating to the Assets, including those held in suspense. After Closing, each Party shall be entitled to participate in all joint interest audits and other audits of Operating Expenses for which such Party is entirely or in part responsible under the terms of this *Section 2.3*.

**ARTICLE III**
**PURCHASE PRICE**

   **3.1     *Purchase Price.*** The purchase price for the Assets shall be $113,203,125.00 (the "*Purchase Price*"), adjusted in accordance with this Agreement and payable by Buyer to Seller at Closing by wire transfer in same day funds to a bank account of Seller (the details of which shall be provided by Seller to Buyer in the Preliminary Settlement Statement).

   **3.2     *Deposit*.**

   (a)     Concurrently with the execution of this Agreement, Buyer has deposited by wire transfer in same day funds with the Escrow Agent the sum of $5,660,156, representing 5% of the Purchase Price (such amount, excluding any interest earned thereon, the "*Deposit*"). If Closing occurs, the Deposit shall be applied toward the Adjusted Purchase Price at Closing.

HN\933868.19

(b)        If (i) all conditions precedent to the obligations of Buyer set forth in *Article VII* (other than those actions or deliveries to occur at Closing) have been met by Seller or waived by Buyer, and (ii) the transactions contemplated by this Agreement are not consummated because of:  (A) the failure of Buyer to materially perform any of its obligations hereunder, or (B) the failure of any of Buyer's representations or warranties hereunder to be true and correct in all material respects as of the date of this Agreement and Closing, then, in such event, Seller shall, as its sole and exclusive remedy, have the right to terminate this Agreement and receive the Deposit, as liquidated damages, from the Escrow Agent pursuant to and in accordance with the Escrow Agreement.

(c)        If this Agreement is terminated by the mutual written agreement of Buyer and Seller, or if Closing does not occur for any reason other than as set forth in *Section 3.2(b)*, then Buyer shall be entitled to the delivery of the Deposit (and any interest earned thereon) from the Escrow Agent pursuant to and in accordance with the Escrow Agreement, free of any claims by Seller with respect thereto.  Buyer and Seller shall thereupon have the rights and obligations set forth in *Section 14.2*.

**3.3      *Adjustments to Purchase Price.***   The Purchase Price shall be adjusted as follows, and the resulting amount shall be herein called the "*Adjusted Purchase Price*":

(a)        The Purchase Price shall be adjusted upward by the following amounts (without duplication):

(i)        an amount equal to the value of all Hydrocarbons attributable to the Assets in storage or existing in pipelines, plants and/or platforms (including inventory) and upstream of the pipeline connection or upstream of the sales meter as of the Effective Time, the value to be based upon the contract price in effect as of the Effective Time (or the sales price, if there is no contract price, in effect as of the Effective Time), less (A) Burdens on such production and (B) severance Taxes deducted by the purchaser of such production;

(ii)       an amount equal to all Operating Expenses and all other costs and expenses paid by Seller that are attributable to the Assets during the Interim Period, whether paid before or after the Effective Time, including (A) bond and insurance premiums paid by or on behalf of Seller with respect to the Interim Period, (B) Burdens and (C) rentals and other lease maintenance payments;

(iii)      the Title Benefit Amounts of any Title Benefits for which the Title Benefit Amounts have been determined prior to Closing;

(iv)      the amount of all Taxes allocated to Buyer but paid by Seller in accordance with *Section 15.2*;

(v)       to the extent not included as an Operating Expense for which an adjustment was made pursuant to *Section 3.3(a)(ii)*, any insurance premiums paid by or on behalf of Seller with respect to the Interim Period; and

(vi)      any other amount provided for elsewhere in this Agreement or otherwise agreed upon by Seller and Buyer.

4

(b)     The Purchase Price shall be adjusted downward by the following amounts (without duplication):

(i)     an amount equal to all proceeds actually received by Seller attributable to the ownership or operation of the Assets, including the sale of Hydrocarbons produced therefrom or allocable thereto during the Interim Period, net of (A) expenses (other than Operating Expenses and other expenses taken into account pursuant to *Section 3.3(a)*) directly incurred in earning or receiving such proceeds, and (B) any sales, excise or similar Taxes in connection therewith not reimbursed to Seller by a Third Party purchaser;

(ii)     if Seller makes the election under *Section 11.2(d)(i)* with respect to a Title Defect, the Title Defect Amount with respect to such Title Defect if the Title Defect Amount has been determined in accordance with this Agreement prior to Closing;

(iii)     if Seller makes the election under *Section 12.1(b)(i)* with respect to a Environmental Defect, the Remediation Amount with respect to such Environmental Defect if the Remediation Amount has been determined in accordance with this Agreement prior to Closing;

(iv)     the Allocated Value of the Assets excluded from the transactions contemplated hereby pursuant to *Section 11.2(d)(ii)*, *Section 11.4(a)(i)*, *Section 11.4(b)(i)*, or *Section 12.1(b)(ii)*;

(v)     the amount of all Taxes allocated to Seller but payable by Buyer in accordance with *Section 15.2*;

(vi)     the Deposit; and

(vii)     any other amount provided for elsewhere in this Agreement or otherwise agreed upon by Seller and Buyer.

**3.4     *Adjustment Methodology.*** When available, actual figures will be used for the adjustments to the Purchase Price at Closing. To the extent actual figures are not available, estimates will be used subject to final adjustments in accordance with *Section 3.6* and *Section 3.7*.

**3.5     *Preliminary Settlement Statement.*** Not less than eight (8) Business Days prior to Closing, Seller shall prepare and submit to Buyer for review a draft settlement statement (the "*Preliminary Settlement Statement*") that shall set forth the Adjusted Purchase Price, reflecting each adjustment made in accordance with this Agreement as of the date of preparation of such Preliminary Settlement Statement and the calculation of the adjustments used to determine such amount, together with the designation of Seller's accounts for the wire transfers of funds as required by *Section 3.1* and Section *9.3(d)*. Within five (5) Business Days of receipt of the Preliminary Settlement Statement, Buyer will deliver to Seller a written report containing all changes with the explanation therefor that Buyer proposes to be made to the Preliminary Settlement Statement. The Parties shall in good faith attempt to agree on the Preliminary Settlement Statement as soon as possible after Seller's receipt of Buyer's written report. The Preliminary Settlement Statement, as agreed upon by the Parties, will be used to adjust the

Purchase Price at Closing; provided that if the Parties do not agree upon a particular item of adjustment set forth in the Preliminary Settlement Statement, then there shall be no adjustment for that particular item at Closing, and any adjustments with respect to such disputed item shall be taken into consideration when determining the Final Price pursuant to *Section 3.6* or shall otherwise be addressed pursuant to *Section 3.7*.

**3.6     Final Settlement Statement.**  On or before ninety (90) days after Closing, a final settlement statement (the "*Final Settlement Statement*") will be prepared by Seller, based on actual income and expenses during the Interim Period and which takes into account all final adjustments made to the Purchase Price and shows the resulting final Purchase Price (the "*Final Price*").  The Final Settlement Statement shall set forth the actual proration of the amounts required by this Agreement.  As soon as practicable, and in any event within thirty (30) days, after receipt of the Final Settlement Statement, Buyer shall return to Seller a written report containing any proposed changes to the Final Settlement Statement and an explanation of any such changes and the reasons therefor (the "*Dispute Notice*").  Any changes not so specified in the Dispute Notice shall be deemed waived and Seller's determinations with respect to all such elements of the Final Settlement Statement that are not addressed specifically in the Dispute Notice shall prevail.  If Buyer fails to timely deliver a Dispute Notice to Seller containing changes Buyer proposes to be made to the Final Settlement Statement, the Final Settlement Statement as delivered by Seller will be deemed to be correct and will be final and binding on the Parties and not subject to further audit or arbitration.  If the Final Price set forth in the Final Settlement Statement is mutually agreed upon by Seller and Buyer, the Final Settlement Statement and the Final Price, shall be final and binding on the Parties hereto (other than with respect to amounts not accounted for therein or settled thereby, which amounts shall be subject to the provisions of *Section 3.9)*.  Any difference in the Adjusted Purchase Price as paid at Closing pursuant to the Preliminary Settlement Statement and the Final Price shall be paid by the owing Party within ten (10) days of final determination of such owed amounts in accordance herewith to the owed Party.  All amounts paid pursuant to this *Section 3.6* shall be delivered in United States currency by wire transfer of immediately available funds to the account specified in writing by the relevant Party.

**3.7     Disputes.**  If Seller and Buyer are unable to resolve the matters addressed in the Dispute Notice, each of Buyer and Seller shall within ten (10) Business Days after the delivery of such Dispute Notice, summarize its position with regard to such dispute in a written document of twenty pages or less and submit such summaries to the Houston, Texas office of Hein & Associates LLP or such other Person as the Parties may mutually select (the "*Accounting Arbitrator*"), together with the Dispute Notice, the Final Settlement Statement and any other documentation such Party may desire to submit.  Within ten (10) Business Days after receiving the Parties' respective submissions, the Accounting Arbitrator shall render a decision choosing either Seller's position or Buyer's position with respect to each matter addressed in any Dispute Notice, based on the materials described above.  Any decision rendered by the Accounting Arbitrator pursuant hereto shall be final, conclusive and binding on Seller and Buyer and will be enforceable against any of the Parties in any court of competent jurisdiction.  The costs of such Accounting Arbitrators shall be borne one-half by Buyer and one-half by Seller.

**3.8     Allocation of Purchase Price / Allocated Values.**  Buyer and Seller agree that the Purchase Price shall be allocated among the Assets as set forth in *Schedule 3.8* to this

HN\933868.19

Agreement (the "*Allocated Values*").  Buyer and Seller will amend *Schedule 3.8* to reflect adjustments to the Purchase Price pursuant to this Agreement.  Buyer and Seller agree that such adjusted allocation is reasonable and shall not take any position inconsistent therewith, including in notices to Preferential Purchase Right holders.  Each Party shall utilize the Allocated Values, as updated by mutual agreement of the Parties to reflect any adjustment to the Purchase Price pursuant to this Agreement and any Assumed Obligations or other items treated as consideration for federal income Tax purposes, in accordance with Section 1060 of the Code for purposes of all federal, state and local Tax returns and reports, including Internal Revenue Service Form 8594, and neither any Party or its Affiliates shall take any position on any Tax return that is inconsistent with such Allocated Values, as adjusted, unless such position is mutually agreed by the Parties or required to be taken pursuant to a final determination, as defined in Section 1313 of the Code.  Seller and Buyer agree to promptly advise the others regarding the existence of any Tax audit or controversy regarding the correctness of the Allocated Values or any adjustment thereto.

**3.9    *Post-Closing Adjustments after Final Settlement Statement*.**  If, after the Parties' agreement upon the Final Settlement Statement, (a) any Party receives monies belonging to the other, including proceeds of production, then such amount shall immediately be paid over to the proper Party, (b) any Party pays monies for Operating Expenses which are the obligation of the other Party hereto, then such other Party shall promptly reimburse the Party which paid such Operating Expenses upon receipt of an invoice from such paying Party, (c) a Party receives an invoice of an expense or obligation which is owed by the other Party, such Party receiving the invoice shall promptly forward such invoice to the Party obligated to pay the same, or (d) if an invoice or other evidence of an obligation is received by a Party, which is partially an obligation of both Seller and Buyer, then the Parties shall consult with each other, and each shall promptly pay its portion of such obligation to the obligee.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to the matters specifically listed or disclosed in the Schedules to this Agreement (as added, supplemented or amended pursuant to *Section 6.7*), Seller represents and warrants to Buyer the following:

**4.1    *Organization, Existence and Qualification*.**  Seller is a limited liability company duly formed and validly existing under the Laws of the State of Delaware.  Seller has all requisite power and authority to own and operate its property (including, its interests in the Assets) and to carry on its business as now conducted.  Seller is duly licensed or qualified to do business as a foreign company in all jurisdictions in which it carries on business or owns assets and such qualification is required by Law, except where the failure to be so qualified would not have a Material Adverse Effect.

**4.2    *Authority, Approval and Enforceability*.**  Seller has full power and authority to enter into and perform this Agreement, the Transaction Documents to which it is a party and the transactions contemplated herein and therein.  The execution, delivery and performance by Seller of this Agreement have been duly and validly authorized and approved by all necessary company action on the part of Seller.  This Agreement is, and the Transaction Documents to which Seller

7

is a party when executed and delivered by Seller will be, the valid and binding obligations of Seller and enforceable against Seller in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar Laws, as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at Law).

**4.3**   ***No Conflicts.***   Assuming the receipt of all Consents and the waiver of, or compliance with, all Preferential Purchase Rights, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated herein will not (a) conflict with or result in a breach of any provisions of the organizational documents of Seller, (b) result in a default or the creation of any Encumbrance or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license or other Applicable Contract to which Seller is a party or by which Seller or the Assets may be bound or (c) violate any Law applicable to Seller or any of the Assets, except in the case of clauses (b) and (c) where such default, Encumbrance, termination, cancellation, acceleration or violation would not have a Material Adverse Effect.

**4.4**   ***Consents.***   Except (a) as set forth in *Schedule 4.4*, (a) for Customary Post-Closing Consents, (a) under Contracts that are terminable upon not greater than sixty (60) days notice without payment of any fee, and (b) for Preferential Purchase Rights, there are no restrictions on assignment, including requirements for consents from Third Parties to any assignment (in each case), that Seller is required to obtain in connection with the transfer of the Assets by Seller to Buyer or the consummation of the transactions contemplated by this Agreement by Seller (each, a "*Consent*").

**4.5**   ***Bankruptcy.***   There are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to Seller's Knowledge, threatened in writing against Seller or any Affiliate of Seller.

**4.6**   ***Foreign Person.***   Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

**4.7**   ***Litigation.***   Except as set forth in *Schedule 4.7*, there is no suit, action or litigation by any Third Party before any Governmental Authority, and no legal, administrative or arbitration proceeding, (in each case) pending or, to Seller's Knowledge, threatened in writing against Seller relating to the Assets.

**4.8**   ***Material Contracts***.

(a)   Except for Contracts entered into in accordance with *Section 6.1*, *Schedule 4.8* sets forth all Applicable Contracts of the type described below (collectively, the "*Material Contracts*"):

(i)   any Applicable Contract that can reasonably be expected to result in aggregate payments by Seller of more than $50,000 during the current or any subsequent calendar year (based solely on the terms thereof and current volumes, without regard to any expected increase in volumes or revenues);

HN\933868.19

(ii)      any Applicable Contract that can reasonably be expected to result in aggregate revenues to Seller of more than $50,000 during the current or any subsequent calendar year (based solely on the terms thereof and current volumes, without regard to any expected increase in volumes or revenues);

(iii)      any Hydrocarbon purchase and sale, transportation, processing or similar Applicable Contract that is not terminable without penalty upon sixty (60) days or less notice;

(iv)      any indenture, mortgage, loan, credit or sale-leaseback or similar Applicable Contract that can reasonably be expected to result in aggregate payments by Seller of more than $50,000 during the current or any subsequent calendar year;

(v)      any Applicable Contract that constitutes a lease under which Seller is the lessor or the lessee of real or Personal Property which lease (A) cannot be terminated by Seller without penalty upon sixty (60) days or less notice and (B) involves an annual base rental of more than $50,000;

(vi)      any farmout agreement, participation agreement, exploration agreement, development agreement, joint operating agreement, unit agreement or similar Applicable Contract; and

(vii)      any Applicable Contract between Seller and any Affiliate of Seller that will not be terminated prior to Closing.

(b)      Except as set forth in *Schedule 4.8* and except for such matters that would not have a Material Adverse Effect, there exists no default under any Material Contract by Seller or, to Seller's Knowledge, by any other Person that is a party to such Material Contract, and no event has occurred that with notice or lapse of time or both would constitute any default under any such Contract by Seller or, to Seller's Knowledge, any other Person who is a party to such Material Contract.

**4.9      *No Violation of Laws.*** Except as set forth in *Schedule 4.9*, as of the date of this Agreement Seller is not in material violation of any applicable Laws with respect to its ownership and operation of the Assets. This *Section 4.9* does not include any matters with respect to Environmental Laws, such matters being addressed exclusively in *Section 4.14*.

**4.10      *Preferential Rights.*** Except as set forth in *Schedule 4.10*, there are no preferential purchase rights, rights of first refusal or other similar rights that are applicable to the transfer of the Assets in connection with the transactions contemplated hereby (each a "*Preferential Purchase Right*").

**4.11      *Royalties, Etc.*** To Seller's Knowledge, Seller has paid all Burdens with respect to the Assets due by Seller, or if not paid, is contesting such Burdens in good faith in the normal course of business.

**4.12      *Imbalances/Suspense.*** There are no material Imbalances or amounts being held in Suspense associated with the Assets as of the Effective Time.

9

**4.13   Current Commitments.**   *Schedule 4.13* sets forth, as of the date of this Agreement, all authorities for expenditures ("*AFEs*") relating to the Assets to drill or rework wells or for other capital expenditures pursuant to any of the Material Contracts for which all of the activities anticipated in such AFEs or commitments have not been completed by the date of this Agreement.

**4.14   Environmental.**

(a)   With respect to the Assets, Seller has not entered into, and is not subject to, any agreements, consents, orders, decrees, judgments, license or permit conditions, or other directives of any Governmental Authority that are in existence as of the date of this Agreement, are based on any Environmental Laws, that relate to the past, present or future use of any of the Assets and that require any change in the present conditions of any of the Assets.

(b)   Except as set forth in *Schedule 4.14*, as of the date of this Agreement, Seller has not received written notice from any Person of any release or disposal of any Hazardous Substance concerning any land, facility, asset or property included in the Assets that: (i) materially interferes with or prevents compliance by Seller with any Environmental Law or the terms of any license or permit issued pursuant thereto; or (ii) gives rise to or results in any common Law or other material Liability of Seller to any Person or Governmental Authority.

(c)   As of the date of this Agreement, the disposal or transportation of any Hazardous Substance from the Assets to any location not on the Assets has been made in compliance with all Environmental Laws.

(d)   To Seller's Knowledge, as of the date of this Agreement, Seller is in compliance with all Environmental Laws in which the failure to be in such compliance would result in a Material Adverse Effect.

**4.15   Production Taxes.**   Except as set forth in *Schedule 4.15*, during the period of Seller's ownership of the Assets, all Taxes and assessments (including penalties and interest) based on or measured by the ownership of the Assets, the production of Hydrocarbons or the receipt of proceeds therefrom that have become due and payable before the Effective Time have been properly paid, other than Taxes which are being contested in good faith.

**4.16   Take-or-Pay Arrangements.**   Seller has not received any prepayments or buydowns, or entered into any take-or-pay or forward sale arrangements other than those set forth in *Schedule 4.16*.  Except as set forth on *Schedule 4.16*, Buyer will not be obligated after the Effective Time to make deliveries of Hydrocarbons under any Applicable Contract without receiving full payment therefor.

**4.17   Property Leases.**   Each material lease agreement (other than the Leases) for real or personal property in connection with the Assets is set forth on *Schedule 4.17*.  Each such lease agreement creates good and valid leasehold estate in the properties leased thereunder and is in full force and effect.  The leasehold rights of Seller under each such lease are free and clear of all Encumbrances, other than Permitted Encumbrances.  There are no leases or other rights granted by Seller to third parties affecting any part of the Assets other than as set forth on *Schedule 4.17*.

10

**4.18    All Material Assets**.  All material Assets, whether tangible or intangible, owned, leased or otherwise held by the Seller in connection with the Business (but excluding Excluded Assets), are described in the Schedules and Exhibits to this Agreement.

**4.19    Undisclosed Liabilities**.  Other than as set forth in *Schedule 4.19* or in the other Schedules to this Agreement, there are no Liabilities that could give rise to a payment of money with respect to the Assets that would be required under GAAP to be disclosed on any of Seller's financial statements, in excess of $50,000. There are no Liabilities of Seller to Third Parties for personal injury or death occurring prior to the Effective Time as a result of Seller's operation of the Assets. Other than as set forth in *Schedule 4.19*, since the Effective Time, Seller has taken no action referenced in Section 6.1(b).

**4.20    Brokers' Fees**.  Seller has incurred no liability, contingent or otherwise, for brokers' or finders' fees relating to the transactions contemplated by this Agreement for which Buyer or any Affiliate of Buyer shall have any responsibility.

**4.21    Plugging and Abandonment**.  Except as set forth on *Schedule 4.21*, with respect to the Assets operated by Seller, there are no wells, platforms or other equipment located on the Assets that Seller, in accordance with Law or by Contract, is obligated as of the Effective Time to plug, dismantle or abandon.

**4.22    Credit Support**.  All bonds, letters of credit and guarantees posted by Seller or its Affiliates with Governmental Authorities and relating to the Assets are listed on *Schedule 4.22* (the "*Credit Support*").

**4.23    Permits**.  There has been no: (a) actual or, to the Knowledge of Seller, threatened suspension or termination of any material permit, license, order, approval, variance, waiver, franchise, right or other authorization required to be obtained from any Governmental Authority (each a "*Permit*") relating to the operation of the Assets, (b) written notice from any Governmental Authority received by Seller prohibiting any activity or operation pertaining to the Assets for which a Permit has been applied for or (c) condition placed on the resumption or issuance of any Permit by any Governmental Authority that remains outstanding.

## ARTICLE V
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller the following:

**5.1    Organization, Existence and Qualification.**  Buyer is a limited liability company duly formed, validly existing, and in good standing under the Laws of the State of Delaware and has all requisite power and authority to own and operate its property and to carry on its business as now conducted.  Buyer is duly licensed or qualified to do business as a foreign limited liability company in all jurisdictions in which it carries on business or owns assets and such qualification is required by Law except where the failure to be so qualified would not have a material adverse effect upon the ability of Buyer to consummate the transactions contemplated by this Agreement.

HN\933868.19

**5.2    *Authority, Approval and Enforceability.*** Buyer has full power and authority to enter into and perform this Agreement, the Transaction Documents to which it is a party and the transactions contemplated herein and therein. The execution, delivery and performance by Buyer of this Agreement have been duly and validly authorized and approved by all necessary company action on the part of Buyer. This Agreement is, and the Transaction Documents to which Buyer is a party when executed and delivered by Buyer will be, the valid and binding obligation of Buyer and enforceable against Buyer in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar Laws, as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at Law).

**5.3    *No Conflicts.*** The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated herein will not (a) conflict with or result in a breach of any provisions of the organizational documents of Buyer, (b) result in a default or the creation of any Encumbrance or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license or other agreement to which Buyer is a party or by which Buyer or any of its property may be bound or (c) violate any Law applicable to Buyer or any of its property, except in the case of clauses (b) and (c) where such default, Encumbrance, termination, cancellation, acceleration or violation would not have a material adverse effect upon the ability of Buyer to consummate the transactions contemplated by this Agreement or perform its obligations hereunder.

**5.4    *Consents.*** There are no consents or other restrictions on assignment, including requirements for consents from Third Parties to any assignment, (in each case) that Buyer is required to obtain in connection with the consummation of the transactions contemplated by this Agreement by Buyer.

**5.5    *Bankruptcy.*** There are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to Buyer's knowledge, threatened in writing against Buyer or any Affiliate of Buyer.

**5.6    *Litigation.*** There is no suit, action or litigation by any Person by or before any Governmental Authority, and no legal, administrative or arbitration proceeding, (in each case) pending, or to Buyer's knowledge, threatened in writing against Buyer that would have a material adverse effect upon the ability of Buyer to consummate the transactions contemplated by this Agreement.

**5.7    *Financing.*** Buyer shall have as of the Closing Date, sufficient cash in immediately available funds with which to pay the Purchase Price, consummate the transactions contemplated by this Agreement and perform its obligations under this Agreement and the Transaction Documents.

**5.8    *Regulatory.*** Buyer is and hereafter shall continue to be qualified per all applicable Laws to own and assume operatorship of state oil, gas and mineral leases in all jurisdictions (including the state waters in the Gulf of Mexico) where the Assets are located, and the consummation of the transactions contemplated by this Agreement will not cause Buyer to be

12

disqualified as such an owner or operator. To the extent required by any applicable Laws, Buyer has, and will hereafter continue to maintain, lease bonds, area-wide bonds or any other surety bonds as may be required by, and in accordance with, all applicable Laws governing the ownership and operation of such leases and has filed any and all required reports necessary for such ownership and operation with all Governmental Authorities having jurisdiction over such ownership and operation.

**5.9    *Independent Evaluation.*** Buyer is sophisticated in the evaluation, purchase, ownership and operation of oil and gas properties and related facilities. In making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer (a) has relied or shall rely solely on its own independent investigation and evaluation of the Assets and the advice of its own legal, Tax, economic, environmental, engineering, geological and geophysical advisors and the express provisions of this Agreement and not on any comments, statements, projections or other materials made or given by any representatives or consultants or advisors of Seller, and (b) has satisfied or shall satisfy itself through its own due diligence as to the environmental and physical condition of and contractual arrangements and other matters affecting the Assets.

**5.10    *Brokers' Fees.*** Buyer has incurred no liability, contingent or otherwise, for brokers' or finders' fees relating to the transactions contemplated by this Agreement for which Seller or Seller's Affiliates shall have any responsibility.

**5.11    *Accredited Investor.*** Buyer is an "accredited investor," as such term is defined in Regulation D of the Securities Act of 1933, as amended, and will acquire the Assets for its own account and not with a view to a sale or distribution thereof in violation of the Securities Act of 1933, as amended, and the rules and regulations thereunder, any applicable state blue sky Laws or any other applicable securities Laws.

## ARTICLE VI
## CERTAIN AGREEMENTS

**6.1    *Conduct of Business*.**

(a)    Except (x) as set forth in *Schedule 6.1*, (y) for the operations covered by the AFEs and other capital commitments described in *Schedule 4.13*, and (z) as expressly contemplated by this Agreement or as expressly consented to in writing by Buyer (which consent shall not be unreasonably delayed, withheld or conditioned), Seller shall from and after the date hereof until Closing:

(i)    manage the Assets in the usual, regular and ordinary manner consistent with past practice; and

(ii)    maintain Seller's books of account and Records relating to the Assets in the usual, regular and ordinary manner, in accordance with the usual accounting practices of each such Person.

(b)    Except (x) as set forth in *Schedule 6.1*, (y) for the operations covered by the AFEs and other capital commitments described in *Schedule 4.13*, and (z) as expressly

13

contemplated by this Agreement or as expressly consented to in writing by Buyer (which consent shall not be unreasonably delayed, withheld or conditioned), Seller shall, from and after the date hereof until Closing:

        (i)      not enter into an Applicable Contract that, if entered into on or prior to the date of this Agreement, would be required to be listed in a Schedule attached to this Agreement, or materially amend or change the terms of any Material Contract;

        (ii)      not transfer, sell, mortgage, pledge, encumber or dispose of any Assets, or enter into any agreement or arrangement to accomplish the foregoing, in each case, other than a sale and/or disposal of Hydrocarbons in the ordinary course of business or a sale of equipment that is no longer necessary in the operation of the Assets or for which replacement equipment has been obtained;

        (iii)      not grant any preferential purchase right, right of first refusal or other similar right to purchase any of the Assets;

        (iv)      not incur or commit to incur any Operating Expenses or other Liabilities other than in the usual, regular and ordinary manner consistent with past practice, or as otherwise required by the Applicable Contracts; and

        (v)      not commit to do any of the foregoing.

        (c)      Buyer acknowledges Seller owns undivided interests in certain of the properties comprising the Assets that it is not the operator thereof, and Buyer agrees that the acts or omissions of the other Working Interest owners (including the operators) who are not Seller or any Affiliate of Seller shall not constitute a breach of the provisions of this *Section 6.1*, and no action required by a vote of Working Interest owners shall constitute such a breach so long as Seller has voted its interest in a manner that complies with the provisions of this *Section 6.1*.

