IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 16-34028 |
| | § | |
| NORTHSTAR OFFSHORE GROUP LLC, | § | |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |
| JAMES KATCHADURIAN, Litigation Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 18-03079 |
| | § | |
| NGP ENERGY CAPITAL MANAGEMENT, | § | |
| L.L.C., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**TRUSTEE'S CONSOLIDATED OPPOSITION TO
MOTIONS FOR PARTIAL DISMISSAL (Dkts. 90 & 91)**

NORTON ROSE FULBRIGHT US LLP
Bob B. Bruner
State Bar No. 24062637
bob.bruner@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, Texas 77010
(713) 651-5151

YETTER COLEMAN LLP
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Tracy N. Leroy
State Bar No. 24062847
tleroy@yettercoleman.com
Wyatt J. Dowling
State Bar No. 24074152
wdowling@yettercoleman.com
Elizabeth A. Wyman
State Bar No. 24088688
ewyman@yettercoleman.com
811 Main, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR PLAINTIFF
LITIGATION TRUSTEE

# TABLE OF CONTENTS

I.     Overview and Summary .................................................................................. 1

II.    Factual and Procedural Background ............................................................. 4

    A.    The Parties ...................................................................................... 4

    B.    Actions giving rise to the claims.................................................... 5

        1.    Defendants conspire to cause Northstar to overpay for NGP assets........... 5

        2.    Defendants saddle Northstar with $120 million in debt. ........................... 5

        3.    In selling Northstar, Defendants were to pay its debt and capital deficit. .................................................................................. 6

        4.    Northstar goes into bankruptcy after Defendants breach their duties. ........................................................................................ 6

    C.    Procedural Posture of this Litigation .............................................. 7

    D.    Governing Legal Standards.............................................................. 9

III.   Argument and Authorities............................................................................. 9

    A.    Defendants continue to rely improperly on outside documents............................. 9

    B.    NGP's Motion repeats rejected arguments as to NGP Capital and NGP Parallel Fund. ................................................................................ 11

    C.    The Complaint states valid fraudulent-transfer claims relating to Propel. ........... 12

        1.    The allegations concerning the Propel overpayment are plausible........... 12

        2.    The Complaint adequately pleads TUFTA and Bankruptcy Code claims. ...................................................................................... 15

    D.    The actual fraudulent-transfer claims are sufficiently pleaded............................ 18

    E.    The Trustee is not pursuing a §548 claim as to the Propel overpayment. ............ 21

    F.    The Complaint states a claim for breach of the duty of loyalty as to Propel. ........ 21

    G.    Plaintiff can amend if the Court requests........................................... 23

Conclusion ................................................................................................................ 24

Certificate of Service ............................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*122261 Fondren, LLC v. Riverbank Realty GP*,
  2010 WL 1741071 (S.D. Tex. 2010) ........................................................9

*In re Am. Ambulette & Ambulance Serv., Inc.*,
  560 B.R. 256 (Bankr. E.D.N.C. 2016)...........................................16, 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................14

*In re B.S. Livingston & Co.*,
  186 B.R. 841 (D.N.J. 1995) .........................................................16

*Bank of Am., N.A. v. Fulcrum Enters., LLC*,
  20 F. Supp. 3d 594 (S.D. Tex. 2014) ...........................................19

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................9

*Boyer v. Belavilas*,
  474 F.3d 375 (7th Cir. 2007) ......................................................16

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
  394 F.3d 285 (5th Cir. 2004) ........................................................9

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ........................................................9

*In re Compton Corp.*,
  831 F.2d 586 (5th Cir. 1987) ......................................................16

*Hall v. Louisiana*,
  2014 WL 1431671 (M.D. La. 2014)........................................12, 13

*In re Hechinger Inv. Co. of Del.*,
  327 B.R. 537 (D. Del. 2005)........................................................19

*In re Hessco Indust., Inc.*,
  295 B.R. 372 (9th Cir. BAP 2003)...............................................16

*Janvey v. Libyan Invest. Auth.*,
  840 F.3d 248 (5th Cir. 2016) .................................................16, 17

*Jolly v. Klein*,
    923 F. Supp. 931 (S.D. Tex. 1996) ........................................................................9

*Midwest Feeders, Inc. v. Bank of Franklin*,
    886 F.3d 507 (5th Cir. 2018) ................................................................................9

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ................................................................................9

*In re RFC & Rescap Liquidating Trust Litig.*,
    2017 WL 1483374 (D. Minn. 2017) ................................................................16, 18

*In re Syntax-Brillian Corp.*,
    2016 WL 1165634 (Bankr. D. Del. 2016) ..........................................................19

**State Cases**

*Citizens Nat'l Bk. of Tex. v. NXS Constr., Inc.*,
    387 S.W.3d 74 (Tex. App.—Houston [14th Dist.] 2012, no pet.)....................16, 17

*Esse v. Empire Energy III, Ltd.*,
    333 S.W.3d 166 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).............16, 17

*Orman v. Cullman*,
    794 A.2d 5 (Del. Ch. 2002).................................................................................22

**Federal Statutes**

11 U.S.C. § 544(b) ..........................................................................................................7

11 U.S.C. § 548(a)(1).................................................................................... 7, 12, 18-21

**State Statutes**

Tex. Bus. & Com. Code § 24.002(7) ............................................................................19

Tex. Bus. & Com. Code § 24.005................................................................................18, 19

Tex. Bus. & Com Code § 24.006(b) ...............................................................................7

**Rules**

Fed. R. Bankr. P.7005.....................................................................................................25

Fed. R. Civ. P. 12(b)(6)...........................................................................................3, 9, 10

# I.    OVERVIEW AND SUMMARY

Through counsel, James Katchadurian ("Trustee"), the Trustee of the Northstar Litigation Trust ("Trust"), respectfully opposes Defendants' motions for partial dismissal ("Motions") of the Trustee's First Amended Complaint ("Complaint"). *See* Dkts. 90 & 91.[1]

The Trustee seeks to recover for contract breaches, fiduciary breaches, fraudulent transfers, and losses suffered by Northstar Offshore Group, L.L.C. ("Northstar"), which was forced into bankruptcy in 2016. Beginning in 2012, NGP used its control over Northstar's board of managers ("Board") to cause Northstar to significantly overpay for assets purchased from another NGP affiliate and portfolio company, Propel Energy, L.L.C. ("Propel"), and to prevent Northstar from exercising rights to millions in capital calls from Defendants. With Northstar in financial straits, Defendants arranged its sale to a subsidiary of Platinum Partners, a bankrupt Ponzi scheme. Before closing, defendant NGP-NOG promised to "eliminate" Northstar's $140 million in bank debt and working capital deficit through a combination of proceeds from the Platinum sale and NGP-NOG's own funds. It promised to do so in exchange for taking a valuable net profits interest in Northstar's most promising oil and gas fields. Instead, NGP-NOG reneged. It took the profits interest and then breached its contract and left Northstar with a $15 million working capital deficit. As a result,