        *6.2*      *Operatorship.*  Buyer and Seller acknowledge and agree that Seller is not the operator of any of the Assets and that Seller cannot and does not covenant or warrant that Buyer will become operator of any of the Assets following Closing.

        *6.3*      *Intentionally Omitted.*

        *6.4*      *Governmental Bonds.*  Buyer acknowledges that none of the Credit Support is transferable to Buyer.  On or before the Closing Date, Buyer shall obtain, or cause to be obtained in the name of the Buyer, replacements for such Credit Support, other than bonds or other security typically obtained post-Closing (such as supplemental bonds required by the Bureau of Ocean Energy Management or other Governmental Authority), to the extent such replacements are necessary (a) for Buyer's ownership of the Assets and (b) to permit the cancellation of the Credit Support posted by Seller and/or its Affiliates with respect to the Assets.  In addition, at or prior to Closing, Buyer shall deliver to Seller evidence of the posting of bonds or other security with all applicable Governmental Authorities meeting the requirements of such authorities to own and, where appropriate, operate, the Assets.

**6.5**    ***Record Retention.***  Buyer shall and shall cause its successors and assigns to, for a period of seven (7) years following Closing (a) retain the Records, (b) provide Seller, its Affiliates and its and their officers, employees and representatives with access to the Records (to the extent that Seller has not retained the original or a copy) during normal business hours for review and copying at Seller's sole cost and expense, and (c) provide Seller, its Affiliates and its and their officers, employees and representatives with access, during normal business hours, to materials received or produced after Closing relating to any indemnity claim made under *Section 13.2* for review and copying at Seller's sole cost and expense (excluding any claims wherein Buyer, on the one hand, and Seller, on the other, are adverse to each other, in which event such access will be subject to the applicable discovery process available to the Parties pursuant to the rules of procedure of the relevant jurisdiction).  At the end of such seven (7) year period and prior to destroying any of the Records, Buyer shall notify Seller in advance of such destruction and provide Seller an opportunity to copy such Records at Seller's sole cost and expense.

**6.6**    ***Guarantees***.  Buyer shall cooperate with Seller in order to cause Seller and its Affiliates to be released, as of the Closing Date, from all guarantees, including any performance bonds previously put in place by Seller, set forth in *Schedule 6.6* (the "*Guarantees*").  Without limiting the foregoing, if required by the counterparty to any Guarantee, Buyer shall provide, effective as of the Closing Date, substitute arrangements of Buyer or its Affiliates covering all periods covered by the Guarantees, such substitute arrangements to be equivalent or better in terms of type of security and creditworthiness of the party providing the security as compared to the Guarantees.  In the event that any counterparty to any such Guarantee does not release Seller and its Affiliates, then, from and after Closing, Buyer shall indemnify Seller or its relevant Affiliate against all amounts incurred by Seller or its relevant Affiliate under such Guarantee (and all costs incurred in connection with such Guarantee) if applicable to Assets acquired by Buyer.  Notwithstanding anything to the contrary contained in this Agreement, any cash placed in escrow by Seller or any Affiliate of Seller pursuant to the Guarantees must be returned to Seller, and shall be deemed an Excluded Asset.

**6.7**    ***Amendment of Schedules***.  Buyer agrees that, with respect to the representations and warranties of Seller contained in this Agreement, Seller shall have the continuing right until Closing to add, supplement or amend the Schedules to its representations and warranties with respect to any matter hereafter arising which, if existing at the date hereof or thereafter, would have been required to be set forth or described in such Schedules.  For all purposes of this Agreement, including for purposes of determining whether the conditions set forth in *Article VII* have been fulfilled, the Schedules to Seller's representations and warranties contained in this Agreement shall be deemed to include only that information contained therein on the date of this Agreement and shall be deemed to exclude all information contained in any addition, supplement or amendment thereto.  Notwithstanding whether or not the Closing occurs, no addition, supplement or amendment to the Schedules shall be deemed to have cured any inaccuracy or breach of a representation or warranty of Seller pursuant to this Agreement, and the full amount of any Liabilities resulting therefrom shall be applied to the limitations set forth in Section 13.4; provided, however, that to the extent such Liabilities exceed such limitations, the limitations shall be reduced to $0.00, and Buyer shall be entitled to indemnification for the amount of such excess Liabilities.

# ARTICLE VII
## BUYER'S CONDITIONS TO CLOSING

The obligations of Buyer to consummate the transactions provided for herein are subject, at the option of Buyer, to the fulfillment by Seller or waiver by Buyer, on or prior to Closing of each of the following conditions:

**7.1** **_Representations._** The representations and warranties of Seller set forth in _Article IV_ shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date).

**7.2** **_Performance._** Seller shall have materially performed or complied with all obligations, agreements and covenants contained in this Agreement as to which performance or compliance by Seller is required prior to or at the Closing Date.

**7.3** **_No Legal Proceedings._** No suit, action, litigation or other proceeding by any Third Party shall be pending before any Governmental Authority seeking to restrain, prohibit, enjoin or declare illegal, or seeking substantial damages in connection with, the transactions contemplated by this Agreement.

**7.4** **_Title Defects and Environmental Defects._** In each case subject to the Individual Title Defect Threshold, the Individual Environmental Threshold and the Aggregate Deductible, as applicable, the sum of (a) all Title Defect Amounts determined under _Section 11.2(g)_ prior to Closing, _less_ the sum of all Title Benefit Amounts determined under _Section 11.2(h)_ prior to Closing, _plus_ (b) all Remediation Amounts for Environmental Defects determined under _Article XII_ prior to Closing, shall be less than 10% of the Purchase Price.

**7.5** **_Casualty Loss._** The aggregate amount of Casualty Losses under _Section 11.3_, shall be less than 10% of the Purchase Price

**7.6** **_Closing Deliverables._** Seller shall have delivered (or be ready, willing and able to deliver at Closing) to Buyer the documents and other items required to be delivered by Seller under _Section 9.3_.

# ARTICLE VIII
## SELLER'S CONDITIONS TO CLOSING

The obligations of Seller to consummate the transactions provided for herein are subject, at the option of Seller, to the fulfillment by Buyer or waiver by Seller on or prior to Closing of each of the following conditions:

**8.1** **_Representations._** The representations and warranties of Buyer set forth in _Article V_ shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date).

16

**8.2     Performance.**   Buyer shall have materially performed or complied with all obligations, agreements and covenants contained in this Agreement as to which performance or compliance by Buyer is required prior to or at the Closing Date.

**8.3     No Legal Proceedings.**   No suit, action, litigation or other proceeding by any Third Party shall be pending before any Governmental Authority seeking to restrain, prohibit or declare illegal, or seeking substantial damages in connection with, the transactions contemplated by this Agreement.

**8.4     Title Defects and Environmental Defects.**   In each case subject to the Individual Title Defect Threshold, the Individual Environmental Threshold and the Aggregate Deductible, as applicable, the sum of (a) all Title Defect Amounts determined under *Section 11.2(g)* prior to Closing, *less* the sum of all Title Benefit Amounts determined under *Section 11.2(h)* prior to Closing, *plus* (b) all Remediation Amounts for Environmental Defects determined under *Article XII* prior to Closing, shall be less than 10% of the Purchase Price.

**8.5     Casualty Loss.**   The aggregate amount of Casualty Losses under *Section 11.3* shall be less than 10% of the Purchase Price.

**8.6     Replacement Bonds and Guarantees.**   Buyer shall have obtained, in the name of Buyer (a) replacements for Seller's and/or its Affiliates' bonds, letters of credit and guarantees, to the extent required by *Section 6.4* and (b) replacements for the Guarantees to the extent required by *Section 6.6*.

**8.7     Closing Deliverables.**   Buyer shall have delivered (or be ready, willing and able to deliver at Closing) to Seller the documents and other items required to be delivered by Buyer under *Section 9.3*.

**ARTICLE IX**
**CLOSING**

**9.1     Date of Closing.**   Subject to the conditions stated in this Agreement, the sale by Seller and the purchase by Buyer of the Assets pursuant to this Agreement (the "*Closing*") shall occur on or before October 11, 2012, or such other date as Buyer and Seller may agree upon in writing.  The date Closing actually occurs shall be the "*Closing Date*".

**9.2     Place of Closing.**   Closing shall be held at the offices of Latham &Watkins L.L.P., 811 Main Street, Suite 3700, Houston, Texas 77002, or such other place as mutually agreed upon by the Parties.

**9.3     Closing Obligations.**   At Closing, the following documents shall be delivered and the following events shall occur, the execution of each document and the occurrence of each event being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

(a)     Seller and Buyer shall execute, acknowledge and deliver the Assignment in sufficient counterparts to facilitate recording in the applicable counties and parishes covering the Assets.

HN\933868.19

(b)     Seller and Buyer shall execute and deliver assignments, on appropriate forms, of state Leases included in the Assets in sufficient counterparts to facilitate filing with the applicable Governmental Authority.

(c)     Seller and Buyer shall execute and deliver the Preliminary Settlement Statement.

(d)     Buyer shall deliver to Seller, to the accounts designated in the Preliminary Settlement Statement, by direct bank or wire transfer in same day funds, the Adjusted Purchase Price after giving effect to the Deposit.

(e)     Seller shall deliver, on forms supplied by Buyer and reasonably acceptable to Seller, transfer orders or letters in lieu thereof directing all purchasers of production to make payment to Buyer of proceeds attributable to production from the Assets from and after the Effective Time, for delivery by Buyer to the purchasers of production.

(f)     Seller shall deliver an executed statement described in Treasury Regulation §1.1445-2(b)(2) certifying that Seller is not a "foreign person" within the meaning of the Code.

(g)     An authorized officer of Seller shall execute and deliver a certificate, dated as of Closing Date, certifying that the conditions set forth in *Section 7.1* and *Section 7.2* have been fulfilled and, if applicable, any exceptions to such conditions that have been waived by Buyer.

(h)     An authorized officer of Buyer shall execute and deliver a certificate, dated as of Closing, certifying that the conditions set forth in *Section 8.1* and *Section 8.2* have been fulfilled and, if applicable, any exceptions to such conditions that have been waived by Seller.

(i)     Seller shall deliver a recordable release of any mortgages, financing statements, fixture filings or security agreements made by Seller affecting the Assets including (i) that certain Deed of Trust, Mortgage, Assignment, Security Agreement Fixture Filing and Financing Statement between Seller and Propel Energy Services, LLC as "Mortgagors" and the Bank of Nova Scotia, Agent, as "Mortgagee" dated June 15, 2011, and recorded at File Number 322897 of the Mortgage Records of Cameron Parish, Louisiana and (ii) those mortgages more particularly described on *Schedule 9.3(i)*.

(j)     Seller and Buyer shall execute and deliver a joint instruction letter directing the Escrow Agent to distribute any interest earned on the Deposit to Buyer.

(k)     Seller and Buyer shall execute and deliver any other agreements, instruments and documents which are required by other terms of this Agreement to be executed and/or delivered at Closing.

**9.4     *Records.*** In addition to the obligations set forth under *Section 9.3* above, but notwithstanding anything herein to the contrary, no later than thirty (30) Business Days after the

HN\933868.19

Closing Date, Seller shall make available to Buyer the Records for pickup from Seller's offices during normal business hours.

## ARTICLE X
## ACCESS/DISCLAIMERS

*10.1   Access.*

(a)     From and after the date hereof and up to and including the Closing Date (or earlier termination of this Agreement) but subject to the other provisions of this *Section 10.1* and obtaining any required consents of Third Parties, including Third Party operators of the Assets, Seller shall afford to Buyer and its officers, employees, agents, accountants, consultants, attorneys, investment bankers and other authorized representatives ("*Buyer's Representatives*") reasonable access, during normal business hours, to the Assets and all Records in Seller's or any of its Affiliates' possession. All investigations and due diligence conducted by Buyer or any Buyer's Representative shall be conducted at Buyer's sole cost, risk and expense and any conclusions made from any examination done by Buyer or any Buyer's Representative shall result from Buyer's own independent review and judgment.

(b)     Subject to the terms of this *Section 10.1*, Buyer shall be entitled to conduct a Phase I environmental property assessment with respect to the Assets.  Seller or its designee shall have the right to accompany Buyer and Buyer's Representatives whenever they are on site on the Assets and also to collect split test samples if any are collected.  Notwithstanding anything herein to the contrary, Buyer shall not have access to, and shall not be permitted to conduct any environmental due diligence (including any Phase I environmental property assessments) with respect to, any Assets where Seller does not have the authority to grant access for such due diligence.

(c)     Buyer shall coordinate its environmental property assessments and physical inspections of the Assets with Seller and all Third Party operators to minimize any inconvenience to or interruption of the conduct of business by Seller or such Third Party operators.  Buyer shall abide by Seller's, and any Third Party operator's, safety rules, regulations and operating policies while conducting its due diligence evaluation of the Assets, including any environmental or other inspection or assessment of the Assets and, to the extent required by Seller or any Third Party operator, execute and deliver any required boarding agreement of Seller or any such Third Party operator.  Buyer hereby defends, indemnifies and holds harmless each of the operators of the Assets and the Seller Indemnified Parties from and against any and all Liabilities arising out of, resulting from or relating to any field visit, environmental property assessment or other due diligence activity conducted by Buyer or any Buyer's Representative with respect to the Assets, **EVEN IF SUCH LIABILITIES ARISE OUT OF OR RESULT FROM, SOLELY OR IN PART, THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION OF LAW OF OR BY A MEMBER OF THE SELLER INDEMNIFIED PARTIES, EXCEPTING ONLY LIABILITIES RESULTING ON THE ACCOUNT OF THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR UNLAWFUL ACT OF A MEMBER OF THE SELLER INDEMNIFIED PARTIES.**

HN\933868.19

(d)        Buyer agrees to promptly provide Seller, but in no event less than five (5) days after receipt or creation, copies of all final reports and test results prepared by Buyer and/or any of Buyer's Representatives which contain data collected or generated from Buyer's due diligence with respect to the Assets.  Seller shall not be deemed by its receipt of said documents or otherwise to have made any representation or warranty, expressed, implied or statutory as to the condition of the Assets or to the accuracy of said documents or the information contained therein.

(e)        Upon completion of Buyer's due diligence, Buyer shall at its sole cost and expense and without any cost or expense to Seller or its Affiliates (i) repair all damage done to the Assets in connection with Buyer's due diligence, (ii) restore the Assets to the approximate same condition than they were prior to commencement of Buyer's due diligence solely to the extent any change in such condition of the Assets was caused by Buyer in connection with its due diligence and (iii) remove all equipment, tools or other property brought onto the Assets in connection with Buyer's due diligence.

(f)        During all periods that Buyer and/or any of Buyer's Representatives are on the Assets, Buyer or such Buyer's Representatives shall maintain, at its sole expense, policies of insurance of the types and in the amounts customarily carried by similarly situated persons. Coverage under all insurance required to be carried by Buyer hereunder will (i) be primary insurance, (ii) list Seller Indemnified Parties as additional insureds and (iii) waive subrogation against Seller Indemnified Parties.  Upon request by Seller, Buyer shall provide evidence of such insurance to Seller prior to entering the Assets.

*10.2    Confidentiality.*  Buyer acknowledges that, pursuant to its right of access to the Records or the Assets, Buyer will become privy to confidential and other information of Seller or its Affiliates and Buyer shall ensure that such confidential information shall be held confidential by Buyer and Buyer's Representatives in accordance with the terms of the Confidentiality Agreement.  If Closing should occur, the foregoing confidentiality restriction on Buyer, including the Confidentiality Agreement, shall terminate (except as to (a) such portion of the Assets that are not conveyed to Buyer pursuant to the provisions of this Agreement, (b) the Excluded Assets and (c) information related to assets other than the Assets).

*10.3    Disclaimers.*

(a)        **EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN *ARTICLE IV* OR *SECTION 11.1(b)* (I) SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (II) SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING, ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF SELLER OR ANY OF ITS AFFILIATES).**

HN\933868.19

(b)     EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN *ARTICLE IV* OR *SECTION 11.1(b)* AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED AS TO (I) TITLE TO ANY OF THE ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION RELATING TO THE ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES TO BE GENERATED BY THE ASSETS, (V) THE PRODUCTION OF OR ABILITY TO PRODUCE HYDROCARBONS FROM THE ASSETS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY SELLER OR THIRD PARTIES WITH RESPECT TO THE ASSETS, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO AND (IX) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT.  EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN *ARTICLE IV* OR *SECTION 11.1(b)*, SELLER FURTHER DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM LATENT VICES OR DEFECTS, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY OF THE ASSETS, RIGHTS OF A PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT BUYER SHALL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS OR DEFECTS (KNOWN OR UNKNOWN, LATENT, DISCOVERABLE OR UNDISCOVERABLE), AND THAT BUYER HAS MADE OR CAUSED TO BE  MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE. WITH RESPECT TO ANY OF THE ASSETS THAT ARE LOCATED IN LOUISIANA OR LOCATED ON THE OUTER CONTINENTAL SHELF ADJACENT TO THE STATE OF LOUISIANA, BUYER ACKNOWLEDGES THAT THIS WAIVER HAS BEEN EXPRESSLY CALLED TO ITS ATTENTION AND INCLUDES A WAIVER OF WARRANTY AGAINST REDHIBITORY VICES ARISING UNDER LOUISIANA CIVIL CODE ARTICLES 2520 THROUGH 2548, INCLUSIVE.

(c)     OTHER THAN AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN *SECTION 4.14*, SELLER HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF

21

MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSETS, AND NOTHING IN THIS AGREEMENT OR OTHERWISE SHALL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY, AND SUBJECT TO BUYER'S LIMITED RIGHTS AS SPECIFIED IN THIS AGREEMENT FOR A BREACH OF SELLER'S REPRESENTATIONS SET FORTH IN *SECTION 4.14*, BUYER SHALL BE DEEMED TO BE TAKING THE ASSETS "AS IS" AND "WHERE IS" WITH ALL FAULTS FOR PURPOSES OF THEIR ENVIRONMENTAL CONDITION AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH ENVIRONMENTAL INSPECTIONS AS BUYER DEEMS APPROPRIATE.

(d)     SELLER AND BUYER AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS *SECTION 10.3* ARE "*CONSPICUOUS*" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LAW.

## ARTICLE XI
## TITLE MATTERS; CASUALTY; TRANSFER RESTRICTIONS

**11.1    *Seller's Title*.**

(a)     <u>General Disclaimer of Title Warranties and Representations</u>.  Except for the special warranty of title as set forth in *Section 11.1(b)* and without limiting Buyer's remedies for Title Defects set forth in this *Article XI*, Seller makes no warranty or representation, express, implied, statutory or otherwise, with respect to Seller's title to any of the Assets and Buyer hereby acknowledges and agrees that Buyer's sole remedy for any defect of title, including any Title Defect, with respect to any of the Assets (i) before Closing, shall be as set forth in *Section 11.2* and (ii) after Closing, shall be pursuant to the special warranty of title set forth in *Section 11.1(b)*.

(b)     <u>Special Warranty of Title</u>.  If Closing occurs, then effective as of the Closing Date, Seller warrants Defensible Title to the Assets (but, with respect to any Lease and any Well associated therewith, limited to the depths set forth in *Exhibit A* or *Exhibit A-1*, as applicable) unto Buyer against every Person whomsoever lawfully claiming or to claim the same or any part thereof by, through or under Seller or its Affiliates, but not otherwise, subject, however, to the Permitted Encumbrances and to any matters of record in the applicable counties and parishes or applicable state records prior to the Title Claim Date; provided, however, that, except with respect to any liability of Seller for any claim asserted in writing by Buyer to Seller in accordance with *Section 11.1(c)* on or before the expiration of the Survival Period for breach of such special warranty, such special warranty shall cease and terminate at the end of such Survival Period.  Said special warranty of title shall be subject to the further limitations and provisions of this *Article XI*.

(c)     <u>Recovery on Special Warranty</u>.

(i) <u>Buyer's Assertion of Title Warranty Breaches</u>.  Prior to the expiration of the period of time commencing as of the Closing Date and ending at 5 p.m. Central Time on the six (6) month anniversary thereof (the "*Survival Period*"), Buyer shall furnish Seller a Title Defect Notice meeting the requirements of *Section 11.2(a)* setting forth any matters which Buyer intends to assert as a breach of Seller's special warranty in *Section 11.1(b)*.  For all purposes of this Agreement, Buyer shall be deemed to have waived, and Seller shall have no further liability for, any breach of Seller's special warranty that Buyer fails to assert by a Title Defect Notice given to Seller on or before the expiration of the Survival Period.  Seller shall have a reasonable opportunity, but not the obligation, to cure any Title Defect asserted by Buyer pursuant to this *Section 11.1(c)(i)*.  Buyer agrees to reasonably cooperate with any attempt by Seller to cure any such Title Defect.

(ii) <u>Limitations on Special Warranty</u>.  For purposes of Seller's special warranty of title, the value of the Leases and/or Wells set forth in *Schedule 3.8*, as appropriate (but limited to the depths, if any, set forth on *Exhibit A* or *Exhibit A-1* for such Lease and/or Well), shall be deemed to be the Allocated Value thereof, as adjusted herein.  Recovery on Seller's special warranty of title shall be limited to an amount (without any interest accruing thereon) equal to the reduction in the Purchase Price to which Buyer would have been entitled had Buyer asserted the Title Defect giving rise to such breach of Seller's special warranty of title as a Title Defect prior to Closing pursuant to *Section 11.2*, in each case taking into account the Individual Title Defect Threshold and the Aggregate Deductible.  Seller shall be entitled to offset any amount owed by Seller for breach of its special warranty of title with respect to any Asset with the amount of any Title Benefits with respect to such Asset as to which Seller gives Buyer notice after the Title Claim Date.

**11.2   *Notice of Title Defects; Defect Adjustments*.**

(a) <u>Title Defect Notices</u>.  Buyer must deliver at least five (5) Business Days before Closing, (the "*Title Claim Date*") claim notices to Seller meeting the requirements of this *Section 11.2(a)* (collectively the "*Title Defect Notices*" and individually a "*Title Defect Notice*") setting forth any matters which, in Buyer's reasonable opinion, constitute Title Defects and which Buyer intends to assert as a Title Defect pursuant to this *Section 11.2(a)*.  For all purposes of this Agreement and notwithstanding anything herein to the contrary (except as provided in *Section 11.1*), Buyer shall be deemed to have waived, and Seller shall have no liability for, any Title Defect which Buyer fails to assert as a Title Defect by a properly delivered Title Defect Notice received by Seller on or before the Title Claim Date; provided, however, that, for purposes of Seller's special warranty to title under *Section 11.1(b)*, such waiver shall not apply to any matter that prior to the Title Claim Date is neither reflected of record in the applicable counties and parishes or in the applicable state records nor discovered by any of Buyer's or any of its Affiliate's employees, title attorneys, landmen or other title examiners while conducting Buyer's due diligence with respect to the Assets.  To be effective, each Title Defect Notice shall be in writing, and shall include (i) a description of the alleged Title Defect and the Asset, or portion thereof, affected by such Title Defect (each a "*Title Defect Property*"), (ii) the Allocated Value of each Title Defect Property, (iii) supporting documents reasonably necessary for Seller to verify the existence of such alleged Title Defect, and (iv) the amount by which Buyer reasonably believes the Allocated Value of each Title Defect Property is reduced by such alleged Title Defect and the computations upon which Buyer's belief is based.  To give Seller an

opportunity to commence reviewing and curing Title Defects, Buyer agrees to use reasonable efforts to give Seller prompt written notice of all alleged Title Defects discovered by Buyer, which notice may be preliminary in nature and supplemented prior to the Title Claim Date.

(b)      *Title Benefit Notices*.  Seller shall have the right, but not the obligation, to deliver to Buyer on or before the Title Claim Date with respect to each Title Benefit a notice (a "*Title Benefit Notice*") including (i) a description of the alleged Title Benefit and the Asset, or portion thereof, affected by such alleged Title Benefit (each a "*Title Benefit Property*"), and (ii) the amount by which Seller reasonably believes the Allocated Value of such Title Benefit Property is increased by such alleged Title Benefit and the computations upon which Seller's belief is based.  Seller shall be deemed to have waived all Title Benefits for which a Title Benefit Notice has not been delivered on or before the Title Claim Date.

(c)      *Seller's Right to Cure*.  Seller shall have the right, but not the obligation, to attempt, at its sole cost, to cure (subject to Buyer's reasonable satisfaction) at any time prior to Closing (the "*Cure Period*"), any Title Defects of which it has been advised by Buyer.

(d)      *Remedies for Title Defects*.  Subject to Seller's continuing right to dispute the existence of a Title Defect and/or the Title Defect Amount asserted with respect thereto and subject to the rights of the Parties pursuant to *Section 14.1(c)*, in the event that any Title Defect timely asserted by Buyer in accordance with *Section 11.2(a)* is not waived in writing by Buyer or cured during the Cure Period, Seller shall, at its sole option, elect to:

(i)      subject to the Individual Title Defect Threshold and the Aggregate Deductible, reduce the Purchase Price by the Title Defect Amount determined pursuant to *Section 11.2(g)* or *Section 11.2(j)*;

(ii)      retain the entirety of the Title Defect Property that is subject to such Title Defect, together with all associated Assets, in which event the Purchase Price shall be reduced by an amount equal to the Allocated Value of such Title Defect Property and such associated Assets; or

(iii)      if applicable, terminate this Agreement pursuant to *Section 14.1(c)*.

(e)      *Remedies for Title Benefits*.  With respect to each Title Benefit Property reported under *Section 11.2(b)*, the Purchase Price shall be increased by an amount (the "*Title Benefit Amount*") equal to the increase in the Allocated Value for such Title Benefit Property caused by such Title Benefit, as determined pursuant to *Section 11.2(h)* or *Section 11.2(j)*.

(f)      *Exclusive Remedy*.  Except for Buyer's rights under Seller's special warranty of title under *Section 11.1(b)* and Buyer's rights to terminate this Agreement pursuant to *Section 14.1(c)*, the provisions set forth in *Section 11.2(d)* shall be the exclusive right and remedy of Buyer with respect to Seller's failure to have Defensible Title with respect to any Asset or any other title matter.

(g)      *Title Defect Amount*.  The amount by which the Allocated Value of a Title Defect Property is reduced as a result of the existence of a Title Defect shall be the "*Title Defect Amount*" and shall be determined in accordance with the following terms and conditions:

HN\933868.19

(i)       if Buyer and Seller agree on the Title Defect Amount, then that amount shall be the Title Defect Amount;

(ii)      if the Title Defect is an Encumbrance that is undisputed and liquidated in amount, then the Title Defect Amount shall be the amount necessary to be paid to remove the Title Defect from the Title Defect Property;

(iii)     if the Title Defect represents a discrepancy between (A) Seller's Net Revenue Interest for any Title Defect Property and (B) the Net Revenue Interest set forth for such Title Defect Property in *Exhibit A-1*, then the Title Defect Amount shall be the product of the Allocated Value of such Title Defect Property multiplied by a fraction, the numerator of which is the Net Revenue Interest decrease and the denominator of which is the Net Revenue Interest set forth for such Title Defect Property in *Exhibit A-1*;

(iv)      if the Title Defect represents an obligation or Encumbrance upon or other defect in title to the Title Defect Property of a type not described above, then the Title Defect Amount shall be determined by taking into account the Allocated Value of the Title Defect Property, the portion of the Title Defect Property affected by the Title Defect, the legal effect of the Title Defect, the potential economic effect of the Title Defect over the life of the Title Defect Property, the values placed upon the Title Defect by Buyer and Seller and such other reasonable factors as are necessary to make a proper evaluation; provided, however, that if such Title Defect is reasonably capable of being cured, the Title Defect Amount shall not be greater than the reasonable cost and expense of curing such Title Defect;

(v)       the Title Defect Amount with respect to a Title Defect Property shall be determined without duplication of any costs or losses included in another Title Defect Amount hereunder; and

(vi)      notwithstanding anything to the contrary in this *Article XI*, the aggregate Title Defect Amounts attributable to the effects of all Title Defects upon any Title Defect Property shall not exceed the Allocated Value of such Title Defect Property.