---

[1]    "**Defendants**" refers to NGP Energy Capital Mgmt., L.L.C. ("NGP Capital"), NGP X US Holdings L.P. ("NGP X US"), NGP Natural Resources X, L.P. ("NGP X"), NGP X Parallel Holdings, L.P. ("NGP Parallel"), NGP Natural Resources X Parallel Fund, L.P. ("NGP Parallel Fund"), NOG Royalty Holdings, L.P. ("NGP-NOG") (collectively, "**NGP**"); Tomas Ackerman, David Albin, Jesse Bomer, David Hayes, and Christopher Ray (collectively, "**NGP Directors**"); and Glynn Roberts, Gaylon Freeman, Mark Stevens, and James Ulm (collectively, "**Northstar Directors**"). In their original motion to dismiss, NGP and NGP Directors referred to NGP defendants as "Entity Movants" and NGP Director defendants as "Individual Movants," Dkt. 19 at 1, but changed those references to "Entity TK Defendants" and "Individual TK Defendants" in their pending Motion. Dkt. 91 at 1. This Opposition follows the Complaint and the Court's Memorandum Opinion in referring to the defendant groups as "NGP," "NGP Directors," and "Northstar Directors." All emphasis in this brief is added by plaintiff, unless otherwise noted.

Northstar suffered millions in losses when it was forced to unwind prematurely a commodity hedge to pay vendors and ultimately to enter bankruptcy.

In 2018, Defendants moved to dismiss the Complaint in its entirety, asserting dozens of arguments and relying on hundreds of pages of extraneous documents attached to the motions as exhibits. *See* Dkts. 19, 23. At the same time, they secured a stay of all discovery, claiming that their motions to dismiss involved "purely legal issues" and could be decided "on the face of the pleadings without any need for discovery." Dkt. 30 (Mot. to Stay ¶1, ¶5).

The Court's recent Memorandum Opinion and Order (Dkts. 74-75) largely rejected Defendants' arguments, including efforts to avoid the standard of review by attaching documents to the motions not referenced in the Complaint or central to any claim. *See, e.g.*, Dkt. 74 (Mem. Op.) at 22 (noting that the Court "cannot properly consider" an assignment attached to the motions and "remains puzzled as to why this is not more appropriate to consider at summary judgment").

The Court further permitted the Trustee to amend as to certain issues, primarily related to additional allegations of insolvency and control that were previewed in responsive briefing and orally at the prior motion to dismiss hearing, and reserved ruling on limited issues relating to the amendments. *See id.* at 46 (reserving ruling on whether NGP benefited from the alleged fraudulent transfers, pending amendments on the issues of control and director independence), 53 (reserving ruling on the "why" of fraud for purposes of the actual fraudulent-transfer claims), 63 (reserving ruling on issue of control for purposes of the breach of loyalty claim). Regarding all other arguments in the motions to dismiss, the Court ruled that "[a]ll other relief . . . is denied." Dkt. 75 (Order). On June 9, 2020, the Trustee filed his First Amended Complaint, supplementing allegations related to insolvency and control, consistent with the Court's direction.

Despite these rulings and clear instruction that the Court cannot consider matters outside

the pleadings on a Rule 12(b)(6) motion, the present Motions reflect Defendants' same strategy to rely on documents outside the pleadings to avoid the standard of review and simply re-urge arguments this Court has already rejected or determined would be subsumed by sufficient allegations of control.

The Motions seek dismissal of all claims relating to Northstar's 2012 overpayment to Propel, which involved NGP's misuse of control to inflate Northstar's preferred bid ($80 million) to the NGP affiliate by *40%* (to over $113 million), even though the next-highest bidder was tens of millions of dollars lower. 1st Am. Compl. ¶41. The Complaint's allegations of controlling owners and interested board members misusing control to enrich an affiliate and themselves, at Northstar's and its creditors' expense, are more than sufficient at the pleadings stage. Nonetheless, the Motions' strategy is to attach yet more documents outside the pleadings—like a purchase and sale contract ("PSA") for the Propel asset purchase, which lists a working-interest percentage of Propel—to argue that claims of overpayment are "implausible" and that Defendants had no "financial incentive" to coerce an overpayment. Dkt. 90 at 3, 5-6; Dkt. 91 at 2-4.

In seeking to incorporate the PSA, Defendants "attempt[] to add to or contradict the facts pleaded by the plaintiff in order to support a motion to dismiss," which of course is improper. *See* Dkt. 74 (Mem. Op.) at 23 (quoting *Kaye v. Lone Star Fund V (U.S.) L.P.*, 453 B.R. 645, 662-63 (N.D. Tex. 2011)). In any event, even accepting as true the *defense* allegations—which is the opposite of the Rule 12(b)(6) standard—the Complaint has ample allegations of Defendants' financial interest in boosting the returns of one NGP portfolio company (Propel) at the expense of another (Northstar), regardless of NGP's ownership levels in the assets sold.

The Motions' other arguments generally repeat those made and rejected by the Court in the initial motions. As set forth in the Trustee's motion to lift the stay of discovery (Dkt. 95), this case

has been stayed for nearly two years and should proceed to discovery in the interests of Northstar's creditors. The Trustee respectfully requests that the Court reject Defendants' attempt to introduce yet more delay and deny the Motions.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

While the Court is familiar with the issues and allegations surrounding Northstar, the Trustee provides the following background for the Court's convenience.

### A.   The Parties

Northstar was a Houston-based oil and gas exploration and production company. On August 12, 2016, creditors filed an involuntary Chapter 11 bankruptcy petition against it here. 1st Am. Compl. ¶31. Northstar filed a voluntary Chapter 11 petition on December 2, 2016. *Id.* On November 22, 2017, it filed its Second Amended Plan of Liquidation. *Id.* ¶32. The next month, the Court approved the Plan. *Id.* The Plan and Confirmation Order established the Trust and appointed James Katchadurian as Litigation Trustee to pursue claims, including the claims set forth in the Complaint, on behalf of the Trust. *Id.* ¶15, ¶33.

NGP is a multi-billion-dollar private equity fund that invests in the energy industry through affiliates like certain defendants in this case and Propel, which sold assets to Northstar in 2012. *Id.* ¶2, ¶40. In the past, NGP has partnered with Northstar executives in lucrative oil and gas investments. Together they sold two prior ventures for a combined $480 million. *Id.* ¶¶2, 35-36. Northstar was the third investment by NGP with the Northstar executive team. *Id.* ¶3. It was a closely held company that was majority owned by NGP X US and NGP-NOG. *Id.* ¶5, ¶38. Through these affiliates, NGP owned the vast majority of Northstar (87%). *Id.*

Northstar's Board was formed in 2012. *Id.* ¶39. NGP controlled Northstar through NGP's control of the Board. *Id.* ¶3, ¶39. Five of the Board's nine directors were current and senior NGP employees: defendants Ackerman, Albin, Bomer, Hays, and Ray. *Id.* ¶¶3-4. The other directors—

defendants Roberts, Freeman, Stevens, and Ulm—were senior Northstar executives. *Id.* ¶3, ¶73.