(h)      <u>Title Benefit Amount</u>. The Title Benefit Amount resulting from a Title Benefit shall be determined in accordance with the following methodology, terms and conditions:

(i)       if Buyer and Seller agree on the Title Benefit Amount, then that amount shall be the Title Benefit Amount;

(ii)      if the Title Benefit represents a discrepancy between (A) Seller's Net Revenue Interest for any Title Benefit Property and (B) the Net Revenue Interest set forth for such Title Benefit Property in *Exhibit A-1*, then the Title Benefit Amount shall be the product of the Allocated Value of such Title Benefit Property multiplied by a fraction, the numerator of which is the Net Revenue Interest increase and the denominator of which is the Net Revenue Interest set forth for such Title Benefit Property in *Exhibit A-1*; and

(iii)     if the Title Benefit is of a type not described above, then the Title Benefit Amounts shall be determined by taking into account the Allocated Value of Title Benefit

Property, the portion of such Title Benefit Property affected by such Title Benefit, the legal effect of the Title Benefit, the potential economic effect of the Title Benefit over the life of such Title Benefit Property, the values placed upon the Title Benefit by Buyer and Seller and such other reasonable factors as are necessary to make a proper evaluation.

(i)     Title Deductibles.  Notwithstanding anything to the contrary, (i) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller for any individual Title Defect for which the Title Defect Amount does not exceed $50,000 (the "*Individual Title Defect Threshold*"); and (ii) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller for any Title Defect that exceeds the Individual Title Defect Threshold unless (A) the amount of the sum of (1) the aggregate Title Defect Amounts of all such Title Defects that exceed the Individual Title Defect Threshold (but excluding any such Title Defects cured by Seller), *plus* (2) the aggregate Remediation Amounts of all Environmental Defects that exceed the Individual Environmental Threshold (but excluding any Environmental Defects cured by Seller), exceeds (B) the Aggregate Deductible, after which point Buyer shall be entitled to adjustments to the Purchase Price or other applicable remedies available hereunder, but, only with respect to the aggregate amount of such Title Defect Amounts and Remediation Amounts in excess of the Aggregate Deductible.  For the avoidance of doubt, if Seller retains any Title Defect Property pursuant to *Section 11.2(d)(iii)*, the Title Defect Amount related to such Title Defect Property will not be counted towards the Aggregate Deductible.

(j)     Title Dispute Resolution.  Seller and Buyer shall attempt to agree on all Title Defects, Title Benefits, Title Defect Amounts and Title Benefit Amounts prior to Closing. If Seller and Buyer are unable to agree by Closing, the Title Defect Amounts and Title Benefit Amounts in dispute shall be exclusively and finally resolved pursuant to this *Section 11.2(j)*. There shall be a single arbitrator, who shall be a title attorney located in Houston, Texas with at least ten (10) years experience in oil and gas titles involving properties in the regional area in which the Title Defect Properties are located, as selected by mutual agreement of Buyer and Seller within fifteen (15) days after the end of the Cure Period, and absent such agreement, by the Dallas, Texas office of JAMS (the "*Title Arbitrator*").  The arbitration proceeding shall be held in Houston, Texas and shall be conducted by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect on the date of commencement of the arbitration (or any subsequent rules created by JAMS to replace those rules), to the extent such rules do not conflict with the terms of this *Section 11.2(j)*.  The Title Arbitrator's determination shall be made within twenty (20) days after submission of the matters in dispute and shall be final and binding upon both Parties, without right of appeal. In making its determination, the Title Arbitrator shall be bound by the rules set forth in *Section 11.2(g)* and *Section 11.2(h)* and, subject to the foregoing, may consider such other matters as in the opinion of the Title Arbitrator are necessary to make a proper determination.  The Title Arbitrator, however, may not award the Buyer a greater Title Defect Amount than the Title Defect Amount claimed by Buyer in its applicable Title Defect Notice.  The Title Arbitrator shall act as an expert for the limited purpose of determining the specific disputed Title Defect, Title Benefit, Title Defect Amount and/or Title Benefit Amount submitted by either Party and may not award damages, interest or penalties to either Party with respect to any matter. Seller and Buyer shall each bear its own legal fees and other costs of presenting its case. Each of Seller and Buyer shall bear one-half of the costs and expenses of the Title Arbitrator.  To the extent that the award of the Title Arbitrator with respect

to any Title Defect Amount or Title Benefit Amount is not taken into account as an adjustment to the Purchase Price pursuant to *Section 3.5* or *Section 3.6*, then within ten (10) days after the Title Arbitrator delivers written notice to Buyer and Seller of his award with respect to a Title Defect Amount or a Title Benefit Amount and, subject to *Section 11.2(i)* (i) Buyer shall pay to Seller the amount, if any, so awarded by the Title Arbitrator to Seller, and (ii) Seller shall pay to Buyer the amount, if any, so awarded by the Title Arbitrator to Buyer.  To the extent any adjustments are not agreed upon by the Parties as of Closing, Closing shall be delayed until any such arbitration conducted pursuant to this Section 11.2(j) is completed and such adjustments to the Purchase Price have been determined in accordance herewith.

### 11.3  *Casualty Loss*.

(a)     Notwithstanding anything herein to the contrary, from and after the Effective Time, if Closing occurs, Buyer shall assume all risk of loss with respect to production of Hydrocarbons through normal depletion (including watering out of any well, collapsed casing or sand infiltration of any well) and the depreciation of Personal Property due to ordinary wear and tear, in each case, with respect to the Assets.

(b)     If, after the date of this Agreement but prior to the Closing Date, any physical damage or destruction to any portion of the Assets occurs (each, a "*Casualty Loss*"), and the Closing thereafter occurs, Seller, at Closing, shall pay to Buyer all sums paid to Seller by Third Parties by reason of any Casualty Loss insofar as with respect to the Assets and shall assign, transfer and set over to Buyer or subrogate Buyer to all of Seller's right, title and interest (if any) in insurance claims, unpaid awards, and other rights against Third Parties (excluding any Liabilities, other than insurance claims, of or against any Seller Indemnified Parties) arising out of such Casualty Loss insofar as with respect to the Assets; provided, however, that Seller shall reserve and retain (and Buyer shall assign to Seller) all right, title, interest and claims against Third Parties for the recovery of Seller's costs and expenses incurred prior to Closing in pursuing or asserting any such insurance claims or other rights against Third Parties.

### 11.4  *Preferential Purchase Rights and Consents to Assign*.

(a)     With respect to each Preferential Purchase Right set forth in *Schedule 4.10*, Seller, prior to Closing, shall send to the holder of each such Preferential Purchase Right a notice in material compliance with the contractual provisions applicable to such Preferential Purchase Right.

(i)     If, prior to Closing, any holder of a Preferential Purchase Right notifies Seller that it intends to consummate the purchase of the Asset to which its Preferential Purchase Right applies or if the time for exercising such Preferential Purchase Right has not expired, then the Asset subject to such Preferential Purchase Right shall be excluded from the Assets to be assigned to Buyer at Closing (but only to the extent of the portion of such Asset affected by the Preferential Purchase Right), and the Purchase Price shall be reduced by the Allocated Value of the Asset (or portion thereof) so excluded.  Seller shall be entitled to all proceeds paid by any Person exercising a Preferential Purchase Right prior to Closing.  If such holder of such Preferential Purchase Right thereafter fails to consummate the purchase of the Asset (or portion thereof) covered by such Preferential Purchase Right on or before sixty (60)

days following the Closing Date, or the time for exercising such Preferential Purchase Right expires without exercise by the holder thereof (A) Seller shall so notify Buyer and (B) Buyer shall purchase, on or before ten (10) days following receipt of such notice, such Asset (or portion thereof) that was so excluded from Seller, under the terms of this Agreement and for a price equal to the amount by which the Purchase Price was reduced at Closing with respect to such excluded Asset (or portion thereof).

(ii)     All Assets for which any applicable Preferential Purchase Right has been waived, or as to which the period to exercise the applicable Preferential Purchase Right has expired, in each case, prior to Closing, shall be sold to Buyer at Closing pursuant to the provisions of this Agreement.

(b)     With respect to each Consent set forth in *Schedule 4.4*, Seller, prior to Closing, shall send to the holder of each such Consent a notice in material compliance with the contractual provisions applicable to such Consent seeking such holder's consent to the transactions contemplated hereby.

(i)     If (A) Seller fails to obtain a Consent set forth in *Schedule 4.4* prior to Closing and the failure to obtain such Consent would cause (1) the assignment of the Assets affected thereby to Buyer to be void or (2) the termination of a Lease under the express terms thereof or (B) a Consent requested by Seller is denied in writing, then, in each case, the Asset (or portion thereof) affected by such un-obtained Consent shall be excluded from the Assets to be assigned to Buyer at Closing, and the Purchase Price shall be reduced by the Allocated Value of such Asset (or portion thereof) so excluded.  In the event that a Consent (with respect to an Asset excluded pursuant to this *Section 11.4(b)(i)*) that was not obtained prior to Closing is obtained within sixty (60) days following Closing, then, within ten (10) days after such Consent is obtained (x) Buyer shall purchase the Asset (or portion thereof) that was so excluded as a result of such previously un-obtained Consent and pay to Seller the amount by which the Purchase Price was reduced at Closing with respect to the Asset (or portion thereof) so excluded and (y) Seller shall assign to Buyer the Asset (or portion thereof) so excluded at Closing pursuant to an instrument in substantially the same form as the Assignment.

(ii)     If Seller fails to obtain a Consent set forth in *Schedule 4.4* prior to Closing (A) and the failure to obtain such Consent would not cause (1) the assignment of the Asset (or portion thereof) affected thereby to Buyer to be void or (2) the termination of a Lease under the express terms thereof and (B) such Consent requested by Seller is not denied in writing by the holder thereof, then the Asset (or portion thereof) subject to such un-obtained Consent shall nevertheless be assigned by Seller to Buyer at Closing as part of the Assets and Buyer shall have no claim against, and Seller shall have no Liability for, the failure to obtain such Consent.

(iii)     Prior to Closing, Seller and Buyer shall use their commercially reasonable efforts to obtain all Consents listed on *Schedule 4.4*; provided, however, that neither Party shall be required to incur any Liability or pay any money in order to obtain any such Consent.

## ARTICLE XII
## ENVIRONMENTAL MATTERS

### 12.1   *Notice of Environmental Defects.*

(a)     <u>Environmental Defects Notice</u>.   Buyer must deliver at least five (5) Business Days before Closing (the "*Environmental Claim Date*") claim notices to Seller meeting the requirements of this *Section 12.1(a)* (collectively the "*Environmental Defect Notices*" and individually an "*Environmental Defect Notice*") setting forth any matters which, in Buyer's reasonable opinion, constitute Environmental Defects and which Buyer intends to assert as Environmental Defects pursuant to this *Section 12.1*.  For all purposes of this Agreement, but subject to Buyer's remedy for a breach of Seller's representation contained in *Section 4.14*, Buyer shall be deemed to have waived, and Seller shall have no liability for, any Environmental Defect which Buyer fails to assert as an Environmental Defect by a properly delivered Environmental Defect Notice received by Seller on or before the Environmental Claim Date.  To be effective, each Environmental Defect Notice shall be in writing and shall include (i) a description of the matter constituting the alleged Environmental Condition (including the applicable Environmental Law violated or implicated thereby) and the Assets affected by such alleged Environmental Condition, (ii) the Allocated Value of the Assets (or portions thereof) affected by such alleged Environmental Condition, (iii) supporting documents reasonably necessary for Seller to verify the existence of such alleged Environmental Condition, and (iv) a calculation of the Remediation Amount (itemized in reasonable detail) that Buyer asserts is attributable to such alleged Environmental Defect.  Buyer's calculation of the Remediation Amount included in the Environmental Defect Notice must describe in reasonable detail the Remediation proposed for the alleged Environmental Condition that gives rise to the asserted Environmental Defect and identify all assumptions used by the Buyer in calculating the Remediation Amount, including the standards that Buyer asserts must be met to comply with Environmental Laws.  Seller shall have the right, but not the obligation, to cure (to Buyer's reasonable satisfaction) any asserted Environmental Defect on or before Closing.

(b)     <u>Remedies for Environmental Defects</u>.  Subject to Seller's continuing right to dispute the existence of an Environmental Defect and/or the Remediation Amount asserted with respect thereto, and subject to the rights of the Parties pursuant to *Section 14.1(c)*, in the event that any Environmental Defect timely asserted by Buyer in accordance with *Section 12.1(a)* is not waived in writing by Buyer or cured during the Cure Period, Seller shall, at its sole option, elect to:

(i)     subject to the Individual Environmental Threshold and the Aggregate Deductible, reduce the Purchase Price by the Remediation Amount;

(ii)    retain the entirety of the Asset that is subject to such Environmental Defect, together with all associated Assets, in which event the Purchase Price shall be reduced by an amount equal to the Allocated Value of such Asset and such associated Assets; or

(iii)   if applicable, terminate this Agreement pursuant to *Section 14.1(c)*.

If Seller elects the option set forth in clause (i) above, Buyer shall be deemed to have assumed responsibility for all of the costs and expenses attributable to the Remediation of the Environmental Condition attributable to such Environmental Defect and all of all Liabilities with respect thereto and such responsibility of Buyer shall be deemed to constitute part of the Assumed Obligations hereunder.

(c)    Exclusive Remedy.  Except for Buyer's remedy for a breach of Seller's representation contained in *Section 4.14* and Buyer's rights to terminate this Agreement pursuant to *Section 14.1(c)*, the provisions set forth in *Section 12.1(b)* shall be the exclusive right and remedy of Buyer with respect to any Environmental Defect with respect to any Asset or other environmental matter.

(d)    Environmental Deductibles.  Notwithstanding anything to the contrary, (i) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller for any individual Environmental Defect for which the Remediation Amount does not exceed $50,000 (the "*Individual Environmental Threshold*"); and (ii) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller for any Environmental Defect for which the Remediation Amount exceeds the Individual Environmental Threshold unless (A) the amount of the sum of (1) the aggregate Remediation Amounts of all such Environmental Defects that exceed the Individual Environmental Threshold (but excluding any Environmental Defects cured by Seller), *plus* (2) the aggregate Title Defect Amounts of all Title Defects that exceed the Individual Title Defect Threshold (but excluding any Title Defects cured by Seller), exceeds (B) the Aggregate Deductible, after which point Buyer shall be entitled to adjustments to the Purchase Price or other applicable remedies available hereunder, but only with respect to the aggregate amount of such Remediation Amounts and Title Defect Amounts in excess of the Aggregate Deductible. For the avoidance of doubt, if Seller retains any Assets pursuant to *Section 12.1(b)(iii)*, the Remediation Amounts relating to such retained Assets will not be counted towards the Aggregate Deductible.

(e)    Environmental Dispute Resolution.  Seller and Buyer shall attempt to agree on all Environmental Defects and Remediation Amounts prior to Closing.  If Seller and Buyer are unable to agree by Closing, the Environmental Defects and/or Remediation Amounts in dispute shall be exclusively and finally resolved by arbitration pursuant to this *Section 12.1(e)*. There shall be a single arbitrator, who shall be an environmental attorney with at least ten (10) years experience in environmental matters involving oil and gas producing properties in the regional area in which the affected Assets are located, as selected by mutual agreement of Buyer and Seller within fifteen (15) days after the Closing Date, and absent such agreement, by the Dallas, Texas office of JAMS (the "*Environmental Arbitrator*").  The arbitration proceeding shall be held in Houston, Texas and shall be conducted by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect on the date of commencement of the arbitration (or any subsequent rules created by JAMS to replace those rules), to the extent such rules do not conflict with the terms of this *Section 12.1*.  The Environmental Arbitrator's determination shall be made within twenty (20) days after submission of the matters in dispute and shall be final and binding upon both Parties, without right of appeal.  In making its determination, the Environmental Arbitrator shall be bound by the rules set forth in this *Section 12.1* and, subject to the foregoing, may consider such other matters as in the opinion of the Environmental Arbitrator are necessary or helpful to make a proper determination.  The Environmental Arbitrator,

however, may not award Buyer its share of any greater Remediation Amount than the Remediation Amount claimed by Buyer in its applicable Environmental Defect Notice. The Environmental Arbitrator shall act as an expert for the limited purpose of determining the specific disputed Environmental Defects and/or Remediation Amounts submitted by either Party and may not award damages, interest or penalties to either Party with respect to any matter. Seller and Buyer shall each bear its own legal fees and other costs of presenting its case. Each of Seller and Buyer shall bear one-half of the costs and expenses of the Environmental Arbitrator. To the extent that the award of the Environmental Arbitrator with respect to any Remediation Amount is not taken into account as an adjustment to the Purchase Price pursuant to *Section 3.5* or *Section 3.6*, then, within ten (10) days after the Environmental Arbitrator delivers written notice to Buyer and Seller of his award with respect to any Remediation Amount, and subject to *Section 12.1(d)* (i) Buyer shall pay to Seller the amount, if any, so awarded by the Environmental Arbitrator to Seller, and (ii) Seller shall pay to Buyer the amount, if any, so awarded by the Environmental Arbitrator to Buyer. To the extent any adjustments are not agreed upon by the Parties as of Closing, Closing shall be delayed until any such arbitration conducted pursuant to this Section 12.1(e) is completed and such adjustments to the Purchase Price have been determined in accordance herewith.

**12.2    *NORM, Wastes and Other Substances.*** Buyer acknowledges that the Assets have been used for exploration, development, and production of oil and gas and that there may be petroleum, produced water, wastes or other substances or materials located in, on or under the Assets or associated with the Assets. Equipment and sites included in the Assets may contain asbestos, NORM or other Hazardous Substances. NORM may affix or attach itself to the inside of wells, materials and equipment as scale, or in other forms. The wells, materials and equipment located on the Assets or included in the Assets may contain NORM and other wastes or Hazardous Substances. NORM containing material and/or other wastes or Hazardous Substances may have come in contact with various environmental media, including, water, soils or sediment. Special procedures may be required for the assessment, remediation, removal, transportation, or disposal of environmental media, wastes, asbestos, NORM and other Hazardous Substances from the Assets.

## ARTICLE XIII
## ASSUMPTION; INDEMNIFICATION; SURVIVAL

**13.1    *Assumption by Buyer.*** Without limiting Buyer's rights to indemnity under this *Article XIII*, from and after Closing, Buyer assumes and hereby agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) all obligations and Liabilities, known or unknown, arising from, based upon, related to or associated with the Assets, regardless of whether such obligations or Liabilities arose prior to, on or after the Effective Time, including obligations and Liabilities relating in any manner to the use, ownership or operation of the Assets, including obligations to (a) furnish makeup gas and/or settle Imbalances according to the terms of applicable gas sales, processing, gathering or transportation Contracts, (b) pay Working Interests, royalties, overriding royalties and other interest owners' revenues or proceeds attributable to sales of Hydrocarbons, (c) Decommission the Assets (the "*Decommisioning Obligations*"), (d) clean up and/or remediate the Assets in accordance with applicable Contracts and Laws, and (e) perform all obligations applicable to or imposed on the lessee, owner or operator under the Leases and the Applicable Contracts, or as

required by Law, (all of said obligations and Liabilities, subject to the exclusions below, herein being referred to as the "*Assumed Obligations*"); provided, Buyer does not assume any obligations or Liabilities of Seller to the extent that they are:

(i)     attributable to or arise out of the ownership, use or operation of the Excluded Assets; or

(ii)     attributable to or arise out of the actions, litigation, suits or other proceedings, if any, including those set forth in *Schedule 13.1*, arising from or related to the ownership or operation of the Assets, or production therefrom, for periods prior to the Effective Time.

**13.2    *Indemnities of Seller*.**  Effective as of Closing, subject to the limitations set forth in *Section 13.4* and *Section 13.8* or otherwise in this Agreement, Seller shall be responsible for, shall pay on a current basis and hereby defends, indemnifies, holds harmless and forever releases Buyer and its Affiliates, and all of its and their respective equityholders, partners, members, directors, officers, managers, employees, agents and representatives (collectively, "*Buyer Indemnified Parties*") from and against any and all Liabilities, whether or not relating to Third Party claims or incurred in the investigation or defense of any of the same or in asserting, preserving or enforcing any of their respective rights hereunder, arising from, based upon, related to or associated with:

(a)     any breach by Seller of any of its representations or warranties contained in *Article IV* and *Section 11.1(b)*;

(b)     any breach by Seller of any of its covenants or agreements under this Agreement;

(c)     any act or omission by Seller involving or relating to the Excluded Assets;

(d)     the actions, litigation, suits or other proceedings, if any, including those set forth in *Schedule 13.1*, arising from or related to the ownership or operation of the Assets, or production therefrom, for periods prior to the Effective Time;

(e)     any Liability of Seller to Third Parties for personal injury or death to the extent occurring prior to the Effective Time as a result of Seller's operation of the Assets;

(f)     the payment of all obligations owed to royalty and overriding royalty interest owners relating to the Assets attributable to the period of time prior to the Effective Time;

(g)     except as provided in *Section 15.2(b)* and *Section 15.2(c)*, obligations for Taxes due as of the Closing Date with respect to the interests of Seller covering Seller's period of ownership; or

(h)     the disposal or transportation of any Hazardous Substance from the Assets during the period of Seller's ownership of the Assets to any location not on the Assets in violation of Environmental Law.

HN\933868.19

**13.3    *Indemnities of Buyer*.**   Effective as of Closing, Buyer and its successors and assigns shall assume, be responsible for, shall pay on a current basis, and hereby defends, indemnifies, holds harmless and forever releases Seller and its Affiliates, and all of its and their respective equityholders, partners, members, directors, officers, managers, employees, agents and representatives (collectively, "*Seller Indemnified Parties*") from and against any and all Liabilities, whether or not relating to Third Party claims or incurred in the investigation or defense of any of the same or in asserting, preserving or enforcing any of their respective rights hereunder, arising from, based upon, related to or associated with:

        (a)    any breach by Buyer of any of its representations or warranties contained in *Article V*;

        (b)    any breach by Buyer of any of its covenants or agreements under this Agreement; or

        (c)    the Assumed Obligations.

**13.4    *Limitation on Liability; Indemnity Escrow*.**

        (a)    Seller shall not have any Liability for any indemnification under *Section 13.2* of this Agreement (i) for any individual Liability unless the amount with respect to such Liability exceeds $100,000, and (ii) until and unless the aggregate amount of all Liabilities for which Claim Notices are delivered by Buyer exceeds 1.5% of the Purchase Price, and then only to the extent such Liabilities exceed 1.5% of the Purchase Price; provided that (A) the adjustments to the Purchase Price under *Section 3.3*, *Section 3.5*, *Section 3.6* or *Section 3.7* and any payments in respect thereof, or (B) any claims arising from or related to fraud or Willful Breach, in each case shall not be limited by this *Section 13.4(a)*.

        (b)    At Closing, and following the receipt by the Escrow Agent of a joint instruction letter authorizing same, the Escrow Agent shall distribute to Buyer all interest earned on the Deposit that is then in the escrow account.  In order to provide security for Seller's indemnification obligations under this Agreement, at Closing the Escrow Agent shall retain in the escrow account the full amount of the Deposit.  On the date that is six (6) months following the Closing Date (or, if such date is not a Business Day, the next Business Day), Seller shall be entitled to receive an amount equal to the positive difference, if any, between the amount in the escrow account minus the aggregate amount of indemnification claims described in any unresolved Claim Notices, and the Parties shall deliver to the Escrow Agent a joint instruction letter authorizing the release of such amount to Seller.  Thereafter, the Parties shall execute one or more joint instruction letter(s) following the resolution of any matters described in any previously outstanding Claim Notice, such that the owed party receives funds to which it may be entitled.  Except as provided in *Section 13.8*, Seller shall have no obligation to indemnify Buyer for aggregate Liabilities that exceed ten percent (10%) of the Purchase Price, and further, following the first anniversary of the Closing Date, Seller shall have no obligation to indemnify Buyer with respect to Liabilities arising under this Agreement or otherwise relating to or associated with the Assets; provided that (i) the adjustments to the Purchase Price under *Section 3.3*, *Section 3.5*, *Section 3.6* or *Section 3.7* and any payments in respect thereof, or (ii) any claims

arising from or related to fraud or Willful Breach, in each case shall not be limited by this *Section 13.4(b)*.

(c)     Notwithstanding anything to the contrary contained in this Agreement, for purposes of determining whether there is a breach of any representation or warranty of Seller with respect to which Buyer is entitled to indemnification under this *Article XIII*, all of the representations and warranties of Seller set forth in *Article IV* that are qualified as to "material," "materiality," "material respects," or "Material Adverse Effect" shall be deemed to have been made without any such qualifications.

*13.5    Express Negligence.*    THE DEFENSE, INDEMNIFICATION, HOLD HARMLESS, RELEASE AND ASSUMED OBLIGATIONS PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE OR RESULTED SOLELY OR IN PART FROM THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION OF LAW OF OR BY ANY INDEMNIFIED PARTY, EXCEPTING ONLY LIABILITIES RESULTING ON THE ACCOUNT OF THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR UNLAWFUL ACT OF SUCH INDEMNIFIED PARTY. BUYER AND SELLER ACKNOWLEDGE THAT THIS STATEMENT COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.

*13.6    Exclusive Remedy.*    Notwithstanding anything to the contrary contained in this Agreement, the Parties agree that, from and after Closing, *Section 6.6*, *Section 10.1(c)*, *Section 11.1(c)*, *Section 13.2* and *Section 13.3*, contain the Parties' exclusive remedies against each other with respect to the transactions contemplated hereby, including breaches of the representations, warranties, covenants and agreements of the Parties contained in this Agreement or in any document or certificate delivered pursuant to this Agreement other than any claims arising from or related to fraud or Willful Breach.   Except as specified in *Section 11.1(c)*, *Section 13.2*, effective as of Closing, Buyer, on its own behalf and on behalf of the Buyer Indemnified Parties, hereby releases, remises and forever discharges Seller and its Affiliates and all such Persons' equityholders, partners, members, directors, officers, employees, agents and representatives from any and all suits, legal or administrative proceedings, claims, demands, damages, losses, costs, Liabilities, interest or causes of action whatsoever, in Law or in equity, known or unknown, which Buyer or the Buyer Indemnified Parties might now or subsequently may have, based on, relating to or arising out of this Agreement, the transactions contemplated by this Agreement, the ownership, use or operation of any of the Assets prior to Closing or the condition, quality, status or nature of any of the Assets prior to Closing, including rights to contribution under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, breaches of statutory or implied warranties, nuisance or other tort actions, rights to punitive damages, common Law rights of contribution and rights under insurance maintained by Seller or any of its Affiliates (except as provided in *Section 11.3(b)*).

*13.7    Indemnification Procedures.*    All claims for indemnification under Section 6.6, Section 10.1(c), Section 13.2 and Section 13.3 shall be asserted and resolved as follows:

HN\933868.19

(a)     For purposes of Section 6.6, Section 10.1(c) and this Article XIII, the term "Indemnifying Party" when used in connection with particular Liabilities shall mean the Party or Parties having an obligation to indemnify another Party or Parties with respect to such Liabilities pursuant to Section 6.6, Section 10.1(c) or this Article XIII, and the term "Indemnified Party" when used in connection with particular Liabilities shall mean the Party or Parties having the right to be indemnified with respect to such Liabilities by another Party or Parties pursuant to Section 6.6, Section 10.1(c) or this Article XIII.