**B.     Actions giving rise to the claims**

Defendants' manipulations to benefit NGP and themselves began shortly after Northstar was created, giving rise to the claims in the Complaint.

**1.      Defendants conspire to cause Northstar to overpay for NGP assets.**

Most relevant to the Motions, NGP used its control of the Board in 2012 to grossly overpay for assets owned by NGP-affiliate and portfolio company Propel. *Id.* ¶40. The assets included oil and gas leases and wells in an area of the Gulf known as the Creole Field. *Id.* Of Propel's three "governing persons," two were NGP employees working in the same Houston office of NGP, including defendant Ackerman, who was also on Northstar's Board. Ex. 1 (10/12/10 Appl. for Registr. of Propel) at 2.

Initially, Northstar proposed offering Propel $80 million for the Creole assets. 1st Am. Compl. ¶39. But this bid was insufficient for NGP, which used its Board control to increase Northstar's bid to the NGP-affiliated company by 40%, to over $113 million. *Id.* This was far higher than the next bidder for the assets. *Id.* ¶¶40-41. Given their financial interests in NGP, the NGP Directors personally benefitted from overpaying an NGP affiliate, *id.* ¶6, ¶40, ¶42, which also gave financial benefits and a reputational boost to NGP in raising funds for other investments. *Id.* ¶40.

**2.      Defendants saddle Northstar with $120 million in debt.**

Having vastly overpaid for the Creole assets, Northstar was left in 2013 with insufficient capital to conduct operations. *Id.* ¶43. Rather than inject needed equity capital into Northstar, NGP chose to saddle the Company with bank debt. *Id.*

In 2013, Wells Fargo agreed to lend Northstar $120 million in short-term debt. *Id.* The bank required NGP to commit to fund $75 million in capital at Northstar's request. *Id.* So on the

same day as the loan, NGP X, NGP Parallel, and NGP X US agreed with Northstar that NGP would inject $75 million into Northstar at its request. *Id.* ¶¶43-44. Northstar Directors also made capital commitments to Northstar. *Id.* ¶¶7-8, 56. Yet, despite Northstar's deepening insolvency, NGP prevented it from calling on the capital funding duties of NGP or Northstar Directors, thus benefitting Defendants at the expense of debt-burdened Northstar. *Id.* ¶45.

### 3.    In selling Northstar, Defendants were to pay its debt and capital deficit.

By 2014, Northstar was in "survival mode" and facing bankruptcy. *Id.* ¶46. Instead of allowing a call on the $75 million capital commitment, NGP crippled Northstar by stopping all expenditures and asset development. *Id.* ¶47.

NGP was looking to avoid its $75 million capital commitment and the impact of a Northstar bankruptcy on NGP's reputation and ability to raise investor capital for other funds. *Id.* ¶¶48-50. Led by NGP Directors, Northstar pursued a sale of its assets, but the offers were below its short-term debt. *Id.* ¶48. Defendants decided to sell Northstar to troubled Platinum Partners. *Id.* ¶¶49-52. NGP knew Platinum had questionable ability to do the deal. *Id.* ¶52. In fact, Platinum failed repeatedly to obtain financing for the purchase and postponed the closing date. *Id.*

Despite pervasive red flags, Defendants pressed forward with a sale to Platinum. With the sale pending, NGP-NOG agreed to pay the insolvent Northstar's debt and give it a fresh start. On closing of the Platinum sale, NGP-NOG was "to pay off the [Northstar] Bank Debt and eliminate the Working Capital Deficit." *Id.* ¶55. In return, Northstar gave a significant net profits interest in its most promising fields to NGP and released NGP-NOG's $75 million capital commitment, along with the director commitments. *Id.* ¶¶55-56.

### 4.    Northstar goes into bankruptcy after Defendants breach their duties.

Despite Defendants' promises, NGP-NOG did not "pay off the [Northstar] Bank Debt and eliminate the Working Capital Deficit." *Id.* ¶¶55-56. Instead, NGP left Northstar without its net

profits interest in valuable prospects (which NGP-NOG retained) and with $15 million in working capital deficit payable immediately. *Id.* ¶56, ¶69. This included $7 million in vendor debts for which Northstar had secured payment extensions until after the closing of the Platinum sale, when it thought NGP-NOG would "eliminate" Northstar's debts. *Id.* ¶57. With a $15 million working capital deficit *not* eliminated and unable to pay creditors, Northstar had to raise cash by unwinding a valuable hedge early, losing millions. *Id.* ¶58. But for Defendants' actions, Northstar would have received the full value of the hedge and avoided the cost and disruption of bankruptcy. *Id.*

### C. Procedural Posture of this Litigation

In 2018, the Trustee filed suit on behalf of the Trust. The Complaint asserts six counts: fraudulent transfers pursuant to 11 U.S.C. §544(b) and the Tex. Uniform Fraudulent Transfer Act ("TUFTA") (Count 1); fraudulent transfers pursuant to 11 U.S.C. §548(a)(1) (Count 2); fiduciary breach by NGP Directors, Northstar Directors, and NGP-NOG (Count 3); contract breach by NGP-NOG (Count 4); and conspiracy (Count 5) and aiding and abetting (Count 6) by all Defendants. *See* Dkt. 1 & 1st Am. Compl. On June 4, 2018, NGP and NGP Directors moved to dismiss the Complaint under Rule 12(b)(6). Dkt. 19. Northstar Directors filed a parallel motion on the same day. Dkt. 23.

In April 2020, the Court issued its Memorandum Opinion and Order. Dkts. 74-75. It dismissed one aspect of Count 1 (constructive fraudulent-transfer claims under Tex. Bus. & Com. Code sec. 24.006(b)) and one aspect of Count 3 (breach of fiduciary duty of care). Dkt. 75. As to a few issues, the Court reserved ruling and granted leave to amend. For example, Defendants argued that the Complaint had not sufficiently alleged NGP's control over Northstar for the fraudulent-transfer claims or lack of director independence for the fiduciary breach claims. Dkt. 74 (Mem. Op.) at 26-27, 63. The Court granted leave for the Trustee to add allegations showing NGP Directors' "continuing employment relationship with NGP at the time they were [Northstar]

board members." *Id.* at 27-28. As for how the Propel overpayment benefitted NGP for fraudulent-transfer claims, the Court "reserve[d] ruling on this issue," given that the coming amendments about "control and director independence" "directly affect the question of whether NGP [] received a benefit from the alleged fraudulent transfers." *Id.* at 46. Likewise, the Court reserved ruling on the argument that the "why" of fraud was not sufficiently alleged as to actual fraudulent-transfer claims. *Id.* at 53. The Court also granted leave to amend concerning Northstar's insolvency as to the 2012 and 2014 transactions. *Id.* at 59-60. As for other grounds alleged, the Court ruled that "[a]ll other relief" in the motions to dismiss "is denied." Dkt. 75.