(b)     To make claim for indemnification under Section 6.6, Section 10.1(c), Section 13.2 and Section 13.3, an Indemnified Party shall notify the Indemnifying Party of its claim under this Section 13.7, including the specific details of and specific basis under this Agreement for its claim (the "Claim Notice"). In the event that the claim for indemnification is based upon a claim by a Third Party against the Indemnified Party (a "Third Party Claim"), the Indemnified Party shall provide its Third Party Claim Notice promptly after the Indemnified Party has actual knowledge of the Third Party Claim and shall enclose a copy of all papers (if any) served with respect to the Third Party Claim; provided that the failure of any Indemnified Party to give notice of a Third Party Claim as provided in this Section 13.7(b) shall not relieve the Indemnifying Party of its obligations under Section 6.6, Section 10.1(c), Section 13.2 and Section 13.3 (as applicable) except to the extent such failure results in insufficient time being available to permit the Indemnifying Party to effectively defend against the Third Party Claim or otherwise materially prejudices the Indemnifying Party's ability to defend against the Third Party Claim. In the event that the claim for indemnification is based upon an inaccuracy or breach of a representation, warranty, covenant or agreement, the Third Party Claim Notice shall specify the representation, warranty, covenant or agreement that was inaccurate or breached.

(c)     In the case of a claim for indemnification based upon a Third Party Claim, the Indemnifying Party shall have thirty (30) days from its receipt of the Claim Notice to notify the Indemnified Party whether it admits or denies its liability to defend the Indemnified Party against such Third Party Claim at the sole cost and expense of the Indemnifying Party. The Indemnified Party is authorized, prior to and during such thirty (30) day period, to file any motion, answer or other pleading that it shall deem necessary or appropriate to protect its interests or those of the Indemnifying Party and that is not prejudicial to the Indemnifying Party.

(d)     If the Indemnifying Party admits its liability to defend the Indemnified Party against a Third Party Claim, it shall have the right and obligation to diligently defend, at its sole cost and expense, the Indemnified Party against such Third Party Claim. The Indemnifying Party shall have full control of such defense and proceedings, including any compromise or settlement thereof. If requested by the Indemnifying Party, the Indemnified Party agrees to cooperate in contesting any Third Party Claim which the Indemnifying Party elects to contest. The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this *Section 13.7(d)*. An Indemnifying Party shall not, without the written consent of the Indemnified Party, (i) settle any Third Party Claim or consent to the entry of any judgment with respect thereto which does not include an unconditional written release of the Indemnified Party from all liability in respect of such Third Party Claim or (ii) settle any Third Party Claim or consent to the entry of any judgment with respect thereto in any manner that may materially and adversely affect the Indemnified Party (other than as a result of money damages covered by the indemnity).

35

(e)     If the Indemnifying Party does not admit its liability or admits its liability to defend the Indemnified Party against a Third Party Claim, but fails to diligently prosecute, indemnify against or settle the Third Party Claim, then the Indemnified Party shall have the right to defend against the Third Party Claim at the sole cost and expense of the Indemnifying Party, with counsel of the Indemnified Party's choosing, subject to the right of the Indemnifying Party to admit its liability and assume the defense of the Third Party Claim at any time prior to settlement or final determination thereof. If the Indemnifying Party has not yet admitted its liability to defend the Indemnified Party against a Third Party Claim, the Indemnified Party shall send written notice to the Indemnifying Party of any proposed settlement and the Indemnifying Party shall have the option for ten (10) days following receipt of such notice to (i) admit in writing its liability to indemnify the Indemnified Party from and against the liability and consent to such settlement and (ii) if liability is so admitted, reject, in its reasonable judgment, the proposed settlement, or (iii) deny liability. Any failure to respond such notice by the Indemnified Party shall be deemed to be an election under subsection (i) above.

(f)     In the case of a claim for indemnification not based upon a Third Party Claim, the Indemnifying Party shall have thirty (30) days from its receipt of the Claim Notice to (i) cure the Liabilities complained of, (ii) admit its liability for such Liability or (iii) dispute the claim for such Liabilities. If the Indemnifying Party does not notify the Indemnified Party within such thirty (30) day period that it has cured the Liabilities or that it disputes the claim for such Liabilities, the amount of such Liabilities shall conclusively be deemed a liability of the Indemnifying Party hereunder.

### 13.8   *Survival.*

(a)     The representations and warranties of the Parties in *Article IV* and *Article V*, and the covenants and agreements of the Parties, shall survive Closing for a period of six (6) months. The representation and warranty of Seller in *Section 11.1(b)* shall terminate as of the expiration of the Survival Period. Representations, warranties, covenants and agreements shall be of no further force and effect after the date of their expiration, provided that there shall be no termination of any bona fide claim asserted pursuant to this Agreement with respect to such a representation, warranty, covenant or agreement prior to its expiration date.

(b)     The indemnities in Section 13.2(a), Section 13.2(b), Section 13.3(a) and Section 13.3(b) shall terminate as of the expiration date of each respective representation, warranty, covenant or agreement that is subject to indemnification, except in each case as to matters for which a specific written claim for indemnity has been delivered to the Indemnifying Party on or before such expiration date. Seller's indemnities in Section 13.2(c) through Section 13.2(h) shall survive Closing for a period of one (1) year, except in each case as to matters for which a specific written claim for indemnity has been delivered to the Indemnifying Party on or before such expiration date. Buyer's indemnities in Section 6.6, Section 10.1(c) and in Section 13.3(c) shall survive Closing without time limit and shall be deemed covenants running with the Assets (provided that Buyer and its successors and assigns shall not be released from any of, and shall remain jointly and severally liable to the Seller Indemnified Parties for, the obligations and Liabilities of Buyer under such Sections of this Agreement upon any transfer or assignment of any Asset).

HN\933868.19

**13.9     Waiver of Right to Rescission.**   Seller and Buyer acknowledge that, following Closing, the payment of money, as limited by the terms of this Agreement, shall be adequate compensation for breach of any representation, warranty, covenant or agreement contained herein or for any other claim arising in connection with or with respect to the transactions contemplated by this Agreement.   As the payment of money shall be adequate compensation, following Closing, Buyer and Seller waive any right to rescind this Agreement or any of the transactions contemplated hereby other than with respect to any claims arising from or related to fraud.

**13.10   Insurance, Taxes.**   The amount of any Liabilities for which any of the Buyer Indemnified Parties is entitled to indemnification under this Agreement or in connection with or with respect to the transactions contemplated by this Agreement shall be reduced by any corresponding insurance proceeds actually received from insurance policies carried by a party (net of any deductibles of premium increases related thereto).

**13.11   Non-Compensatory Damages.**   None of the Buyer Indemnified Parties nor Seller Indemnified Parties shall be entitled to recover from Seller or Buyer, or their respective Affiliates, any special, indirect, consequential, punitive, exemplary, remote or speculative damages, including damages for lost profits of any kind arising under or in connection with this Agreement or the transactions contemplated hereby, except to the extent any such Party suffers such damages to a Third Party, which damages (including costs of defense and reasonable attorneys' fees incurred in connection with defending against such damages) shall not be excluded by this provision as to recovery hereunder.   Subject to the preceding sentence, Buyer, on behalf of each of the Buyer Indemnified Parties, and Seller, on behalf of each of Seller Indemnified Parties, waive any right to recover any special, indirect, consequential, punitive, exemplary, remote or speculative damages, including damages for lost profits of any kind, arising in connection with or with respect to this Agreement or the transactions contemplated hereby.

**13.12   Cooperation by Buyer - Retained Litigation.**   Buyer agrees to use reasonable efforts to cooperate with Seller in connection with Seller's defense and other actions relating to or arising out of the litigation and claims set forth in *Schedule 13.1*.   At Seller's sole cost and expense, Buyer agrees to make reasonably available Buyer's employees engaged in the operation of the Assets during normal business hours for the purposes of providing testimony, depositions, information and other related activities relating to such litigation and claims.

**13.13   Disclaimer of Application of Anti-Indemnity Statutes.**   The Parties acknowledge and agree that the provisions of any anti-indemnity statute relating to oilfield services and associated activities shall not be applicable to this Agreement and/or the transactions contemplated hereby.

**13.14   Several Obligations of Each Seller; No Waiver.**

(a)     The obligations, liabilities, covenants, agreements and rights of each Seller party hereunder shall be several, and not be joint and several, and no Seller party shall be liable for any obligation or liability or any breach by any other Seller party of such breaching Seller party's covenants or agreements hereunder.

HN\933868.19

(b)     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby shall cause any Seller party to relinquish, waive or otherwise release any Liabilities or rights such Seller party may have against any other Seller party, in each case, that may exist or arise prior to, on or after the date of this Agreement or the Closing Date, whether such Liabilities or rights arise out of contract, tort or otherwise.

## ARTICLE XIV
## TERMINATION, DEFAULT AND REMEDIES

**14.1     Right of Termination.**  This Agreement and the transactions contemplated herein may be terminated at any time prior to Closing:

(a)     by Seller, at Seller's option, if any of the conditions set forth in *Sections 8.1, 8.2, 8.5* or *8.6* have not been satisfied on or before October 30, 2012 (the "*Outside Date*"), and, except with respect to a breach of Buyer's obligation to pay the Purchase Price at Closing or a breach of Buyer's representations and warranties set forth in *Section 5.5* and/or *Section 5.7*, following written notice thereof from Seller to Buyer specifying the reason such condition is unsatisfied (including any breach by Buyer of this Agreement), such condition remains unsatisfied for a period of ten (10) Business Days after Buyer's receipt of written notice thereof from Seller;

(b)     by Buyer, at Buyer's option, if any of the conditions set forth in *Sections 7.1, 7.2* or *7.5* have not been satisfied on or before the Outside Date and, following written notice thereof from Buyer to Seller specifying the reason such condition is unsatisfied (including any breach by Seller of this Agreement), such condition remains unsatisfied for a period of ten (10) Business Days after Seller's receipt of written notice thereof from Buyer;

(c)     by Buyer if the condition set forth in *Sections 7.3* or *7.4* has not been satisfied on or before the Outside Date or by Seller if the condition set forth in *Sections 8.3* or *8.4* is not satisfied on or before the Outside Date; or

(d)     by Seller or Buyer if mutually agreed in writing;

provided, however, that no Party shall have the right to terminate this Agreement pursuant to clause (a) or (b) above if such Party or its Affiliates are at such time in material breach of any provision of this Agreement.

**14.2     Effect of Termination.**  If the obligation to close the transactions contemplated by this Agreement is terminated pursuant to any provision of *Section 14.1* hereof, then, except as provided in *Section 3.2* and except for the provisions of *Sections 1.1, 10.1(c)* through *(f), 10.2, 10.3, 13.11,* this *Section 14.2, Section 14.3* and *Article XV* ( other than *Sections 15.2(b), 15.7* and *15.8*) and such of the defined terms set forth on Annex 1 to give context to such sections, this Agreement shall forthwith become void and the Parties shall have no liability or obligation hereunder except and to the extent such termination results from the breach by Seller of any of its covenants or agreements hereunder in which case Buyer shall have the right to seek all remedies available at Law or in equity, including specific performance, for such breach. Pursuant to and in accordance with *Section 3.2,* if Seller terminates this Agreement pursuant to

HN\933868.19

*Section 14.1(a)* based on any of the conditions set forth in *Sections 8.1* or *8.2* not being satisfied on or before the Outside Date (subject to notice and cure as set forth in *Section 14.1(a)*), then Seller is entitled to receive the Deposit (and any interest earned thereon) as liquidated damages from the Escrow Agent pursuant to and in accordance with *Section 3.2* and the Escrow Agreement, and the receipt of such Deposit (and the interest earned thereon) shall constitute full and complete satisfaction of any and all damages Seller may have against Buyer.

**14.3   *Return of Documentation and Confidentiality.*** Upon termination of this Agreement, Buyer shall (a) return to Seller all title, engineering, geological and geophysical data, environmental assessments and/or reports, maps and other information furnished by Seller to Buyer and (b) destroy all materials containing any of the information set forth in clause (a) above, prepared by or on behalf of Buyer in connection with its due diligence investigation of the Assets, in each case in accordance with, and subject to the retention exceptions set forth in, the Confidentiality Agreement and an officer of Buyer shall certify same to Seller in writing.

**ARTICLE XV**
**MISCELLANEOUS**

**15.1   *Appendices, Exhibits and Schedules.*** All of the Appendices, Exhibits and Schedules referred to in this Agreement are hereby incorporated into this Agreement by reference and constitute a part of this Agreement. Each Party to this Agreement and its counsel has received a complete set of Appendices, Exhibits and Schedules prior to and as of the execution of this Agreement.

**15.2   *Expenses and Taxes; 1031 Like-Kind Exchange.*** Except as otherwise specifically provided, all fees, costs and expenses incurred by Buyer or Seller in negotiating this Agreement or in consummating the transactions contemplated by this Agreement shall be paid by the Party incurring the same, including, legal and accounting fees, costs and expenses.

(b)   All required documentary, filing and recording fees and expenses in connection with the filing and recording of the assignments, conveyances or other instruments required to convey title to the Assets to Buyer shall be borne by Buyer. Seller shall retain responsibility for, and shall bear and pay, all federal income Taxes, state income Taxes, and other similar Taxes (including any applicable interest or penalties) incurred or imposed with respect to (i) the transactions described in this Agreement or (ii) the ownership of the Assets, the production of Hydrocarbons, or the receipt of proceeds therefrom for all periods prior to the Closing Date. Buyer shall assume responsibility for, and shall bear and pay, all state sales and use Taxes (including any applicable interest or penalties) incurred or imposed with respect to the transactions described in this Agreement. Seller shall retain responsibility for, and shall bear and pay, all ad valorem, property, severance, production, and similar Taxes and assessments based upon or measured by the ownership of the Assets, the production of Hydrocarbons, or the receipt of proceeds therefrom (including any applicable penalties and interest) and assessed against the Assets by any Taxing Authority for any period or portion thereof prior to the Effective Time. Buyer shall be responsible for, and shall bear and pay, all such Taxes and assessments assessed against the Assets by any Taxing Authority for any period or portion thereof that begins on or after the Effective Time. For purposes of this Agreement, the foregoing proration of ad valorem and property Taxes shall be accomplished at Closing based on the ratio of the number of days in

the year prior to (for Seller) and on and after (for Buyer) the Effective Time to the total number of days in the year as applied to the amount of ad valorem and property Taxes for the most recent year for which the amount of such Taxes can be finally determined at Closing. Buyer shall be responsible for delivering payment to the Taxing Authorities of all ad valorem and property Taxes for the current year.

(c)     Notwithstanding anything in this Agreement to the contrary, Seller shall have the right at any time prior to Closing to assign all or a portion of its rights under this Agreement (the "*Assigned Rights*") to a Qualified Intermediary in order to accomplish the transaction in a manner that will comply, either in whole or in part, with the requirements of a like-kind exchange pursuant to Section 1031 of the Code (an "*Exchange*"). In the event Seller assigns the Assigned Rights to a Qualified Intermediary pursuant to this *Section 15.2(c)*, then Seller agrees to notify Buyer in writing of such assignment at or before Closing. Buyer hereby consents to any such assignment and Buyer agrees to pay the Purchase Price (as may be adjusted under the terms of this Agreement) for the Assets into a qualified escrow or qualified trust account as directed by the Qualified Intermediary and Seller in writing and upon making such payment(s), Buyer's obligation to pay such amount to Seller under this Agreement shall be deemed satisfied and fully discharged; provided that: (i) the Closing shall not be delayed or affected by reason of the Exchange, (ii) Seller shall effect its Exchange through an assignment of the Assigned Rights to a Qualified Intermediary, but such assignment shall not release Seller from any of its Liabilities or obligations to Buyer under this Agreement and (iii) Seller shall indemnify Buyer against any additional costs or damages directly incurred by Buyer on account of Seller's consummation of the transaction through an Exchange. Each of Seller and Buyer hereby acknowledge and agree that any assignment of this Agreement by Seller pursuant to this *Section 15.2(c)* shall not release a Party from, or modify, any of its respective Liabilities and obligations (including indemnity obligations to each other) under this Agreement (except as provided in the preceding sentence). Buyer further consents to the reassignment, following the Closing, of all of the Assigned Rights that survive the Closing from the Qualified Intermediary to Seller. Buyer by its consent to an Exchange shall not be responsible in any way for Seller's compliance with such Exchange and makes no representations as to any particular Tax treatment that may be afforded to Seller by reason of such assignment or any other actions taken in connection with the Exchange.

**15.3    *Assignment.*** Except as provided in *Section 15.2(c)*, this Agreement may not be assigned by either Party without prior written consent of the other Party; provided, however, that Buyer may assign this Agreement to any wholly owned subsidiary of Buyer. In the event a Party consents to any such assignment by the other Party or Buyer assigns this agreement to one of its wholly owned subsidiaries, such assignment shall not relieve the assigning Party of any obligations and responsibilities hereunder. Any assignment or other transfer by Buyer or its successors and assigns of any of the Assets shall not relieve Buyer or its successors or assigns of any of their obligations (including indemnity obligations) hereunder, as to the Assets so assigned or transferred.

**15.4    *Preparation of Agreement.*** Both Seller and Buyer and their respective counsel participated in the preparation of this Agreement. In the event of any ambiguity in this Agreement, no presumption shall arise based on the identity of the draftsman of this Agreement.

**15.5    Publicity.**  Seller and Buyer shall promptly consult with each other with regard to all press releases or other public or private announcements issued or made at or prior to Closing concerning this Agreement or the transactions contemplated herein, and, except as may be required by applicable Laws or the applicable rules and regulations of any Governmental Authority or stock exchange, neither Buyer nor Seller shall issue any such press release or other public or private announcement without the prior written consent of the other Party, which shall not be unreasonably withheld or delayed.

**15.6    Notices.**  All notices and communications required or permitted to be given hereunder shall be in writing and shall be delivered personally, or sent by bonded overnight courier, or mailed by U.S. Express Mail or by certified or registered United States Mail with all postage fully prepaid, or sent by electronic mail (provided any such electronic transmission is confirmed either orally or by written confirmation), addressed to the appropriate Party at the address for such Party shown below or at such other address as such Party shall have theretofore designated by written notice delivered to the Party giving such notice:

If to Seller:

Propel Energy, LLC
952 Echo Lane, Suite 250
Houston, Texas 77024
Attention: David E. Beck
Email: dbeck@propelenergy.com

J & S Program 2006 L.P.
J & S 2008 Program, L.L.C.
J & S Oil & Gas Management, Ltd.
J & S Oil and Gas, LLC
16801 Greenspoint Park Drive, Suite 140
Houston, Texas  77060
Attention: Ronnie Montgomery II
Email: ronnie@jsoilgas.com

ACOGIF LLC
11 Etonshire Court
The Woodlands, TX 77381
Attention: Alex Warmath
Email: alexwarmath@gmail.com

Minghung Exploration LLC
11 Etonshire Court
The Woodlands, TX 77381
Attention: Christopher Rivet-Carnac
Email: chris@rivett-carnac.com

Madison, L.L.C.
100 Asma Blvd, Ste 110

HN\933868.19

Lafayette, LA 70508
Attention: C. William Rogers
Email: cwr@rozel.com

Lewiston Atlas, Ltd.
3300 Kingswood St
Houston, Texas 77092
Attention: Yandell Rogers III
Email: yrogers@lewistonltd.com

Deep South Energy, Inc.
260 Monteigne
Lafayette, LA 70506
Attention: Jim Gamble
Email: d.s.energy@cox.net

Stokes & Spiehler Properties, Inc.
P O Box 52006
Lafayette, LA 70505
Attention: Bruce Jordan
Email: bjordan@stokesandspiehler.com

With a copy to:

Propel Energy, LLC
c/o Natural Gas Partners
125 E. John Carpenter Fwy, Suite 600
Irving, Texas  75062
Attention:  Craig Glick
Email:  cglick@ngptrs.com

With additional copy to:

Latham & Watkins LLP
811 Main Street, Suite 3700
Houston, TX 77002
Attention:  Jeffrey S. Muñoz
Email:  jeff.munoz@lw.com

Fishman Haygood Phelps
Walmsley Willis & Swanson, L.L.P.
201 St. Charles Ave., Suite 4600
New Orleans, Louisiana
Attention:  Scott Willis
Email:  swillis@fishmanhaygood.com

42

If to Buyer:

        Northstar Offshore Group, LLC
        11 Greenway Plaza, Suite 2800
        Houston, TX 77046
        Attention:  Brian Macmillan
        Email:  bmac@nstaroffshore.com

With a copy to:

        Natural Gas Partners
        125 E. John Carpenter Fwy, Suite 600
        Irving, Texas  75062
        Attention:  Christopher Ray
        Email: cray@ngptrs.com
        Attention:  Jesse Bomer
        Email:  jbomer@ngptrs.com

With additional copy to:

        Locke Lord LLP
        600 Travis Street, Suite 2800
        Houston, TX 77002
        Attention:  Mitch Tiras
        Email:  mtiras@lockelord.com

Any notice given in accordance herewith shall be deemed to have been given only when delivered to the addressee in person, or by courier, or transmitted by facsimile transmission during normal business hours on a Business Day (or if delivered or transmitted after normal business hours on a Business Day or on a day other than a Business Day, then on the next Business Day), or upon actual receipt by the addressee during normal business hours on a Business Day after such notice has either been delivered to an overnight courier or deposited in the United States Mail, as the case may be (or if delivered after normal business hours on a Business Day or on a day other than a Business Day, then on the next Business Day).  The Parties hereto may change the address and facsimile numbers to which such communications are to be addressed by giving written notice to the other Parties in the manner provided in this *Section 15.6.*

    *15.7*    ***Further Cooperation.***  After Closing, Buyer and Seller shall execute and deliver, or shall cause to be executed and delivered, from time to time such further instruments of conveyance and transfer, and shall take such other actions as any Party may reasonably request, to convey and deliver the Assets to Buyer, to perfect Buyer's title thereto, and to accomplish the orderly transfer of the Assets to Buyer in the manner contemplated by this Agreement.

    *15.8*    ***Filings, Notices and Certain Governmental Approvals.***  Promptly after Closing Buyer shall (a) record all assignments of state Leases executed at Closing in the records of the applicable Governmental Authority, (b) if applicable, send notices to vendors supplying goods and services for the Assets and to the operator of such Assets of the assignment of such Assets to

43

Buyer, (c) actively pursue the unconditional approval of all applicable Governmental Authorities of the assignment of the Assets to Buyer and (d) actively pursue all other consents and approvals that may be required in connection with the assignment of the Assets to Buyer and the assumption of the Liabilities assumed by Buyer hereunder, in each case, that shall not have been obtained prior to Closing.  Buyer obligates itself to take any and all action required by any Governmental Authority in order to obtain such unconditional approval, including the posting of any and all bonds or other security that may be required in excess of its existing lease, pipeline or area-wide bond.

    *15.9    Entire Agreement; Conflicts.*    THIS AGREEMENT, THE APPENDICES, EXHIBITS AND SCHEDULES HERETO, THE TRANSACTION DOCUMENTS AND THE CONFIDENTIALITY AGREEMENT COLLECTIVELY CONSTITUTE THE ENTIRE AGREEMENT AMONG THE PARTIES PERTAINING TO THE SUBJECT MATTER HEREOF AND SUPERSEDE ALL PRIOR AGREEMENTS, UNDERSTANDINGS, NEGOTIATIONS AND DISCUSSIONS, WHETHER ORAL OR WRITTEN, OF THE PARTIES PERTAINING TO THE SUBJECT MATTER HEREOF.  THERE ARE NO WARRANTIES, REPRESENTATIONS OR OTHER AGREEMENTS AMONG THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, AND NEITHER SELLER NOR BUYER SHALL BE BOUND BY OR LIABLE FOR ANY ALLEGED REPRESENTATION, PROMISE, INDUCEMENT OR STATEMENTS OF INTENTION NOT SO SET FORTH.  IN THE EVENT OF A CONFLICT BETWEEN THE TERMS AND PROVISIONS OF THIS AGREEMENT AND THE TERMS AND PROVISIONS OF ANY SCHEDULE OR EXHIBIT HERETO, THE TERMS AND PROVISIONS OF THIS AGREEMENT SHALL GOVERN AND CONTROL; PROVIDED, HOWEVER, THAT THE INCLUSION IN ANY OF THE SCHEDULES AND EXHIBITS HERETO OF TERMS AND PROVISIONS NOT ADDRESSED IN THIS AGREEMENT SHALL NOT BE DEEMED A CONFLICT, AND ALL SUCH ADDITIONAL PROVISIONS SHALL BE GIVEN FULL FORCE AND EFFECT, SUBJECT TO THE PROVISIONS OF THIS *SECTION 15.9*.

    *15.10   Parties in Interest*.   The terms and provisions of this Agreement shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and permitted assigns.  Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the Parties or their successors and permitted assigns, or the Parties' respective related Indemnified Parties hereunder any rights, remedies, obligations or liabilities under or by reason of this Agreement; provided that only a Party and its respective successors and assigns will have the right to enforce the provisions of this Agreement on its own behalf or on behalf of any of its related Indemnified Parties (but shall not be obligated to do so).

    *15.11   Amendment.*   This Agreement may be amended only by an instrument in writing executed by the Parties hereto against whom enforcement is sought.