The First Amended Complaint made the permitted amendments, specifying the NGP Directors' ongoing NGP employment relationship while they were Board members and clarifying Northstar's balance-sheet insolvency at and after the 2014 sale to Platinum. *See, e.g.*, 1st Am. Compl. ¶4, ¶53, ¶57, ¶63.

Rather than address the amendments and few issues "reserved" by the Court, the Motions re-argue prior issues already rejected. Defendants argue that challenges to the Propel overpayment are not "plausible" without knowing the ownership percentage of the NGP affiliate in assets sold to Northstar. *See, e.g.*, Dkt. 91 at 2 (arguing the Trustee "fails to allege the percentage ownership of Propel Energy in [the assets sold to Northstar]"). This is a variation of a Rule 8 plausibility point made two years ago. *See* Dkt. 56 (8/27/18 Tr.) at 15-16 (Defendants assert allegations of a Propel overpayment are "not plausible" unless "NGP owned a greater percentage of Propell [*sic*] than" of Northstar). Likewise, group-pleading arguments, which the Court rejected, Dkt. 74 at 33-34, reappear in an argument that the Complaint does not give a factual basis for claims against NGP Energy Capital Management, L.L.C. ("NGP Capital") or NGP Natural Resources X Parallel Fund, L.P. ("NGP Parallel Fund"). *See* Dkt. 91 at 6-7. And Defendants re-argue an earlier position,

almost word for word, that the Trustee alleges insufficient "badges of fraud" for fraudulent-transfer claims. *Compare, e.g.*, Dkt. 19 at 22-24 *with* Dkt. 91 at 14-16.

### D.    Governing Legal Standards

Motions to dismiss for failure to state a claim are disfavored. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Because a Rule 12(b)(6) motion tests the legal sufficiency of a pleading, "It is not a procedure for resolving contests about the facts or the merits of the case." *Jolly v. Klein*, 923 F. Supp. 931, 942 (S.D. Tex. 1996). In deciding such a motion, a court is to "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 513 (5th Cir. 2018) (cite omitted); *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). The court will "examine the complaint to determine whether the allegations provide relief on any possible theory." *Ramming v. United States*, 281 F.3d 158, 162 (5th Cir. 2001) (cites omitted).

Dismissal is proper only when a pleading fails to state a claim based on "either a lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *122261 Fondren, LLC v. Riverbank Realty GP*, 2010 WL 1741071, at *1 (S.D. Tex. 2010) (cite omitted). The complaint "does not need detailed factual allegations," but must allege sufficient facts "to raise a right to relief above the speculative level," assuming that "all the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### III.    ARGUMENT AND AUTHORITIES

Since the First Amended Complaint amply pleads its claims, the Motions should be denied.

### A.    Defendants continue to rely improperly on outside documents.

As an initial matter, Defendants' attachment and use of the PSA with Propel is improper. *See* Dkt. 91, Ex. A (9/27/12); Dkt. 90 n.5. The law prohibiting the use of extrinsic evidence at this stage is well-established and discussed in detail in the Memorandum Opinion:

- "When ruling on a motion to dismiss under Rule 12(b)(6), a court may generally only consider factual allegations contained within the 'four corners' of the complaint," Dkt. 74 at 12 (cite omitted);

- Under the incorporation-by-reference exception, a court may consider extrinsic evidence "if (1) the document is attached to a defendant's motion to dismiss; (2) the document is referred to in the plaintiff's complaint; and (3) the document is central to the plaintiff's claims," *id.* at 12-13;

- Documents "may be used by a defendant 'simply [to provide] additional notice of the basis of the suit to the plaintiff' and further 'aid[] the court in determining whether a claim has been stated,'" or to provide "the context from which any quotation or reference in the motion is drawn to aid the court in correctly construing that quotation or reference," *id.* at 21 (cites omitted); and

- Documents that are "merely evidence of an element of the plaintiff's claim," that are "used to support a defendant's affirmative defense," or used to "contradict the allegations" do not fall within the exception.

*Id.* at 13, 21. Based on these established principles, the Court struck several extrinsic documents Defendants tried to rely on in their original motions to dismiss. *Id.* at 11-23.

Yet the Motions attach the PSA for improper purposes. The PSA is not "referred to in the Plaintiff's complaint" as is required for incorporation. *In re Xtreme Power Inc.*, 563 B.R. 614, 629 (Bankr. W.D. Tex. 2016). The Complaint has no claims under the PSA and never quotes a word from it. Defendants' supposed hook to incorporate the PSA is a line in the Complaint stating *when* "Northstar and Propel signed the sale agreement" for the Creole Field assets. *See* Dkt. 91 at 10 & n.33; 1st Am. Compl. ¶41 ("In September of 2012, Northstar and Propel signed the sale agreement significantly overpaying for the Creole Field interests."). The "agreement" referenced in the Complaint is embodied in a group of related documents, including a bill of sale and the PSA. Defendants choose one document from that group, which is not referred to or quoted in the Complaint, that they think is helpful to prove "implausibility."

Even if the Complaint were to refer to the PSA (it does not), the PSA is not "central to" any claim. If anything, it is central only to *contradict* the Complaint in Defendants' defense that,

despite allegations that Defendants misused their Northstar control to orchestrate a $30 million overpayment to an NGP affiliate, the PSA somehow shows Northstar did *not* overpay. This is improper. Defendants may not use a document "to contest the Trustee's allegations," nor "use a motion to dismiss to do so. That is an issue for summary judgment." Dkt. 74 at 24. Accordingly, the Trustee has moved to strike and disregard the PSA for purposes of deciding the Motions. In any event, the Court should deny the Motions.

### B.    NGP's Motion repeats rejected arguments as to NGP Capital and NGP Parallel Fund.

The Court should deny the NGP Motion in challenging the factual basis for claims against NGP Capital and NGP Parallel Fund. *See* Dkt. 91 at 6-7. As before, the new Complaint alleges fraudulent-transfer claims against these NGP entities, as well as aiding and abetting and conspiracy liability for the fraudulent-transfer and fiduciary breach claims. 1st Am. Compl. ¶¶59-66, 67-71, 79-83.

First, this is not an issue on which the Court reserved ruling in its Memorandum Opinion, and it has nothing to do with the permitted amendments to the Complaint. The second motion to dismiss simply reargues points from its original motion that were denied. NGP argued originally that the claims "impermissibly group together Defendants," including NGP Capital and NGP Parallel Fund. *See* Dkt. 19 at 24-25. It said the allegations failed to "distinguish Defendants' roles" in the challenged transactions. *Id.* The Court directly rejected the argument:

> [T]he Trustee asserts fraudulent transfers against various NGP Entities, the Northstar Directors, and the NGP Directors . . . . [T]he Trustee's allegations are that each of the Defendants participated in the transfers alleged . . . . The Complaint does not violate Federal Rule of Procedure 8(a)'s prohibition against group pleading.