    *15.12   Waiver; Rights Cumulative.*   Any of the terms, covenants, representations, warranties or conditions hereof may be waived only by a written instrument executed by or on behalf of the Party waiving compliance.  No course of dealing on the part of Seller or Buyer or their respective officers, employees, agents, or representatives and no failure by Seller or Buyer

to exercise any of its rights under this Agreement shall, in each case, operate as a waiver thereof or affect in any way the right of such Party at a later time to enforce the performance of such provision.  No waiver by any Party of any condition, or any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.  The rights of Seller and Buyer under this Agreement shall be cumulative and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

    ***15.13  Arbitration.***  Unless expressly provided otherwise in this Agreement, any and all Arbitrable Disputes must be resolved through the use of binding arbitration using three (3) arbitrators, conducted by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect on the date of commencement of arbitration (or any subsequent rules created by JAMS to replace those rules), as supplemented to the extent necessary to determine any procedural appeal questions by the Federal Arbitration Act (Title 9 of the United States Code).  If there is any inconsistency between this Article or the Federal Arbitration Act, the terms of this Article shall control the rights and obligations of the Parties.  If there is more than one (1) Arbitrable Dispute that involves the same facts and Parties as the facts and Parties with respect to which an arbitration has been initiated pursuant to this Agreement, such disputes shall be consolidated into the first arbitration initiated pursuant to this Agreement.  No other arbitration shall be consolidated with any arbitration initiated pursuant to this Agreement without the agreement of the Parties thereto. Arbitration may be initiated by a Party ("*Claimant*") serving written notice on the other Party ("*Respondent*") that the Claimant has referred the Arbitrable Dispute to binding arbitration.  Claimant's notice initiating binding arbitration must describe in reasonable detail the nature of the Arbitrable Dispute and the facts and circumstances relating thereto and identify the arbitrator Claimant has appointed.  Respondent shall respond to Claimant within thirty (30) days after receipt of Claimant's notice, identifying the arbitrator Respondent has appointed.  If Respondent fails for any reason to name an arbitrator within the thirty (30) day period, Claimant shall name the arbitrator for Respondent's account.  The two (2) arbitrators so chosen shall select a third arbitrator (who must have not less than seven (7) years experience as a lawyer in the energy industry) within thirty (30) days after the second arbitrator has been appointed.  If the two arbitrators are unable to agree on a third arbitrator within thirty (30) days from the date the second arbitrator has been appointed, then a third arbitrator shall be selected by the JAMS office in Dallas, Texas, with due regard given to the selection criteria above and input from the Parties and other arbitrators.  JAMS shall select the third arbitrator not later than ninety (90) days from initiation of arbitration.  In the event JAMS should fail to select the third arbitrator within ninety (90) days from initiation of arbitration, then either Party may petition the Chief United States District Judge for the Southern District of Texas to select the third arbitrator.  Due regard shall be given to the selection criteria above and input from the Parties and other arbitrators.  Claimant shall pay the compensation and expenses of the arbitrator named by or for them, and Respondent shall pay the compensation and expenses of the arbitrator named by or for it.  Claimant and Respondent shall each pay one-half of the compensation and expenses of the third arbitrator.  All arbitrators must be neutral Parties who have never been officers, directors, managers, partners, members, equity owners, investors, agents' representatives or employees of the Parties or any of their Affiliates.  Unless expressly provided otherwise in this Agreement, the two (2) arbitrators named by the Parties must each have at least seven (7) years experience in the energy industry, and must have a formal education or training in the area of dispute resolution.  The hearing shall

be conducted in Houston, Texas and commence within sixty (60) days after the selection of the third arbitrator. The Parties and the arbitrators should proceed diligently and in good faith in order that the award may be made as promptly as possible. The arbitrators shall determine the Arbitrable Disputes of the Parties and render a final award in accordance with the substantive Law of the State of Texas, excluding the conflicts provisions of such Law. The arbitrators shall render their decision on or before sixty (60) days following the completion of the hearing. The arbitrators' decision shall be in writing and set forth the reasons for the award and may include an award of all or any portion of costs to the prevailing Party, including reasonable attorneys' fees and disbursements. All statutes of limitations and defenses based upon passage of time applicable to any Arbitrable Dispute (including any counterclaim or setoff) shall be interrupted by the filing of the arbitration and suspended while the arbitration is pending. The terms hereof shall not create or limit any obligations of a Party to defend, indemnify, or hold harmless another Party against court proceedings or other claims. In order to prevent irreparable harm, the arbitrators shall have the power to grant temporary or permanent injunctive or other equitable relief. A Party may, notwithstanding any other provision of this Agreement, seek temporary injunctive relief from any court of competent jurisdiction; provided that the Party seeking such relief shall (if arbitration has not already been commenced) simultaneously commence arbitration. Such court-ordered relief shall not continue more than ten (10) days after the appointment of the arbitrators and in no event for longer than sixty (60) days. Except as provided in the Federal Arbitration Act, the decision of the arbitrators shall be binding on and non-appealable by the Parties. Each Party agrees that any arbitration award against it may be enforced in any court of competent jurisdiction and that any Party may authorize any such court to enter judgment on the arbitrators' decisions. The arbitrators may not grant or award indirect, consequential, punitive or exemplary damages or damages for lost profits.

**15.14  *Severability.*** If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

**15.15  *Removal of Name.*** As promptly as practicable, but in any case within one hundred twenty (120) days after the Closing Date, Buyer shall eliminate the names "Propel Energy", "Propel", "Forza Operating LLC", "Forza" and any variants thereof from the Assets and, except with respect to such grace period for eliminating existing usage, shall have no right to use any logos, trademarks or trade names belonging to Seller or any of its Affiliates.

**15.16  *Counterparts.*** This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all of such counterparts shall constitute for all purposes one agreement. Any signature hereto delivered by a Party by facsimile or other electronic transmission shall be deemed an original signature hereto.

*[Remainder of page intentionally left blank.  Signature page follows.]*

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first written above.

**SELLER:**

**PROPEL ENERGY, LLC**

By: _____

Name:   William J. Scarff

Title:    President and CEO

**J & S PROGRAM 2006 L.P.**

By: _____

Name:   Ronnie Montgomery II

Title:    President

**J & S 2008 PROGRAM, L.L.C.**

By: _____

Name:   Ronnie Montgomery II

Title:    President

**J & S OIL & GAS MANAGEMENT, LTD.**

By: _____

Name:   Ronnie Montgomery II

Title:    President

**J & S OIL & GAS, LLC**

By: _____

Name:   Ronnie Montgomery II

Title:    President

**ACOGIF LLC**

By: _____

Name: _____

Title: _____

**MINGHUNG EXPLORATION LLC**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first written above.

**SELLER:**

**PROPEL ENERGY, LLC**

By: _____
Name:  William J. Scarff
Title:    President and CEO

**J & S PROGRAM 2006 L.P.**

By: _____
Name:  Ronnie Montgomery II
Title:    President

**J & S 2008 PROGRAM, L.L.C.**

By: _____
Name:  Ronnie Montgomery II
Title:    President

**J & S OIL & GAS MANAGEMENT, LTD.**

By: _____
Name:  Ronnie Montgomery II
Title:    President

**J & S OIL & GAS, LLC**

By: _____
Name:  Ronnie Montgomery II
Title:    President

**ACOGIF LLC**

By: _____
Name: _____
Title: _____

**MINGHUNG EXPLORATION LLC**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first written above.

**SELLER:**

**PROPEL ENERGY, LLC**

By: _____
Name:  William J. Scarff
Title:   President and CEO

**J & S PROGRAM 2006 L.P.**

By: _____
Name:  Ronnie Montgomery II
Title:   President

**J & S 2008 PROGRAM, L.L.C.**

By: _____
Name:  Ronnie Montgomery II
Title:   President

**J & S OIL & GAS MANAGEMENT, LTD.**

By: _____
Name:  Ronnie Montgomery II
Title:   President

**J & S OIL & GAS, LLC**

By: _____
Name:  Ronnie Montgomery II
Title:   President

**ACOGIF LLC**

By: _Alex T. Warmath_
Name:  ALEX T. WARMATH
Title:   PRESIDENT

**MINGHUNG EXPLORATION LLC**

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]
S-1

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first written above.

**SELLER:**

**PROPEL ENERGY, LLC**

By: _____
Name:   William J. Scarff
Title:   President and CEO

**J & S PROGRAM 2006 L.P.**

By: _____
Name:   Ronnie Montgomery II
Title:   President

**J & S 2008 PROGRAM, L.L.C.**

By: _____
Name:   Ronnie Montgomery II
Title:   President

**J & S OIL & GAS MANAGEMENT, LTD.**

By: _____
Name:   Ronnie Montgomery II
Title:   President

**J & S OIL & GAS, LLC**

By: _____
Name:   Ronnie Montgomery II
Title:   President

**ACOGIF LLC**

By: _____
Name: _____
Title: _____

**MINGHUNG EXPLORATION LLC**

By: _____
Name:   C.C. RIVETT-CARNAC
Title:   PRESIDENT

[SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]
S-1

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first written above.

**SELLER (continued):**

**STOKES & SPIEHLER PROPERTIES, INC.**

By: _____

Name: _____

Title: _____

**DEEP SOUTH ENERGY, INC.**

By: _____

Name: _____

Title: _____

**LEWISTON ATLAS, LTD.**

By: _____

Name: _____

Title: _____

**MADISON, L.L.C.**

By: _____

Name: _____

Title: _____

**BUYER:**

**NORTHSTAR OFFSHORE GROUP, LLC**

By: _____

Name: S. Glynn Roberts

Title:  President

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first written above.

SELLER (continued):

STOKES & SPIEHLER PROPERTIES, INC.

By: _____
Name: _____
Title: _____

DEEP SOUTH ENERGY, INC.

By: *James D. Gamble*
Name: *James D. Gamble*
Title: *President*

LEWISTON ATLAS, LTD.

By: _____
Name: _____
Title: _____

MADISON, L.L.C.

By: *C. William Rogers*
Name: *C. William Rogers*
Title: *Managing member*

BUYER:

NORTHSTAR OFFSHORE GROUP, LLC

By: _____
Name: S. Glynn Roberts
Title:  President

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first written above.

**SELLER (continued):**

**STOKES & SPIEHLER PROPERTIES, INC.**

By: _____
Name: _____
Title: _____

**DEEP SOUTH ENERGY, INC.**

By: _____
Name: _____
Title: _____

**LEWISTON ATLAS, LTD.**

By: _____
Name: W. Yandell Rogers III
Title: CEO

**MADISON, L.L.C.**

By: _____
Name: _____
Title: _____

**BUYER:**

**NORTHSTAR OFFSHORE GROUP, LLC**

By: _____
Name: S. Glynn Roberts
Title:  President

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first written above.

SELLER (continued):

**STOKES & SPIEHLER PROPERTIES, INC.**

By: _____
Name: _____
Title: _____

**DEEP SOUTH ENERGY, INC.**

By: _____
Name: _____
Title: _____

**LEWISTON ATLAS, LTD.**

By: _____
Name: _____
Title: _____

**MADISON, L.L.C.**

By: _C. William Rogers_
Name: _C. William Rogers_
Title: _managing member_

BUYER:

**NORTHSTAR OFFSHORE GROUP, LLC**

By: _____
Name: S. Glynn Roberts
Title:  President

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first written above.

SELLER (continued):

STOKES & SPIEHLER PROPERTIES, INC.

By: _____
Name: _____
Title: _____

DEEP SOUTH ENERGY, INC.

By: _____
Name: _____
Title: _____

LEWISTON ATLAS, LTD.

By: _____
Name: _____
Title: _____

MADISON, L.L.C.

By: _____
Name: _____
Title: _____

BUYER:

NORTHSTAR OFFSHORE GROUP, LLC

By: _____
Name: S. Glynn Roberts
Title:   President

[SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]
S-2

APPENDIX 1
DEFINED TERMS

"*Accounting Arbitrator*" shall have the meaning set forth in *Section 3.7.*

"*Adjusted Purchase Price*" shall have the meaning set forth in *Section 3.3.*

"*AFEs*" shall have the meaning set forth in *Section 4.13.*

"*Affiliate*" shall mean any Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, another Person. The term "control" and its derivatives with respect to any Person mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Aggregate Deductible*" shall mean one and one-half percent (1.5%) of the Purchase Price.

"*Agreement*" shall have the meaning set forth in the introductory paragraph herein.

"*Allocated Values*" shall have the meaning set forth in *Section 3.8.*

"*Applicable Contracts*" shall mean all Contracts to which Seller is a party or is bound relating to any of the Assets and (in each case) that will be binding on Buyer after Closing, including: confidentiality agreements; farmin and farmout agreements; bottom hole agreements; crude oil, condensate and natural gas purchase and sale, gathering, transportation and marketing agreements; hydrocarbon storage agreements; acreage contribution agreements; operating agreements; balancing agreements; pooling declarations or agreements; unitization agreements; processing agreements; saltwater disposal agreements; facilities or equipment leases; crossing agreements; letters of no objection; platform use agreements; production handling agreements; and other similar contracts and agreements, but exclusive of any master service agreements and Contracts relating to the Excluded Assets.

"*Arbitrable Dispute*" shall mean, except for disputes to be resolved by the Accounting Arbitrator, Title Arbitrator or Environmental Arbitrator as provided in this Agreement, any and all disputes arising under, related to, or in connection with this Agreement or any of the transactions contemplated hereby.

"*Assets*" shall have the meaning set forth in *Section 2.1.*

"*Assigned Rights*" shall have the meaning set forth in *Section 15.2(c).*

"*Assignment*" shall mean the Assignment and Bill of Sale from Seller to Buyer, pertaining to the Assets, substantially in the form attached to this Agreement as *Exhibit B.*

"*Assumed Obligations*" shall have the meaning set forth in *Section 13.1.*

HN\933868.19

"*Burden*" shall mean any and all royalties (including lessor's royalty), overriding royalties, production payments, net profits interests and other burdens upon, measured by or payable out of production.

"*Business Day*" shall mean a day (other than a Saturday or Sunday) on which commercial banks in Texas are generally open for business.

"*Buyer*" shall have the meaning set forth in the introductory paragraph herein.

"*Buyer Indemnified Parties*" shall have the meaning set forth in *Section 13.2*.

"*Buyer's Representatives*" shall have the meaning set forth in *Section 10.1(a)*.

"*Casualty Loss*" shall have the meaning set forth in *Section 11.3(b)*.

"*Claim Notice*" shall have the meaning set forth in *Section 13.7(b)*.

"*Closing*" shall have the meaning set forth in *Section 9.1*.

"*Closing Date*" shall have the meaning set forth in *Section 9.1*.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended.

"*Confidentiality Agreement*" shall mean that certain Confidentiality Agreement between Seller and Buyer dated as of June 28, 2012.

"*Consent*" shall have the meaning set forth in *Section 4.4*.

"*Contract*" shall mean any written or oral contract, agreement, agreement regarding indebtedness, indenture, debenture, note, bond, loan, collective bargaining agreement, lease, mortgage, franchise, license agreement, purchase order, binding bid, commitment, letter of credit or any other legally binding arrangement, including farmin and farmout agreements; participation, exploration and development agreements, crude oil, condensate and natural gas purchase and sale, gathering, transportation and marketing agreements, operating agreements, balancing agreements, unitization agreements, processing agreements, facilities or equipment leases, platform use and platform sharing agreements, production handling agreements and other similar Contracts, but excluding, however, any Lease, easement, right-of-way, permit or other instrument creating or evidencing an interest in the Assets or any real or immovable property related to or used in connection with the operations of any Assets.

"*Credit Support*" shall have the meaning set forth in *Section 4.22*.

"*Cure Period*" shall have the meaning set forth in *Section 11.2(c)*.

"*Customary Post Closing Consents*" shall mean the consents and approvals from Governmental Authorities, including the State of Louisiana Department of Conservation, for the assignment of the Assets to Buyer that are customarily obtained after the assignment of properties similar to the Assets.

"*Decommission*" shall mean all decommissioning activities and obligations as are required by Law, any Governmental Authority or agreements (expressly including such activities described and defined as of the Effective Time and as may be amended thereafter, in Title 30 of the Code of Federal Regulations, Sections 250.1700 *et seq.*) including all well plugging, replugging and abandonment, platform dismantlement and removal, facility dismantlement and removal, pipeline and flowline removal, dismantlement and removal of all other property of any kind related to or associated with operations or activities and associated site clearance, site restoration and site remediation.

"*Decommissioning Obligations*" shall have the meaning set forth in *Section 13.1*.

"*Defensible Title*" shall mean such title of Seller with respect to the Assets that, as of the Effective Time and the date hereof and subject to Permitted Encumbrances:

(a)     with respect to each Well shown in *Exhibit A-1* (but limited to any depth restrictions contained in *Exhibit A-1*), entitles Seller to receive not less than the Net Revenue Interest set forth in *Exhibit A-1* for such Well (but limited to any depth restrictions contained in *Exhibit A-1*), except for (i) decreases in connection with those operations in which Seller or its successors or assigns may from and after the date of this Agreement elect to be a non-consenting co-owner, (ii) decreases resulting from the establishment or amendment from and after the date of this Agreement of pools or units, (iii) decreases required to allow other Working Interest owners to make up past underproduction or pipelines to make up past under deliveries, and (iv) as otherwise set forth in *Exhibit A-1*;

(b)     with respect to each Well shown in *Exhibit A-1* (but limited to any depth restrictions contained in *Exhibit A-1*), obligates Seller to bear not more than the Working Interest set forth in *Exhibit A-1* for such Well (but limited to any depth restrictions contained in *Exhibit A-1*), except (i) increases resulting from contribution requirements with respect to defaulting co-owners under applicable operating agreements, (ii) increases to the extent that such increases are accompanied by a proportionate increase in Seller's Net Revenue Interest, and (iii) as otherwise set forth in *Exhibit A-1*; and

(c)     is free and clear of all Encumbrances.

"*Deposit*" shall have the meaning set forth in *Section 3.2(a)*.

"*Dispute Notice*" shall have the meaning set forth in *Section 3.6*.

"*Effective Time*" shall mean 7:00 a.m. (Central Time) on September 1, 2012.

"*Encumbrance*" shall mean any lien, mortgage, security interest, pledge, charge or similar encumbrance.

"*Environmental Arbitrator*" shall have the meaning set forth in *Section 12.1(e)*.

"*Environmental Claim Date*" shall have the meaning set forth in *Section 12.1(a)*.

"*Environmental Condition*" shall mean (a) a condition existing on the date of this Agreement with respect to the air, soil, subsurface, surface waters, ground waters and/or sediments that causes an Asset (or Seller with respect to an Asset) not to be in compliance with any Environmental Law or (b) the existence as of the date of this Agreement with respect to the Assets or their operation thereof of any environmental pollution, contamination or degradation where remedial or corrective action is presently required (or if known, would be presently required) under Environmental Laws.

"*Environmental Defect*" shall mean an Environmental Condition with respect to an Asset that is not set forth in *Schedule 4.14*.

"*Environmental Defect Notice*" shall have the meaning set forth in *Section 12.1(a)*.

"*Environmental Laws*" shall mean all applicable Laws in effect as of the date of this Agreement, including common Law, relating to the protection of the public health, welfare and the environment, including, those Laws relating to the storage, handling and use of chemicals and other Hazardous Substances and those Laws relating to the generation, processing, treatment, storage, transportation, disposal or other management thereof.   The term "*Environmental Laws*" does not include good or desirable operating practices or standards that may be employed or adopted by other oil and gas well operators or recommended by a Governmental Authority.

"*Escrow Agent*" shall mean Capital One, National Association.

"*Escrow Agreement*" shall mean that certain deposit and indemnity escrow agreement dated of even date herewith, attached hereto as *Exhibit D*.

"*Exchange*" shall have the meaning set forth in *Section 15.2(c)*.

"*Excluded Assets*" shall mean (a) all of Seller's corporate minute books, financial records and other business records that relate to Seller's business generally (excluding materials to the extent relating to the ownership and operation of the Assets); (b) all trade credits, all accounts, all receivables and all other proceeds, income or revenues attributable to the Assets and attributable to any period of time prior to the Effective Time; (c) all claims and causes of action of Seller arising under or with respect to any Contracts that are attributable to periods of time prior to the Effective Time (including claims for adjustments or refunds); (d) subject to *Section 11.3*, all rights and interests of Seller (i) under any policy or agreement of insurance or indemnity, (ii) under any bond or (iii) to any insurance or condemnation proceeds or awards arising, in each case, from acts, omissions or events or damage to or destruction of property; (e) all Hydrocarbons produced and sold from the Assets with respect to all periods prior to the Effective Time; (f) all claims of Seller for refunds of, rights to receive funds from any Governmental Authority or loss carry forwards with respect to (i) production or any other Taxes attributable to any period prior to the Effective Time, (ii) income or franchise Taxes or (iii) any Taxes attributable to the Excluded Assets; (g) all personal computers and associated peripherals and all radio and telephone equipment; (h) all of Seller's proprietary computer software, patents, trade secrets, copyrights, names, trademarks, logos and other intellectual property; (i) all documents and instruments of Seller that may be protected by an attorney-client privilege; (j) all data that

cannot be disclosed to Buyer as a result of confidentiality arrangements under agreements with Third Parties; (k) all audit rights arising under any of the Applicable Contracts or otherwise with respect to any period prior to the Effective Time or to any of the Excluded Assets, except for any Imbalances assumed by Buyer; (l) all geophysical and other seismic and related technical data and information relating to the Assets which Buyer has not separately agreed in writing to transfer; (m) documents prepared or received by Seller with respect to (i) lists of prospective purchasers for such transactions compiled by Seller, (ii) bids submitted by other prospective purchasers of the Assets, (iii) analyses by Seller of any bids submitted by any prospective purchaser, (iv) correspondence between or among Seller, any of its representatives and any other working interest owner or any prospective purchaser other than Buyer with respect to a sale of the Assets or any portion thereof; and (v) correspondence between or among Seller, any of its representatives and any other working interest owner with respect to any of the bids, the prospective purchasers or the transactions contemplated by this Agreement; (n) any offices, office leases and any personal property located in or on such offices or office leases; (o) any leases and other assets specifically listed in *Exhibit C*; (p) any Hedge Contracts; (q) any debt instruments; and (r) any assets described in *Section 2.1(d)* or *Section 2.1(e)* that are not assignable.

"*Final Price*" shall have the meaning set forth in *Section 3.6*.

"*Final Settlement Statement*" shall have the meaning set forth in *Section 3.6*.

"*GAAP*" shall mean United States generally accepted accounting principles.

"*Guarantees*" shall have the meaning set forth in *Section 6.6*.

"*Governmental Authority*" shall mean any federal, state, local, municipal, tribal or other government; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or Taxing Authority or power, and any court or governmental tribunal, including any tribal authority having or asserting jurisdiction.

"*Hazardous Substances*" shall mean any pollutants, contaminants, toxins or hazardous or extremely hazardous substances, materials, wastes, constituents, compounds or chemicals that are regulated by, or may form the basis of liability under, any Environmental Laws, including NORM and other substances referenced in *Section 12.2*.

"*Hedge Contract*" shall mean any Contract to which Seller is a party with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"*Hydrocarbons*" shall mean oil and gas and other hydrocarbons produced or processed in association therewith.

"*Imbalances*" shall mean all Well Imbalances and Pipeline/Platform Imbalances.

"*Indemnifying Party*" shall have the meaning set forth in *Section 13.7(a)*.

"*Individual Environmental Threshold*" shall have the meaning set forth in *Section 12.1(d)*.

"*Individual Title Defect Threshold*" shall have the meaning set forth in *Section 11.2(i)*.

"*Interim Period*" shall mean that period of time commencing with the Effective Time and ending at 7:00 a.m. (Central Time) on the Closing Date.

"*Knowledge*" shall mean with respect to Seller, the actual knowledge (without investigation) of the following Persons:  Ronnie Montgomery, Gary Lee, Bill Rogers, Robbie Vaughn, Yvonne Mitchell and William Scarff.

"*Law*" shall mean any applicable statute, law, rule, regulation, ordinance, order, code, ruling, writ, injunction, decree or other official act of or by any Governmental Authority.

"*Leases*" shall have the meaning set forth in *Section 2.1(a)*.

"*Liabilities*" shall mean any and all claims, causes of action, payments, charges, judgments, assessments, liabilities, losses, damages, penalties, fines and costs and expenses, including any attorneys' fees, legal or other expenses incurred in connection therewith and including liabilities, costs, losses and damages for personal injury or death or property damage or environmental damage or remediation.

"*Material Adverse Effect*" shall mean an event or circumstance that, individually or in the aggregate, results in a material adverse effect on the ownership, operation or value of the Assets taken as a whole and as currently operated as of the date of this Agreement or a material adverse effect on the ability of Seller to consummate the transactions contemplated by this Agreement and perform its obligations hereunder; provided, however, that a Material Adverse Effect shall not include any material adverse effects resulting from: (a) the announcement of the transactions contemplated by this Agreement; (b) changes in general market, economic, financial or political conditions (including changes in commodity prices, fuel supply or transportation markets, interest or rates) in the area in which the Assets are located, the United States or worldwide (provided such change or effect does not disproportionately affect Seller or the Assets); (c) changes in conditions or developments generally applicable to the oil and gas industry in the area where the Assets are located (provided such change or effect does not disproportionately affect Seller or the Assets); (d) acts of God, including hurricanes, storms or other naturally occurring events; (e) acts or failures to act of Governmental Authorities; (f) civil unrest, any outbreak of disease or hostilities, terrorist activities or war or any similar disorder; (g) changes in the prices of Hydrocarbons; (h) a change in Laws and any interpretations thereof from and after the date of this Agreement; and (i) natural declines in well performance.

"*Material Contracts*" shall have the meaning set forth in *Section 4.8(a)*.

"*Net Revenue Interest*" shall mean, with respect to any Well (but limited to the depths, if any, set forth on *Exhibit A-1* for such Well) the interest in and to all Hydrocarbons produced, saved and sold from or allocated to such Well (but limited to the depths, if any, set forth on *Exhibit A-1* for such Well) after giving effect to all Burdens.

"*NORM*" shall mean naturally occurring radioactive material.

"*Operating Expenses*" shall have the meaning set forth in *Section 2.3*.

"*Outside Date*" shall have the meaning set forth in *Section 14.1(a)*.

"*Party*" and "*Parties*" shall have the meaning set forth in the introductory paragraph herein.

"*Permit*" shall have the meaning set forth in *Section 4.23*.

"*Permitted Encumbrances*" shall mean:

(a)     the terms and conditions of all Leases and all Burdens if the net cumulative effect of such Leases and Burdens does not operate to reduce the Net Revenue Interest of Seller with respect to any Well to an amount less than the Net Revenue Interest set forth in *Exhibit A-1* for such Well (but limited to the depths, if any, set forth on *Exhibit A-1* for such Well), and does not obligate Seller to bear a Working Interest with respect to any Well in any amount greater than the Working Interest set forth in *Exhibit A-1* for such Well (unless the Net Revenue Interest for such Well is greater than the Net Revenue Interest set forth in *Exhibit A-1* in the same proportion as any increase in such Working Interest);

(b)     preferential rights to purchase and required consents to assignment and similar agreements expressly set forth in the Schedules to this Agreement;

(c)     liens for Taxes or assessments not yet due or delinquent or, if delinquent, that are being contested in good faith in the normal course of business;

(d)     Customary Post-Closing Consents;

(e)     conventional rights of reassignment;

(f)     such Title Defects as Buyer may have waived;

(g)     all applicable Laws and all rights reserved to or vested in any Governmental Authority (i) to control or regulate any Asset in any manner; (ii) by the terms of any right, power, franchise, grant, license or permit, or by any provision of Law, to terminate such right, power, franchise, grant, license or permit or to purchase, condemn, expropriate or recapture or to designate a purchaser of any of the Assets; (iii) to use such property in a manner which does not materially impair the use of such property for the purposes for which it is currently owned and operated; or (iv) to enforce any obligations or duties affecting the Assets to any Governmental Authority with respect to any franchise, grant, license or permit;

Appendix 1-7

(h)      rights of a common owner of any interest in rights-of-way, permits or easements held by Seller and such common owner as tenants in common or through common ownership;

(i)      easements, conditions, covenants, restrictions, servitudes, permits, rights-of-way, surface leases and other rights in the Assets for the purpose of platform or other operations, facilities, pipelines, transmission lines, transportation lines, distribution lines, power lines, telephone lines and other like purposes, or for the joint or common use of the lands situated in State of Louisiana waters, rights-of-way, facilities and equipment, which, in each case, do not materially impair the operation or use of the Assets as currently operated and used;

(j)      vendors, carriers, warehousemen's, repairmen's, mechanics', workmen's, materialmen's, construction or other like liens arising by operation of Law in the ordinary course of business or incident to the construction or improvement of any property in respect of obligations which are not yet due or which are being contested in good faith by appropriate proceedings by or on behalf of Seller;

(k)      liens created under Leases and/or operating agreements or by operation of Law in respect of obligations that are not yet due or that are being contested in good faith by appropriate proceedings by or on behalf of Seller;

(l)      any Encumbrance affecting the Assets that is discharged by Seller at or prior to Closing;

(m)      any matters referenced and set forth in *Exhibit A* or *Exhibit A-1* and all litigation set forth in *Schedule 4.7*; and

(n)      the Leases and all other Encumbrances, Contracts (including the Applicable Contracts), instruments, obligations, defects and irregularities affecting the Assets that individually or in the aggregate are not such as to materially interfere with the operation or use of any of the Assets (as currently operated and used), do not reduce the Net Revenue Interest of Seller with respect to any Well to an amount less than the Net Revenue Interest set forth in *Exhibit A-1* for such Well (but limited to the depths, if any, set forth on *Exhibit A-1* for such Well), and do not obligate Seller to bear a Working Interest with respect to a currently producing formation in any Well in any amount greater than the Working Interest set forth in *Exhibit A-1* for such Well (unless the Net Revenue Interest for such Well is greater than the Net Revenue Interest set forth in *Exhibit A-1* in the same proportion as any increase in such Working Interest).