Dkt. 74 (Mem. Op.) at 33-34. Ignoring that ruling, NGP now makes the indistinguishable argument under Rule 8 that the allegations fail to state a claim as to two *members* of the groups alleged. Dkt.

91 at 6-7. Duplicating arguments is a waste of time and resources. *Hall v. Louisiana*, 2014 WL 1431671, at *2 (M.D. La. 2014) (denying most of second motion to dismiss: "the Court declines to waste precious judicial resources conducting duplicative analysis and re-analyzing the sufficiency of certain claims").

Second, the allegations as to NGP Capital and NGP Parallel Fund state a claim. As the Court held in examining the Trustee's allegations against NGP entities in the transactions at issue, the Trustee established the "who" for purposes of the claims and the roles of NGP, NGP Directors, and Northstar Directors in causing the transfers. Dkt. 74 at 51-52. Indeed, a fraudulent transfer "is not an act that 'inherently could have been committed by only *one* defendant.'" *Id.* at 34 (orig. emph.) (cite omitted). The Complaint states how NGP—including NGP Capital and NGP Parallel Fund—caused Northstar to overpay an NGP affiliate and release critical capital commitments by NGP and the directors. 1st Am. Compl. ¶¶6-12, 40-42, 54-56. The Court should deny the Motions.

### C.      The Complaint states valid fraudulent-transfer claims relating to Propel.

The Complaint requests avoidance of the Propel overpayment or recovery of the value of the transferred property as actual or constructive fraudulent transfers under TUFTA. 1st Am. Compl. ¶¶59-66. The Motions call the claims "implausible" without alleging Propel's level of ownership in the assets sold and argue that the benefits Defendants got are legally insufficient to warrant recovery under TUFTA or the Bankruptcy Code. Dkt. 91 at 7-14; Dkt. 90 at 8-15. Defendants are incorrect on all counts.

### 1.      The allegations concerning the Propel overpayment are plausible.

Defendants argue, for purposes of the fraudulent-transfer claims (and the fiduciary breach claims, *see infra* at 25-27), that the Complaint's allegations are not plausible unless it identifies how much of the Creole Field assets that Propel owned. *See* Dkt. 91 at 8-9.

First, once again, this argument has nothing to do with the amendments that Northstar was

permitted to make or any "reserved" issues. Indeed, at the hearing on the initial motions, Defendants questioned the plausibility of allegations that they caused one affiliate (Northstar) to overpay another (Propel) "unless NGP owned a greater percentage of Propell [*sic*] than" it owned of Northstar. Dkt. 56 (8/28/18 Tr.) at 16; *see also id.* at 28 ("This is outside the Record, but NGP owned a much smaller interest in Propell [*sic*] than it owned in Northstar . . . ."). They said that absent a "motivation to overpay," the claims are implausible, *id.* at 17, and it was just as likely the result of a "successful" and "competitive auction" that there was a "a gap between the high bid and the next high[est] bid." *Id.* at 53-54. The Court heard the argument, among many others, and except for matters on which it reserved ruling, held that "[a]ll other relief sought" by Defendants is "denied." Dkt. 75. Re-arguing rejected theories is a waste of time and resources.

Second, this "plausibility" argument fails. Allegations relating to the Propel overpayment are plausible on their face, not at all consistent with competitive bidding or an auction, and describe Defendants' motives. The deal is suspect on its face since the buyer and seller were NGP entities. 1st Am. Compl. ¶40. In addition, how the $113 million purchase price was set was contrary to a competitive process. When Northstar was asked by NGP Director Tomas Ackerman what bid Northstar would "love" for the assets, it proposed $80 million, but then NGP, through the NGP Directors, "caused Northstar to increase its bid by 40% to over $113 million." *Id.* ¶41. Tellingly, "the next highest bidder was tens of millions below the Northstar purchase price." *Id.* ¶42. And while not alleged in the Complaint (which allegations are sufficient), the Court may take judicial notice of state filings that show Defendant Ackerman and another NGP employee in the same Houston office of NGP were two of Propel's three "governing persons." Ex. 1 (10/12/10 Appl. for Registr. of Propel with the Tex. Sec. of State) at 2; *see* Dkt. 74 at 17 ("A court may take judicial notice of public disclosure documents filed with the Secretary of State."). Mr. Ackerman was also

on Northstar's Board as an NGP Director and involved in the Propel negotiations. *See* 1st Am. Compl. ¶40 (Ackerman proposing to Northstar that he "back channel" discussions with Propel over the purchase price).

Third, benefits from the Propel overpayment are credibly alleged: "Padding its profits from the sale of this field would give NGP both immediate accounting benefits and a reputational boost in raising future funds." *Id.* ¶40. This self-dealing benefitted NGP Directors as well "by virtue of their financial ties to NGP as current employees," as "their NGP compensation would have been impacted in part by the profits of and distributions from Propel." *Id.* These facts state plausible fraudulent-transfer claims as to the Propel overpayment. A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009).

Defendants' theory that the benefits to them are implausible absent specific facts regarding how much of the transferred assets that Propel owned ignores the actual allegations and tries to isolate Northstar and Propel from their status as NGP portfolio companies. NGP has run many funds over the years, including prior iterations of Northstar with its management team, designated by Roman numerals in the fund names. *See* 1st Am. Compl. ¶¶34-38 (discussing Northstar and predecessors in connection with NGP affiliates Natural Gas Partners VIII, IX, and X). The Complaint notes NGP's concern with its reputation and ability raise investor money for future funds in connection with its misuse of control over Northstar. *Id.* ¶¶9, 40, 49-50, 52. The claims do not need further allegations of Propel's ownership levels in the assets sold to Northstar to state a claim concerning Defendants' overpayment from one NGP affiliate to another to secure the substantial alleged benefits.

Finally, Defendants' "plausibility" argument relating to Propel appears to be primarily a

way to incorporate the PSA, which is outside the pleadings and should be stricken. *See supra* at 13-15. If Defendants dispute the overpayment to Propel, that is an issue for summary judgment after the parties have done discovery concerning this transaction.

### 2. The Complaint adequately pleads TUFTA and Bankruptcy Code claims.

The Motions argue that NGP-NOG, NGP Directors, and Northstar Directors did not get "the type of independent or direct benefits that warrant recovery under TUFTA or the Bankruptcy Code." Dkt. 91 at 10-11; Dkt. 90 at 12-15. (The Motions do not make this argument as to NGP Capital, NGP X US, NGP X, NGP Parallel, and NGP Parallel Fund.)