"*Person*" shall mean any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, Governmental Authority or any other entity.

"*Personal Property*" shall have the meaning set forth in *Section 2.1(f)*.

"*Pipeline/Platform Imbalance*" shall mean any marketing imbalance between the quantity of Hydrocarbons attributable to the Assets required to be delivered by Seller under any Contract relating to the purchase and sale, gathering, transportation, storage, processing

HN\933868.19

(including any production handling and processing at a platform or a separation facility) or marketing of Hydrocarbons and the quantity of Hydrocarbons attributable to the Assets actually delivered by Seller pursuant to the relevant Contract, together with any appurtenant rights and obligations concerning production balancing at the delivery point into the relevant sale, gathering, transportation, storage or processing facility.

"*Preferential Purchase Right*" shall have the meaning set forth in *Section 4.10*.

"*Preliminary Settlement Statement*" shall have the meaning set forth in *Section 3.5*.

"*Propel*" shall have the meaning set forth in the introductory paragraph of this Agreement.

"*Purchase Price*" shall have the meaning set forth in *Section 3.1*.

"*Qualified Intermediary*" has the meaning provided such term in Section 1.1031(k)-1(g)(4)(v) of the Treasury Regulations.

"*Records*" shall have the meaning set forth in *Section 2.1(h)*.

"*Remediation*" shall mean, with respect to an Environmental Condition, the implementation and completion of any remedial, removal, response, construction, closure, disposal or other corrective actions required under Environmental Laws to correct or remove such Environmental Condition.

"*Remediation Amount*" shall mean, with respect to an Environmental Condition, the cost of the Remediation of such Environmental Condition.

"*Seller*" shall have the meaning set forth in the introductory paragraph of this Agreement.

"*Seller Indemnified Parties*" shall have the meaning set forth in *Section 0*.

"*Survival Period*" shall have the meaning set forth in *Section 11.1(c)(i)*.

"*Tax*" or "*Taxes*" shall mean any tax (including any income tax, franchise tax, capital gains tax, gross receipts tax, license tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, environmental tax, inventory tax, occupancy tax, severance tax, withholding tax, payroll tax, employment tax, gift tax, estate tax or inheritance tax, wealth tax, other import or export duties), levy, assessment, tariff, impost and levies of similar nature, imposition, toll, duty (including any customs duty), deficiency or fee, and any related charge or amount (including any fine, penalty or interest), imposed, assessed or collected by or under the authority of any Governmental Authority or payable pursuant to any tax-sharing agreement or pursuant to any other contract relating to the sharing or payment of any such tax, levy, assessment, tariff, impost, imposition, toll, duty, deficiency or fee, together with any interest and penalties with respect thereto, imposed by or on behalf of any Taxing Authority.

"*Taxing Authority*" shall mean, with respect to any Tax, the governmental entity or political subdivision thereof that imposes such Tax, and the agency (if any) charged with the

collection of such Tax for such entity or subdivision, including any governmental or quasi-governmental entity or agency that imposes, or is charged with collecting, social security or similar charges or premiums.

"*Third Party*" shall mean any Person other than a Party to this Agreement or an Affiliate of a Party to this Agreement.

"*Third Party Claim*" shall have the meaning set forth in *Section 13.7(b)*.

"*Title Arbitrator*" shall have the meaning set forth in *Section 11.2(j)*.

"*Title Benefit*" shall mean any right, circumstance or condition that operates (a) to increase the Net Revenue Interest of Seller in any Well above that shown for such Well in *Exhibit A-1* to the extent the same does not cause a greater than proportionate increase in Seller's Working Interest therein above that shown in *Exhibit A-1*, or (b) to decrease the Working Interest of Seller in any Well below that shown for such Well in *Exhibit A-1* to the extent the same causes a decrease in Seller's Working Interest that is proportionately greater than the decrease in Seller's Net Revenue Interest therein below that shown in *Exhibit A-1*.

"*Title Benefit Amount*" shall have the meaning set forth in *Section 11.2(e)*.

"*Title Benefit Notice*" shall have the meaning set forth in *Section 11.2(b)*.

"*Title Benefit Property*" shall have the meaning set forth in *Section 11.2(b)*.

"*Title Claim Date*" shall have the meaning set forth in *Section 11.2(a)*.

"*Title Defect*" shall mean any Encumbrance, defect or other matter that causes Seller not to have Defensible Title in and to the Assets as of the Effective Time; provided that the following shall not be considered Title Defects:

      (a)    defects arising out of lack of corporate or other entity authorization unless such corporate or other entity action was not authorized and results in another Person's superior claim of title to the relevant Asset;

      (b)    defects based on a gap in Seller's chain of title in the applicable state records, unless such gap is shown to exist in such records by an abstract of title, title opinion or landman's title chain which documents shall be included in a Title Defect Notice;

      (c)    defects based upon the failure to record any assignments of interests in such federal Leases in any applicable county or parish records; and

      (d)    defects that have been cured by applicable Laws of limitations or presumptions.

"*Title Defect Amount*" shall have the meaning set forth in *Section 11.2(g)*.

"*Title Defect Notice*" shall have the meaning set forth in *Section 11.2(a)*.

"*Title Defect Property*" shall have the meaning set forth in *Section 11.2(a)*.

"*Transaction Documents*" shall mean those documents executed pursuant to or in connection with this Agreement.

"*Treasury Regulations*" shall mean the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code.  All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute, proposed or final Treasury Regulations.

"*Units*" shall have the meaning set forth in *Section 2.1(c)*.

"*Wells*" shall have the meaning set forth in *Section 2.1(b)*.

"*Well Imbalance*" shall mean any imbalance at the wellhead between the amount of Hydrocarbons produced from a Well and allocable to the interests of Seller therein and the shares of production from the relevant Well to which Seller is entitled, together with any appurtenant rights and obligations concerning future in kind and/or cash balancing at the wellhead.

"*Willful Breach*" means, with respect to any Party, that such Party does one or more of the following:  (a) such Party willfully and intentionally breaches in any material respect (by refusing to perform or by taking an action prohibited) any material pre-Closing covenant applicable to such Party, (b) such Party intentionally misrepresents any of the matters covered by its representations and warranties under this Agreement as of the date hereof, or (c) such Party willfully and intentionally causes any of its representations and warranties under this Agreement to not be true and correct in all material respects as of the Closing Date.

"*Working Interest*" shall mean, with respect to any Well (but limited to the depths, if any, set forth on *Exhibit A-1* for such Well), the interest in and to such producing formation for such Well that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such producing formation for such Well, but without regard to the effect of any Burdens.

**END OF APPENDIX 1**

HN\933868.19

# EXHIBIT A

## LEASES

1.     Lease for Oil, Gas and Other Liquid or Gaseous Minerals designated as State Lease No. 18423, dated January 12, 2005, executed by the State of Louisiana, through the State Mineral Board, as Lessor, in favor of Rozel Energy II, L.L.C., as Lessee, recorded February 16, 2005 under Entry No. 290963, COB 999, Records of Cameron Parish, Louisiana;

2.     Lease for Oil, Gas and Other Liquid or Gaseous Minerals designated as State Lease No. 18521, dated April 13, 2005, executed by the State of Louisiana, through the State Mineral Board, as Lessor, in favor of Rozel Energy II, L.L.C., as Lessee, recorded May 24, 2005 under Entry No. 292650, COB 1003, Records of Cameron Parish, Louisiana;

3.     Lease for Oil, Gas and Other Liquid or Gaseous Minerals designated as State Lease No. 18524, dated April 13, 2005, executed by the State of Louisiana, through the State Mineral Board, as Lessor, in favor of Rozel Energy II, L.L.C., as Lessee, recorded May 24, 2005 under Entry No. 292651, COB 1003, Records of Cameron Parish, Louisiana;

4.     Lease for Oil, Gas and Other Liquid or Gaseous Minerals designated as State Lease No. 19031, dated July 12, 2006, executed by the State of Louisiana, through the State Mineral Board, as Lessor, in favor of Rozel Energy II, L.L.C., as Lessee, recorded August 1, 2006 under Entry No. 299501, Records of Cameron Parish, Louisiana;

5.     Lease for Oil, Gas and Other Liquid or Gaseous Minerals designated as State Lease No. 19190, dated December 13, 2006, executed by the State of Louisiana, through the State Mineral Board, as Lessor, in favor of Rozel Energy II, L.L.C., as Lessee, recorded January 10, 2007 under Entry No. 302151, Records of Cameron Parish, Louisiana;

6.     Lease for Oil, Gas and Other Liquid or Gaseous Minerals designated as State Lease No. 19192, dated December 13, 2006, executed by the State of Louisiana, through the State Mineral Board, as Lessor, in favor of Rozel Energy II, L.L.C., as Lessee, recorded January 10, 2007 under Entry No. 302152, Records of Cameron Parish, Louisiana; and

7.     Lease for Oil, Gas and Other Liquid or Gaseous Minerals designated as State Lease No. 20473 dated November 10, 2010, executed by the State of Louisiana, through the State Mineral and Energy Board, as Lessor, in favor of Wainwright & Boyer Land Services, LLC, as Lessee, recorded December 9, 2010 under Entry No. 321156, Records of Cameron Parish, Louisiana.

Exhibit A

**END OF EXHIBIT A**

# EXHIBIT A-1

# WELLS

**Net Revenue Interest / Working Interest**

1.     Forza Operating, LLC - VUB; SL 18423 No.     See Exhibit F allocations for NRI and WI.
   1 Well (Serial No. 231746), Creole Offshore Field,
   Cameron Parish, Louisiana

2.     Forza Operating, LLC - VUB; SL 18423 No. 1-D     See Exhibit F allocations for NRI and WI.
   Well (Serial No. 232797), Creole Offshore Field,
   Cameron Parish, Louisiana

3.     Forza Operating, LLC - VUB; SL 18423 No. 2     See Exhibit F allocations for NRI and WI.
   Well (Serial No. 234959), Creole Offshore Field,
   Cameron Parish, Louisiana

4.     Forza Operating, LLC - VUB; SL 18423 No. 2-D     See Exhibit F allocations for NRI and WI.
   Well (Serial No. 236075), Creole Offshore Field,
   Cameron Parish, Louisiana

5.     Forza Operating, LLC - VUB; SL 18423 No. 3 Well,     See Exhibit F allocations for NRI and WI.
   Formerly  SL 2760 No. A-5 Well (Serial No. 151097),
   Creole Offshore Field, Cameron Parish, Louisiana

6.     Forza Operating, LLC - VUB; SL 18521 No. 1     See Exhibit F allocations for NRI and WI.
   Well (Serial No. 233855), Creole Offshore Field,
   Cameron Parish, Louisiana

7.     Forza Operating, LLC - VUB; SL 18521 No. 1-D     See Exhibit F allocations for NRI and WI.
   Well (Serial No. 235106), Creole Offshore Field,
   Cameron Parish, Louisiana

8.     Forza Operating, LLC - VUB; SL 18521 No. 2     See Exhibit F allocations for NRI and WI.

Exhibit A-1

HN\933868.19

Well (Serial No. 237827), Creole Offshore Field,

Cameron Parish, Louisiana;

9.      Forza Operating, LLC - VUB; SL 18521 No. 2-D          See Exhibit F allocations for NRI and WI.

        Well (Serial No. 239090), Creole Offshore Field,

        Cameron Parish, Louisiana

10.     Forza Operating, LLC - VUB; SL 18521 No. 3           See Exhibit F allocations for NRI and WI.

        Well (Serial No. 237828), Creole Offshore Field,

        Cameron Parish, Louisiana

11.     Forza Operating, LLC - VUB; SL 18521 No. 3-D          See Exhibit F allocations for NRI and WI.

        Well (Serial No. 244585), Creole Offshore Field,

        Cameron Parish, Louisiana

12.     Forza Operating, LLC - VUA; SL 18519 No. 1           See Exhibit F allocations for NRI and WI.

        Well (Serial No. 232725), Creole Offshore Field,

        Cameron Parish, Louisiana

13.     Forza Operating, LLC - VUB; SL 18521 No. 4           See Exhibit F allocations for NRI and WI.

        Well (Serial No. 242708) Creole Offshore Field,

        Cameron Parish, Louisiana

14.     Forza Operating, LLC - VUB; SL 18521 No. 5           See Exhibit F allocations for NRI and WI.

        Well (Serial No. 242709), Creole Offshore Field,

        Cameron Parish, Louisiana

15.     Forza Operating, LLC - VUB; SL 18521 No. 5-D          See Exhibit F allocations for NRI and WI.

        Well (Serial No. 243814), Creole Offshore Field,

        Cameron Parish, Louisiana

16.     Forza Operating, LLC - VUB; SL 18521 No. 8           See Exhibit F allocations for NRI and WI.

        Well Formerly SL 18423 #6 Well (Serial No. 244198), Creole Offshore Field,

        Cameron Parish, Louisiana

Exhibit A-1

17.   Forza Operating, LLC - VUB; SL 18521 No. 8-D          See Exhibit F allocations for NRI and WI.
      Well (Serial No. 245227), Creole Offshore Field,
      Cameron Parish, Louisiana

18.   Forza Operating, LLC - VUB; SL 18521 No. 6            See Exhibit F allocations for NRI and WI.
      Well (Serial No. 243958), Creole Offshore Field,
      Cameron Parish, Louisiana (permitted)

19.   Forza Operating, LLC - VUB; SL 18521 No. 7            See Exhibit F allocations for NRI and WI.
      Well (Serial No. 243959), Creole Offshore Field,
      Cameron Parish, Louisiana (permitted)


Salt Water Disposal Wells

1.    Forza Operating, LLC - Troy Bailey SWD No. 1          --     See Exhibit F allocations for WI
      Well (Serial No. 973555), Creole Offshore Field,
      Cameron Parish, Louisiana

2.    Forza Operating, LLC – Wilma Picou SWD No. 1          --     See Exhibit F allocations for WI
      Well (Serial No. 974150), Creole Offshore Field,
      Cameron Parish, Louisiana (permitted only – not an actual well)


**END OF EXHIBIT A-1**


Exhibit A-1

# EXHIBIT A-2

## EASEMENTS AND RIGHTS-OF-WAY

1.   Contract of Lease dated March 23, 1998, by and between John Henry Lebleu, et al, as Lessors, and Burlington Resources Oil & Gas Company, as Lessee, recorded under Entry No. 258498, Conveyance Book 890, Records of Cameron Parish, Louisiana;

2.   Act of Amendment to Contract of Lease dated August 25, 2006 by and between C. F. Henry Properties, LLC, as Lessor, and Rozel Operating Company, as Lessee, recorded under Entry No. 299995, Records of Cameron Parish, Louisiana;

3.   Second Amendment to Contract of Lease dated October 25, 2006, by and between C. F. Henry Properties, LLC, as Lessor, and Rozel Operating Company, as Lessee, recorded under Entry No. 301195, Records of Cameron Parish, Louisiana;

4.   Assignment of Easements, Rights-Of-Way and Surface Leases dated effective July 1, 2006, by and between Burlington Resources Oil & Gas Company LP and Burlington Resources Offshore Inc., as Assignors, and Rozel Operating Company, as Assignee, recorded under Entry No. 299817, Records of Cameron Parish, Louisiana;

5.   Agreement for Surface Lease and Saltwater Injection dated June 13, 2006 granted by Troy Bailey to Callon Petroleum Operating Company, et al., recorded August 10, 2006 under Entry No. 299698, Records of Cameron Parish, Louisiana, as corrected by Act of Correction and Ratification dated effective January 1, 2008, and recorded July 22, 2008 under Entry No. 311905, Records of Cameron Parish, Louisiana;

6.   Agreement for Surface Lease and Saltwater Injection dated June 14, 2006 granted by Wilma Ann Landry Picou, et al., to Callon Petroleum Operating Company, et al., recorded August 10, 2006 under Entry No. 299699, Records of Cameron Parish, Louisiana, as amended by agreement dated June 14, 2008, and recorded April 7, 2009 under Entry No. 314955, Records of Cameron Parish, Louisiana;

7.   Pipeline Right-of-Way (4796) Grant from the State of Louisiana to Rozel Operating Company dated March 7, 2007, and recorded March 16, 2007 under Entry No. 303024, Records of Cameron Parish, Louisiana;

8.   Pipeline Right-of-Way (4999) Grant from the State of Louisiana to Rozel Operating Company dated March 26, 2008, and recorded April 11, 2008 under Entry No. 310309, Records of Cameron Parish, Louisiana;

9.   Pipeline Right-of-Way (5357) Grant from the State of Louisiana to Superior Oil Company dated May 3, 1957;

HN\933868.19

10. Assignment of Right-Of-Way (5357) by and between Burlington Resources Oil & Gas Company LP and Rozel Operating Company, approved August 24, 2006, recorded under Entry No. 300151, Records of Cameron Parish, Louisiana;

11. Pipeline Right-of-Way (982) Grant from the State of Louisiana to Michigan Wisconsin Pipe Line Company dated July 23, 1968, recorded August 15, 1968, Records of Cameron Parish, Louisiana;

12. Assignment of Right-Of-Way (982) by and between ANR Pipeline Company, successor to Michigan Wisconsin Pipe Line Company and Callon Petroleum Operating Company, approved August 28, 2006;

13. Assignment of Right-Of-Way (982) by and between Callon Petroleum Operating Company and EPL of Louisiana, LLC, June 4, 2007, recorded June 18, 2007 under Entry No. 304964, Records of Cameron Parish, Louisiana;

14. Pipeline Right-of-Way (4722) Grant from the State of Louisiana to Callon Petroleum Operating Company dated June 26, 2006, recorded under Entry No. 299192, Records of Cameron Parish, Louisiana;

15. Assignment of Right-Of-Way (4722) by and between Callon Petroleum Operating Company and EPL of Louisiana, LLC, June 4, 2007, recorded June 18, 2007 under Entry No. 304963, Records of Cameron Parish, Louisiana;

16. Pipeline Right-of-Way (5326) Grant from the State of Louisiana to Forza Operating, LLC dated July 18, 2011, and recorded December 13, 2011 under Entry No. 324689, Records of Cameron Parish, Louisiana; and

17. Pipeline Right-of-Way (5327) Grant from the State of Louisiana to Forza Operating, LLC dated July 18, 2011, and recorded December 13, 2011 under Entry No. 324692, Records of Cameron Parish, Louisiana.

18. Surface Lease Agreement dated July 5, 2012, granted by Troy Bailey, et ux, to Forza Operating LLC, recorded July 23, 2012 under Entry No. 326623, Records of Cameron Parish, Louisiana.


**END OF EXHIBIT A-2**

# EXHIBIT A-3

# PERSONAL PROPERTY

See attached.

EXHIBIT A-3

PERSONAL PROPERTY

<u>Creole Onshore Facility</u>

PRODUCTION PROCESS EQUIPMENT LIST

**West Cameron Block 2 Onshore Production Facility**

**7/1/2012**

| Creole Production Facility Equipment | |
|---|---|
| **Equipment** | **Description** |
| Glycol Regenerator Vent JATCO BTEX Condenser and KO Pot | Finned cooler, JATCO condensate pot and 2'x2'x2' vaporbox |
| 3 - Heater Treaters | 500,000 BTU/HR 6' x 20' 50 # ASME coded vertical heater treater with accessories and steel welded skid |
| 6 - 500 Barrel Storage Tanks (Built 2006) | 500 BBL 12'x25' Steel Welded Vertical Tanks, with 8" round hatch and 24"x36" manway, with walkways & stairs |
| 2 - 2000 Barrel Storage Tanks | 2000 BBL Steel Tanks with walkways & Stairs |
| 6 - Tank level monitoring gauges | Murphy OPHC-20 Hi-Lo tank level switch |
| Low-pressure 3-phase Vertical Separator | Low-pressure 60"x10', 125psi @100 F, 3-phase vertical separator |
| 1 - Horizontal Dehy Unit | 30'x10' Horizontal Dehy Unit with Burner & Contact Tower |
| Fuel Gas Skid | Fuel gas filter separator skid with 10 3/4" x 5' vertical separator, 285psi @ 100 F, 6"x6' filter with instrumentation. |
| 1 - Gas Meter Runs | 2" Simplex gas meter run with 1" bypass line with instrumentation, chart recorder, and related equipment |
| 3 - Gas Meter Runs | 4" Gas Meter Runs, Daniels Sr. |
| 1 - Gas Meter Run | 3" Gas Meter Run, Daniels Sr. |
| 5 - Recording Meter with Chart | Barton Recorder Model 202; 3-pen 1500 psi @150 F, Battery Operated Clock; 5 SS Manifold Valves |
| Morgan Metal Building | Morgan Model 12201 CTAHUSO Metal 10'x20' Storage Building |
| 7 - Safety Hi-Lo Pilots | Hi-Lo Safety Pilots relay |
| 4 - Total Flow Recorders | Gas Recorders - Serial #23112167, 320001769, 320009451, 0942164595 |
| 3 Phase Seperator | 60"x30' Vertical Sep. 3 phase WP 125 |
| Dehy Unit | 20" x 25' Serial #S8371 with 90-15 glycol pump |
| 8 - Chemical Tanks | poly tanks |
| 4 - Chemical Pumps | Timberline |
| Gas Compressor | Leased from Exterran |
| Gas Compressor | Leased from Exterran |
| 1 - Gas Recorder | Barton Recorder 1500x100 (ANR Sales) |
| 1 - Gas Recorder | Total Flow Electronic (ANR Sales) |
| 1 - Total Flow Meter | ABB UFL06213 Total Flow |
| Miscellaneous Piping, Tubing & Fittings | |

| Creole Production Facility Equipment | |
|---|---|
| **Equipment** | **Description** |
| TROY BAILEY SALT WATER DISPOSAL SYSTEM | |
| Salt Water Injection Pump | 3-1/2" Wilson - Snyder Pump w/ Electric Motor (ser#P150-126) |
| Salt Water Injection Pump | 3" National J-60 Triplex Pump with electric motor |
| Salt Water Well Head (Tree) | Wellhead with valvues and instruments |
| Water Filter | OPC Filter |
| 2 - 1500 bolted tanks | |

| WC BLOCK 2 18423 #1 |
| --- |
| **Platform Purchased & Fabricated Equipment** |
| 1 ea Test Separator Skid includes: |
|     1 ea HP Test Separator (30" x 10" 1440 psig) |
|     1 ea Fuel Gas Scrubber (10" x 1'-7" 250 psig) |
|     1 ea 3" Daniels Meter Run |
| Well Header Manifold |
| Connecting Piping and Instrumentation |
| 1 ea Chemical Injection Pump Skid includes: |
|     1 ea Chemical Injection Pumps - N Sidewinder 42002 |
| 3 ea Chemical Injection Tanks and Containment Pan |
| 1 ea 4'-6" x 8' Metal Building |
|     Galvanized Sheet metal wing 1/4" floor |
| 3 ea Aid to Navigation Lights |
| 1 ea Well Control Panel and Instrumentation |
| 1 ea Well Protector |
| 1 ea 48" x 54" Caisson |
| 1 ea Cassion Ladder |
| 1 ea Well Protector to Boat Landing Bridge, 10 feet in length |
| 1 ea Boat Landing, 360 degree wrap around |
| 1 ea 29'-1" x 21'-6" Production Deck |
| 1 ea 27'-6" x 27'-6" Helideck |
| Platform Signs and Miscellaneous Equipment |

SL 18423 #3

| WC BLOCK 2 18423 #3 |
| --- |
| **Platform Purchased & Fabricated Equipment** |
| 1 Nav-Aid Light |
| 1 Cassion Ladder |
| 1 Chemical Injection Pump |
| 1 Well Control Panel and Instrumentation |
| 1 Well Head Jacket |
| Platform Signs and Miscellaneous Equipment |

SL 18423 #2-2D

| WC BLOCK 2 18423 #2 & 2D |
|---|
| **Platform Purchased & Fabricated Equipment** |
| 1 ea Test Separator Skid includes: |
|     1 ea HP Test Separator (30" x 10" 1440 psig) |
|     1 ea Fuel Gas Scrubber (10" x 1'-7" 250 psig) |
|     1 ea 3" Daniels Meter Run |
| 2 ea Chemical Injection Tanks and Containment Pan |
| 1 ea Part Shed |
| 3 ea Aid to Navigation Lights |
| 1 ea Well Control Panel and Instrumentation |
| 4 ea Stainless Steel Tanks |
| 1 ea Gas Lift Meter Run |
| 4- pile well control platform |
| 1 - Cassion Ladder |
| 1 - Well Protector |
| Platform Signs and Miscellaneous Equipment |
| |

SL 18521 #1

| WC BLOCK 2 18521 #1 |
|---|
| **Platform Purchased & Fabricated Equipment** |
| 1 ea Test Separator Skid includes: |
|     1 ea HP Test Separator (30" x 10" 1440 psig) |
|     2 ea 2" Daniels Meter Run |
|     Well Header Manifold |
|     Connecting Piping and Instrumentation |
| 1 ea Chemical Injection Pump Skid includes: |
|     1 ea Chemical Injection Pumps - Timberline |
| 3 ea Chemical Injection Tanks and Containment Pan |
| 1 ea ARO Simp Pump |
|     ARO Model ARO650583-C43 w/ Foot value and Air Motor |
| 1 ea Sump Tank includes, level switches, manway, piping |
| 3 ea Aid to Navigation Lights - Model FA_249 Marine Lanterns |
| 1 ea Well Control Panel and Instrumentation |
| 1 ea 48" Caisson |
| 1 ea Cassion Ladder |
| 1 ea Boat Landing 360 degree wrap around |
| 1 ea 27'-3" x 22'-3" Dual Level Production/Sump Deck |
| Platform Signs and Miscellaneous Equipment |

| WC BLOCK 2 18521 #2 -2D - 3 -3D - 8 - 8D |
|---|
| **Platform Purchased & Fabricated Equipment** |
| 1 ea Chemical Injection Pumps |
|      SWP040F-002 Pumps |
| 1 ea Aid to Navigation Light - Model FA_249 Marine Lantern |
| 1 ea Well Control Panel and Instrumentation |
| 1 ea 10-Pipe Well Protector |
| 1 ea 4-Pile Well Control Platform |
| 1 ea Caisson Ladder |
| 1 ea Well Protector to Well Control Platform Bridge |
|      8 feet in length |
| Platform Signs and Miscellaneous Equipment |
| 3-Way YD Body, Size 45 657 Remanufactured Divert Valve |
| 1 ea Control Panel - Cortec Manifolds Systems 3" ANSI Cl 600 Inlet Manifold Skid |
| 2 ea Well Control Bundles of 1/4" ss tbg. |
|      600 ft spools of coated stainless steel tubing |
| 3 ea 2" Simplex meter runs & Myrtle Chokes with Barton Recorders |
| 1 ea Poly tank (chemical) |
| 1 ea Timberline chemical pump |
| 1 ea 6 well 4 log header system |
| 1 ea 18" x 6' vertical fuel gas seperator w/ instrumentation & safety systems (serial #1202) |
| 1 - 24" x 10' vertical 2 phase seperator, MAWP 1440 w/ instrumentation & safety systems |
| 2 ea 36" x 10' Vertical 3 phase seperator, MAWP 1440 w/ instrumentation & safety systems (serial #4201 & 010980) |

| WC BLOCK 3 18519 #1 |
|---|
| **Platform Purchased & Fabricated Equipment** |
| 1 ea Test Separator Skid includes: |
|     1 ea HP Test Separator (30" x 10" 1440 psig) |
|     1 ea Fuel Gas Scrubber (10" x 1'-7" 250 psig) |
|     1 ea 3" Daniels Meter Run |
| 1 ea Line Heater 1.2 MMBTU |
| 1 ea Well Control Panel and Instrumentation |
| 1 ea Well Protector |
| 1 ea 48" x 54" Caisson |
| 1 ea Cassion Ladder |
| 1 ea Well Protector to Boat Landing Bridge, 10 feet in length |
| 1 ea Boat Landing, 360 degree wrap around |
| 1 ea 29'-1" x 21'-6" Production Deck |
| 1 ea 27'-6" x 27'-6" Helideck |
| 1 ea Low Pressure 36" x 10' Vertical 3 phase seperator w/ meter runs & recorder (Serial #HP 0075) |
| 1 ea 24" x 25' Glycol dehy unit w/ pumps & contact tower (Serial #70-1676) |
| Platform Signs and Miscellaneous Equipment |

SL 18521 #4

| WC BLOCK 2 18521 #4 |
| --- |
| **Platform Purchased & Fabricated Equipment** |
| 1 ea Well panel and instrumentation |
| 1 ea 36" x 10' 3 phase seperator, MAWP 1440 (Serial # CL11-1294) |
| 1 ea Fuel gas pot, 12" x 5' |
| 1 ea Header |
| Platform Signs and Miscellaneous Equipment |
|  |

SL 18521 #5-5D

| WC BLOCK 2 18521 #5, 5D |
| --- |
| **Platform Purchased & Fabricated Equipment** |
| 1 ea Well panel and instrumentation |
| 1 ea 36" x 10' 3 phase seperator, MAWP 1440 (Serial # 42376) |
| 1 ea 2 well 3 log header |
| 2 ea Poly tanks |
| 2 ea Timberline chemical pumps |
| 1 ea 24" x 6' Fuel gas scrubber, MAWP 1440 (Serial #1201) |
| Platform Signs and Miscellaneous Equipment |
| |

# EXHIBIT B

## FORM OF ASSIGNMENT AND BILL OF SALE

See attached.