In repeating the no-benefits argument from their initial motions, Defendants misapply the Memorandum Opinion and case law regarding liability for fraudulent-transfer claims. In their original motions, Defendants labeled Propel (ignoring its status as an NGP affiliate) a "separate entity" and claimed that the Complaint alleged no facts explaining any benefit to them from the overpayment to Propel. *See* Dkt. 19 at 12. In rejecting this no-benefits argument, the Court noted the specific allegations of benefits to Defendants from the Propel deal, including that NGP caused the overpayment to inflate its profits and boost its reputation. Dkt. 74 at 44. In fact, the Court held that Defendants had "not set forth a good faith argument" on this issue, ruling that further allegations of NGP control over Northstar and director independence "directly affect the question of whether [Defendants] received a benefit from the alleged fraudulent transfers." *Id.* at 46.

Contrary to the Court's ruling and case law, the Motions ignore the Complaint's allegations (now supplemented) of NGP control over Northstar, its relationship to Propel, and divided loyalties of Northstar's Board. *See, e.g.*, Dkt. 91 at 11-13. The Motions also ignore the case law that a "person for whose benefit a transfer was made" under the fraudulent-transfer statutes is not limited

to situations where a debtor transfers assets to a creditor to satisfy a guaranteed debt. *See id.* at 11.[2]

The law is clear that persons can be liable as beneficiaries of fraudulent transfers where they direct

or control the transfer and receive pecuniary benefits.[3]

The Motions misread the *Janvey* decision to suggest that they are not liable under TUFTA

or the Bankruptcy Code no matter what benefits they got from the Propel overpayment. Dkt. 91 at

11-12, discussing *Janvey v. Libyan Invest. Auth.*, 840 F.3d 248 (5th Cir. 2016); Dkt. 90 at 12-14

(same). *Janvey* is inapposite. It was primarily concerned with the application of the Foreign

Sovereign Immunities Act to a corporation owned by the Libyan government, and only

incidentally considered an allegation that a transferee's shareholders benefitted from the fraudulent

---

[2]  *See, e.g., In re RFC & Rescap Liquidating Trust Litig.*, 2017 WL 1483374, at \*12 (D. Minn. 2017) (courts "do not limit the application of beneficiary liability to instances involving guarantors—more pertinently, nothing in the relevant statutory language suggests any such limitation."); *In re Am. Ambulette & Ambulance Serv., Inc.*, 560 B.R. 256, 272 (Bankr. E.D.N.C. 2016) ("The traditional entity for whom the benefit of a transfer is made is a guarantor or debtor, yet § 550(a)(1) is not exclusive, and there may be other entities that receive the benefit of a transfer from which the trustee may recover.").

[3]  *See, e.g., Citizens Nat'l Bk. of Tex. v. NXS Constr., Inc.*, 387 S.W.3d 74, 85 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("The transfer directly benefitted [defendant] because it increased the value of an entity owned by [defendant] and which [defendant] needed to sell."); *Esse v. Empire Energy III, Ltd.*, 333 S.W.3d 166, 180-81 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (shareholders were persons for whose benefit the transfer was made because defendants were controlling shareholders of transferee); *Boyer v. Belavilas*, 474 F.3d 375, 377 (7th Cir. 2007) (defendant was person for whose benefit transfers to custodial accounts were made, even though defendant was not the beneficiary of such accounts, because defendant nevertheless controlled the account and used this control to divert funds to benefit other entities defendant owned); *In re Hessco Indust., Inc.,* 295 B.R. 372 (9th Cir. BAP 2003) (trust beneficiaries were persons for whose benefit a transfer to a trust was made, notwithstanding that the defendant beneficiaries were not the only beneficiaries and did not subsequently receive transfers from the trust, as defendant beneficiaries benefitted from tax advantages of the trust and its assets); *In re RFC*, 2017 WL 1483374, at \*12 (allegations of future employment with transferee was sufficient to plead that individual defendants were entities for whose benefit transfer was made); *In re Am. Ambulette*, 560 B.R. at 272 (because defendants "controlled virtually all aspects of the Debtors and caused the transfers of the Debtors' assets in order to benefit the new ventures under their control or in whom they held controlling interests," defendants could be liable as parties for whose benefit the transfers were made); *In re B.S. Livingston & Co.*, 186 B.R. 841, 864 (D.N.J. 1995) (allegations that principal received employment with transferee were sufficient to plead that defendants were parties for whose benefit transfer was made); *see also In re Compton Corp.*, 831 F.2d 586, 595 (5th Cir. 1987) (court must "look through the form of the transaction and determine which entity actually benefitted from the transfer").

-16-

transfer simply because they were shareholders. *Id.* at 266. In concluding that shareholder status alone was insufficient to confer a benefit for purposes of a TUFTA fraudulent-transfer claim, the court distinguished between the bare allegation of shareholder "benefit" before it from the fact patterns in two Texas decisions where shareholders *were* found to be TUFTA beneficiaries.

> The *Esse* court determined that shareholders were transfer beneficiaries because they had "assented to and benefitted from these transfers" and knowingly participated in the wrongdoing . . . . The *Citizens National Bank* court determined that a shareholder was a transfer beneficiary because the shareholder was actually involved with the transfer.

*Id.* (discussing *Esse*, 333 S.W.3d 166 and *Citizens Nat'l Bank*, 387 S.W.3d 74).[4]

Here, unlike in *Janvey*, the Complaint does not allege that Defendants were mere investors, passive shareholders, or bystanders to the Propel transaction or releases of capital commitments. Rather, Defendants "assented to, "benefitted from," and "knowingly participated in" the Propel overpayment and releases. *Id.* Among the Complaint's allegations is that Northstar and Propel were active NGP portfolio companies; Northstar's Board was controlled by five, senior NGP employees (the NGP Directors) who served on the private equity fund's investment committee, "co-founded" NGP, were active in "portfolio management" and "monitoring of active portfolio companies" for NGP, and one was NGP's general counsel. 1st Am. Compl. ¶¶4, 40. Defendant Ackerman (an NGP Director) was involved in "back channel" negotiations over the Northstar/Propel purchase price, such that NGP's involvement in the affiliate deal was a problem

---

[4]   The remainder of Defendants' cited cases simply stand for the general and unremarkable propositions that a guarantor is one example of a person for whose benefit a transfer can be made, and a person for whose benefit a transfer is made is necessarily distinct from an initial or intermediate transferee of such transfer. Defendants cite no authority suggesting that a guarantor or other co-liable party is the *only* category of persons that may be liable as persons for whose benefit a transfer is made or that otherwise involve nefarious insider transactions of the type alleged in the Trustee's Complaint. Indeed, as set forth in footnote 3 above, and as *Janvey* itself noted, courts that *have* considered self-serving transactions directed by insiders or other persons in control have uniformly held that such persons may be liable as persons for whose benefit the transfer was made.

given its position on both sides, including Ackerman's simultaneous role as NGP Director *and* in Propel's governance. *Id.* ¶41; *see supra* at 9, 17-18. NGP representatives were two of three of Propel's "governing persons," including Mr. Ackerman. *Id.* Northstar Directors, who were repeat management for Northstar and prior NGP-backed predecessors, were beholden to NGP which controlled their jobs, salaries, and benefits. 1st Am. Compl. ¶¶34-37. Ultimately, "[t]hrough its NGP Directors, NGP caused Northstar to increase its bid by 40% to over $113 million," even though "the next highest bidder was tens of millions below the Northstar purchase price." *Id.* ¶42. Northstar Directors "approved this transaction that caused Northstar to drastically overpay for its interest in the field." *Id.*[5]

These facts are far afield from *Janvey*'s considerations, and they state valid fraudulent-transfer claims. The Court should deny the Motions.