HN\933868.19

**EXHIBIT B**

**FORM OF ASSIGNMENT AND BILL OF SALE**

This Assignment and Bill of Sale (this *"Assignment"*) is from [_____], a [_____] (*"Assignor"*), whose address is [_____], to Northstar Offshore Group, LLC, a Delaware limited liability company (*"Assignee"*), whose address is 11 Greenway Plaza, Suite 2800, Houston, Texas 77046, and is effective as of 7:00 A.M., Central Time, on September 1, 2012 (the *"Effective Time"*). Capitalized terms used herein but not otherwise defined shall have the meanings given such terms in *Article 2* of this Assignment.

**ARTICLE 1**
**ASSIGNMENT OF ASSETS**

**Section 1.1    Assignment**.  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby grants, bargains, assigns, conveys and transfers unto Assignee all of Assignor's right, title and interest in and to the assets described in *Sections 1.1(a)* through *(h)* below (such assets, less and except the Excluded Assets (as hereinafter defined), collectively, the *"Assets"*):

(a)    the oil and gas leases described in *Exhibit A*, subject to any reservations or depth restrictions described in *Exhibit A*, together with any and all other right, title and interest of Assignor in and to the leasehold estates created thereby subject to the terms, conditions, covenants and obligations set forth in such leases and/or *Exhibit A*, and all other interests of Assignor of any kind or character in such leases, subject (in each case) to any reservation or depth restrictions described in *Exhibit A* (such interest in such leases, the *"Leases"*);

(b)    all wells located on any of the Leases or on any other lease with which any Lease has been unitized (such interest in such wells, including the wells set forth in *Exhibit A-1*, the *"Wells"*), and in all Hydrocarbons produced therefrom or allocated thereto;

(c)    all rights and interests in, under or derived from all unitization and pooling agreements in effect with respect to any of the Leases or Wells and the units created thereby (the *"Units"*);

(d)    except for those that may not be assigned as set forth on Schedule 4.4 to the Purchase Agreement (as hereinafter defined), all Applicable Contracts and all rights thereunder;

(e)    except for those that may not be assigned as set forth on Schedule 4.4 to the Purchase Agreement, all permits, licenses, servitudes, easements, rights-of-way and nonexclusive access rights to the extent used in connection with the ownership or operation of any of the Leases, Wells, Units or other Assets, including those described on Exhibit A-2 to the Purchase Agreement;

(f)    all equipment, machinery, fixtures and other personal, moveable and mixed property, operational and nonoperational, known or unknown, located on any of the Leases, Wells, Units or other Assets or used in connection therewith, including pipelines,

gathering systems, manifolds, buoys, well equipment, casing, tubing, pumps, motors, fixtures, machinery, compression equipment, flow lines, processing and separation facilities, platforms, structures, materials and other items used in the operation thereof, including those items described on Exhibit A-3 to the Purchase Agreement;

      (g)    all Imbalances relating to the Assets; and

      (h)    all of the files, records, information and data, whether written or electronically stored, to the extent primarily relating to the Assets in Assignor's or its Affiliates' possession, including: (i) land and title records (including abstracts of title, title opinions and title curative documents); (ii) Applicable Contract files; (iii) correspondence; (iv) operations, environmental, production and accounting records and (v) facility and well records.

**EXCEPTING AND RESERVING** to Assignor, however, all Excluded Assets.

**TO HAVE AND TO HOLD** the Assets unto Assignee, its successors and assigns, forever, subject, however, to all the terms and conditions of this Assignment.

    **Section 1.2**   **Assignment Subject to Purchase Agreement; Retained Rights and Obligations**.  This Assignment is made in accordance with and is subject to the terms, covenants and conditions contained in that certain Purchase and Sale Agreement dated as of September [\_\_\_], 2012 by and among Assignor, Assignee and certain other parties named therein (the "*Purchase Agreement*"), a copy of which can be obtained from Assignee as the above referenced address.  The terms and conditions of the Purchase Agreement are incorporated herein by reference, and in the event of a conflict between the provisions of the Purchase Agreement and this Assignment, the provisions of the Purchase Agreement shall control.  The execution and delivery of this Assignment by Assignor, and the execution and acceptance of this Assignment by Assignee, shall not operate to release or impair any surviving rights or obligations of Assignor or Assignee under the Purchase Agreement.

**ARTICLE 2**
**DEFINED TERMS**

    **Section 2.1**   **Definitions**.  Capitalized terms that are not otherwise defined in this Assignment shall have the meanings given to such terms in the Purchase Agreement.

**ARTICLE 3**
**DISCLAIMERS**

    **Section 3.1**   **Disclaimers of Warranties and Representations**.

    **(a)**    **EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN ARTICLE IV OR SECTION 11.1(b) OF THE PURCHASE AGREEMENT, (I) ASSIGNOR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (II) ASSIGNOR EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ASSIGNEE OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS,**

- 2 -

CONSULTANTS OR REPRESENTATIVES (INCLUDING, ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ASSIGNEE BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF ASSIGNOR OR ANY OF ITS AFFILIATES).

(b)     EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN ARTICLE IV OR SECTION 11.1(b) OF THE PURCHASE AGREEMENT, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ASSIGNOR EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO ANY OF THE ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES TO BE GENERATED BY THE ASSETS, (V) THE PRODUCTION OF OR ABILITY TO PRODUCE HYDROCARBONS FROM THE ASSETS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY ASSIGNOR OR THIRD PARTIES WITH RESPECT TO THE ASSETS, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO ASSIGNEE OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THE PURCHASE AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO AND (IX) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT. EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN ARTICLE IV OR SECTION 11.1(B) OF THE PURCHASE AGREEMENT, ASSIGNOR FURTHER DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM LATENT VICES OR DEFECTS, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY OF THE ASSETS, RIGHTS OF A PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES HERETO THAT ASSIGNEE SHALL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS OR DEFECTS (KNOWN OR UNKNOWN, LATENT, DISCOVERABLE OR UNDISCOVERABLE), AND THAT ASSIGNEE HAS MADE OR CAUSED TO BE  MADE SUCH INSPECTIONS AS ASSIGNEE DEEMS APPROPRIATE. WITH RESPECT TO ANY OF THE ASSETS THAT ARE LOCATED IN LOUISIANA OR LOCATED ON THE OUTER CONTINENTAL SHELF ADJACENT TO THE STATE OF LOUISIANA, ASSIGNEE ACKNOWLEDGES THAT THIS WAIVER HAS BEEN EXPRESSLY CALLED TO ITS

- 3 -

ATTENTION AND INCLUDES A WAIVER OF WARRANTY AGAINST REDHIBITORY VICES ARISING UNDER LOUISIANA CIVIL CODE ARTICLES 2520 THROUGH 2548, INCLUSIVE.

(c)     OTHER THAN AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN SECTION 4.14 OF THE PURCHASE AGREEMENT, ASSIGNOR HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSETS, AND NOTHING IN THE PURCHASE AGREEMENT OR THIS ASSIGNMENT OR OTHERWISE SHALL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY, AND SUBJECT TO ASSIGNEE'S LIMITED RIGHTS AS SPECIFIED IN THE PURCHASE AGREEMENT FOR A BREACH OF ASSIGNOR'S REPRESENTATIONS SET FORTH IN SECTION 4.14 OF THE PURCHASE AGREEMENT, ASSIGNEE SHALL BE DEEMED TO BE TAKING THE ASSETS "AS IS" AND "WHERE IS" WITH ALL FAULTS FOR PURPOSES OF THEIR ENVIRONMENTAL CONDITION AND THAT ASSIGNEE HAS MADE OR CAUSED TO BE MADE SUCH ENVIRONMENTAL INSPECTIONS AS ASSIGNEE DEEMS APPROPRIATE.

(d)     ASSIGNOR AND ASSIGNEE AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS *SECTION 3.1* ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LAW.

**ARTICLE 4**
**MISCELLANEOUS**

**Section 4.1     Assumed Obligations**.     Assignee hereby assumes the Assumed Obligations subject to the terms of the Purchase Agreement.

**Section 4.2     Separate Assignments**.  Where separate assignments of Assets have been, or will be, executed for filing with and approval by applicable Governmental Authorities, any such separate assignments (a) shall evidence the Assignment and assignment of the applicable Assets herein made, and shall not constitute any additional Assignment or assignment of the Assets, (b) are not intended to modify, and shall not modify, any of the terms, covenants and conditions, or limitations on warranties, set forth in this Assignment and are not intended to create, and shall not create, any representations, warranties or additional covenants of or by Assignor to Assignee, and (c) shall be deemed to contain all of the terms and provisions of this Assignment, as fully and to all intents and purposes as though the same were set forth at length in such separate assignments.

**Section 4.3     Governing Law; Arbitration**.  THIS ASSIGNMENT AND THE LEGAL RELATIONS AMONG THE PARTIES HERETO SHALL BE GOVERNED BY

- 4 -

AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS RULE OR PRINCIPLE THEREOF TO THE EXTENT SUCH RULE OR PRINCIPLE WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.  ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF, RELATING TO OR IN CONNECTION WITH THIS ASSIGNMENT OR THE VALIDITY HEREOF, SHALL BE FINALLY SETTLED BY ARBITRATION IN ACCORDANCE WITH SECTION 15.13 OF THE PURCHASE AGREEMENT.

**Section 4.4     Successors and Assigns**.  This Assignment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that nothing in this Assignment shall assign or grant, or in any way operate to assign or grant, any right, title or interest in, to or under the Purchase Agreement to any successor or assign of Assignee with respect to the Assets or any part thereof, it being expressly understood that rights, titles and interests under the Purchase Agreement may only be obtained or assigned in strict accordance with the terms thereof.

**Section 4.5     Titles and Captions**.  All Article or Section titles or captions in this Assignment are for convenience only, shall not be deemed part of this Assignment and in no way define, limit, extend or describe the scope or intent of any provisions hereof.  Except to the extent otherwise stated in this Assignment, references to "Articles" and "Sections" are to Articles and Sections of this Assignment, and references to "Exhibits" are to the Exhibits attached to this Assignment, which are made a part hereof and incorporated herein for all purposes.

**Section 4.6     Counterparts**.  This Assignment may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all of such counterparts shall constitute for all purposes one agreement.  Multiple counterparts of this Assignment may be recorded with federal agencies and in the counties and parishes of the states where the Assets are located, but the inclusion of a description of any Asset in more than one counterpart of this Assignment shall not be construed as having effected any cumulative, multiple or overlapping interest in the applicable Asset.

*[Signature Page Follows]*

HN\933869.6

EXECUTED as of the date of the parties' acknowledgments below, but effective at the Effective Time.

**WITNESSES:**                                      **ASSIGNOR:**

_____                             [_____]
Name:_____

_____                             By: _____
Name:_____                                Name: _____
                                                    Title: _____

**WITNESSES:**                                      **ASSIGNEE:**

                                                    **NORTHSTAR OFFSHORE GROUP, LLC**
_____
Name:_____

_____                             By: _____
Name:_____                                Name: _____
                                                    Title: _____

STATE OF _____                      §
                                               §
COUNTY OF _____                     §


      On this _____ day of _____ 2012, before me appeared _____, to me personally known, who being by me duly sworn (or affirmed) did say that he/she is the _____, of [_____], a [_____], and that the instrument was signed and sealed on behalf of the [_____] by authority of its [_____] and that he/she acknowledged the instrument to be the free act and deed of the [_____].

      IN WITNESS WHEREOF, I have hereunto set my hand and official seal in the City of _____,_____, on the day and year first above written.


_____

Notary Public in and for the State of _____


*Signature Page to Acknowledgment*

STATE OF _____                    §
                                            §
COUNTY OF _____                      §


      On this ____ day of _____ 2012, before me appeared _____,
to me personally known, who being by me duly sworn (or affirmed) did say that he/she is the
_____, of Northstar Offshore Group, LLC, a Delaware limited liability
company, and that the instrument was signed and sealed on behalf of the limited liability
company by authority of its managers and that he/she acknowledged the instrument to be the free
act and deed of the limited liability company.

      IN WITNESS WHEREOF, I have hereunto set my hand and official seal in the
City of _____, _____, on the day and year first above written.


_____

Notary Public in and for the State of _____

*Signature Page to Acknowledgment*

# EXHIBIT A

## LEASES

**[NTD: To include final Exhibit A from PSA.]**

# EXHIBIT A-1

## WELLS

**[NTD: To include final Exhibit A-1 from PSA, without reference to NRI/WI information.]**

**EXHIBIT C**

**EXCLUDED ASSETS**


1. Any claims Seller may have related to the matters surrounding the Vessel/Dry Docked Wingwall (Named:  JMC-109) made subject to that proceeding entitled Cashman Equipment Corp. v. Rozel Operating Company, et al, Civil Action No. 3:2008-cv-00363, United States District Court, Middle District of Louisiana.

.

Exhibit C
HN\933868.19

# EXHIBIT D

## FORM OF ESCROW AGREEMENT

See attached.

HN\933868.19

## EXHIBIT D

### ESCROW AGREEMENT

This Escrow Agreement is entered into by and between Capital One, National Association (the "Escrow Agent"), a national banking association organized under the laws of the United States of America, Propel Energy, LLC, a Delaware limited liability company ("Propel"), J & S Program 2006 L.P., a Texas limited partnership ("J&S") and Madison, L.L.C., a Louisiana limited liability company (together with Propel and J&S, "Seller"), and Northstar Offshore Group, LLC, a Delaware limited liability company ("Buyer").

This Escrow Agreement is referred to in the Purchase and Sale Agreement of even date herewith ("Purchase Agreement") between Seller, Buyer and certain other parties described therein.

1. Escrow Agent shall establish an Escrow Account and Buyer shall deposit with Escrow Agent for placement in the Escrow Account $5,660,156.

2. Escrow Agent shall hold the funds in the Escrow Account and shall invest the funds held in the Escrow Account including, without limitation, any interest and earnings thereon (the "Escrow Funds") in the Fidelity U. S. Treasury Only Money Market Fund, #542 as hereby directed by the execution of this document. Amounts in such Mutual Funds are not deposits of or obligations of Escrow Agent nor are they insured or guaranteed by the FDIC or any other government agency. With the execution of this document, the parties acknowledge receipt of prospectuses and/or disclosure materials associated with the investment vehicle, either through means of hardcopy or via access to the website associated with the investment vehicle.

3. Escrow Agent shall hold the Escrow Funds in escrow until such Escrow Funds are released to either Buyer or Seller pursuant to and in accordance with this Escrow Agreement.

4. Each of Buyer and Seller acknowledges and understands that the Escrow Agent is required by Rule 14b-2(b)(4) of the Securities Exchange Act of 1934 to disclose the Buyer's and Seller's name, address, and securities position to requesting issuers unless directed otherwise by the undersigned. Each of Buyer and Seller hereby (check one)

   _____X_____   consents to disclosure

   _____   objects to disclosure

5. Escrow Agent for performing its obligations under the Escrow Agreement shall be entitled to an annual administration fee in accordance with the schedule attached as Exhibit A, plus reimbursement of reasonable attorney fees. The fees and expenses of the Escrow Agent shall be paid in full by Buyer.

6.     Escrow Funds shall be disbursed based on the joint written instructions of Buyer and Seller, signed by Buyer and Seller and substantially in the form attached hereto as <u>Exhibit B</u>. If, at any time, there shall exist any conflict, dispute or disagreement between, among or involving any of the parties with respect to the holding or distribution of any portion of the Escrow Funds, or a dispute, disagreement or reasonable uncertainty as to any other obligations of the Escrow Agent hereunder as to the distribution of any portion of the Escrow Funds, then the Escrow Agent shall make distributions of such Escrow Funds only (a) in accordance with the joint written instructions of Buyer and Seller or (b) in accordance with Section 17.

7.     The parties agree that the duties of Escrow Agent are only those specifically provided for herein, are purely ministerial in nature, and that so long as it has acted in good faith the Escrow Agent shall incur no liability whatsoever for any action taken or omitted by it, or any action suffered by it to be taken or omitted, except in the event of its willful misconduct or gross negligence.

8.     Subject to Section 7 above, the Escrow Agent may consult with counsel of its own choice and shall have full and complete authorization and protection for any action taken or suffered by it hereunder in good faith and in accordance with the opinion of such counsel.

9.     Buyer and Seller shall jointly and severally reimburse and indemnify the Escrow Agent for, and hold it harmless against, any and all reasonable loss, liability, costs or expenses in connection herewith (including, without limitation, fees, disbursements and other charges of counsel incurred by the Escrow Agent in any dispute, controversy, action or legal proceeding between it and one of the other parties hereto, or between it and a third party, or pursuant to Sections 6 and 17 hereof), incurred by the Escrow Agent arising out of or in connection with its acceptance of, or the performance of its duties and obligations under this Escrow Agreement (except those arising out of or in connection with Escrow Agent's willful misconduct, gross negligence or bad faith) as well as the reasonable costs and expenses of defending against any claim or liability arising out of or relating to this Escrow Agreement.

10.    The Escrow Agent shall have no liability for loss arising from any cause beyond its control, including, but not limited to, the following: (i) the act, failure or neglect of any agent or correspondent selected by the Escrow Agent or the parties hereto; (ii) any delay, error, omission or default connected with the remittance of funds not caused by the Escrow Agent; (iii) any delay, error or omission or default of any mail, telephone or wireless agency or operator; and (iv) the acts or edicts of any government or governmental agency or other group or entity exercising governmental powers.

11.    All of the terms and conditions in connection with the Escrow Agent's duties and responsibilities are contained in this instrument in the context of the Purchase Agreement between Buyer and Seller. The Escrow Agent is not expected or

required to be familiar with the provisions of the Purchase Agreement or any other instrument or agreement between Buyer and Seller or anyone else and shall not be charged with any responsibility or liability in connection with the observance or nonobservance by anyone of the provisions of any such instrument or agreement.

12.     The Escrow Agent shall have no duties or responsibilities other than those expressly set forth herein.  The Escrow Agent shall have no duty to enforce any obligation of any person to make any payment or delivery, or to direct or cause any payment or delivery to be made, or to enforce any obligation of any person to perform any other act.  The Escrow Agent shall be under no liability to the other parties hereto or to anyone else by reason of any failure on the part of any other party heretofore, any maker, guarantor, endorser or other signatory of any document or any other person to perform such person's obligations under any such document.

13.     The Escrow Agent may rely conclusively and shall be protected in acting upon any order, notice, demand, certificate, opinion of counsel, statement, instrument, report or other paper or other document (not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information contained therein), which is reasonably believed by the Escrow Agent to be genuine and to be signed or presented by the proper person or persons.

14.     The Escrow Agent shall not be responsible for the sufficiency or accuracy of the form of, or the execution, validity, value or genuineness of, any document or property received, held or delivered by it hereunder, or of any signature or endorsement thereon, or for any lack of endorsement thereon, or for any description therein; nor shall the Escrow Agent be responsible or liable to the other parties hereto or to anyone else in any respect on account of the identity, authority or rights of the persons executing or delivering or purporting to execute or deliver any document or property or this Escrow Agreement, in each case, except to the extent the foregoing is caused by the willful misconduct, gross negligence or bad faith of the Escrow Agent.  The Escrow Agent shall have no responsibility with respect to the use or application of any funds delivered by the Escrow Agent pursuant to the provisions hereof.  Except to the extent arising out of the Escrow Agent's willful misconduct, gross negligence or bad faith, the Escrow Agent shall not be liable to parties hereto or to anyone else for any loss which may be incurred by reason of any investment of any monies which it holds hereunder.

15.     This Escrow Agreement may not be modified, canceled, abrogated or rescinded without the written consent of all parties hereto.   Subject to Section 16, the Escrow Agent shall not be bound or in any way affected by any notice of any modification, cancellation, abrogation or rescission of this Escrow Agreement, or any fact or circumstances affecting or alleged to affect the rights or liabilities of any other person, unless the same shall be in writing and signed by all of the other

Capital One Confidential
HOU:0026048/00001:1638261v1
HN\942043.5

parties hereto and, if its duties as Escrow Agent hereunder are effected thereby, unless it shall have given prior written consent thereto.

16.    The Escrow Agent may resign for any reason upon twenty (20) days' written notice to Buyer and Seller specifying the date upon which such resignation shall take effect. In addition, Buyer and Seller, acting jointly, shall have the right to terminate the appointment of the Escrow Agent by giving it five (5) days' written notice of such termination, specifying the date upon which such termination shall take effect. In the event of the resignation or termination of the Escrow Agent, upon the expiration of such twenty (20) days' or five (5) days' notice, as applicable, the Escrow Agent may deliver all cash or property in its possession under this Escrow Agreement to any successor escrow agent or other person appointed by Buyer and Seller; or, if no successor escrow agent or person has been appointed, to any court of competent jurisdiction in Harris County, State of Texas. Upon either such delivery, the Escrow Agent's obligations hereunder with respect to the Escrow Funds shall cease and terminate and the Escrow Agent shall be released from any and all liability under this Escrow Agreement with respect to the Escrow Funds. A termination under this paragraph shall in no way change the terms of Section 9 affecting indemnification. The Escrow Agent's sole responsibility from the time of the expiration of the twenty (20) day or five (5) day, as applicable, notice periods set forth above in this paragraph until such delivery and termination shall be to keep safely the Escrow Funds and to deliver the same to a person designated by Buyer and Seller or in accordance with the directions of a final order or judgment of the court.

17.    In the event any conflict, disagreement or dispute arises between, among or involving any rights of the parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to the Escrow Agreement, or the Escrow Agent is uncertain as to its duties or rights hereunder or shall receive instructions from any party hereto with respect to the Escrow Funds which, in its reasonable opinion, are in conflict with any of the provisions of this Escrow Agreement or any instructions received from one of the other parties to this Escrow Agreement, the Escrow Agent shall be entitled to (i) refrain from taking any action other than to keep the Escrow Funds in question until such time as there has been a "final determination" of the rights of the applicable parties with respect to the Escrow Funds or (ii) deposit at any time the Escrow Funds into any court of competent jurisdiction and to commence an action in the nature of interpleader at the cost and expense of Buyer and Seller to adjudicate the parties' rights thereto and thereafter shall have no further obligations or liabilities to anyone under this Escrow Agreement. For purposes of this Section 17, there shall be deemed to have been a "final determination" of the rights of the applicable parties with respect to the Escrow Funds at such time as any of the applicable parties shall file with the Escrow Agent (i) an official certified copy of a court order, together with an opinion of counsel of the party filing the foregoing, in form and substance acceptable to the Escrow Agent and its counsel, stating that the court order is a final determination of the rights of the parties hereto with respect to the Escrow Funds in question, that the time to appeal from said court

order has expired, and that said court order is binding upon the applicable parties, or (ii) a fully executed agreement or consent by and among the applicable parties, which provides for disposition of the Escrow Funds in question.

18.    If the Escrow Agent becomes a party to any litigation or dispute by reason hereof, it is hereby authorized to deposit with the clerk of a court of competent jurisdiction any and all cash or other property held by it pursuant hereto and, thereupon, shall stand fully relieved and discharged of any further duties hereunder.  If the Escrow Agent is threatened to be made a party to litigation by reason hereof, it is authorized to interplead all interested parties in any court of competent jurisdiction and to deposit with the clerk of such court any cash, and all other property held by it pursuant hereto and, thereupon, shall stand fully relieved and discharged of any further duties hereunder in respect of the Escrow Funds and the matter(s) giving rise thereto.  Buyer and Seller hereby jointly and severally agree to reimburse Escrow Agent upon demand for any costs and expenses, including, but not limited to, counsel fees incurred in connection with any interpleader action commenced by Escrow Agent pursuant to this Section 18.

19.    Nothing contained herein shall be deemed to obligate the Escrow Agent to pay or transfer any monies hereunder unless and until such funds are received by the Escrow Agent.

20.    This Escrow Agreement shall terminate upon the earlier of the release of the Escrow Funds or the joint written instructions of Buyer and Seller.

21.    All notices, requests, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given when received and shall be hand delivered or sent by a nationally recognized courier service (receipt requested) or mailed by registered or certified mail, postage paid, return receipt requested and addressed:

To Escrow Agent:                Capital One, N.A.
Trust Department
201 St. Charles Avenue, 23rd Floor
New Orleans, LA  70170
Fax (504) 533-3447
Telephone (504) 533-3406

With a copy to
(which shall not constitute notice):    Capital One, N.A.
265 Broadhollow Road
Melville, New York 11747
Attention: Bank Legal Department

To Seller:                  Propel Energy, LLC
952 Echo Lane, Suite 250
Houston, Texas 77024

Attention: David E. Beck
Fax:  (713) 463-6505

J&S Program 2006, L.P.
16801 Greenspoint Park Drive
Suite 140
Houston, Texas 77060
Attention:  Ronnie Montgomery II
Fax:  (281) 453-8250

Madison, L.L.C.
100 Asma Blvd, Ste 110
Lafayette, LA 70508
Attention: C. William Rogers
Fax: (337) 237-4334

With a copy to
(which shall not constitute notice):    Natural Gas Partners
125 E.  John Carpenter Freeway,
Suite 600
Irving, Texas 75062
Attention:  Craig Glick
Fax:    (972) 432-1441

With an additional copy to
(which shall not constitute notice):    Latham & Watkins
811 Main Street, Suite 3700
Houston, Texas 77002
Attn:  Jeffrey Muñoz
Telephone:  (713) 546-7423
Fax:  (713) 546-5401
Email:  jeff.munoz@lw.com

Fishman Haygood Phelps
Walmsley Willis & Swanson, L.L.P.
201 St. Charles Ave., Suite 4600
New Orleans, Louisiana
Attention:  Scott Willis
Fax:  (504) 310-0264

To Buyer:  Northstar Offshore Group, LLC
11 Greenway Plaza, Suite 2800
Houston, Texas 77046
Attn:  Brian H. Macmillan, Senior Vice
President Land and Business Development
Telephone:  (713) 386-1046
Fax:    (713) 626-3444
email:  bmac@nstaroffshore.com

With a copy to
(which shall not constitute notice):  Natural Gas Partners
125 E. John Carpenter Freeway,
Suite 600
Irving, Texas 75062
Attn:  Christopher D. Ray
Fax:    (972) 432-1441
email:  cray@ngptrs.com

With an additional copy to
(which shall not constitute notice):  Locke Lord LLP
600 Travis Street, Suite 2800
Houston, TX 77002
Attention:  Mitch Tiras
Fax:  (713) 229-2674

Any party or parties to be notified or copied may change the address for notices or the person to whose attention notices are to be directed by written notice given to each other party (including parties to be copied) in the manner provided above.