### D. The actual fraudulent-transfer claims are sufficiently pleaded.

Defendants argue that the actual fraudulent-transfer claims under TUFTA §24.005(a)(1) and 11 U.S.C. §548(a)(1)(A) fail because the "only 'badges of fraud' that Plaintiff pleaded are not sufficient to allege actual intent." Dkt. 91 at 14-15; Dkt. 90 at 15-16.[6]

As an initial matter, the Court should deny the Motions because Defendants simply ignore the totality of allegations concerning the Propel overpayment and releases of insider commitments.

---

[5]   Further, plaintiffs need not quantify the amount of any such benefit at the pleading stage. Rather, it is sufficient that a benefit was pleaded and the amount of any such benefits should be determined at trial following discovery. *See, e.g., In re RFC*, 2017 WL 1483374, at *12 ("Although [plaintiff] has not yet quantified the benefit," the value of the benefit alleged could be established at trial); *In re Am. Ambulette*, 560 B.R. at 237 ("The court must only find that a benefit to these Defendants has been plausibly alleged . . .").

[6]   The Motions are unclear about whether this argument applies to only the Propel overpayment or both the 2012 and 2014 transactions. This Opposition assumes Defendants seek dismissal of the claims as to both the Propel overpayment and the 2014 releases of insider funding commitments. As noted below, *see infra* at 25, Plaintiff's claim under 11 U.S.C. §548 only applies to the 2014 transactions.

They propose a "check-the-box inquiry" on the badges of fraud for purposes of these claims, which is not the analysis. *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *5 (Bankr. D. Del. 2016).

More important, Defendants are simply incorrect that the "only 'badges of fraud'" pleaded in the Complaint are that "the consideration was not reasonably equivalent to the value of the asset transferred and that Northstar was insolvent." Dkt. 91 at 15; Dkt. 90 at 16. The Motions omit that the Complaint alleges in detail that the 2012 and 2014 transactions were to or involved "*insiders*." *See id.* at 14 n.50 (quoting badges of fraud from Tex. Bus. & Com. Code §24.005(b)(1), which considers whether the "transfer or obligation was to an insider").[7] Insider means a "director," "officer of the debtor," "person in control of the debtor," "an affiliate, or an insider of an affiliate as if the affiliate were the debtor." Tex. Bus. & Com. Code §24.002(7). Without question, each of Defendants and non-party Propel was an "insider" as to the transactions at issue. *See also Bank of Am., N.A. v. Fulcrum Enters., LLC*, 20 F. Supp. 3d 594, 604 (S.D. Tex. 2014) (generally an insider is "an entity whose close relationship with the debtor subjects any transactions made between the debtor and the insider to heavy scrutiny"). Propel and each Defendant was a director or officer of Northstar, in control of Northstar, or an affiliate. *See, e.g.*, 1st Am. Compl. ¶¶3-6, 37-40, 63. Propel was an NGP affiliate and portfolio company, like Northstar. *Id.* ¶¶6, 40, 63, 74, 81. Two of Propel's three governing persons was an NGP employee, including Defendant Ackerman, working from the same NGP office. Ex. 1 at 2.

Another badge of fraud that the Motions ignore is whether the transactions were concealed. *See* Tex. Bus. & Com. Code §24.005(b)(3); *Hechinger*, 327 B.R. at 551 (badges of fraud under §548(a)(1) include "secrecy or concealment of the transaction"). Here, the Letter Agreement that

---

[7] Similarly, the non-exclusive list of badges of fraud for claims under 11 U.S.C. §548(a)(1)(A) considers, among other factors, "the relationship between the debtor and the transferee." *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 551 (D. Del. 2005).

released Defendants' capital commitments was secret; the very "fact that it exists shall be kept confidential by the Parties." Dkt. 19, Ex. D §9. Defendants asked to seal the Letter Agreement with the releases, along with other documents for Northstar's sale to Platinum. They said,

> The Contract, including the Final Settlement Statement, is confidential by its terms . . . . Movants seek a sealing order that would maintain the protection of the confidential information contained in the Confidential Exhibits.

Dkt. 15 (Mot. to Seal ¶9, ¶14).

In short, the Complaint adequately alleges intent to support the fraudulent-transfer claims. And there is more. For example, Defendants hid the fact that Northstar's purchase of Propel assets was from an NGP affiliate. The Northstar/Propel agreement prohibits publicity about the deal absent prior written consent. Indeed, NGP's October 18, 2012 press release concerning Northstar's purchase of the Creole Field assets never mentions Propel, let alone its affiliate relationship to Northstar and NGP, referring only to "private sellers" as involved in the deal. The Trustee has located no public statement by Defendants, or anyone, disclosing that Northstar's asset purchase was from another NGP affiliate.

Finally, both Motions spin the Complaint to suggest that it somehow proves a lack of bad intent. *See* Dkt. 91 at 15 ("facts the Plaintiff does plead demonstrate that [NGP Defendants] did *not* have an intent to defraud any creditors."); Dkt. 90 at 17 (same). The Complaint cites an email from NGP Director Ackerman to Northstar management to show that Northstar's preferred bid for the Propel assets was $80 million, which NGP caused to be hiked up 40% to over $113 million. 1st Am. Compl. ¶41. The Motions' puzzling interpretation is that NGP simply was "trying to negotiate the lowest price possible . . . by consulting a Northstar manager." Dkt. 91 at 15 (emph. removed). The Motions also cherry-pick allegations in the Complaint, ignore the remainder, and conclude that NGP "had every motive to create and preserve as much equity as possible in

Northstar." *Id.* (emph. removed). These may be defensive theories to pursue in discovery, but they are hardly reasonable readings of the Complaint's allegations. The Court should deny the Motions.

### E.    The Trustee is not pursuing a §548 claim as to the Propel overpayment.

The Motions seek dismissal of an actual fraudulent-transfer claim purportedly "added to the Amended Complaint [by Plaintiff] . . . without leave," based on the two-year look-back period of §548(a)(1). Dkt. 91 at 16; Dkt. 90 at 17-18. The request is unmerited.