22.    (a) The provisions of this Escrow Agreement, and all the rights and obligation of the parties hereunder, shall be governed by, and construed and enforced in accordance with the laws of the State of Texas applicable to agreements made and to be performed wholly within such state.

(b) The parties hereto hereby consent to the jurisdiction of any State or Federal Court located within Harris County, State of Texas and irrevocably agree that all actions or proceedings arising out of or relating to this Escrow Agreement shall be litigated in such courts. The parties hereto accept for each of itself and in connection with its properties, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts and waives any defense of forum non conveniens, and irrevocably agree to be bound by any judgment rendered thereby in connection with the Escrow Agreement. The parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Escrow Agreement.

23. The rights created by this Escrow Agreement shall inure to the benefit of, and the obligations related thereby shall be binding upon, the successors and assigns of the parties hereto.

24. Except as otherwise provided herein, no assignment or attempted assignment of this Escrow Agreement or any interest hereunder shall be effective without the written consent of Buyer and Seller and the Escrow Agent. Any assignment of rights or delegation of duties under this Escrow Agreement by a party hereto without the prior written consent of the other parties hereto, if such consent is required hereby, shall be void. Except as otherwise provided herein, the remedies provided herein will be cumulative and will not preclude the assertion by any of the parties hereto of any rights or the seeking of any other remedies against the other parties hereto.

25. Buyer and Seller represent and warrant to the Escrow Agent that (i) they are duly authorized to enter into this Escrow Agreement and the transactions contemplated hereunder, (ii) this Escrow Agreement is a valid and binding obligation and does not conflict with, violate or cause a default under any provisions of federal or state law or any order, decree, license, permit or the like or any other agreement or instrument to which they are a party or by which they are bound; and (iii) the officer or officers signing this Escrow Agreement on their behalf are duly authorized to do so.

26. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions, including Escrow Agent, to obtain, verify and record information that identifies each person/entity opening an account. For this account, Escrow Agent will need the principal name and address of each party, tax payer identification number, and other information, such as certified articles of incorporation, a government-issued business license, a partnership agreement, and annual report filed with the Secretary of State (or equivalent), or a trust agreement, that will allow the Escrow Agent to identify the parties to the Escrow.

27. This Escrow Agreement constitutes the entire understanding and agreement of the parties hereto with respect to the subject matter described herein and supersedes all prior agreements or understandings, written or oral, between the parties with respect thereto. This Escrow Agreement may be amended, waived, supplemented or otherwise modified only by a written instrument signed by all the parties hereto. The waiver by any party hereto of a breach of any provision of this Escrow Agreement shall not operate or be construed as a waiver of any subsequent breach.

28. Any provision of this Escrow Agreement that is prohibited or unenforceable in any jurisdiction shall not affect the validity or enforceability of any other provision in such jurisdiction or the validity or enforceability of such provision in any other jurisdiction.

29.     All exhibits attached to this Escrow Agreement are hereby incorporated and made a part of this Escrow Agreement.

30.     This Escrow Agreement may be executed and delivered in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.  The exchange of copies of this Escrow Agreement and of signature pages by facsimile or by electronic image scan transmission in .pdf format shall constitute effective execution and delivery of this Escrow Agreement as to Buyer and Seller and the Escrow Agent and may be used in lieu of the original Escrow Agreement for all purposes.  The Escrow Agent or any other party that delivers an executed counterpart signature page by facsimile or by electronic scan transmission in .pdf format shall promptly thereafter deliver a manually executed counterpart signature page to each of the other parties, as applicable; provided, however, that the failure to do so shall not affect the validity, enforceability, or binding effect of this Escrow Agreement.

*[Signature page to follow]*

Capital One Confidential
HOU:0026048/00001:1638261v1
HN\942043.5

This Escrow Agreement has been executed in counterparts by the parties hereto on and is in full force and effect as of September __, 2012.

**SELLER**:

PROPEL ENERGY, LLC

By: _____
Name:  William J. Scarff
Title:   President and CEO

J & S PROGRAM 2006, L.P.

By: _____
Name:  Ronnie Montgomery II
Title:   President

MADISON, L.L.C.

By: _____
Name: _____
Title: _____

**BUYER**:

NORTHSTAR OFFSHORE GROUP, LLC

By: _____
Name:  Brian H. Macmillan
Title:   Senior Vice President Land & Business
            Development

**ESCROW AGENT**:

CAPITAL ONE, NATIONAL ASSOCIATION

By: _____
Name: _____
Title: _____

## EXHIBIT A

See attached.

Capital One Confidential
HN\942043.5

**Exhibit A**

**Escrow Agent Fee**

**The Escrow Agent shall receive for its services under the aforementioned escrow agreement the following fees:**

ADMINISTRATION FEE:   $5,000.00
(Annually, or any part thereof)

TRANSACTIONAL FEE:   None anticipated, Included in the Administration Fee

1099 PREPARATION:   None anticipated

OUT-OF-POCKET
EXPENSES:   None are anticipated, but any reasonable expenses are assessable. All expenses of legal counsel are considered assessable unless incurred in defense of the Escrow Agent resulting from its own willful or gross negligence.

EXTRAORDINARY
SERVICES:   If services are required that are not set forth in the escrow agreement, additional fees will be charged based on the services required and responsibilities assumed.

The parties to the Escrow Agreement understand and agree that Escrow Agent may receive certain revenue on mutual fund investments.  Such revenue may take one of two forms:

Shareholder Servicing Payments: Escrow Agent may receive Shareholder Servicing Payments as compensation for providing certain services for the benefit of the money market fund company.   Shareholder Services typically provided by Capital One, N.A. include the maintenance of shareholder ownership records, distributing prospectuses and other shareholder information materials to investors and handling proxy voting materials.   Typically, Shareholder Servicing payments are paid under a money market fund's 12b-1 distribution plan and impact the investment performance of the Fund by the amount of the fee.   The Shareholder Servicing fee payable from any money market fund is detailed in the Fund's prospectus that will be provided to you.

Revenue Sharing Payments: Escrow Agent may receive revenue sharing payments from a money market fund company.   These payments represent a reallocation to Escrow Agent of a

portion of the compensation payable to the fund company in connection with your account's money market fund investment. Revenue Sharing payments constitute a form of fee sharing between the fund company and Escrow Agent and do not, as a general rule, result in any additional charge or expense in connection with a money market fund investment, are not paid under a 12b-1 plan, and do not impact the investment performance of the Fund. The amount of any revenue share, if any, payable to Escrow Agent with respect to your account is available upon request.

EXHIBIT B

**Joint Instruction Letter**

Capital One, National Association
[_____]
[_____]
Attention: [_____]

Re: Propel/Northstar Escrow

The undersigned hereby give notice (this "Joint Instruction Letter") pursuant to Section 6 of that certain Escrow Agreement (the "Escrow Agreement"), dated September [____], 2012, by and among Capital One, National Association, as escrow agent (the "Escrow Agent"), Propel Energy, LLC, a Delaware limited liability company ("Propel"), J & S Program 2006 L.P., a Texas limited partnership ("J&S") and Madison, L.L.C., a Louisiana limited liability company (together with Propel and J&S, "Seller"), and Northstar Offshore Group, LLC, a Delaware limited liability company ("Buyer"), and direct the Escrow Agent to disburse the amount(s) set forth below and in the manner set forth below.  Capitalized terms used but not defined in this Joint Instruction Letter shall have the meanings ascribed thereto in the Escrow Agreement.

### Disbursement to Propel Energy, LLC

Disbursement Amount:        [_____]

Wiring Instructions:        Bank of Houston
                            ABA # 113025147
                            Acct. # 225052
                            Reference:  Northstar

### Disbursement to ACOGIF LLC:

Disbursement Amount:        [_____]

Wiring Instructions:        Citibank, N.A. NYC
                            ABA #021000089
                            Acct: #40553953
                            Reference: Schwab Acct: #61867500

### Disbursement to Minghung Exploration LLC:

Disbursement Amount:        [_____]

Wiring Instructions:        Citibank NA NYC
                            ABA #021000089
                            Acct: #40553953

Reference: Schwab Acct: #34264297

**Disbursement to J & S Program 2006 L.P.:**

Disbursement Amount:          [_____]

Wiring Instructions:          Post Oak Bank
                              ABA #113024957
                              Acct #00000411900
                              Contact: Kris Lyons (713-439-3932)
                              Reference: Northstar

**Disbursement to J & S 2008 Program, L.L.C.:**

Disbursement Amount:          [_____]

Wiring Instructions:          Post Oak Bank
                              ABA #113024957
                              Acct #015693
                              Contact: Kris Lyons (713-439-3932)
                              Reference: Northstar

**Disbursement to J & S Oil & Gas Management, Ltd.:**

Disbursement Amount:          [_____]

Wiring Instructions:          Post Oak Bank
                              ABA #113024957
                              Acct #00000383000
                              Contact: Kris Lyons (713-439-3932)
                              Reference: Northstar

**Disbursement to J & S Oil & Gas, LLC:**

Disbursement Amount:          [_____]

Wiring Instructions:          Post Oak Bank
                              ABA #113024957
                              Acct #0000073700
                              Contact: Kris Lyons (713-439-3932)
                              Reference: Northstar

**Disbursement to Lewiston Atlas, Ltd.:**

Disbursement Amount:    [_____]

Wiring Instructions:    Bank of America, N.Aa
ABA #026009593
Acct #004774449977
Reference: Northstar

### Disbursement to Madison, L.L.C.:

Disbursement Amount:    [_____]

Wiring Instructions:    JP Morgan Chase Bank NA
ABA #021000021
Acct #703751297
Reference: Northstar

### Disbursement to Deep South Energy, Inc.:

Disbursement Amount:    [_____]

Wiring Instructions:    Home Bank
ABA #265270303
Acct #2053675102
Reference: Northstar

### Disbursement to Stokes & Spiehler Properties, Inc.:

Disbursement Amount:    [_____]

Wiring Instructions:    Whitney Bank
ABA #065400153
Acct #716213915
Reference: Northstar

### Disbursement to Buyer:

Disbursement Amount:    [_____]

Wiring Instructions:    [_____]

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have caused this Joint Instruction Letter to be executed and delivered on this [____] day of [_____], 20[___]

**SELLER**:

PROPEL ENERGY, LLC

By: _____
Name: _____
Title: _____

J & S PROGRAM 2006, L.P.

By: _____
Name: _____
Title: _____

MADISON, L.L.C.

By: _____
Name: _____
Title: _____

**BUYER**:

NORTHSTAR OFFSHORE GROUP, LLC

By: _____
Name: _____
Title: _____

# EXHIBIT E

## LIST OF ADDITIONAL SELLERS

1. J & S Program 2006 L.P., a Texas limited partnership

2. J & S 2008 Program, L.L.C., a Texas limited liability company

3. J & S Oil & Gas Management, Ltd., a Texas limited partnership

4. J & S Oil & Gas, LLC, a Texas limited liability company

5. ACOGIF LLC, a Texas limited liability company

6. Deep South Energy, Inc., a Louisiana corporation

7. Lewiston Atlas, Ltd., a Texas limited partnership

8. Madison, L.L.C., a Louisiana limited liability company

9. Minghung Exploration LLC, a Texas limited liability company

10. Stokes & Spiehler Properties, Inc., Louisiana corporation

HN\933868.19

# EXHIBIT F

## OWNERSHIP INTEREST AMONG SELLER

| Seller | Net Revenue Interest | Working Interest |
|---|---|---|
| J & S Program 2006 L.P. | 0.15466875 | 0.2118750 |
| J & S 2008 Program, L.L.C. | 0.09855021 | 0.1350000 |
| J & S Oil & Gas Management, Ltd. | 0.02281250 | 0.0312500 |
| J & S Oil & Gas, LLC | 0.02281250 | 0.0312500 |
| ACOGIF LLC | 0.00486669 | 0.0066667 |
| Deep South Energy, Inc. | 0.00365000 | 0.0050000 |
| Lewiston Atlas, Ltd. | 0.07300000 | 0.1000000 |
| Madison, L.L.C. | 0.07117500 | 0.0975000 |
| Minghung Exploration LLC | 0.00608310 | 0.0083333 |
| Propel Energy LLC | 0.25550000 | 0.3500000 |
| Stokes & Spiehler Properties, Inc. | 0.00547500 | 0.0075000 |
| **Totals:** | **0.71859375** | **0.9843750** |

HN\933868.19

## DISCLOSURE SCHEDULES

Inclusion of a matter on a Schedule to this Agreement in relation to a representation or warranty which addresses matters having a Material Adverse Effect shall not be deemed an indication that such matter does or does not, or may or may not, have a Material Adverse Effect. Likewise, the inclusion of a matter on a Schedule to this Agreement in relation to a representation or warranty shall not be deemed an indication that such matter necessarily would or would not, or may or may not, breach such representation or warranty absent its inclusion on such Schedule. Matters reflected in the Schedules to this Agreement, including specifications of the Assets, are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for information purposes only, do not necessarily include other matters of a similar nature, and shall not expand the scope of the representations and warranties set forth in this Agreement.

Any fact or item which is clearly and conspicuously disclosed on any Schedule to this Agreement in such a way as to make its relevance or applicability to information called for by another Schedule or other Schedules to this Agreement reasonably apparent shall be deemed to be disclosed on such other Schedule or Schedules, as the case may be, notwithstanding the omission of a reference or cross-reference thereto.

Each of the Schedules to this Agreement is qualified in its entirety by reference to specific provisions of this Agreement, and is not intended to constitute, and shall not be construed as constituting, representations or warranties of Seller, except as and to the extent provided in this Agreement.

HN\933868.19

**Schedule 3.8**

**Allocated Values**

| State Lease | Allocated Value ($) |
|:---:|:---:|
| 19190 | 4,740,087 |
| 18423 | 12,242,283 |
| 20473* | 9,543,701 |
| 19031 | 3,975,278 |
| 18521 | 77,677,592 |
| 18524 | 3,024,185 |
| 19192 | 2,000,000 |
| **TOTAL:** | 113,203,125 |

Disclosure Schedules

## Schedule 4.4

## Consents

1) Crude Oil Purchase Contract (Contract No. 7554-1001) dated June 11, 2008, by and between Forza Operating, LLC and Plains Marketing, L.P., as thereafter amended; and

2) Base Contract for Sale and Purchase of Natural Gas dated October 20, 2011, by and between Samsung Oil & Gas USA Corp. and Forza Operating, LLC

HN\933868.19

**Schedule 4.7**

**Litigation**

1.      Vessel / Dry Docked Wingwall (Named:  JMC-109) made subject to that proceeding entitled Cashman Equipment Corp. v. Rozel Operating Company, et al, Civil Action No. 3:2008-cv-00363, United States District Court, Middle District of Louisiana.

HN\933868.19

**Schedule 4.8**

**Material Contracts**

1.  Joint Operating Agreement dated December 22, 2005, by and between Rozel Operating Company, as Operator, and Madison, L.L.C., Lewiston Atlas, Ltd., J & S Oil & Gas, LLC and Browning Oil Company, as Non-Operators;

2.  Participation Agreement dated December 22, 2005 and January 12, 2006, by and between Madison, L.L.C., et al;

3.  Bill of Sale of SL 2760 A-5 Well and Associated Pipeline and Onshore Facilities by and between Burlington Resources Oil & Gas Company LP and Burlington Resources Offshore Inc., as Assignors, to Rozel Operating Company, as Assignee, recorded under Entry No. 299818, Records of Cameron Parish, Louisiana;

4.  Assignment and Bill of Sale dated effective January 1, 2008, by and between Callon Petroleum Operating Company, et al, as Assignors, and Lewiston Atlas, Ltd., et al, as Assignees, recorded March 14, 2008 under Entry No. 309786, Records of Cameron Parish, Louisiana;

5.  Voluntary Unit Agreement dated May 14, 2008, by and between Madison, L.L.C., et al, and the State of Louisiana, through the State Mineral Board, recorded June 11, 2008 under Entry No. 311326, Records of Cameron Parish, Louisiana, as amended by act dated February 18, 2009, recorded April 1, 2009 under Entry No. 314885, Records of Cameron Parish, Louisiana, as amended by act dated December 12, 2011, recorded January 26, 2012 under Entry No. 325006, Records of Cameron Parish, Louisiana;

6.  Crude Oil Purchase Contract (Contract No. 7554-1001) dated June 11, 2008, by and between Forza Operating, LLC and Plains Marketing, L.P., as thereafter amended;

7.  Base Contract for Sale and Purchase of Natural Gas dated October 20, 2011, by and between Samsung Oil & Gas USA Corp. and Forza Operating, LLC; and

8.  Master Compression Services Agreement dated May 31, 2011, by and between EXLP Operating LLC thru its Member Manager, Exterran Partners, L.P., and Forza Operating, LLC; and as thereafter amended; and

9.  Maritime Employment Agreement (pumper contract) dated March 1, 2011, by and between Forza Operating, LLC and Quality Companies USA, LLC, et al; and

10. Brokerage Agreement (Bareboat Charter Agreement) dated June 1, 2012 by and between Stagg Marine Transportation, LLC and Forza Operating, LLC; and

HN\933868.19

11.    Rental Agreement dated August 1, 2010 by and between Wilma Picou and Forza
       Operating, LLC.


**END OF SCHEDULE 4.8**

HN\933868.19

**Schedule 4.9**

**Violation of Laws**

None.

**Schedule 4.10**

**Preferential Rights**

None.

HN\933868.19

**Schedule 4.13**

**Current Commitments**

None.

HN\933868.19

**Schedule 4.14**

**Environmental**

A 10" pipeline oil spill that occurred in June 2011 is currently being monitored for any additional remediation that may be needed and for any additional issues that may occur.  All work has been done in conjunction with the approval of the Department of Environmental Quality of the State of Louisiana and the Louisiana Oil Spill Coordinator's Office.  The pipeline has been replaced with new 10" and 6" lines.

HN\933868.19

**Schedule 4.15**

**Production Taxes**

None.

HN\933868.19

**Schedule 4.16**

**Take-or-Pay Arrangements**

None.

**Schedule 4.17**

**Property Leases**

See Exhibit A-2 and Schedule 4.8.

**Schedule 4.19**

**Liabilities**

None.

**Schedule 4.21**

**Plugging and Abandonment**

None.

**Schedule 4.22**

**Credit Support**

<u>Forza Operating LLC Bonds</u>

1. Operator's Financial Assurance Bond with the State of Louisiana (LAC 43:XIX.104):

   a. Financial Security Bond: Letter of Credit No. 47, in the amount of $250,000; wells covered by the bond: Creole Field, Cameron Parish, Louisiana, less the VUB; SL 18521 #8 (Serial #244198) & #8D (Serial #245227)

   b. Financial Security Bond: Letter of Credit No. 69, in the amount of $250,000; amended to cover the VUB; SL 18521 #8 (Serial #244198) & #8D (Serial #245227), Creole Field, Cameron Parish, Louisiana

2. Surety Bond Road Bond (for traveling parish roads) with the Cameron Parish Police Jury dated July 24, 2012, in the amount of $54,352.00, relative to the drilling of the Wilma Picou SWD #1 Well, Creole Field, Cameron Parish, Louisiana and the use of Trosclair Rd, Creole, Louisiana.

HN\933868.19

**Schedule 6.1**

**Conduct of Business**

None.

## Schedule 6.6

## Guarantees

1. Performance Bond by and between Rozel Operating Company, as Principal, RLI Insurance Company, as Surety, and Burlington Resources Oil & Gas Company LP and Burlington Resources Offshore Inc., as Obligee, dated August 15, 2006, in the amount of $250,000.00.

HN\933868.19

## Schedule 9.3(i)

## Seller Mortgages

**A.** **Schedule of mortgages to be released**

1. Act of Mortgage, Assignment of Production, Security Agreement and Financing Statement dated June 29, 2007 from J & S Oil & Gas, LLC to Whitney National Bank, recorded July 19, 2007 under File No. 305596 of the conveyance and mortgage records of Cameron Parish, Louisiana;

   (i) *assigned by* Assignment of Notes, Liens, Security Interests and Other Rights dated February 4, 2011 by Whitney National Bank as assignor, DB Energy Trading LLC as assignee, and J & S Program 2006 L.P. and J & S Oil and Gas LLC as debtors, filed February 14, 2011 under File No. 321675 of the conveyance records of Cameron Parish, Louisiana; and

   (ii) *amended and restated by* Act of Amended and Restated Mortgage, Assignment of Production, Security Agreement, Fixture Filing and Financing Statement dated February 4, 2011 by J & S Program 2006 L.P. and J & S Oil and Gas LLC as mortgagors and debtors and DB Energy Trading LLC as mortgagee and secured party, recorded February 14, 2011 under File No. 321679 of the mortgage records of Cameron Parish, Louisiana.

2. Mortgage, Collateral Assignment, Security Agreement and Financing Statement dated October 4, 2007 from Madison, L.L.C. to JPMorgan Chase Bank, N.A., recorded October 9, 2008 under File No. 307107 of the mortgage records of Cameron Parish, Louisiana;

   (i) *partially released by* Request to Cancel dated February 7, 2011 by JPMorgan Chase Bank, N.A. (with attached Act of Partial Release dated February 4, 2011 by JPMorgan Chase Bank, N.A. and Madison, L.L.C.), recorded February 7, 2011 under File No. 321595 of the mortgage records of Cameron Parish, Louisiana; and

   (ii) *amended by* First Amendment to Mortgage, Collateral Assignment, Security Agreement and Financing Statement dated February 4, 2011 by Madison, L.L.C. and JPMorgan Chase Bank, N.A., recorded February 9, 2011 under File No. 321630 of the mortgage records of Cameron Parish, Louisiana.

3. Act of Mortgage, Assignment of Production, Security Agreement, Fixture Filing and Financing Statement dated March 29, 2011 by J & S 2008 Program, L.L.C. as mortgagor and debtor and DB Energy Trading LLC as mortgagee and secured party, recorded April 4, 2011 under File No. 322137 of the mortgage records of Cameron Parish, Louisiana;

   (i) *partially released by* Request for Partial Cancellation dated December 29, 2011 by DB Energy Trading LLC (with attached Partial Release of Liens and Security Interest and Reconveyance dated effective December 1, 2011 by DB Energy

Trading LLC), recorded February 14, 2012 under File No. 325178 of the mortgage records of Cameron Parish, Louisiana.

**B.**   **Schedule of financing statements to be terminated**

1.   UCC-1 financing statement by J & S Oil & Gas, LLC as debtor and Whitney National Bank as secured party, filed July 19, 2007 under UCC File No. 12-305597 of the UCC-1 records of Cameron Parish, Louisiana;

  (i)   *assigned by* UCC-3 assignment from Whitney National Bank to DB Energy Trading LLC, filed February 14, 2011 under UCC File Nos. 12-321673 and 12-321674A of the UCC-3 records of Cameron Parish, Louisiana; and

  (ii)   *amended by* UCC-3 amendment restating collateral, filed February 14, 2011 under UCC File No. 12-321674 of the UCC-3 records of Cameron Parish, Louisiana.

2.   UCC-1 financing statement by Madison, L.L.C. as debtor and JPMorgan Chase Bank, N.A. as secured party, filed October 5, 2007 under UCC File No. 28-431601 of the UCC records of Lafayette Parish, Louisiana;

  (i)   *amended by* UCC-3 amendment partially releasing collateral, filed February 7, 2011 under UCC File No. 28-450867 of the UCC records of Lafayette Parish, Louisiana;

  (ii)   *amended by* UCC-3 amendment adding collateral, filed February 8, 2011 under UCC File No. 28-450895 of the UCC records of Lafayette Parish, Louisiana;

  (iii)   *continued by* UCC-3 continuation statement, filed June 5, 2012 under UCC File No. 28-459939 of the UCC records of Lafayette Parish, Louisiana; and

  (iv)   *amended by* UCC-3 amendment changing address of secured party, filed July 17, 2012 under UCC File No. 28-460682 of the UCC records of Lafayette Parish, Louisiana.

3.   UCC-1 financing statement by Madison, L.L.C. as debtor and JPMorgan Chase Bank, N.A. as secured party, filed October 5, 2007 under UCC File No. 28-431610 of the UCC records of Lafayette Parish, Louisiana;

  (i)   *continued by* UCC-3 continuation statement, filed June 5, 2012 under UCC File No. 28-459940 of the UCC records of Lafayette Parish, Louisiana; and

  (ii)   *amended by* UCC-3 amendment changing address of secured party, filed September 4, 2012 under UCC File No. 28-461509 of the UCC records of Lafayette Parish, Louisiana.

HN\933868.19

4.     UCC-1 financing statement by J & S 2008 Program, L.L.C. as debtor and DB Energy Trading LLC as secured party, filed April 4, 2011 under UCC File No. 55-1370772 in the UCC records of Terrebonne Parish, Louisiana.

   (i)     amended by UCC 3 amendment deleting certain collateral, filed February 14, 2012 under UCC File No. 55-1392565 of the UCC records of Terrebonne Parish, Louisiana.

**C.     Schedule of previously-released mortgage for which a Supplement of Release (reconveying certain collateral to Mortgagor and its successors and assigns) needs to be recorded in the conveyance records of Cameron Parish, Louisiana.**

1.     Mortgage, Collateral Assignment, Security Agreement and Financing Statement dated August 8, 2007 from Lewiston Atlas, Ltd. to Rogers Grandchildren Trust for the Children of Laura Rogers Braun *et al.*, recorded August 22, 2007 under File No. 306322 of the Cameron Parish conveyance and mortgage records;

   (i)     *released by* Request for Cancellation dated February 2, 2011 by Matthew Rogers as trustee for Rogers Grandchildren Trust for the Children of Laura Rogers Braun, Rogers Grandchildren Trust for the Children of Leslie Rogers Stanke and Rogers Grandchildren Trust for the Children of W. Yandell Rogers, III, recorded February 7, 2011 under File No. 321599 of the mortgage records of Cameron Parish, Louisiana.

2.     Mortgage, Collateral Assignment, Security Agreement and Financing Statement dated August 1, 2008 from Stokes & Spiehler Properties, Inc. to Bruce M. Jordan and Sandra Schleif Jordan, recorded January 21, 2009 under File No. 313971 of the conveyance and mortgage records of Cameron Parish, Louisiana;

   (i)     *released by* Request for Cancellation dated February 3, 2011 by Bruce M. Jordan and Sandra Schleif Jordan, recorded February 7, 2011 under File No. 321598 of the mortgage records of Cameron Parish, Louisiana.

[End of Schedule]

## Schedule 13.1

## Retained Litigation

1.　　Vessel / Dry Docked Wingwall (Named:  JMC-109) made subject to that proceeding entitled Cashman Equipment Corp. v. Rozel Operating Company, et al, Civil Action No. 3:2008-cv-00363, United States District Court, Middle District of Louisiana.