The Trustee did not add a fraudulent transfer claim under 11 U.S.C. §548(a)(1)(A) for the Propel overpayment. That claim concerns the 2014 releases of capital commitments to Northstar, 1st Am. Compl. ¶69, acknowledges the look-back period under the statute, *id.* ¶70, and notes the Trustee seeks avoidance of the transfers and to recover "the value of the released funding commitments." *Id.* ¶71. Defendants' argument appears to arise from addition of the phrase "2012 Transfer" to the last sentence of paragraph 70 of the Complaint, which is *not* intended to expand the §548(a)(1)(A) claim to the Propel overpayment. While the Complaint and this clarification should be sufficient, if the Court feels it is necessary, the Trustee can file a supplement to the Complaint to delete that reference to the "2012 Transfer."

### F.    The Complaint states a claim for breach of the duty of loyalty as to Propel.

Defendants repeat an argument from their first motions that fiduciary claims as to the Propel overpayment fail because Defendants are protected by the business judgment rule. Dkt. 91 at 17-19; Dkt. 90 at 18-22. The argument is wrong.

When Defendants made this argument last time, the Court held that a showing of a violation of the duty of loyalty rebuts the business judgment rule, and facts "demonstrating that a *majority* of a board that approved the transaction in dispute was *interested and/or lacked independence*" would be sufficient. Dkt. 74 at 61-63 (orig. emph.). Any presumption is overcome where a plaintiff

pleads that the board "was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of the company and all of its shareholders." *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002).

> To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders.

Dkt. 74 at 63 (cite omitted). The Court allowed the Trustee to amend the Complaint to show the "directors' relation to NGP and how that relationship allegedly established a lack of independence and NGP's control over the directors." *Id.* at 63.

Here, there is no presumption of the business judgment rule. The facts alleged are clear: NGP Directors, Northstar Directors, and NGP-NOG were interested in and lacked independence in the Propel transaction. Despite the fact that Propel was another NGP portfolio company, NGP, through the NGP Directors and control over the jobs, salaries, and benefits of Northstar Directors (who had managed prior NGP-backed companies for years, 1st Am. Compl. ¶¶34-37), caused Northstar to jump its bid by 40% to over $113 million. *Id.* ¶¶5, 41. Defendant Ackerman was simultaneously a governing person of Propel (with another NGP employee), on Northstar's Board, and involved in negotiating the deal. *Id.* ¶41; Ex. 1 at 2.

To avoid these facts, the Motions ignore these divided loyalties in the Propel deal and focus instead on allegations of benefits to NGP Directors, Northstar Directors, and NGP-NOG from the overpayment. They say the alleged benefits are "incidental and immaterial" and "implausible." Dkt. 91 at 18-19. But they do not explain how the benefits are incidental or immaterial. For example, the Complaint alleges that Northstar overpaid by tens of millions in the Propel deal, and NGP did so to boost its investment reputation, which is "material" to NGP as a private equity fund. 1st Am. Compl. ¶¶40-42, 49.

Concerning plausibility, Defendants simply repeat their incorrect argument that these overpayment claims require additional allegations about Propel's ownership in the assets sold to Northstar. Dkt. 91 at 19. The Motions again rely on matters outside the pleadings to claim that the PSA shows they had no incentive to cause Northstar to overpay. *Id.* The notion that overpayment could not have occurred because NGP (through Propel) had only a 35% interest in the assets sold assumes every inference in Defendants' favor, contradicts the allegations, and relies on extrinsic matters. It should be disregarded at this stage. *See supra* at 13-15.

The fiduciary claim requires no further allegations about Defendants' motives in causing Northstar to overpay the NGP affiliate. For example, Northstar Directors argue that it is implausible that they would have participated in the overpayment to Propel without alleging they "were employees of NGP-NOG" or "otherwise profited from inflating the purchase price." Dkt. 90 at 21. This ignores the Complaint's allegations that Northstar Directors were beholden to NGP given its control over their jobs and salaries and their history as repeat management for NGP-backed companies. 1st Am. Compl. ¶¶3, 5, 35-37. There are ample allegations of Northstar Directors' incentives to put Northstar interests *after* those of NGP and Propel, with respect to both the Propel overpayment and releases of capital commitments, despite the company's deepening insolvency.

### G.     Plaintiff can amend if the Court requests.

Finally, the Motions conclude with a boilerplate assertion that all alleged defects identified "cannot be cured." *See, e.g.*, Dkt. 90 at 22. The Trustee believes the Motions should be denied. If the Court finds that amendments are warranted, the Trustee can amend to allege the following facts:

- Concerning the argument that the Complaint's allegations are insufficient as to NGP Capital and NGP Parallel Fund, *see* Dkt. 91 at 6-7, the Trustee can allege that NGP Capital was the primary hedge-fund entity controlling and directing

the activities of the NGP affiliates involved in the 2012 and 2014 transactions and employed NGP Directors, either directly or through its affiliate, Natural Gas Partners. NGP Capital managed the private equity funds for Northstar and Propel. Its former CEO and co-founder of NGP, Kenneth Hersh, signed the 2014 Letter Agreement releasing NGP-NOG and the directors of their capital commitments to Northstar.

- Concerning the argument that it is implausible NGP would cause Northstar to overpay, *id.* at 8-10, the Trustee can allege that the Propel investment was in an earlier and different NGP fund (fund IX) from the fund relating to Northstar (fund X); that NGP Directors, including Defendant Ackerman, were responsible for managing *both* the Northstar and Propel investments; that NGP employees (including Ackerman) were in control of Propel's governance at the time; and that the overpayment was calculated to boost the perceived returns of fund IX and promote/protect NGP's reputation with current and future investors.

- Concerning the argument that not enough badges of fraud are alleged for the actual fraudulent-transfer claims, Dkt. 91 at 14-16, the Trustee can allege that the 2012 and 2014 deals were hid through confidentiality and no-publicity clauses, and in the Propel transaction, Defendants did not publicly disclose that Northstar's purchase of the Creole Field assets involved another NGP affiliate.

## CONCLUSION

For these reasons, Defendants' Motions for Partial Dismissal of the Trustee's First Amended Complaint should be denied in their entirety.

Date: July 21, 2020

Respectfully submitted,

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Tracy N. Leroy
State Bar No. 24062847
tleroy@yettercoleman.com
Wyatt J. Dowling
State Bar No. 24074152
wdowling@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (Fax)

_____

Bob B. Bruner
State Bar No. 24062637
bob.bruner@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010
(713) 651-5151

ATTORNEYS FOR PLAINTIFF
JAMES KATCHADURIAN, LITIGATION TRUSTEE
NORTHSTAR LITIGATION TRUST

## CERTIFICATE OF SERVICE

I certify that on this July 21, 2020, this pleading was served through the Court's e-filing system on all parties who have appeared in this adversary proceeding, per Fed. R. Bankr. P.7005.

_/s/ Wyatt J. Dowling_
Wyatt J. Dowling